UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
EMILY FORSYTHE,                      )
        Plaintiff,                   )
v.                                   )        Civil Action No. 1:20-cv-10002
WAYFAIR, LLC                         )
        Defendant.                   )
_____)

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Wayfair, LLC ("Wayfair") files this Memorandum of Law in support of its Motion for

Summary Judgment.  Plaintiff resigned from her job at Wayfair in September 2019, after her

boss, Kory McKnight, and boss's boss, Matt Witte, repeatedly counseled her about performance

problems amid escalating complaints about Plaintiff from many colleagues.  After she resigned,

Plaintiff brought this action, claiming that she had actually been terminated in retaliation for an

internal complaint she made alleging that a male subordinate sat too close to her twice and once

touched her shirt.  The Human Resources department investigated that internal complaint and

could not substantiate her allegations.  The person she claims retaliated against her, McKnight,

had no involvement with the internal complaint or investigation.  Plaintiff's complaint fails to

state discrete counts.  Wayfair assumes, for purposes of this motion only, that her incoherent

complaint intended to state at most three claims under Title VII and M.G.L c. 151B:  (1)

"tolerating" sexual harassment against Plaintiff by her male subordinate; (2) purported retaliation

by McKnight for her internal complaint against the subordinate; and (3) sex discrimination by

McKnight based on two remarks that did not even reference gender.  Am. Compl., ¶¶30-31.  To

the extent that is what Plaintiff is actually claiming, all of these claims fail as a matter of law.

**Summary of Undisputed Record Evidence**

In January 2017, Plaintiff began working at Wayfair, an online seller of home décor, as a

Senior Manager in the Industrial Engineering Department, which builds physical infrastructure in Wayfair buildings.  SF ¶¶9-10.  She reported to Matt Witte ("Witte").  SF ¶9.

In July 2018, Plaintiff recruited her former colleague from Amazon, Mike McDole, to come work for her at Wayfair.  SF ¶11.  She did so despite the fact that the two had a romantic interlude in December 2015 after she invited him to fly in for a weekend stay with her at her parents' house.  SF ¶¶6-7.  At Plaintiff's urging, Wayfair hired McDole, to work for Plaintiff knowing nothing of the prior romantic relationship.  SF ¶¶12-13.

By January 2019, Plaintiff and McDole expressed to management that they were having challenges working together, with McDole complaining to Witte that Plaintiff was micromanaging him, and Plaintiff complaining that McDole's performance was inconsistent.  SF ¶21.  McDole was not the first coworker to report problems working with Plaintiff; one complained Plaintiff was "extremely rude" and another accused her of discrimination.  SF ¶¶17-18.  By January, 2019, McDole was interviewing for roles to get away from Plaintiff's team and told her so.  SF ¶22.  Plaintiff said, "Don't leave."  SF ¶23.  In March of 2019, she invited McDole to a brewery event and to "Dinner & Drinks."  SF ¶¶25-26.  He declined both.  *Id.* During this entire period of time, the entire first quarter of 2019, Plaintiff said nothing to anyone at Wayfair that suggested McDole had touched her inappropriately or harassed her.  SF ¶56.

On April 1, 2019, McDole left Plaintiff's team for an Operations position in California, across the country from Plaintiff, who was based in Kentucky and traveling to Boston.  SF ¶¶29-30.  In the new role, he had limited need to interact with Plaintiff professionally, but he continued to complain that Plaintiff was seeking him out in California, harassing and bullying him.  SF ¶¶33, 36.  Plaintiff, in turn, complained that McDole's work emails to her from California were rude and aggressive.  *Id.*  Plaintiff suggested they meet together with Witte and

HR to try to resolve their differences, but when McDole readily agreed, Plaintiff backed out.  SF ¶35.  Other colleagues also complained to Witte about Plaintiff, causing him to meet with her in June to coach her on improving communication.  SF ¶39.  In July, Plaintiff planned a visit to the California building that McDole ran; McDole complained to Witte that he did not trust her in the building.  SF ¶¶40-41.  Plaintiff visited in July anyway and met with McDole.  SF ¶55 Again, Plaintiff said nothing to anyone, including McDole, about any inappropriate touching.  SF ¶58

On August 5, 2019, a new Director, Kory McKnight, started work at Wayfair and became Plaintiff's supervisor.  SF ¶44.  He lived in Chicago and rarely interacted with Plaintiff in person SF ¶46.  Plaintiff did not get along with her new boss; she admits they had a "personality clash."  *Id.*  Meanwhile, Wayfair leaders continued to call Witte to complain about Plaintiff.  SF ¶47.  He had never had so many complaints about one employee.  SF ¶48.  One wrote, "I can barely work with her.  It is a struggle to want to help on any project she is involved in."  SF ¶49.

On August 14, 2019, Plaintiff sent Witte an email, asking him not to share it with anyone, and asking Witte to talk to McDole about his professionalism in emails.  SF ¶50.  Witte asked, "Is he bullying you in person or just feel it over the emails?"  Plaintiff replied, "**He is good in person.**  Just via email he has an edge." SF ¶51 (emphasis added).  When Witte later read her email's 14-page attachment, he saw that -- buried among 50 entries about a year of interactions -- were allegations that McDole had sat too close to her, once in January 2019 and once in March 2019, so that their knees touched, and an allegation that on her July 2019 visit to California, he touched her shirt when she met with him.  SF ¶¶52-55.  She also alleged that McDole had asked if she was still with her boyfriend and if she tried online dating.  SF ¶55.  Prior to this time, Plaintiff had not complained to anyone about any harassment.  SF ¶56.  She admits that she said nothing to her subordinate McDole to suggest that he was harassing her.  SF ¶¶57-58.  Although

she was his boss in January and March, she issued him no warnings or reprimands.  SF ¶57.

Though Plaintiff's email did not refer to the alleged touching as harassment, Witte promptly

escalated the email to HR.  SF ¶59.  Plaintiff thanked Witte for addressing her complaint so

professionally.  SF ¶60.  At that point, it was in HR's hands to investigate and McKnight and

Witte had no further involvement in that investigation.  SF ¶61.

On August 15, 2019, McKnight spoke with McDole and Plaintiff about McDole's

objection to Plaintiff visiting his building in August and reassured them that he would assist in

getting the work done.  SF ¶65.  Plaintiff texted her new boss McKnight:  "Thanks for talking.

This is the first time in months that I feel good about a lot of stuff and having you here has

removed a tremendous amount of stress.  I really appreciate your support."  SF ¶66.

Concerns about Plaintiff's performance intensified.  SF ¶¶71-78.  McKnight asked

Plaintiff three times to participate in a particular regular call, but she did not.  SF ¶72.  A Senior

Project Manager wrote that she was "angry" about Plaintiff's handling of a task.  SF ¶73.  When

another employee complained about Plaintiff, McKnight told Plaintiff to smooth it over, but

Plaintiff instead chastised the employee for escalating the issue.  SF ¶74.  Another executive

wrote to complain about Plaintiff's naiveté in discussing schedules and told McKnight that it

"worries [him] deeply."  SF ¶75.  Another complained Plaintiff was condescending, non-

cooperative, and not collaborative.  SF ¶77.  Plaintiff herself acknowledged in a self-review that,

"I don't think I have been delivering."  SF ¶78.  Though Plaintiff did not take well to criticism or

coaching, McKnight and Witte confined themselves to verbal feedback rather than a more formal

process because HR's investigation of the harassment complaint was still pending.  SF ¶79.

Trevor Shaffer-Figueroa of Wayfair's HR investigated Plaintiff's harassment complaint.

SF ¶80.  He interviewed Plaintiff about the allegations in her August 14 email.  *Id.*  Though

4

asked expressly whether she had been romantically involved with McDole, Plaintiff did not disclose her prior consensual romantic encounter with McDole. SF ¶81. After the interview, she emailed the investigator to change her allegation about the July touching incident; her new story was that instead of McDole touching her shirt, he touched "between [her] boobs." SF ¶83. The investigator interviewed McDole who adamantly denied ever touching Plaintiff. SF ¶84. There were no eyewitnesses. SF ¶80. Plaintiff pointed to two employees familiar with her interactions with McDole; both told the investigator that Plaintiff and McDole did not get along but neither was more to blame. SF ¶¶85-86. McDole pointed the investigator to an in-house recruiter who had handled a "troubling" request that Plaintiff had made requesting that they refuse to reimburse McDole for an expense; the recruiter corroborated McDole's account and told the investigator Plaintiff was a "notoriously difficult stakeholder." SF ¶87. The investigator reviewed the McDole emails that Plaintiff called "aggressive" and found no issue with them. SF ¶88.

Meanwhile, Witte and McKnight struggled with Plaintiff's escalating performance problems. SF ¶90. Within a month of reporting to McKnight, Plaintiff was demanding that he never speak directly to her team, which McKnight *and* Witte told her was contrary to Wayfair's business needs. SF ¶91. Witte reached out to HR asking if the investigation had concluded and explained they needed to document the numerous issues with Plaintiff's performance. SF ¶92. Witte and McKnight pulled together copious documentation of the problems with Plaintiff's performance. SF ¶93. Plaintiff told Witte she was looking for other jobs. SF ¶91.

At the investigation's close, on September 16, 2019, the investigator reported to both parties that he was unable to substantiate Plaintiff's claims of harassment; he recommended that she and McDole work with their leaders to improve the communication between them. SF ¶96.

On September 17, 2019, McKnight met with one of Plaintiff's Project Managers who had asked him for help because she was having a conflict with Plaintiff. SF ¶101. Plaintiff texted her boss demanding he not talk to her team directly and drove to his office where she shocked McKnight by berating and attacking him in a manner he found completely insubordinate and disrespectful. SF ¶¶102-103. He reiterated to her that he needed to be able to talk with anyone on the team and that he had been getting many complaints about her performance. SF ¶¶104-105. He told her "this is not working" and that they needed to have a formal meeting with HR about next steps. SF ¶106. When Witte found McKnight shaken after the meeting, McKnight told him Plaintiff had "erupted." SF ¶107. The same day, just five weeks after McKnight become her boss, Plaintiff texted Witte about McKnight: "If [McKnight] wants to run the projects, take me off all of them. I'm not working with someone like him." SF ¶108. Plaintiff then wrote HR claiming that in the September 17 meeting, McKnight had said that he had already talked to HR and Witte about getting her off his team and she claimed that he was retaliating against her for her August 14 email about McDole. SF ¶111. HR investigated this retaliation complaint, speaking with both Plaintiff and McKnight, and could not substantiate it. SF ¶¶114-119.

The investigator called Plaintiff to advise her that he could not substantiate her allegation that McKnight had retaliated against her. SF ¶120. She illegally recorded the call. *Id.* During that call, Plaintiff said to the investigator, "you had asked me . . . what I would think would be appropriate next steps. I would be very interested in having you talk to Candice [Smith in HR] and your team and putting together a compelling severance package." SF ¶122. When he hung up, he reported to Ms. Smith in HR that Plaintiff had resigned and requested a severance package. SF ¶123. After consulting with counsel, they sent an email accepting Plaintiff's

resignation and a severance agreement offering two months' severance pay.  SF ¶127.  HR

informed McKnight and Witte that Plaintiff had resigned and requested severance.  SF ¶128.

### Argument

Summary judgment must enter when the record evidence shows no genuine issue of

material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

Plaintiff cannot "rely on bold assertions, unsupported conclusions, or optimistic surmises."

*Torrech-Hernandez v. GE Co.*, 519 F.3d 41, 47 (1st Cir. 2008).

## I.     THE SEXUAL HARASSMENT CLAIM FAILS AS A MATTER OF LAW

To prove a prima facie case of sexual harassment against Wayfair based on alleged

harassment by McDole, a subordinate and later a coworker, Plaintiff must show: (1) she is in a

protected class; (2) she experienced unwelcome sexual harassment; (3) the harassment was based

on sex; (4) the harassment was so severe or pervasive as to alter the conditions of her

employment and create an abusive work environment; (5) the conduct was objectively *and*

subjectively offensive, such that a reasonable person would find it hostile or abusive and she in

fact did perceive it to be so; and (6) some basis for employer liability. *Ponte v. Steelcase Inc.*,

741 F.3d 310, 320 (1st Cir. 2014).[1]  Even if she could prove her dubious allegations of touching,

she cannot show any basis for Wayfair's liability, or that McDole's alleged conduct was severe

or pervasive, or objectively and subjectively offensive, as a matter of law.

### A.     Plaintiff Cannot Show Any Basis for Employer Liability

Plaintiff's harassment claim fails because she cannot show any basis to hold Wayfair

liable for alleged harassment.  McDole was Plaintiff's subordinate during the incidents in which

their knees allegedly touched, and then he was her peer during the incident when he allegedly

---

[1]  "The Massachusetts [SJC] has said that it is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting …c. 151B."  *Ponte v. Steelcase Inc.*, 741 F.3d at 319.

touched her shirt.  SF ¶55.  To establish Wayfair's liability for harassment, Plaintiff must show

that Wayfair: (1) knew or should have known about the harassing conduct; and (2) failed to take

prompt, effective and reasonable remedial action.  *Noviello v. City of Bos.*, 398 F.3d 76, 95 (1st

Cir. 2005); *Walker v. City of Holyoke*, 523 F. Supp. 2d 86, 107 (D. Mass. 2007).

It is undisputed that Wayfair had no notice of any alleged harassment until Plaintiff's

August 14 email.  SF ¶56.  When Witte saw her allegations (which she did not even describe as

harassment to Witte), he promptly escalated the email to HR, which conducted a prompt,

thorough investigation.  SF ¶¶59, 67.  HR could not substantiate Plaintiff's story:  She had never

complained to anyone about any of the incidents which allegedly occurred five and seven months

earlier; her allegations shifted even during the investigation itself; McDole's denial was credible;

there were no eyewitnesses; the witnesses to their interactions did not support Plaintiff's account

and did support McDole's; Plaintiff's reporting delay meant there was no video of the open area

where she claimed the July incident took place; and an independent review of the emails

revealed nothing inappropriate.  SF ¶¶56, 80, 83-86, 88-89.  The investigator found both

Plaintiff and McDole needed to work on improving communication.  SF ¶98.

This investigation was a prompt, effective and reasonable remedial action as a matter of

law.  The fact that Wayfair found that the facts did not substantiate Plaintiff's claim does not in

any way diminish that they discharged their legal duty to remediate, because an employer is "not

obligated to punish an [employee] for unsubstantiated claims of harassment." *Walker*, 523 F.

Supp. 2d at 109.  A good faith investigation of alleged harassment satisfies the employer's

obligation to take prompt, adequate remedial action.  *Id.; see also, e.g., Harris v. L & L Wings,*

*Inc.*, 132 F.3d 978, 984 (4th Cir. 1997) ("The legal standard of 'prompt and adequate remedial

action' in no way requires an employer to dispense with fair procedures for those accused or to

discharge every alleged harasser…. And a good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard, even if the investigation turns up no evidence of harassment."); *Swenson v. Potter*, 271 F.3d 1184, 1196–97 (9th Cir. 2001) ("Employees are no better served by a wrongful determination that harassment occurred than by a wrongful determination that no harassment occurred. We should be wary of tempting employers to conduct investigations that are less than fully objective and fair.") [2]

### B.      McDole's Alleged Conduct Did Not Create a Hostile Environment

Plaintiff's claim also fails for the independent reason that she cannot show that the alleged harassment by McDole rose to the level of a hostile environment as a matter of law. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To determine whether an environment is "hostile" or "abusive," the Court may consider: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. "[O]ffhand comments, and isolated incidents are not sufficient to create actionable harassment; the hostile work environment standard must be kept sufficiently demanding to ensure that Title VII does not become a general civility code." *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001).

McDole's alleged conduct was not severe or pervasive as a matter of law. In the first two alleged incidents, Plaintiff alleged only that he sat close enough that their knees brushed for a

---

[2] For the same reasons, the *Faragher/Ellerth* affirmative defense bars the Title VII claim:  (1) Wayfair exercised reasonable care to prevent and correct promptly the harassment.  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) and (2) Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Wayfair or to avoid harm otherwise. *Id.; Noviello*, 398 F.3d at 94–95.

moment before she moved.  SF ¶¶53-54.  Plaintiff admits that she said nothing to him to suggest

it was harassment or uncomfortable.  SF ¶¶57-58.  She reported it to no one, though she had a

managerial obligation to do so.  *Id.*  She did not discipline him in any way, though he was her

subordinate.  *Id.*  Instead, she continued to rate him highly, compliment him ("You're the best"),

and invite him to "dinner & drinks" and a brewery event.  SF ¶¶25-26, 28.  In the third incident,

which allegedly occurred in an open area on her visit to California that he tried to *prevent*, she

alleged that he cursorily touched a polka dot on her blouse.  SF ¶¶41, 55.  She described it this

way in writing to her boss and to the HR investigator in an interview.  SF ¶¶55, 83.  She then

tried to change her story to suggest McDole touched her chest with "a lingering touch."  SF ¶83.

She admitted she "laughed it off."  SF ¶55.  She said nothing to suggest his behavior was

unwelcome and reported it to no one.  SF ¶58.  In an email to Witte *after* these alleged events,

she wrote about McDole, "**He is good in person**."  SF ¶51 (emphasis added).  When she did

finally report the incidents, she buried them in a long list (mentioning the shirt-touching on page

13 of 14) of mundane interactions without using the term "sexual harassment."   SF ¶50. [3]

These allegations do not rise to the level of severe or pervasive harassment.  The

incidents were isolated, months apart.  They were so de minimis that she failed even to mention

them to McDole even when she was his direct boss with an obligation to do so.  SF ¶57.  She did

not complain about them to anyone for months.  SF ¶56.  There was certainly nothing physically

threatening or humiliating about them.  She continued to seek him out, compliment him, invite

him to social events, "laugh it off," and to admit to her boss *after* all these alleged events that

"He is good in person."  SF ¶51.  Though she insisted McDole's emails were "bullying,"

Wayfair's investigators found nothing harassing in the emails, the mundane contents of which

---

[3] In fact, she used the term "harassing" once in the same document (at page 10), to describe the banal fact of
McDole sending her two emails in one day and copying her supervisor (Witte) and two others.  SF ¶50.

are record evidence.  SF ¶88.  The few comments she claims he made about online dating apps and the like were mild banter in which she admits she participated.  SF ¶80.

Plaintiff also cannot make the required showing that she subjectively found McDole's conduct to be abusive.  She said nothing to McDole even when he was her direct report, made no contemporaneous report of the incidents, and did not even label them "sexual harassment" when she belatedly briefly alluded to them in an ordinary email.  SF ¶¶50-52, 56-58.  Instead, by her own admission, she just moved a little further from McDole the two times he allegedly sat too close, and "laughed it off" when he allegedly touched her shirt.  SF ¶¶53-55.   After the alleged incidents, she proceeded to compliment and seek out McDole.  SF ¶¶27-28, 40.   Nor can she show that a reasonable person would objectively have found these minor incidents, spaced months apart, to rise to the level of hostile or abusive.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) ( "isolated incidents (unless extremely serious) will not amount to" a hostile or abusive work environment under Title VII; "conduct must be extreme to amount to a change in the terms and conditions of employment…"); *Coll.-Town v. MCAD*, 400 Mass. 156, 162 (1987) ("The discrimination prohibited by [c. 151B], encompasses a work environment pervaded by abuse and harassment.").

The First Circuit has not hesitated to affirm summary judgment in cases that do not meet the high standard for a harassment claim.  *See, e.g., Ponte*, 741 F.3d at 320-1 (affirming summary judgment for employer where "[n]o reasonable jury could conclude" that supervisor's conduct amounted to hostile environment when, on two separate occasions, supervisor put his arm around new female subordinate (in one instance for 15-20 minutes) as he drove her, at his insistence, back to her hotel; noting plaintiff did not herself use term "sexual harassment" and failed to report the conduct for months).  The Circuit has required far more to establish severe or

11

pervasive harassment.  *Id., citing, e.g., Marrero v. Goya of P.R. Inc.*, 304 F.3d 7, 19 (1st Cir.

2002) (affirming claim where plaintiff "harass[ed] on a daily basis, including humiliating sexual

remarks and innuendos" for over a year"); *Crowley* v. *LL Bean, Inc.*, 303 F.3d 387, 397 (1st Cir

2002) (affirming judgment for plaintiff where 4- months of unwanted touching and innuendo

ended with him breaking into her home and accosting her).  The harassment claim fails.

## II.     PLAINTIFF'S RETALIATION CLAIM FAILS

Plaintiff claims that McKnight retaliated against her for bringing her harassment claim

against McDole.  She brings this claim despite the undisputed facts that:  McKnight was not even

employed at Wayfair when the alleged incidents occurred and was not involved with HR's

investigation of it; McKnight was at Wayfair for a little over a week when she sent Witte her

August 14 email complaining about McDole; McKnight barely knew McDole, the subject of that

complaint; Plaintiff did not get along with McKnight in the few weeks they worked together

because of a "personality conflict"; and her employment ended when she asked HR for a

"compelling severance package" and HR accepted her resignation with a severance offer.

### A.      Plaintiff Cannot Establish a Prima Facie Case

To establish a prima facie retaliation claim, she must show that (i) she engaged in

protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were

causally linked.  *Noviello*, 398 F.3d at 88; *Sullivan v. Raytheon Co.*, 262 F.3d 41, 48 (1st Cir.

2001).  Plaintiff cannot show any adverse action or any causal link with her complaint.

#### 1.      There Was No Adverse Action as a Matter of Law

Plaintiff cannot show that Wayfair subjected her to an adverse action.  *See Morales-*

*Vallellanes v. Potter*, 605 F.3d 27, 36 (1st Cir. 2010); *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707

(2011).  Retaliatory adverse actions under Title VII are those that would "dissuade[] a reasonable

worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry.*

*Co.* v. *White*, 548 U.S. 53, 60 (2006).  This is an "objective test."  *Lockridge v. Univ. Of Maine*, 597 F.3d 464, 472 (1st Cir. 2010).  "Examples of adverse employment actions in the retaliation context include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Morales-Vallellanes*, 605 F.3d at 36.  "Minor disruptions in the workplace, including 'petty slights, minor annoyances, and simple lack of good manners,' fail to qualify." *Id.*.  Similarly, under c. 151B, an adverse action must be "substantial enough to have materially disadvantaged an employee."  c. 151B, §§ 4, 4A; *Psy-Ed Corp.*, 459 Mass. at 708.  The adverse action must cause "real harm, as opposed to … subjective feelings of disappointment and disillusionment."  *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 664 (1996).

Under these standards, Plaintiff cannot show any adverse action.  While Plaintiff alleges in her complaint that she was "terminated," the undisputed facts, and Plaintiff's own recorded telephone call, transcribed and attached to the instant motion, show otherwise.  Am. Compl. ¶¶ 30-31.  It is undisputed that Plaintiff asked HR on September 19, 2019, in a call she illegally recorded, to put together a "compelling severance package."  SF ¶122.  Before requesting severance, she told Witte she was seeking jobs externally, told Witte, "If McKnight wants to run the projects, take me off all of them," and "I'm not working with someone like him," and sent 54 Wayfair documents to her personal email account.  SF ¶¶108, 125, 128.  HR then accepted her resignation and gave her the standard  two months' severance.  SF ¶127.  McKnight had no authority to fire anyone and was not involved in the decision to accept Plaintiff's resignation; he learned of it after HR accepted the resignation.  SF ¶110.

Unable to dispute  her resignation, Plaintiff also claims that McKnight retaliated against her on September 17, 2019, by his comments to her when she stormed into his office to confront

him.  SF ¶¶102, 111.  It is undisputed that in this meeting McKnight told her he had been getting

a lot of complaints about her communication and performance.  SF ¶105.  McKnight testified

that in this meeting -- in which Plaintiff attacked and berated him -- he told her "this is not

working," and that they needed to meet with HR ; Plaintiff alleges that he said he had talked to

Witte and HR about "getting her off his team."  SF ¶106, 111.  Based on this alleged comment,

she asked HR to look into whether McKnight was retaliating against her, a claim HR

investigated and found unsubstantiated.  SF ¶114-119.  That same day, she told Witte:  "If

[McKnight] wants to run the projects, take me off all of them.  I'm not working with someone

like him."  SF ¶108.  The unrebutted evidence is that McKnight had no authority to fire Plaintiff

-- only HR did -- and that while he and Witte had asked for a meeting with HR to review

performance issues, it did not occur before Plaintiff resigned.  SF ¶¶92, 110.  On these facts,

McKnight's statement, even as alleged by Plaintiff, is not an adverse action.  Merely proposing a

meeting, transfer or change that never comes to fruition is not an adverse action as a matter of

law.  *Ahern v. Shinseki*, 629 F.3d 49 (1st Cir. 2010) (supervisor's proposal of change in schedule

was not an adverse action because proposal was not adopted).  There was no adverse action.  The

undisputed fact is that she was *not* removed from the team or fired. Plaintiff recorded herself

asking  HR for severance, pay that by definition accompanies a separation.  SF ¶122.

## 2. There Is No Causal Link Between Her Complaint and Any Adverse Action

Even if Plaintiff could show any adverse action (which she cannot), she cannot show any

causal connection between her internal complaint and any adverse action.  "Of course, '[t]he

mere fact that one event followed another is not sufficient to make out a causal link.'" *Mole v.*

*Univ. of Massachusetts*, 442 Mass. 582, 592 (2004).  "That an employer knows of a

discrimination claim and thereafter takes some adverse action against the complaining employee

does not, by itself, establish causation. 'Were the rule otherwise, then a disgruntled employee, no

matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint.'" *Mole*, 442 Mass. at 592 (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991)). Plaintiff must prove Wayfair's "desire to retaliate was the but-for cause of the challenged employment action." *Theidon v. Harvard Univ.*, 948 F.3d 477, 505, 508 (1st Cir. 2020); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Plaintiff cannot show that her internal complaint to Witte on August 14 against McDole was the but-for cause of McKnight's performance-management actions. The undisputed evidence is that numerous Wayfair employees made an avalanche of complaints about Plaintiff's performance to McKnight *and* Witte. SF ¶¶17-18, 47-49, 71-78. Witte testified he has never in his career fielded so many complaints against one employee. SF ¶48. By late August and September 2019, the complaints were daily. SF ¶¶71-78. Plaintiff's coworkers complained about Plaintiff's communication style, knowledge, condescension, failure to collaborate, naiveté, and refusal to share information. *Id.* One wrote: "It's getting to the point that I can barely work with her . . . It is a struggle to want to help on any project that she is involved in." SF ¶49. She admitted in a self-review, "I don't think I have been delivering." SF ¶78. She refused to follow her boss' directions on multiple occasions and would not take feedback. SF ¶¶71-77. She persisted in telling her boss not to speak to her team, despite repeated coaching that this was not how Wayfair's managers worked. SF ¶¶91, 108. She drove to her boss' office to berate him, leaving him shaken and shocked. SF ¶¶101-1007. The overwhelming record evidence demonstrates that McKnight's performance-management decisions with respect to Plaintiff were based exclusively on managing her escalating performance problems.

Further, there is simply no evidence in the record to suggest that his performance-management decisions had any causal connection to her harassment allegations about McDole. Even Plaintiff admits she thinks the harassment complaint was only "part of" supposed retaliation. SF ¶112.  But it is undisputed that McKnight had nothing to do with Plaintiff's harassment complaint.  The complaint itself was about McDole, whom McKnight barely knew. SF ¶¶63, 118.   McKnight agreed with Witte's decision to escalate it promptly to HR and had no role in HR's investigation.  SF ¶¶59, 61.  Plaintiff claims McKnight spoke of it once, to say he was aware of the complaint and found the alleged harassment despicable if true.   SF ¶62. Plaintiff's only allegation of supposed retaliatory animus is her implausible claim that McKnight purportedly said on September 10, 2019, some version of "I had a woman like you on my team and she complained and you know what happened to her?  She left the team."  SF ¶134.  But even if she could prove he made this comment, it is not evidence of retaliatory animus against Plaintiff.  There is no evidence that the statement refers to Plaintiff's complaint a month earlier against McDole; it is far more logical that it referred to Plaintiff's numerous complaints about all the other coworkers with whom she had workplace battles, and about which McKnight was counseling her, at the time of the comment.  SF ¶105.  This is particularly true given the unrebutted evidence that McKnight has never had any other employee bring a harassment complaint against him.  SF ¶134.  Her prima facie retaliation claim fails.

### B.      Plaintiff Cannot Show Pretext

Wayfair clearly articulated a legitimate non-retaliatory reason for McKnight's actions: Witte and McKnight had received a long series of written and oral complaints about Plaintiff's performance from myriad Wayfair employees. *Walker v. City of Holyoke*, 523 F. Supp. 2d at 102.  Plaintiff cannot show that any action McKnight took in response to her performance problems was a pretext for retaliation.  "The pretext inquiry focuses on the employer, and

whether the employer believed that its stated reason for [any adverse action] was credible."
*Ponte*, 741 F.3d at 323, citing *Meléndez v. Autogermana, Inc.*, 622 F.3d 46, 53 (1st Cir. 2010).
"For a plaintiff to 'impugn the veracity' of the employer's proffered reason is insufficient;
instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to
conclude that the employer's reason for termination was a 'sham' intended to cover up the
employer's true motive." *Id.*, citing *Mesnick*, 950 F.2d at 824.

Plaintiff cannot show that McKnight's stated concerns about her performance were a
pretext for retaliation, or that the real reason for her counseling was because she complained
about McDole. It is undisputed that employees at Wayfair had complained, verbally and in
writing, about Plaintiff's performance to Witte before McKnight even worked at Wayfair, and
before her August 14 email about McDole. SF ¶¶17-18, 48-49. After McKnight started at
Wayfair, many employees who worked directly with Plaintiff complained about her
communication style and performance, not only to McKnight but to Witte and to Plaintiff
directly. SF ¶¶71-77. The record contains a raft of such complaints. *Id.* Plaintiff herself
admitted in a self-review that she was having problems performing her job. SF ¶78. The
overwhelming evidence is that instead of correcting the escalating concerns, Plaintiff doubled
down: at the meeting where McKnight indicated he would involve HR, Plaintiff was heatedly
chastising her boss for speaking with members of her team, despite that both McKnight and
Witte had explained repeatedly that he was simply doing his job. SF ¶108. These undisputed
facts are fatal to her claim of pretext. *Compare Ponte*, 741 F.3d at 323 (no pretext where
performance complaints came from, and went to, people other than alleged retaliating supervisor;
plaintiff admitted to problems performing and in final month "did not redeem herself").

Ironically, the record evidence is clear that McKnight was not even involved in HR's decision to accept Plaintiff's resignation.  SF ¶128.

Moreover, there is no evidence that McKnight did not believe his proffered reasons for managing her performance, or that his legitimate performance concerns were a sham intended to cover up some retaliatory motive.  *Compare Ponte*, 741 F.3d at 323.  Plaintiff's harassment complaint did not involve McKnight; he had no role in investigating it and barely knew McDole.  SF ¶¶61, 63, 118.   The day after she raised the concerns about McDole, she thanked McKnight for his support and told him "having you here had removed a tremendous amount of stress."   SF ¶66.  The alleged comment by McKnight that he had a woman on his team who complained who left the team is not itself sufficient to establish retaliatory pretext, particularly where the comment could as easily have referred to Plaintiff's numerous disputes with coworkers.  SF ¶105, 134.  *Lavalley v. Quebecor World Book Servs. LLC*, 315 F. Supp. 2d 136, 148–49 (D. Mass. 2004) ("isolated or ambiguous remarks" insufficient to prove pretext).

## III.    ANY CLAIM FOR SEX DISCRIMINATION FAILS

Plaintiff's Complaint alludes cryptically to "sex discrimination" by McKnight, even as Plaintiff testified that she did not bring a gender discrimination claim.  Am. Compl. 30-31; SF ¶130.  Regardless, Plaintiff has not made out a sex discrimination claim under any theory.[4]

To establish gender-based hostile environment, Plaintiff must prove six elements: (1) unwelcome harassment that was (2) severe or pervasive, and (3) both objectively and subjectively offensive; and (4) membership in a protected class, (5) that the harassment was motivated by sex, and (6) a basis for employer liability."  *Maldonado-Catala v. Municipality of*

---

[4] Her lawyer's leading question to her about the nature of her claim was an incoherent suggestion that McKnight "engaged in sex discrimination in retaliation" for her harassment complaint  SF ¶130.  Any such theory is not legally viable, as there is no viable retaliation or gender discrimination claim, as shown herein in Sections (II) and (III).

*Naranjito*, 876 F.3d 1, 10 n.11 (1st Cir. 2017).[5]  Plaintiff cannot show that McKnight engaged in any conduct at all motivated by her gender, let alone any that was severe or pervasive, or objectively or subjectively offensive, as a matter of law.

Plaintiff's scant allegations of supposed sex discrimination by McKnight rest primarily on two supposedly "sexist" statements.  SF ¶131. First, Plaintiff claims that on August 5, 2019, the day they met, McKnight allegedly made a comment about recruiting one or more former colleagues, who were male, to Wayfair.  She claims he asked what her salary was, said that his former colleagues would not work for less, and that "I only have your L6 spot to figure this out." SF ¶136.  It is undisputed that Wayfair had instructed McKnight to recruit former colleagues to the team for open positions.  SF ¶45. It is undisputed that Plaintiff was not an L6 employee, making her allegation even more nonsensical.  SF ¶133.[6]  Plaintiff herself recruited male former colleagues, including McDole, to Wayfair, and admits that McKnight recruiting employees was not a problem.  SF ¶45.[7]  She did not report this purported comment to anyone.  SF ¶132.  Only ten days later, she was texting McKnight to say "having you here has removed a tremendous amount of stress.  I really appreciate your support."  SF ¶66.  Second, she claims that on September 10, 2019, McKnight said some version of, "I had a woman like you on my team and she complained and you know what happened to her?  She left the team."  SF ¶134.  It is undisputed that by September 10, 2019, Plaintiff was complaining about coworkers, and they about her, and she was relentlessly complaining about McKnight talking to her team members. SF ¶¶71-77, 108.  Again, she did not report this purported comment to anyone.  SF ¶134.

---

[5] *See Walker v. City of Holyoke*, 523 F. Supp. 2d at 106 ("[T]he state and federal law claims [for gender-based hostile work environment harassment] are considered under substantively similar standards.")

[6] Notably, this alleged comment was made nine days before she brought her harassment complaint on August 14, 2019, and therefore cannot be retaliation for the complaint when it preceded it.   SF ¶¶50, 132.

[7] It is also undisputed that he had access to her salary information in the Wayfair computer system.  SF ¶133.

Plaintiff also alleges that the Industrial Operations Team was "in general just very male dominated, very bro'y, very boys club, very chauvinistic," though the only example she could recall was one male employee jokingly mimicking kissing another male employee at his going away party.  SF ¶135.   None of these are linked to McKnight, with whom she only worked for a few weeks.  "General allegations of a discriminatory culture have less probative weight when, as here, plaintiff is alleging disparate treatment [because] the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why."  *Caesar v. Shinseki*, 887 F. Supp. 2d 289, 300 (D. Mass. 2012).

These allegations do not establish a sex discrimination claim.  The alleged comments did not even reference Plaintiff's gender.  None of the alleged conduct was severe or pervasive, or objectively or subjectively offensive, as a matter of law.  She did not report them as offensive to anyone.  *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 227 (1st Cir. 2012) (affirming dismissal of gender claim and stating that complaints are open to dismissal "[i]f the factual allegations… are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture").  Any gender claim fails as a matter of law.

## Conclusion

Wayfair requests summary judgment on all counts of Plaintiff's Complaint.

Dated: November 6, 2020

Respectfully submitted,
WAYFAIR, LLC
By its attorney,

*/s/ Lynn A. Kappelman*
Lynn A. Kappelman (BBO No. 642017)
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:     (617) 946-4800
lkappelman@seyfarth.com

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2020, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


*/s/ Lynn A. Kappelman*
Lynn A. Kappelman