UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EMILY FORSYTHE ⟩ | |
| ⟩ | |
| ⟩ | Civil Action No. 1:20-cv-10002 |
| Plaintiff, ⟩ | |
| ⟩ | |
| v. ⟩ | |
| ⟩ | |
| WAYFAIR, LLC ⟩ | |
| Defendant. ⟩ | |
| ⟩ | |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Wayfair, LLC ("Wayfair") submits this Statement of Undisputed Facts[1] in support of its Motion for Summary Judgment.

**A.    Wayfair**

1.    Wayfair is an online seller of home furnishings, décor, and other products for the home, directly to consumers.  Witte Tr. 6-8, 161.

2.    Wayfair has policies forbidding sexual harassment, discrimination, and retaliation.   Wayfair provides training on such policies.  McKnight Tr. 46-47, 88; Shaffer Tr. 13-15, 52; McDole Tr. 11; Witte Tr. 33, 51-52; WAYFAIR 1364, 1369-72.  Wayfair's "Talent Management" group performs its Human Resources ("HR") function.  Shaffer Tr. 6.

**B.    The Plaintiff Met Michael McDole at a Prior Job at Amazon**

3.    Plaintiff's first job after receiving her MBA was working at Amazon.  She worked there from 2014 to December of 2015.  Pl. Tr. 23, 37.

---

[1] All statements herein are set forth for purposes of Defendant's Motion for Summary Judgment only, are not admissions by Defendant, and may not be used for any purpose other than Defendant's Motion for Summary Judgment, including without limitation any other proceeding in this lawsuit.

4.      While working at Amazon in 2015, Plaintiff met Michael McDole.  Neither reported to the other at Amazon.  They interacted just twice in person at Amazon, once involving a lunch.  Plaintiff claims not to recall if they had other communications.  Pl. Tr. 26-29, 31-32.

5.      McDole never sexually harassed Plaintiff at Amazon, and she never complained about him at Amazon.  Pl. Tr. 33.

**C.      Plaintiff Offered That McDole Could Visit Her Parents' House**

6.      In December 2015, Plaintiff had left Amazon and was between jobs.  Pl. Tr. 34. She said to McDole, "You're welcome to come and stay at my parents' house for a few days." Her parents lived in Cohasset, MA.  He was in Kentucky.  Pl. Tr. 34, 36; McDole Tr. at 21-23.

7.      McDole traveled to Plaintiff's parents' house and stayed 2-3 days.  McDole and Plaintiff did tourist activities, went out to dinner, and had a consensual romantic encounter in which they kissed twice.  Pl. Tr. 38-40; McDole Tr. at 22-24, 30.

8.      Plaintiff claims a few weeks thereafter, McDole said he wanted to see her again, she said she wasn't interested, and they had no more communication about it.  Pl. Tr. 40-41.

**D.      Plaintiff Took a Job at Wayfair**

9.      In January 2017, Plaintiff started at Wayfair as a Senior Manager (L4).  Pl. Tr. 45-46; Witte Tr. 46.  She reported to Matt Witte, an Associate Director (L5), who in March 2017 was promoted to Director (L6) with up to 168 reports.  Witte Tr. 6, 9.

10.      Witte and Plaintiff were in the Industrial Engineering Department; the Department's focus is building physical infrastructure in Wayfair's buildings.  Witte Tr. 6-8, 146.

66308529v.3

**E.      Plaintiff Recruited McDole to Come Work at Wayfair**

11.      In July 2018, while still a Senior Manager, Plaintiff sought out McDole to recruit him to come work at Wayfair, reporting to her.  Pl. Tr. 52, 59; McDole Tr. 117.  Despite that reporting relationship, she did not discuss with him their previous romantic interlude.  Pl. Tr. 64.

12.      Plaintiff encouraged Wayfair to offer McDole more money to recruit him.  She wrote, "I worked with him at Amazon and he has been very voluntarily transparent with what he needs to move.  We recruited him and he will need a compelling offer to leave where [he is.]"  Pl. Ex. 2; McDole Tr. 117.

13.      While recruiting McDole, Plaintiff did not tell Witte that she and McDole had had a consensual romantic interlude.  Pl. Tr. 79.  She told Witte that McDole was a "phenomenal operations manager, incredibly smart, hardworking, really good at his job, and I thought he would be really great on the team."  Witte knew Plaintiff "was a big fan of Mike."  *Id.*; Witte Tr. 58-9.

**F.      McDole Joined Wayfair Reporting to Plaintiff**

14.      McDole started at Wayfair on August 3, 2018, reporting to Plaintiff.  Pl. Tr. 83; Wayfair's Answer to Complaint ¶7.

15.      In August 2018, when McDole mentioned to Plaintiff that he had been hiking and was going to hike again that evening, she asked if she could tag along and then did so.  McDole Tr. 118.  Witte thought this was odd but chalked it up to their good relationship.  Witte Tr. 156.

16.      Plaintiff claims in his first months at Wayfair, McDole was sometimes "awesome," and "a rock star," while other times he was ignoring her and his tasks.  Pl. Tr. 84.

**G.      Witte Received Periodic Complaints about Plaintiff's Performance**

17.      Witte received some complaints about Plaintiff.  In August 2018, Christa Cabriales, a Warehouse Operations Team Lead, emailed him that Plaintiff was "extremely rude in her communication to me," which was "unprofessional and unwarranted," and "I'd appreciate if her attitude and demeanor is addressed directly as she was outright rude."  Pl. Ex. 14.

18.      In the summer of 2018, an employee named Davina Heard complained she was discriminated against by Plaintiff, on the grounds that Plaintiff said that to advance to a Senior Manager (L4) position, one needed a degree from a prestigious university.  Witte told Plaintiff her comments were unacceptable and inconsistent with Wayfair's values.  Witte Tr. 41-48.

19.      But Witte believed Plaintiff was a great employee for him in 2017 and 2018 overall, and promoted her to Associate Director (L5) in September 2018. But as she grew into that higher-level role and the responsibilities and pressure mounted, Witte observed that Plaintiff could be condescending or dismissive to others.  Plaintiff Tr. 48; Witte Tr. 6, 99; McKnight Tr. 12-13.

**H.      McDole Started Interviewing for New Roles to Get Away from Plaintiff**

20.      Between January and August 2019, there were periods of time when Plaintiff and McDole got along.  Pl. Tr. 89; McDole Tr. 106.

21.      However, in the first quarter of 2019, Witte observed that Plaintiff and McDole had challenges working together.  Plaintiff complained to Witte that McDole was not doing all assigned tasks.  McDole complained that Plaintiff was micromanaging him.  Witte Tr. 60-61.

66308529v.3

22.     By January 2019, McDole was interviewing for roles on other teams, to get away from Plaintiff's team.  He was uncomfortable working on her team and had lost trust in his career and development under her.  McDole Tr. 106-8, 118-19, 121.   McDole told Plaintiff that he wanted to leave her team and not report to her.  She told him she did not want him to leave.  Pl. Tr. 91-92.

23.     On January 10, 2019, Plaintiff wrote to McDole on Slack (Wayfair's internal messaging service):  "Were you late because you were interviewing."  He answered, "Yes."  She replied, "Don't leave."  Pl. Ex. 5; Witte Tr. 101.  Plaintiff asked McDole to stay through July 30, 2019.  McDole Tr. 95-6.

24.     In February 2019, Plaintiff told Witte by email she wanted to revise McDole's performance review, on which she had rated him "exceeds expectations" in January, because she felt his performance had slipped, though she said McDole "is still a strong performer."  Witte Ex. 1, Tr. 68-71.  Witte observed that Plaintiff had a top-down management style, which caused conflicts with McDole, who had an opinion-based on experience on how to do his tasks.  Witte Tr. 73.

I.     **Plaintiff Continued to Pursue McDole in March 2019**

25.     On March 7, 2019, Plaintiff sent McDole information about a Harpoon Brewery event for St. Patrick's Day.  Pl. Tr. 145; Pl. Ex. 12.  He did not go.  McDole Tr. 99, 122.

26.     On March 14, 2019, Plaintiff sent McDole an email invite with the subject line, "Dinner & Drinks."  On the day of the scheduled dinner, March 20, 2019, McDole declined and they did not go.  Pl. Ex. 9 at p. 5-6, 11; Pl.  Tr. 142; McDole Tr. 30, 33, 108, 121-2.

27.     On March 14, 2019, Plaintiff wrote to the site director of Wayfair's Perris, CA site about McDole transitioning roles for an April 1, 2019 start date.  She stated in part, "Mike is going to knock it out of the park. . ."  WAYFAIR 000215.

28.     On March 26, 2019, Plaintiff wrote to McDole, "You're the best." Pl. Ex. 4.

**J.     McDole Left Plaintiff's Team**

29.     McDole left Plaintiff's team on April 1, 2019.  Pl. Tr. 93-94.  He moved laterally to a role as a Senior Manager at a site in Lathrop, California, to run Operations at that site.  Operations' function is to manage employees to move parcels.  Witte Tr. 145-46.

30.     As of April 2019, Plaintiff lived in Kentucky and traveled as needed to Boston.  McDole lived in Texas and commuted to California.  Pl. Tr. 95, 119; Witte Tr. 30, 65.

31.     Plaintiff and McDole still had some limited professional interactions after he stopped reporting to her, when she had projects in buildings he was working in.  She saw him less than once a week and more than once every two months.  Pl. Tr. 96, 137.

**K.     Plaintiff and McDole Had Workplace Disagreements After April 2019**

32.     Witte believed that the way that Plaintiff and McDole interacted beginning in April 2019 was unprofessionally non-collaborative.  He did not like it.  Witte Tr. 167-68.

33.     Plaintiff complained to McDole about his emails, which she believed were belittling, demeaning, rude and aggressive.  Pl. Tr. 100; McDole Tr. 42.  McDole in turn believed that Plaintiff was harassing and bullying him.  McDole Tr. 97-98.

34.     On April 11, 2019, McDole sent Plaintiff a last text, before deleting her number: "I didn't transfer to Ops because I consider it to be my calling in life.  It's because I didn't trust

6

you, or your direction, or my career in your hands.  I didn't back out of dinner over an email.  It's because I don't think you're a good person and I don't want to surround myself with that in my personal life.  So hopefully that clears things up a bit."  Pl. Ex. 9 at p. 7.  McDole Tr. 36, 41.

35.    Plaintiff suggested she and McDole set up a meeting with HR and Witte.  McDole emailed her on April 18, 2019, and said in part, "I fully support setting something up, I think it's absolutely necessary."  Pl. Tr. 97-98; Pl. Ex. 6; McDole Tr. 97.  He wanted to tell HR that he had taken steps to distance from Plaintiff, including physically moving across the country, but that she continued to engage him.  McDole Tr. 97.  Plaintiff then told McDole, "Before we make ourselves look like children, since we can't resolve our own issues, I'd like to work this out without HR."  She said that because she "didn't want to look bad at HR."  Pl. Tr. 101-02.

36.    In April 2019, Plaintiff and McDole complained to Witte about each other.  She said McDole was not listening to her; McDole said she was bullying him and he would go to HR if they could not work it out.  He expressed displeasure that Plaintiff continued to engage him, beyond what was necessary for work, and despite his efforts to stop communications.  Witte Tr. 140-41, 145-46, 149; McDole Tr. 36-38.  McDole made this complaint again in late April or early May. McDole Tr. 36-38, 43-44, 109-120; Witte Tr. 150-153.

**L.    Plaintiff Had Disputes with Other Colleagues**

37.    In April 2019, Jonathan Marcoux, an Industrial Engineering Manager, wrote to Witte to express "concerns" about Plaintiff's workplace interactions with others.  Pl. Ex. 15.

38.    In June 2019, Arron Velarde, Site Director for Lathrop, wrote Plaintiff and Witte about Plaintiff's removal of McDole's name from a slide presentation, which he felt was "petty."

He forwarded the exchange to Witte, saying, "Only forwarding you this because it relates to the weird tension I continue to see from both sides." Witte replied, "I agree with you." Pl. Ex. 16.

39.     In June 2019, at Witte's request, he and Plaintiff had a 1:1 meeting. Pl. Tr. 160. He outlined discussion points for the meeting. One was "Attitude Perception: Want to give you very honest open feedback to help you out with communication to keep things tight but positive. . ." Another was, "McDole -- How is this going?" Under the title "Stress," he wrote, "You need to find a way to keep a level head as stress leads to downstream ripple effects on the team." Pl. Ex. 17. Plaintiff said nothing about any alleged sexual harassment by McDole. Pl. Tr. 161-2.

**M.     Communications in July and Early August 2019**

40.     In July 2019, Plaintiff wrote to McDole: "Hi, Mike. Congrats on the promotion. We both know you're going to do a wonderful job in Perris. Just wanted to give you a heads up that I will be on-site in Perris July 22nd to 23rd. Thanks. Emily." Pl. Tr. 105. At that point, McDole was responsible for a Wayfair site in Perris, California. McDole Tr. 11, 37.

41.     McDole complained to Witte again in July and August, in anticipation of her visits, that he did not trust Plaintiff to be in the building that he was running. McDole Tr. 37.

42.     On August 4, 2019, Plaintiff forwarded to Witte an email McDole had sent her team. She asked Witte, "Is there anything you can do on this to calm him down? We have responded to him that the racking is only 50% done. . . . Mike needs to relax. Did you get a chance to talk to him a few weeks ago about working through Jim and not pushing/bullying?" Witte explained he hadn't connected yet with McDole but would. WAYFAIR 408.

43.     Each time Plaintiff complained to Witte about McDole's communications, Witte talked to McDole, who would explain his side of the story and complain about Plaintiff.  Witte's view was neither was working well together.  Witte Tr. 175-6, 179.

**N.      Plaintiff Began Reporting to Kory McKnight**

44.     Kory McKnight started at Wayfair on July 29, 2019 as a Director (L6).  McKnight Tr. 6, 58.  A week later, on August 5, 2019, McKnight assumed supervision of Plaintiff and met with her that day.  Pl. Tr. 152-3; McKnight Tr. 12, 58; Witte Tr. 24-25.

45.     At the time, there were a number of open roles and McKnight had been told to hire people he had worked with before.  McKnight told Plaintiff he had a former colleague from Walmart, Mike Thayer ("Thayer"), who would be a good fit to add to the team.  He shared Thayer's resume with Plaintiff.  McKnight Tr. 13-15; Pl. Tr. 173-74, 255-256.  Plaintiff had no problem with McKnight trying to recruit people from outside Wayfair.  Pl. Tr. 173-74.  She herself recruited five people, including McDole, from a former company.  Pl. Tr. 51-52, 173.

46.     McKnight lived in Chicago.  In the first month of the reporting relationship, Plaintiff recalls interacting with him in person only one time.  Pl. Tr. 153.  Yet Plaintiff did not get along with McKnight.  Asked at deposition, "And why would you say you didn't get along?" she testified, "Personality clash."  Pl. Tr. 174.

**O.      Complaints about Plaintiff to Witte Continued**

47.     In August, 2019, during the onboarding process of McKnight, Wayfair leaders were calling Witte to complain about Plaintiff, which he discussed with McKnight.  They hoped that hiring additional personnel would help alleviate some pressure.  McKnight Tr. 28; Witte Tr. 100; McKnight Ex. 2 at WAYFAIR 001301.

48.     Before August 14, 2019, Witte received many verbal complaints about Plaintiff, including from Arron Velarde, Genatro Bugarin, Joe Guardinio, Melissa Malik, Bill Ayres, and Allan Lyall.  He has never had so many complaints about an employee.  Witte Tr. 96-100.

49.     On August 6, 2019, Rob Holtz, Associate Director of Automation Engineering, wrote to Witte about Plaintiff:  "It is getting to the point that I can barely work with her.  It is a struggle to want to help on any project that she is involved in."  Pl. Tr. 154-5; Pl. Ex. 13.

**P.      Plaintiff Wrote in an Email to Her Boss That McDole Was *"Good in Person,"* but Attached a Long Document that Included Allegations of Inappropriate Touching by McDole**

50.     On August 14, 2019, Plaintiff sent Witte an email that said, "Please don[']t share this with anyone or forward it to anyone.  I'm going to be in Perris next week starting a new hire. Was wondering if you had a chance to talk to [McDole] about his professionalism and cooling his aggression in emails?  I'm also attaching a summary of correspondence between me and Mike."  Pl. Ex. 8; Pl. Tr. 110-11.

51.     When he received this email, Witte was traveling in the UK with McKnight.  Pl. Tr. 129; McKnight Tr. 62; Witte Tr. 17, 158.  Witte responded, "Hey!  Is he bullying you in person, or just feel it over the emails?"  Plaintiff replied, "He is good in person.  Just via email he has an edge.  He is relentless even though we have provided answers or given timelines."  Pl. Ex. 8; Pl. Tr. 111.

52.     When Witte had time to read the 14-page attachment, which contained about 50 entries summarizing Plaintiff's interactions with McDole from September 2018 to August 2019, he realized that deep in the document she had made -- for the first time -- three allegations that McDole touched her inappropriately.  Witte Tr. 17, 158;  Pl. Ex. 9; Pl. Tr. 116-17, 128-29.

53.     She alleged that on January 22, 2019:  "Mike and I had an in-person meeting in Perris.  Uncomfortable situation where Mike was sitting on one side of the table and I was sitting on the exact opposite.  Conversation started heated but as it calmed down, Mike scooted his chair around the entire table and moved right next to me.  We were sitting side by side.  Mike moved his chair so that our knees were touching and he put his hand on my leg.  I moved my chair back and put space between us and kept talking."  Pl. Ex. 9 at p. 4; Pl. Tr. 122-23.

54.     She alleged that on March 13, 2019: "Mike and I had another in-person meeting in Boston. . . It was a heated conversation.  Mike was sitting on one si[d]e of the table and I was on the other.  . . . At this point, we both were saying how much we don't like fighting with each other.  Mike moved his chair around the table and moved to close to me [sic] that our knees/legs were touching.  I moved my chair back and created space between us."  Pl. Ex. 9 at p. 5; Pl. Tr. 84, 122-24.

55.     She alleged that on July 22, 2019:  "I was having lunch at the small table near HR.  Mike came over and sat down next to me.  I moved my lunch aside and turned to talk to him.  I was wearing a shirt with little spots all over it and it had buttons running up the front in the middle.  Mike was staring at the buttons or a spot.  I asked him what was wrong and if I had spilled something on my shirt.  As he was looking very closely at is.  He reached out and touched my buttons and a spot that was part of the shirt.  He said he couldn't tell if that was a spot or lunch. I laughed it off."  She also alleged that he asked if she was still with her boyfriend and if she had tried online dating.  Pl. Ex. 9 at p. 13; Pl. Tr. 126.

**Q.    Plaintiff Had Never Reported Any Harassment or Said Anything to McDole Even When He Reported Directly to Her**

56.    Prior to August 14, 2019, Plaintiff had not complained to anyone at Wayfair that McDole had sexually harassed her.  Pl. Tr. 86, 112-13, 123-5; Shaffer Tr. 51, 173.

57.    In January and March, 2019, Plaintiff had been McDole's manager, with an obligation to report any inappropriate conduct.  But she said nothing to suggest to him that he was subjecting her to unwelcome sexual harassment.  She issued him no written or verbal warnings or reprimand for inappropriate behavior.  Pl. Tr. 86-89, 123-5; Shaffer Tr. 172-73.

58.    Plaintiff admits that in July, she did not tell McDole him his behavior was unwelcome or that she was uncomfortable.  She did not complain to anyone at Wayfair about the incident at the time.  Pl. Tr. 126-28, 150.

**R.    Witte Escalated Plaintiff's Complaint to HR**

59.    Witte shared Plaintiff's email with McKnight, and they agreed that Witte needed to escalate Plaintiff's complaint to HR to investigate.  Witte did so.  McKnight Tr. 32, 62-63; Pl. Tr. 130; WAYFAIR 000079; Witte Tr. 17, 38.

60.    Plaintiff wrote to Witte on August 22, 2019 thanking him for addressing her HR issue so promptly and professionally.  Pl. Tr. 130-31; McKnight Tr. 64.

61.    McKnight had no other involvement in the sexual harassment complaint or HR investigation.  McKnight Tr. 31, 61, 64, 85, 88.

62.    Plaintiff claims that she had one conversation with McKnight about her complaint, in which he told her he was aware of her complaint, that McDole's actions were "disgusting" or "despicable," and he would not tolerate them.  Pl. Tr. 80, 177-78, 180-83.

McKnight testified he never discussed the complaint with Plaintiff, because he believed it was inappropriate for him to discuss an ongoing investigation.  McKnight Tr. 62-63, 67.

**S.      On August 15, 2019, Plaintiff Thanked McKnight for His Support**

63.      McDole had learned Plaintiff would be traveling to Perris and asked McKnight that she not be involved in his site.  McKnight, who did not know McDole, wanted to understand why and keep things professional and respectful.  McKnight Tr. 61, 69-70; McDole Tr. 51.

64.      On August 15, 2019, McKnight texted Plaintiff:  "I want to talk to you about your trip to Perris.  [McDole] has reached out to me and wants me to call him.  I know there is some friction there but want to talk to you before I talk to him."  Pl. Ex. 22.

65.      Plaintiff and McKnight spoke.  McKnight communicated that he wanted to support her and that he wanted McDole to respect her and support their work in McDole's building.  McKnight Tr. 70-71.  McKnight also spoke with McDole who complained that Plaintiff was not professional, did not communicate the schedules, and was not sharing information.  McKnight asked McDole to give him a chance, and said that he would work to support him as a partner and Plaintiff would support the project.  McKnight Tr. 71.

66.      After Plaintiff and McKnight spoke, Plaintiff texted McKnight:  "Thanks for talking.  This the first time in months that I feel good about a lot of stuff and having you here has removed a tremendous amount of stress.  I really appreciate your support."  He responded, "Of course!  I'm happy to hear that."  McKnight also said:  "Just talked to [McDole] . . no need to discuss details.  If he needs something from you or feels you['re] not able to provide him with the info [I] told him to call me.  I don't want any more drama.  I told him we all need to work

together.  And that his building is Wayfair's building."  Plaintiff replied, "Thanks.  Have a great rest of the night."  Pl. Ex. 22; Pl. Tr. 192-93; McKnight Tr. 65-66, 72.

**T.      HR Began Its Investigation into Plaintiff's Sexual Harassment Complaint**

67.      Candice Smith (Smith) is Wayfair's Director of Talent Management for Field Locations.  Smith Tr. 7, 53-54.  Smith assigned Plaintiff's complaint to Trevor Shaffer-Figueroa ("Shaffer-Figueroa") in HR to investigate; he tracked his investigation in a spreadsheet. WAYFAIR 000079; Shaffer Tr. 9, 89, 169.

68.      Shaffer-Figueroa  promptly reached out to Plaintiff, who he had not met or spoken with before.  She told him she was going on vacation and would not be able to speak until August 29, 2019.  Pl. Tr. 132; WAYFAIR 000079; Shaffer Tr. 54.

69.      He also informed McDole of the investigation.  Shaffer Tr. 87.  At the outset, McDole asked, "I'm assuming this has to do with me asking her not to visit this building?" to which Shaffer-Figueroa responded, "partially."  WAYFAIR 000079, p. 8.

70.      He told Witte and McKnight that he would be investigating the complaint, but did not share any content of the investigation.  Shaffer Tr. 88-90; Witte Tr. 95.

**U.      Coworkers' Reported Concerns about Plaintiff Escalated in August 2019**

71.      Plaintiff admits that in August 2019, McKnight told Plaintiff that she could improve her communication.  Pl. Tr. 154.

72.      On August 27, 2019, McKnight asked Plaintiff three times to participate in particular daily calls, and believed that Plaintiff refused to follow his direction, prompting

complaints from the organizer of the calls.  McKnight Tr. 39, 52-3, 61, 66-67; Pl. Ex. 19.

McKnight gave Plaintiff feedback, which he believed she did not take well.  McKnight Tr. 72.

73.     On August 28, 2019, a Senior Project Manager wrote to Plaintiff in part:  "Emily,
Just to let you know, I am angry about the design of the [] platform and how I was not able to
review the design prior to install."  She forwarded the message to McKnight who responded,
"OK.  This is exactly why I want the Implementation team . . . involved with the detail design.
We will improve this going forward.  For now we just have to fix it and move on."  He
forwarded the exchange to Witte.  Pl. Ex. 18.

74.     On August 29, 2019, Witte and McKnight received a complaint from Frances
Thunder ("Thunder") on the sales and operations planning team.  McKnight asked Plaintiff to
politely call Thunder and let her know that it wasn't her intent to upset.  McKnight observed that
Plaintiff immediately got defensive and then agreed to call Thunder and apologize.  Moments
later, Witte sent McKnight a screen shot in which Plaintiff had written to Thunder, "The way you
escalated your issue with my communication I consider to be very unprofessional."  McKnight
Ex. 2; Witte Tr. 82-83, 100-01.

75.     On August 30, 2019, a Wayfair executive named Allan Lyall wrote to McKnight
and Witte, in relevant part:  "Kory, Matt, I'm reflecting on how casual Emily talked about the
sorter schedules . . . Can one of you deep dive the schedules and validate all assumptions."
McKnight responded in part:  "I will work directly with MHS regarding these deliverables and
will advise on any improvements we can make in the coming days.."  Lyall replied, "Thanks, the
naivety [sic] of the conversation worries me deeply."  Pl. Ex. 20.

76.     McKnight was working with Plaintiff on performance issues every day, every week.  Witte Tr. 101.  He observed that Plaintiff did not take well to criticism or coaching.  In his view, they would discuss how she could approach things differently, Plaintiff would agree and then "go and do, quite often, the opposite."  McKnight Tr. 28-29, 31.

77.     Site Director for Lathrop, CA, Arron Velarde called and emailed McKnight multiple times to complain about Plaintiff.  Velarde said Plaintiff was condescending, non-cooperative, not collaborative, not sharing information and intentionally withholding information.  Velarde asked McKnight not to involve Plaintiff in projects in his building.  McKnight felt that she was not being a good business partner.  McKnight Tr. 48-49, 55, 80-81.

78.     On August 30, 2019, Plaintiff sent Witte and McKnight a six month self-review.  She listed "things that have been difficult,"  including that "I am not sure what I am going after and don't think I have been delivering.  This frustration has shown in my overall attitude and I am aware of this," and that "I haven't been as fast to respond to requests .. . I want to get better at responding to all the one-off requests."  Witte Ex. 2.

79.     While McKnight was giving Plaintiff verbal feedback on her behaviors, McKnight and Witte held off on more formal performance management while the harassment investigation was pending, at the instruction of HR.  Witte Tr. 100-01, 104-08.

**V.     HR Interviewed Plaintiff about Her Allegations**

80.     Shaffer-Figueroa interviewed Plaintiff about her complaint on August 29, 2019 and took notes.  She said there were no witnesses to the alleged harassment.  Pl. Tr. 136-37; Shaffer Tr. 138-139, 165; WAYFAIR 000079, pp. 3-4.  Plaintiff alleged that in the July meeting, McDole asked whether she still had a boyfriend (she said no), whether she had any dating apps

(she "answered no, casually") and that he said wouldn't it be funny if we ended up together (she

answered, "yeah that would be funny").  Shaffer Ex. 2.

81.     Shaffer-Figueroa asked Plaintiff if she knew McDole before Wayfair.  She said

they had worked together previously but had no personal relationship.  She did not disclose their

consensual romantic interlude in December 2015.  Shaffer Tr. 174-75.  Pl. Tr. 81, 133.

82.     Shaffer-Figueroa's notes reflect that he asked Plaintiff, "If you were his manager

you had an obligation to report inappropriate behavior from a subordinate, why did you not

report Mike?"  She replied, "I was embarrassed since I recruited him from Amazon."

WAYFAIR 00079.  Shaffer-Figueroa determined Plaintiff had allowed McDole to transfer out of

her line of authority without sharing information about alleged misconduct.  Shaffer Tr. 116-17.

83.     On September 4, 2019, she emailed Shaffer-Figueroa to change her allegation

about the July incident, saying for the first time that instead of just touching her shirt, McDole

"touched me right on my chest, in between [my] boobs" in a "lingering touch."  Shaffer Tr. 76-

78; WAYFAIR 526-27.  Shaffer-Figueroa noted that she did not have an explanation for why she

was changing her allegation.  Shaffer Ex. 2.

## W.     HR Also Interviewed McDole

84.     Shaffer-Figueroa interviewed McDole twice about Plaintiff's allegations.

McDole Tr. 51-52, 67.  His notes indicate that when asked if he had touched Plaintiff on or near

her chest, McDole shook his head "no" and exhaled indicating disbelief, asking, "Is she saying I

touched her?"  Shaffer said, "I need to know if you ever made physical contact with Emily as

I've described.  McDole replied, "Unbelievable.  I can't believe she would say that.  No.  That

never happened."  He denied ever touching Plaintiff inappropriately.  McDole explained that it

17

was actually Plaintiff seeking his attention and that he had not enjoyed working for Plaintiff. Shaffer Tr. 79-80, 118-19, 139-144; WAYFAIR 000079, pp. 8-9; McDole Tr. 16-19, 26-29, 46-48.  Shaffer-Figueroa found McDole's denial of harassment credible.  Shaffer Tr. 144-45.

## X.    HR Interviewed Other Witnesses Who Did Not Support Plaintiff's Complaint

85.     Plaintiff claimed that James Lowe ("Lowe") was a witness to the nature of the relationship.  Shaffer-Figueora spoke with Lowe, who reported that Plaintiff and McDole did not get along, but that he not think either was more to blame.  Shaffer Tr. 47-48, 67, 70-71, 90-91; WAYFAIR 000079, p. 7; Lowe Tr. 13-14, 33-34, 39-40.

86.     Plaintiff also claimed Brittany Skaggs ("Skaggs") was a witness to the nature of the relationship.  Skaggs told Shaffer-Figueroa that: Plaintiff and McDole did not get along and acted like a bickering couple; she never saw anything inappropriate from either; and Plaintiff is a "micromanager" who rubbed McDole the wrong way.   Shaffer Tr. 67, 72-73; WAYFAIR 00079; Skaggs Tr. 18-19; 25-27, 35, 49-50, 69, 79-80.  Skaggs testified, "Ms. Forsythe would bait Mr. McDole and find ways to get him upset, in which case then it would be -- they would both raise their voices at each other and it would make others uncomfortable."  She testified Plaintiff and McDole "couldn't get along" and "were dragging everyone in their entire team into their drama."  Skaggs Tr. 61, 79.

87.     McDole told Shaffer-Figueroa that Stella Karadimis ("Karadimis"), an in-house recruiter, had reported troubling actions by Plaintiff with respect to McDole.  Karadimis told Shaffer-Figueroa that Plaintiff had questioned one of McDole's expenses, Karadimis had escalated it to her boss, they found the expense appropriate and told Plaintiff so.  His notes

reflect that the recruiter explained, "Emily is a notoriously difficult stakeholder," and "She has a tendency to be argumentative and loud."  Shaffer Tr. 67, 70; WAYFAIR 000079, pp. 9-10.

88.     Shaffer-Figueroa reviewed the McDole emails that Plaintiff claimed were too aggressive.  Neither he nor Smith found them hostile or aggressive.  Shaffer Tr. 74-75, 134-35.

89.     Because Plaintiff's report was not timely, Shaffer-Figueroa could not view security system footage for the open office area where Plaintiff claimed one alleged incident occurred.  Shaffer Tr. 50-51.

**Y.     Plaintiff's Performance Issues Continued Escalating in September 2019 and McKnight and Witte Sought HR's Assistance**

90.     By late August and early September, 2019, Plaintiff's performance issues escalated to the point where employees were calling Witte and McKnight to complain every day about Plaintiff's confrontational or aggressive behaviors toward their sites.  Witte Tr. 114-15.  McKnight consulted frequently with Witte.  McKnight Tr. 28.

91.     On September 12, 2019, following Plaintiff telling Kory not to speak with her team, Witte spoke with Plaintiff and explained that Kory needed to be able to communicate as needed through all levels to gather the information he needed to do his job.  Plaintiff asked if she could look internally for other roles and said she was interviewing with four other companies.  McKnight Ex. 2 at WAYFAIR 001301; Pl. Ex. 23; Pl. Tr. 195.

92.     On Friday, September 13, 2019, Witte emailed Smith, asking, "Have you concluded the investigation with Emily?  Kory is having some issues with Emily's performance and communication.  We would like to document the conversation officially.  Would you be the right person to get on a call with us?"  Witte Ex. 4.

19

93.     Plaintiff's performance was so challenging that, the week of September 16, 2019, McKnight and Witte pulled email and written documentation of the problems, and asked those who made verbal complaints to write a summary. They did so, per standard practice at Wayfair, to be able to share with HR for consideration of potential next steps, such as a performance plan. McKnight Tr. 41-42, 58-60; Witte Tr. 96-97, 101-02, 104-05.

94.     Victor Davis, West Coast Regional Director of Operations, wrote an email summary of feedback from his team regarding Plaintiff.  McKnight Tr. 39, 53.  He wrote, "There have been several times when Emily's tone has come off unprofessional and has caused some integrity questioning.  I have seen her almost use a 'Power' approach with many people in meetings . . . to get her way."  He wrote that Plaintiff "gave me the impression" she was "not necessarily someone who wanted to help drive initiatives or be hands on in the project, instead, forward on questions with little ownership in the decisions."  He noted an interaction in which "it was clear that Emily wanted to poke at [McDole] more than anything and I remember leaving the meeting uncomfortable due to some tactics Emily used in the meeting."  He mentioned feedback from recruiting that Plaintiff had questioned McDole's expenses "to get back at Mike or to cause issues and not in an attempt to do the right thing for [W]ayfair."  Pl. Ex. 21; McKnight Tr. 53.

95.     McKnight and Witte compiled the information together into one document, recording problems with Plaintiff's performance dating back to August 27, 2019.  McKnight Tr. 58-60; McKnight Ex. 2 (also Witte Ex. 8); Witte Tr. 132-3.

**Z.      HR Found Sexual Harassment Allegations Unsubstantiated**

96.     Smith forwarded Witte's email about wanting to connect about Plaintiff's performance to Shaffer-Figueroa asking, "Hi --did you meet with Emily to wrap up?  Also, did

you loop in the Boston team on the investigation.  We should likely help Boston with this documented conversation."  Witte Ex. 4.

97.      On September 16, 2019, Shaffer-Figueroa responded to Smith that the investigation had concluded, and that he had been able to close out with Plaintiff and McDole and was working on scheduling follow-up conversations with them and their leaders.  Smith forwarded that to Witte.  Witte Ex. 4; Witte Tr. 105.

98.      Shaffer-Figueroa had determined that the harassment allegations were unsubstantiated, while "Evidence supports that both accused and complainant communicate with each other in a tone not conducive to a productive and supportive environment."  He recommended a conversation with their leaders about better communications.  Shaffer Tr. 45, 82, 169; WAYFAIR 79.

99.      On September 16, 2019, Shaffer-Figueroa told Plaintiff and McDole that he had been unable to substantiate her allegations and explained his recommendation regarding effective communication going forward.  Shaffer Tr. 87, 96; WAYFAIR 00079.

100.      Shaffer-Figueroa also communicated his recommendation to Witte and McKnight.  Witte and McKnight explained that they had concern about Plaintiff's communications more generally.  Shaffer Tr. 84.  McKnight also told Smith about Plaintiff's communication style issues and the complaints he had heard from others.  Smith Tr. 71-72.

**AA.      Plaintiff Exploded at McKnight on September 17, 2019**

101.      On September 17, 2019, McKnight met with one of Plaintiff's Project Managers, Kelly Brieg, who had reached out to him asking for help resolving an issue with Plaintiff giving

direction against what the site wanted, creating conflicts, and being unwilling to share a schedule with the site director.  While there, another project manager gave McKnight a short unplanned tour of the site.  McKnight Tr. 24-25, 50; Witte Tr. 120-21.

102.   Learning of the meeting, Plaintiff sent McKnight a text message demanding that he not talk to her team directly and that she and he have an in-person meeting.  McKnight Tr. 24-25; McKnight Ex. 1.  She then drove to where McKnight was and appeared at the door of the conference room he was in.  McKnight Tr. 26-27.

103.   McKnight felt that Plaintiff "berated" him,  and "attacked" him, that she was "completely disrespectful and out of line."  He was "completely shocked with her approach and accusations."  McKnight Tr. 22-23, 26-27.

104.   Plaintiff told McKnight not to speak with her vendors or team members without her and accused him of doing so intentionally to keep her uninformed.  McKnight told her he disagreed, and that given how busy they were, it was a normal practice for him to reach out to people directly, a message he had been stating for weeks.  McKnight Tr. 22-23, 27.  Witte and McKnight both regularly worked with and directed junior employees.  Witte Tr. 120-21.

105.   McKnight told Plaintiff "I've been getting a lot of complaints about your performance.  I've been getting a complaints about your communication."  Pl. Tr. 178.  He told her that she had not been forthcoming in sharing information, had not been collaborative, and had been condescending to many of her peers.  McKnight Tr. 27, 78.  McKnight felt that he had been coaching her on these issues for weeks.  McKnight Tr. 27.

66308529v.3

106.     McKnight told her, "This is not working," and that they needed to have a formal sit-down with HR to determine next steps.  He said that because she had caught taken him off guard with attacking him and falsely accusing him of intentionally keeping her uninformed.  This was the last conversation McKnight ever had with Plaintiff.  McKnight Tr. 21, 27-28, 40-41.

107.     Immediately after the meeting, McKnight spoke with Witte in an adjacent room. McKnight Tr. 22.  Witte observed that McKnight was "almost shattered and shaking" from his conversation with Plaintiff; Witte knew something was wrong.  McKnight told Witte that Plaintiff had "basically erupted on him."  Witte Tr. 120.

108.     That same day, Plaintiff texted Witte to complain about McKnight reaching out directly to members of her team.  She said, "If he wants to run the projects, take me off all of them.  I'm not working with someone like him."  Witte responded, "It's all part of his team.  I've always called vendors and people running projects.  It's part of the role to apply pressure to vendors and get quick feedback."  McKnight Ex. 2 at WAYFAIR 001302.

109.     Also that same day, Plaintiff sent McKnight and Witte an email from her personal email account purporting to recap the conversation.  McKnight and Witte discussed it, and McKnight explained that he had *not* told Plaintiff that he had already talked to Witte about getting HR involved and getting her of the team.  McKnight Tr. 21, Ex. 1;  Witte Tr. 122-26.

110.     McKnight and Witte had no authority to hire or fire anyone; that is an HR decision.  McKnight understood that performance management at Wayfair often involves coaching first, then a formal sit down to review documentation, then a performance improvement plan, and then, if necessary, termination.  McKnight Tr. 41, 75-76; Witte Tr. 122-24.

66308529v.3

## BB.     Plaintiff Internally Claimed Retaliation

111.     That same day, September 17, 2019, Plaintiff sent an email complaint to HR alleging that McKnight retaliated against her.  She claimed that McKnight had said that he had already talked to Witte and HR about "getting me off his team."  She claimed, "I feel that I am being retaliated against due to my complaint of harassment and sexual harassment," and asked, "Is there any way to look into this?"  Pl. Tr. 179; Shaffer Tr. 37-38, 150-51 and Ex. 3.

112.     Plaintiff testified that she believes that "part of" what McKnight was allegedly retaliating against her for was her sexual harassment complaint about McDole.  Pl. Tr. 179.

113.     On September 18, 2019, Smith wrote to Witte, "Hi -- we'll need to pause on anything with her since she just filed a retaliation complaint with us last night.  We can talk more about it in the morning.  Also, would you forward the documentation to me?"  Witte understood this to mean that they could not proceed with any perforamnce improvement plan while the retaliation investigation was pending, but could still give her feedback because she was still working under their direction managing multimillion dollar projects.  Witte Tr. 113-117, Ex. 5.

## CC.     HR Investigated and Could Not Substantiate the Retaliation Allegation

114.     On September 19, 2019, Shaffer-Figueroa spoke with Plaintiff about her retaliation allegation.  She alleged that McKnight said he did not want her on the team and was already working with HR to get her removed from her position.  His notes reflect that he asked her, "How is discussing that you have communication challenges or issues retaliation?" and that she answered, "I'm not sure."  Shaffer Tr. 38, 98-100, 154; WAYFAIR 1271-2.

115.     The same day, Shaffer-Figueroa spoke with McKnight about the allegation. McKnight explained that he had been voicing to Plaintiff some frustrations around how she

communicated, at which point she became very loud, which prompted him to say "this is not working" and that he wanted to get HR involved. McKnight explained that he had never said that he was getting her off the team. Shaffer-Figueroa's contemporaneous notes reflect that McKnight said, "To be honest [the meeting] was terrible. Emily was defensive, argumentative and ended up 'storming out' of the office," and "Trevor, I have never dealt with someone so difficult and so rude. There's just no reason for it." Shaffer Tr. 97-99, 150-55; WAYFAIR 000079, p. 10.

116.    Shaffer-Figueroa believed McKnight's description of the meeting was consistent with the report from others that Plaintiff could become loud and difficult to deal with, and felt that Plaintiff downplayed her behavior in the meeting. Shaffer Tr. 154, 166-7.

117.    Shaffer-Figueroa verified with Candice Smith whether anyone in HR was working to remove Plaintiff (as she had alleged) and Smith said "no." Shaffer Tr. 102-03.

118.    McKnight had not been involved in the investigation of Plaintiff's harassment complaint. Pl. Tr. 80, 174-75. In fact, Plaintiff told Shaffer-Figueroa that she was not even sure if McKnight knew who McDole was. Shaffer Tr. 164; WAYFAIR 001271-2.

119.    Shaffer-Figueroa determined that the retaliation allegation was unsubstantiated. Shaffer Tr. 40.

## DD.    HR Explained to Plaintiff That It Had Not Substantiated Her Internal Retaliation Complaint

120.    On Thursday, September 19, 2019, Plaintiff talked to Shaffer-Figueroa on the phone. Plaintiff illegally recorded the conversation. Shaffer Tr. 112; PLAINTIFF 000084.

121.     Shaffer-Figueroa told Plaintiff that he had been unable to substantiate her claim that McKnight retaliated against her.  He said, "So in order to establish some form of retaliation, I would have to establish some kind of link between Kory and his conduct and the report that you had made, and based on my conversations and the available evidence, I'm not able to establish any kind of link or connection between the two, so I can't substantiate that any kind of retaliation was taking place."  Transcript at p. 3; Plaintiff's Response to Request for Admission No. 1; Shaffer Tr. 110.

### EE.     Plaintiff Resigned on September 19, 2019

122.     In the September 19, 2019 call, Plaintiff said "you had asked me what would -- what I would think would be appropriate next steps.  I would be very interest[ed] in having you talk to Candice and your team and putting together a compelling severance package."  Pl. Tr. 199-200; Transcript at p. 5; Plaintiff's Response to Request for Admission No. 1.  Shaffer-Figueroa said nothing about severance until Plaintiff brought it up.  Shaffer Tr. 175-76.

123.     As soon as he hung up with Plaintiff, Shaffer-Figueroa told Smith that Plaintiff had resigned and was requesting a severance package.  Smith understood Plaintiff's request for severance to mean that Plaintiff was resigning.  Shaffer Tr. 39, 59-60; Smith Tr. 35, 37.

124.     Shaffer-Figueroa and Smith consulted with lawyers at Wayfair concerning accepting Plaintiff's resignation.  Smith Tr. 36-7; Shaffer Tr. 27-28.  Smith was not the decision-maker regarding accepting the resignation.  Smith Tr. 107.  The decision was made that same day to accept her resignation, and a severance agreement was drafted.  Shaffer Tr. 156, 171.

125.    The day before, on September 18, 2019, Plaintiff had emailed 54 documents, including one marked "confidential," from her Wayfair email to her g-mail account without permission.  Pl. Tr. 204-05, 208, 243-46.  This violated Wayfair policy.  Shaffer Tr. 178.

126.    HR intended to communicate its acceptance of Plaintiff's resignation on September 20, but Plaintiff requested a paid day off.   Pl. Tr. 231; Shaffer Tr. 22, 60, 107, 131.

127.    On the evening of Monday, September 23, 2019, Shaffer-Figueroa sent Plaintiff an email (written with advice of counsel) accepting her resignation and attaching a severance agreement with two months of severance pay.  Pl. Tr. 201-02; Shaffer Tr. 18, 107.

128.    HR informed McKnight and Witte that Plaintiff had resigned.  On September 24, 2019, McKnight emailed his team, "Just a courtesy heads up, Emily Forsythe has decided to leave Wayfair.  Today will be her last day with the Company."  McKnight Tr. 42-44. WAYFAIR 1318.  Witte considered it in keeping with the fact that she had told him a few weeks earlier she was looking for positions outside Wayfair.  Witte Tr. 173-74, 183, 186.

## FF.    Plaintiff's Allegations Changed Yet Again in Her Federal Court Complaint

129.    In her federal court complaint, Plaintiff provided a different description of the alleged July harassment than she told Witte or HR.  She claimed for the first time that McDole started at her breasts, ran his right hand down her blouse, beginning above her cleavage and moving toward her waist.  She claimed she moved away from him to avoid further contact and he laughed and walked away.  *Compare* Pl. Tr. 146-147 *with* Pl. Ex. 9 (para. 13); Pl. Tr. 146-50.

**GG.    Plaintiff's Theory of Sex Discrimination**

130.    Plaintiff testified that she did not bring a sex discrimination claim separate and distinct from her sexual harassment and retaliation claims.  Pl. Tr. 263.  When her own counsel asked her, "We have stated that Mr. McKnight engaged in sex discrimination in retaliation, even if he did not specially engage in the sexual harassment himself.  Correct?"  Plaintiff testified, "yes."  Pl. Tr. 255.

131.    Plaintiff claims that McKnight made two statements she considered "sexist."  Pl. Tr. 264.

132.    First, Plaintiff claims that on August 5, 2019, when discussing recruiting on the day she first met McKnight, McKnight stated that he wanted to bring over three male former colleagues from Walmart, asked her what she made, and when she told him $135,000, stated, "They're not going to work for less than 135.  I only have your L6 spot left to figure this out." Pl. Tr. 172-73, 180, 256, 264.  She never mentioned this to Witte.  Witte Tr. 118-19.

133.    Plaintiff was a L5, not an L6.  McKnight was an L6.  McKnight had access to his employees' salaries in the company's Workday system.  The only Walmart employee he brought to Wayfair was Mike Thayer, the employee he told Plaintiff he wanted to recruit, who was an L5. McKnight Tr. 12-14, 57-58; Pl. Tr. 174, 180; Witte Tr. 134-5.

134.    Second, Plaintiff claims that on September 10, 2019, she had a conversation with McKnight.  At deposition, she first testified that he said, "I had a woman on my team is, like, very similar to you.  And you know what happened to her?  She left the team."  Pl. Tr. 182. Later she testified that he said, "I had a woman like you on my team and she complained and you know what happened to her?  She left the team."  She did not report this alleged conversation to

anyone at Wayfair.  Pl. Tr. 182, 184-85, 196, 264.  McKnight denies ever making the alleged comment.  He had never had any female subordinate complain about any kind of discrimination or harassment.  McKnight Tr. 17-20, 67-68.

135.    She claims that the industrial operations team was "in general was just very male dominated, very bro'y, very boys club, very chauvinistic."  The example she provided was of a male employee grabbing and mimicking kissing another male at a going away party, with people laughing.  She could not recall any other examples.  Pl. Tr. 266; Witte Tr. 138-9.

136.    She claims McKnight treated Arron Velarde better than her because they were friends and had a "brotherly affection."  Pl. Tr. 268-70.  McKnight only knew Velarde for a matter of weeks while Plaintiff was at the company, and part of that time Velarde was on paternity leave.  McKnight Tr. 54-55.

Dated: November 6, 2020                    Respectfully submitted,

                                           WAYFAIR, LLC

                                           By its attorney,

                                           */s/ Lynn A. Kappelman*
                                           Lynn A. Kappelman (BBO No. 642017)
                                           SEYFARTH SHAW LLP
                                           Seaport East
                                           Two Seaport Lane, Suite 300
                                           Boston, MA 02210-2028
                                           Telephone:    (617) 946-4800
                                           Fax:          (617) 946-4801
                                           lkappelman@seyfarth.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2020, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


*/s/ Lynn A. Kappelman*
Lynn A. Kappelman