Exhibit 1

# Exhibit 1

1            UNITED STATES DISTRICT COURT

             DISTRICT OF MASSACHUSETTS

2              CA NO. 1:20-cv-10002

3

     *******************************

4    EMILY FORSYTHE,

5            Plaintiff,

6    vs.

7    WAYFAIR, LLC,

8            Defendant.

     *******************************

9

10

11     VIDEOTAPED REMOTE DEPOSITION of EMILY FORSYTHE

12          Monday, July 13, 2020 - 9:30 a.m.

13              Veritext Remote Office

14

15

16

17

18            Kimberley J. Bouzan, CSR

                    Veritext

19

20

21

22

23

24

Page 22

1    Q. And did you get your degree in business
2 from Cornell?
3    A. I did.
4    Q. What year?
5    A. What year did I graduate?
6    Q. Yes. What year did you get your master's
7 in business from Cornell?
8    A. I graduated in 2014.
9    Q. And what year did you graduate from
10 college at Cornell?
11   A. 2009.
12   Q. And have you ever been in the military,
13 ma'am?
14   A. No.
15   Q. All right. Have you ever been arrested
16 for a felony?
17   A. No.
18   Q. And your case, your insurance coverage
19 case in which you had a deposition, did that ever
20 go to trial?
21   A. No.
22   Q. Did it reach -- did you reach a
23 settlement with the insurance company?
24   A. I think so. I don't know if it was

Page 23

1 called a settlement.
2    Q. Did you get money from the insurance
3 company as a result of your car accident?
4    A. They reimbursed me for money I had paid.
5    Q. What was your first job after you left
6 Cornell with a master's in business in 2014?
7    A. I went to Amazon.
8    Q. And where were you located when you
9 worked for Amazon?
10   A. In Louisville, Kentucky.
11   Q. And what was your title there?
12   A. I was a pathways operations manager.
13   Q. And what were your duties and
14 responsibilities as a pathways operations
15 manager?
16   A. I had a lot of responsibilities.
17   Q. Great. We've got a lot of time. What
18 were your duties and responsibilities as a
19 pathways operations manager in Louisville for
20 Amazon?
21   A. So I started by running a shift, so an
22 area manager. And then the roles and
23 responsibilities and duties were to run the shift
24 and help your team perform and hit productivity

Page 24

1 rates. In addition to that, I also had special
2 projects I worked on, such as productivity
3 projects and efficiency projects and how to
4 optimize inventory flow and system flow.
5       And then when I was an operations
6 manager, it was part of, like, a development
7 program. I ran a portion of the shift and I ran
8 the productivity metrics and really -- like
9 running product through the building. And then I
10 also had special projects, such as cost
11 reduction, lien type of projects, and operational
12 efficiency projects.
13   Q. And as a pathways operations manager did
14 you have people reporting to you?
15   A. I did.
16   Q. How many direct reports did you have?
17   A. It depended on which part of my job I was
18 in.
19   Q. So why don't you tell me. For each part
20 of your job, how many direct reports did you
21 have, Ms. Forsythe?
22   A. When I was an area manager, I had
23 anywhere between 20 to 60 depending on the
24 season. And then when I was an operations

Page 25

1 manager, I had anywhere from four to eight direct
2 reports depending on the season.
3    Q. Okay. And as an area manager, what were
4 the titles of the people that reported to you at
5 Amazon?
6    A. I don't remember.
7    Q. Okay. What were their job duties and
8 responsibilities? The people that reported to
9 you at Amazon when you were an area manager, what
10 were they doing on a day-to-day basis?
11   A. Packing product.
12   Q. And that's why it increased seasonally
13 because there were certain seasons where you
14 needed more people packing product; right?
15   A. That's correct.
16   Q. As an operations manager, you said you
17 had four to eight direct reports. What were
18 their titles?
19   A. Area managers.
20   Q. Okay. And each area manager similarly
21 had 20 to 60 direct reports below them. Correct?
22   A. Sometimes they had more.
23   Q. And how long were you at Amazon as an
24 area manager before you received a promotion to

7 (Pages 22 - 25)

Page 26

1  operations manager?
2     A. I can't remember. It was less than a
3  year.
4     Q. Okay. And how long were you at Amazon in
5  the promoted role as operations manager?
6     A. It was less than a year.
7     Q. And during the period that you worked at
8  Amazon, did you meet Michael McDole?
9     A. Yes, I did.
10    Q. And when did you meet Mr. McDole while
11 you worked at Amazon?
12    A. What month or day?
13    Q. As best you can remember.
14    A. I met him sometime in 2005 around --
15    Q. I'm going to stop you there. You weren't
16 at Amazon until 2015 and you just said 2005. Did
17 I -- did you misspeak?
18    A. I never said I wasn't at Amazon until
19 2015. 2014.
20    Q. Okay. Well, how could you have met
21 Mr. McDole at Amazon in 2005 if you didn't get to
22 Amazon until 2014?
23    A. I didn't meet him in 2005.
24    Q. All right. Well, that's what you just

Page 27

1  said, so let's start again.
2        When did you first meet Mr. McDole?
3     A. Sometime in 2015.
4     Q. Perfect. Okay. Go ahead.
5        Do you happen to remember what time of
6  year it was?
7     A. No.
8     Q. Do you remember the season? Was it fall?
9  Winter? Summer? Spring?
10    A. No. Fall.
11    Q. What job were you doing when you first
12 met Mr. McDole? Were you an area manager?
13    A. No.
14    Q. So you had already received the promotion
15 to area manager when you met Mr. McDole?
16    A. That's correct.
17    Q. And what job was he doing?
18    A. He was also a pathways operations
19 manager.
20    Q. And you were still located in Louisville,
21 Kentucky; is that correct? At that point.
22    A. When we met?
23    Q. Yes.
24    A. Yes. That's correct.

Page 28

1     Q. And was he also physically located in
2  Louisville, Kentucky, or was Mr. McDole located
3  somewhere else when you first met?
4     A. He was located somewhere else.
5     Q. Okay. And did he report to you or did
6  you report to him? That is Mr. McDole while you
7  were both at Amazon.
8     A. No.
9     Q. He never reported to you and you never
10 reported to him at Amazon?
11    A. No.
12    Q. Okay. So how would you two have occasion
13 to interact at Amazon when you did interact? You
14 and Mr. McDole.
15    A. Are you asking how we met?
16    Q. Yes. When you would see him, it was not
17 in the context of him reporting to you or you
18 reporting to him, so how would you have occasion
19 to interact, if you did at all, while you were at
20 Amazon?
21    A. So we met and interacted two or three
22 times at Amazon. The first time that I met him,
23 I was doing a site visit of the building he was
24 working in as I was working on a project related

Page 29

1  to a function that was in his building.
2        The second time we met, he came down to
3  tour the building I was in because he wanted to
4  learn an operational process that was happening
5  in my building.
6     Q. Okay. And the third time?
7     A. I can't remember a third time.
8     Q. Okay. So it's just probably two times
9  that you interacted at Amazon?
10    A. I believe so.
11    Q. Okay. Did you ever go out socially with
12 Mr. McDole while you were both at Amazon?
13    A. I believe after he toured the building in
14 Louisville we got lunch.
15    Q. Okay. So that was the second time you
16 interacted while you were at Amazon. That was
17 when he came to Louisville and you got lunch; is
18 that right?
19    A. It was a work-related lunch.
20    Q. Yeah. Okay.
21        Was there anybody else at lunch with you
22 and Mr. McDole in Louisville that time?
23    A. I can't remember.
24    Q. And the first time was when you made a

8 (Pages 26 - 29)

Page 30

1 site visit to his building -- is that correct --
2 in, like, the fall of 2015?
3     A. The first time I met him?
4     Q. Yes.
5     A. Yes, that's correct.
6     Q. And did you interact socially with him
7 outside of work during that visit?
8     A. No.
9     Q. Okay. Did you ever have phone calls with
10 Mr. McDole, other than those two occasions when
11 you went to visit his site in the fall of 2015
12 and then when he went to visit your site in
13 Louisville and you had lunch? Did you ever have
14 phone calls with him while you two were at
15 Amazon?
16     A. During which time?
17     Q. Any time. Any time that you and
18 Mr. McDole were working at Amazon, did you guys
19 have phone calls other than those two visits we
20 just talked about?
21     A. I can't remember.
22     Q. How about text messages? Did you and
23 Mr. McDole exchange text messages while the two
24 of you were at Amazon?

Page 31

1     A. I believe we did.
2     Q. Okay. And was it all about the -- either
3 his site visit to your facility or your site
4 visit to his facility?
5     A. I believe it was.
6     Q. Okay. So you didn't exchange any text
7 messages with Mr. McDole while you two were at
8 Amazon that wasn't about those two site visits
9 we've talked about?
10     A. I can't remember.
11     Q. Okay. So when you went out in
12 Louisville, it was for lunch. You never went out
13 in the evening; is that correct?
14     A. I can't remember.
15     Q. So you know you went out for lunch, but
16 you might have also gone out in the evening in
17 Louisville with Mr. McDole?
18     A. I can't remember what we did.
19     Q. Okay. How about e-mails? Did the two of
20 you exchange e-mails about anything -- during
21 this period you were at Amazon, did you exchange
22 e-mails about anything other than his visit to
23 Louisville for work-related reasons and your
24 visit to his facility for work-related reasons?

Page 32

1     A. I can't remember.
2     Q. So you may have. You just don't
3 remember?
4     A. I may have. I don't remember.
5     Q. Okay. Did you have his personal e-mail
6 address during the period of time that you and
7 Mr. McDole both worked at Amazon?
8     A. I have no idea. I don't remember that.
9     Q. Do you know if he had your personal
10 e-mail address during the time you and Mr. McDole
11 worked at Amazon?
12     A. I don't know. I don't remember.
13     Q. Did you have -- was it your practice to
14 give out your cell phone number for texting to
15 folks that you worked with at Amazon?
16     A. Yes.
17     Q. Okay. So have we covered all of the
18 interactions you had with Mr. McDole while the
19 two of you both worked at Amazon?
20     A. I'm not sure.
21     Q. Okay. Well, I think I've asked you if
22 you texted him, if you e-mailed him, if you
23 called him about anything other than the two
24 visits you've identified for me. Were there any

Page 33

1 other interactions you had with Mr. McDole that
2 you haven't told us about in this deposition
3 while the two of you worked at Amazon?
4     A. Not that I recall.
5     Q. Okay. And certainly while the two of you
6 worked at Amazon, Mr. McDole never sexually
7 harassed you. Is that fair to say?
8     A. That's -- can you say that question
9 again?
10     Q. Sure. While the two of you worked at
11 Amazon, do you believe that Mr. McDole engaged in
12 sexual harassment of you?
13     A. No.
14     Q. And you never complained to anybody at
15 Amazon about Mr. McDole at all; is that correct?
16     A. That's correct.
17     Q. Okay. At some point you reached out to
18 Mr. McDole and asked him to stay at your parents'
19 house in Cohasset; is that correct?
20     A. No. That's not correct.
21     Q. Okay. Tell me -- is it fair to say that
22 Mr. McDole came and stayed at your parents' house
23 in Cohasset? Is that correct?
24     A. Yes.

9 (Pages 30 - 33)

1    Q. So why don't you tell me how it came to
2  be -- first of all, when did that occur?  When
3  did Mr. McDole come to stay at your parents'
4  house in Cohasset?
5    A. December 2015.
6    Q. Okay.  Were you still working at Amazon
7  in December 2015?
8    A. No, I was not.
9    Q. Where were you working then?
10   A. I was in between jobs.
11   Q. Okay.  And was he still working at Amazon
12 in December 2015?
13   A. You'd have to ask him.
14   Q. Well, he came to your parents' house in
15 Cohasset.  Did you know where he was working at
16 the time?
17   A. I can't remember.
18   Q. Where did you reach out to him?  When you
19 talked about him coming to Cohasset, how did you
20 two talk about that?
21   A. I don't remember.
22   Q. Okay.  So you're not working in December
23 2015, and Mr. McDole comes to stay at your
24 parents' house in Cohasset.  Presumably you

1  invited him there.  He didn't show up uninvited.
2  Is that fair?
3    A. No.  That's not fair.
4    Q. So he showed up at your parents' house in
5  Cohasset uninvited.  Is that what you're telling
6  me?
7    A. That's not accurate.
8    Q. Okay.  So it's one or the other.  You
9  either invited him or you didn't invite him.
10 Which is correct?
11   A. I can't answer that question.  There's a
12 third option.
13   Q. What's the third option?  You tell me.
14   A. He invited himself.
15   Q. Okay.  So he invited himself to your
16 parents' house in Cohasset.  And how did he know
17 how to -- where to come?  The address and all
18 that.
19   A. I gave him the address.
20   Q. Okay.  So he invited himself to your
21 parents' house in Cohasset.  Was that over the
22 phone?  In an e-mail?  In a text?
23   A. I can't remember.
24   Q. Okay.  Did you tell him, "No.  I don't

1  want you to come visit me at my parents' house in
2  Cohasset"?
3    A. I did not say that.
4    Q. Why?  If you didn't want him there, why
5  didn't you tell him that you didn't want him to
6  come to your parents' house in Cohasset?
7    A. I never said I didn't want him there.  I
8  just didn't invite him.
9    Q. I see.  And, I'm sorry, did you say he
10 did that over -- he invited himself over the
11 phone, over text, or by e-mail?
12   A. I can't remember.
13   Q. And had you been texting him prior to
14 that Cohasset visit?
15   A. I can't recall.
16   Q. Okay.  So how did it come to be,
17 Ms. Forsythe, that Mr. McDole showed up on your
18 parents' doorstep in Cohasset in December of
19 2015?  Give me the background.
20   A. He had reached out to me and said he has
21 to take vacation.  He's never been to Boston.
22 And I said, "You're welcome to come and stay at
23 my parents' house for a few days."
24   Q. So let me stop you there.  I thought you

1  told me he invited himself to your parents'
2  house.  You just said you told him you're welcome
3  to stay at my parents' house for a few days.  Is
4  that not an invitation?  What am I missing?
5    A. I don't think that's an invitation.
6    Q. Okay.  Fine.  It's a matter of definition
7  then.  Okay.
8       So you say you're welcome to come stay at
9  my parents' house for a couple of days.  And when
10 he reached out to you to say he was coming to
11 Boston, had you spoken with him at all since you
12 left Amazon, either by text, phone, e-mail at
13 all?
14   A. I don't remember.
15   Q. When exactly did you leave Amazon?  How
16 long before this December 2015 meeting in
17 Cohasset?
18   A. I left Amazon the second -- I believe it
19 was the second week of December.  The first or
20 second week of December --
21   Q. Okay.
22   A. -- of 2015.
23   Q. Okay.  So it wasn't -- it was within a
24 month of you leaving Amazon that he came to your

**Page 38**

1 parents' house in Cohasset; is that correct?
2   A. That's correct.
3   Q. Okay. And how long did he actually stay
4 at your parents' house in Cohasset?
5   A. Two or three days, I believe.
6   Q. Okay. And you were no longer working at
7 Amazon, so this wasn't a work-related meeting.
8 Is that fair to say?
9   A. That's fair to say.
10   Q. And how did Mr. McDole get to Cohasset?
11   A. I don't remember.
12   Q. Okay. Did you pick him up at the
13 airport?
14   A. I don't remember.
15   Q. Did he meet your parents?
16   A. He met my parents.
17   Q. And what did the two of you do in
18 Cohasset for two or three days in December of
19 2015?
20   A. Tourist activities.
21   Q. Did you go out to dinner together?
22   A. I believe so.
23   Q. Did the two of you ever kiss or have any
24 sort of romantic interlude during Mr. McDole's

**Page 39**

1 visit to Cohasset?
2   A. Yes, we did.
3   Q. Did you do more than just kiss during
4 Mr. McDole's visit to Cohasset?
5   A. No, we did not.
6   Q. And as you sit here today, was that
7 welcome or unwelcome?
8   A. That was welcome.
9   Q. Okay. So other than kissing, you and
10 Mr. McDole never had anything more romantic
11 during his visit in Cohasset. Is that fair to
12 say?
13   A. That's fair to say.
14   Q. And did you kiss more than once during
15 his visit to Cohasset?
16   A. Define "more than once."
17   Q. Fair enough. On more than one occasion
18 did the two of you find yourselves kissing?
19   A. In a day?
20   Q. Yes.
21   A. Yes. We kissed twice.
22   Q. Was it all in the same day or was it over
23 a two- or three-day period that you kissed?
24   A. It was all in the same day.

**Page 40**

1   Q. And when Mr. McDole left, did you ever
2 discuss, either in person or by written
3 communication, the prospect of having a romantic
4 relationship continue?
5   A. Did he and I discuss that?
6   Q. Yes. After he left your parents' house
7 in Cohasset and you guys had kissed, did you talk
8 any more about whether the two of you would have
9 a romantic relationship?
10   A. He had told me he wanted to see me again,
11 and I told him I wasn't interested in seeing him
12 again because I wasn't romantically interested in
13 him.
14   Q. Okay. And how many times did you have a
15 conversation about his romantic interest in you
16 and your disinterest? Was it once or more than
17 once?
18   A. I don't remember. It was at least one
19 time.
20   Q. And how soon after he left in December of
21 2015 did you have that conversation where he
22 indicated he was interested and you indicated
23 that you weren't?
24   A. A few weeks after.

**Page 41**

1   Q. Okay. And did he ever approach you again
2 indicating he was interested in you after that
3 conversation but before you reached out to him
4 about Wayfair?
5   A. I don't remember.
6   Q. So let's go back for a minute. After
7 Amazon, what was your next job?
8   A. When I left Amazon where did I go after
9 that?
10   Q. Yes. What was your next job after
11 Amazon? After 2015, December, when you left
12 Amazon.
13     By the way -- sorry. Strike that.
14     Why did you leave Amazon? Did you resign
15 or were you fired?
16   A. I resigned.
17   Q. Why did you resign?
18   A. I had another job offer.
19   Q. Okay. And from whom did you have another
20 job offer?
21   A. I had two offers. I had one from
22 Walmart.com and then I had one from Globe
23 Composite Solutions.
24   Q. Did you accept one of them?

Page 42

1    A.  I did.
2    Q.  And when did you start the next job?
3    A.  January 2016.
4    Q.  Okay.  And with whom did you work in
5  January 2016?
6    A.  The people or the company name?
7    Q.  The company name.
8    A.  Globe Composite Solutions.
9    Q.  And what was Globe Composite Solutions'
10  business?
11    A.  Plastics manufacturing.
12    Q.  And what was your title with Globe
13  Composite Solutions in January of 2016?
14    A.  I was a project manager.
15    Q.  And where were you physically located?
16    A.  What city or what town?
17    Q.  Either.
18    A.  I started in Rockland, Massachusetts, and
19  then we moved to Stoughton, Massachusetts.
20    Q.  And during the period you were with Globe
21  Composite Solutions, did you receive any
22  promotions?
23    A.  No.
24    Q.  And when did you leave Globe Composite

Page 43

1  Solutions?
2    A.  I left December 2016.
3    Q.  So you were only there for less than a
4  year.  Is that fair?
5    A.  Yes.
6    Q.  And did you resign or were you
7  terminated?
8    A.  I resigned.
9    Q.  And why did you only stay at Global
10  Composite Solutions for less than a year?
11    A.  I was working on a contract that was a
12  year, and I knew I was only going to stay there
13  for a year when I took the job.
14    Q.  And they didn't give you an opportunity
15  to stay on?
16    A.  They did.
17    Q.  But you just chose not to?
18    A.  That's correct.
19    Q.  And did you have a job opportunity when
20  you resigned in December of 2016 from Globe
21  Compact Solutions?
22    A.  It's Globe Composite Solutions.
23    Q.  Did you have a job offer when you
24  resigned?

Page 44

1    A.  From them or from another company?
2    Q.  When you resigned from Globe Composite,
3  did you have an offer from another company?
4    A.  I did.
5    Q.  From whom?
6    A.  Wayfair.
7    Q.  And how did you learn of the opportunity
8  at Wayfair in December of 2016?
9    A.  I learned about it before December 2016.
10    Q.  How did you learn about it?
11    A.  I was contacted by a recruiter on
12  LinkedIn from Wayfair.
13    Q.  And what was the opportunity for which
14  you applied and were offered the job?
15    A.  I didn't apply.  They just interviewed me
16  and then offered me a job.
17    Q.  What was the job?
18    A.  They had contacted me -- there was two
19  jobs.  I can't remember the titles.  They had
20  contacted me in the summer for one role.  I got
21  that offer; I turned it down.  It wasn't a good
22  fit, and I can't remember the name of that job.
23    And then I reached out to them because my
24  year was coming to an end and I loved the

Page 45

1  company, and the job they offered me in December
2  was senior manager of something, but I can't
3  remember the full title.
4    Q.  Okay.  So we'll look at that in a minute,
5  but what were the duties and responsibilities of
6  the job that you started in at Wayfair?
7    A.  I was working on flow optimization and
8  standardization and the middle-mile network.
9    Q.  And what is the "middle-mile network"?
10    A.  That is a final mile transportation
11  network to get freight directly to a customer.
12    Q.  And when you first went to work for
13  Wayfair -- when did you first take that -- start
14  that job at Wayfair?
15    A.  January 2017.
16    Q.  And when you first went to work for
17  Wayfair in January 2017, where were you
18  geographically based?
19    A.  In Boston.
20    Q.  Did that ever change during your tenure
21  with Wayfair?  Did you ever move somewhere else
22  geographically?
23    A.  I did.
24    Q.  Where did you move -- well, strike that.

12 (Pages 42 - 45)

Page 46

1  Let me start again.
2      Would it be fair to say that your job
3  with Wayfair, when you first started in January
4  of 2017, was as a sales and operations senior
5  manager?  Does that sound familiar?
6      A.  Not the sales piece.
7      Q.  Okay.  Just operations senior manager?
8      A.  I don't think I was in operations.  I
9  know I was a senior manager, but I can't remember
10  the full title.
11      Q.  Okay.  So let's just stop with that
12  position in Boston for a moment.
13      How were you compensated?  Did you
14  receive a salary?
15      A.  I did receive a salary.
16      Q.  Do you recall what your salary was when
17  you first started at Wayfair?
18      A.  I believe my base salary was 110.
19      Q.  Okay.  And did you receive any other form
20  of compensation when you first went to Wayfair?
21  Bonus?  Stock options?  Anything else?
22      A.  As part of my compensation package?
23      Q.  Yes.
24      A.  The package included stock, restricted

Page 47

1  stock units, and bonus, and medical, dental
2  benefits.
3      Q.  And do you know what the bonus was based
4  on?  Was it based on your individual contribution
5  or was it based on how well the company did or
6  both?
7      A.  I don't know how it was based.
8      Q.  Okay.  How many others were in the same
9  job title that you were in at Wayfair, if you
10  know?
11      A.  I have no idea.
12      Q.  Did people report to you as a senior
13  manager when you first went to Wayfair?
14      A.  When I first started?  Like, in January?
15      Q.  January of 2017, as a senior manager, did
16  you have direct reports?
17      A.  Not in January of 2017.
18      Q.  To whom did you report in January of
19  2017?  Did you report to Matt Witte?
20      A.  No.  If you hadn't asked me, I wouldn't
21  have remembered his name.  Somebody else.
22      Q.  Okay.  At some point did it change -- the
23  person that you reported to change?
24      A.  Yes.

Page 48

1      Q.  When was that and to whom did you report
2  when that changed?
3      A.  I don't remember when it changed, and I
4  reported to this -- the initial guy and then I
5  reported to Matt Witte.
6      Q.  And you were still reporting to
7  Matt Witte when you were a senior manager; is
8  that correct?
9      A.  That's correct.
10      Q.  And were you still in Boston at that
11  point or did you move locations?
12      A.  I was still in Boston.
13      Q.  Okay.  At some point at Wayfair were you
14  promoted to associate director?
15      A.  At some point I was promoted to associate
16  director.
17      Q.  And in that job as associate director,
18  did your duties and responsibilities change?
19      A.  They expanded.
20      Q.  And what did they include once they
21  expanded?
22      A.  They included a lot of stuff.  Launching
23  buildings, launching a project management office,
24  working on developing reporting, working with

Page 49

1  facilities and real estate to stand up buildings,
2  managing capital projects, starting all of the
3  capital reporting, building out an analyst team,
4  working with capacity to create standards for
5  launching systems, managing relationships with
6  vendors, executing projects, closing out
7  projects, and reporting out on progress.
8      Q.  And in this job as an associate director,
9  is it fair to say you now had people reporting to
10  you for the first time?
11      A.  That's not fair to say.
12      Q.  So I think you told me that as a senior
13  manager there was no one reporting to you.  Did I
14  mess that up?
15      A.  Yes.  You messed that up.
16      Q.  For the entire period that you were
17  senior manager did you have direct reports?
18      A.  Not for the entire period.
19      Q.  Okay.  So at some point you had people
20  reporting to you as a senior manager; is that
21  correct?
22      A.  That is correct.
23      Q.  Okay.  When did that change?  When were
24  you still a senior manager but you had people

13 (Pages 46 - 49)

Page 50

1    reporting to you?
2        A.  I can't remember the first direct report.
3    I started -- it was that first year.  Sometime in
4    that first year in 2017.
5        Q.  And who was reporting to you?  How many
6    people did you have reporting to you as a senior
7    manager?
8        A.  I had Steven.  I had -- Mike was
9    reporting to me as a senior manager.
10       Q.  Mike McDole?
11       A.  Yeah.  I had -- I want to -- three to
12   five, I think.  I'd have to write it down and
13   look through my notes.
14       Q.  We'll go back to that.  And do you know
15   what Stephen's last name is?
16       A.  Grimes.
17       Q.  Do you know any of the other people that
18   were reporting to you during the period you were
19   senior manager?
20       A.  I'd have to look.
21       Q.  So in terms of -- strike that.
22           During your employment with Wayfair, how
23   many people did you personally recruit to come to
24   Wayfair?

Page 51

1        A.  I have no idea.
2        Q.  Was it more than one?
3        A.  Yes.  It was more than one.
4        Q.  Was it more than five?
5        A.  Can I write it down and count?
6        Q.  Sure.
7        A.  So I've -- can I ask you, like, a
8    clarifying question?
9        Q.  Sure.
10       A.  Are you counting people who were on
11   different teams and then I recruited them to my
12   team?
13       Q.  I'm counting people who were outside of
14   Wayfair.  Let's do an outside of Wayfair and then
15   an inside-of-Wayfair recruiting, just so we can
16   separate them.
17           So inside of Wayfair, how many people did
18   you recruit to come to your team?
19       A.  Hold on.  I'm still counting everyone.
20   I'm sorry.
21           So outside of Wayfair, I would say -- I
22   would estimate five people, and inside of
23   Wayfair, recruiting them from a different team to
24   join my team, is two.

Page 52

1        Q.  Did you get any kind of financial
2    incentive, as an employee of Wayfair, to recruit
3    people from inside Wayfair to your team?
4        A.  No.
5        Q.  Did you get any financial incentive, as a
6    Wayfair employee, to recruit people from outside
7    of Wayfair to your team?
8        A.  Did I personally or was it a company
9    policy?
10       Q.  No.  Did you -- were you able to get any
11   additional compensation when you were -- when you
12   recruited someone from outside of Wayfair to your
13   team?
14       A.  No.
15       Q.  Okay.  At some point did you recruit
16   Mike McDole to come to Wayfair from Amazon?
17       A.  Can you restate that question?
18       Q.  At some point did you reach out to
19   Mr. McDole and try to recruit him to come work
20   for you at Amazon -- I'm sorry -- at Wayfair?
21       A.  Yes.
22           And can you hold on one second?  Can I
23   just turn down my AC?  I'm freezing.
24       Q.  Yes.

Page 53

1        A.  Hold on.
2        Q.  As you sit here today, do you remember
3    when it was that you reached out to Mr. McDole
4    and asked him if he would come work for you at
5    Wayfair?
6        A.  I don't remember.
7        Q.  Do you remember what year it was?
8        A.  I'd have to look.
9        Q.  What position were you in when you
10   reached out to him to come work for you at
11   Wayfair?
12       A.  I was a senior manager.
13       Q.  Okay.  So we'll look at some documents
14   that may refresh your recollection, but as you
15   sit here today -- well, let's look at those
16   documents just so we can ground ourselves in
17   time.  Let me see if I can do this.  Bear with
18   me.
19           (Exhibit No. 2 marked for
20   identification.)
21   BY MS. KAPPELMAN:
22       Q.  Can you see this document that I have up
23   on the screen?
24       A.  I can.

14 (Pages 50 - 53)

Page 54

1    Q. I'm going to show you the whole document
2 in a second, but do you recognize the top
3 document as an e-mail you would have sent on
4 July 17, 2018, as part of your Wayfair duties?
5    A. Can I ask a really silly question?
6    Q. Sure.
7    A. How do I know I sent this?
8    Q. Well, I'm asking you if you recognize
9 this as what an e-mail you would have sent looks
10 like. If you're claiming you don't remember any
11 of these e-mails, I'll certainly show them to you
12 and you can tell me you don't remember them.
13       But I'm asking you: Assuming I didn't
14 create it on a whole cloth and we pulled it down
15 from the server, does this look like the kind of
16 thing you would see while you worked at Wayfair
17 if you sent an e-mail to someone else?
18    A. This looks like the kind of e-mail I
19 would have sent at Wayfair to someone else.
20    Q. Okay. So let's just take a minute since
21 you're not sure if it's real. If you sent an
22 e-mail to -- first of all, who's Molly Ahadpour?
23 Do you know someone with that name?
24    A. I've never met her but I know about her,

Page 55

1 but I don't know what role she has. She's in
2 some type of recruiting HR role.
3    Q. Okay. As you sit here today, do you
4 remember having correspondence with Molly over
5 the years that you worked at Wayfair about
6 anything?
7    A. I remember -- I know we e-mailed.
8    Q. Okay. And when you would send an e-mail
9 during the period you worked at Wayfair, would it
10 look like this? Would it have your name, the
11 date, the time, the person you were sending it to
12 with a subject line?
13    A. It would look like this.
14    Q. So let's look at this particular one.
15 The subject line is "Mike McDole," and the date
16 is July 17, 2018. Take a moment to read this
17 e-mail, and let me know if you recognize it. If
18 you remember sending it.
19    A. I don't remember sending that.
20    Q. Okay. So does it refresh your
21 recollection, though, that when you were
22 recruiting Mr. McDole it was in the summer of
23 2018?
24    A. Yes.

Page 56

1    Q. Okay. And let's sort of look -- I'm
2 going to go down and let you read the very first
3 e-mail on this string just so we can see it.
4 This e-mail, if you can see the whole thing, is
5 from you, dated July 17, 2018, to an Anna Doumas,
6 D-o-u-m-a-s. Do you see that?
7    A. Yes, I do.
8    Q. And the subject line again is "Mike
9 McDole"?
10    A. That is correct.
11    Q. And it says -- you purportedly are
12 writing to Anna.
13       "Hi. Any updates on comp bands for
14 Mike?"
15    A. I see that.
16    Q. As you sit here today, do you recall
17 sending this e-mail to an Anna Doumas about the
18 compensation that you could pay Mr. McDole if you
19 were to recruit him to the Wayfair company?
20    A. I don't remember sending this e-mail.
21    Q. So do you remember that in July of 2018
22 you were lobbying to pay Mr. McDole a higher
23 salary than folks wanted to offer him?
24    A. I don't remember that.

Page 57

1    Q. Do you remember -- let's look at this one
2 dated July 17, 2018. Let's just see if you
3 can -- I want to make sure you can see the whole
4 thing. So Molly writes to you and Anna Doumas
5 and Kelsey Lundstrom.
6       By the way, who's Anna and who's Kelsey?
7    A. I don't remember their titles.
8    Q. Were they in recruiting? HR? Comp?
9 Something like that?
10    A. I think so.
11    Q. So looking at this chain of e-mails, it
12 does not refresh your recollection at all about
13 conversations you were having with these three
14 people about recruiting Mr. McDole and his base?
15    A. Can you repeat that question?
16    Q. Sure. Does this refresh your
17 recollection at all, looking at this chain of
18 e-mails, that you were communicating with Molly,
19 Anna, and Kelsey about what you would pay
20 Mr. McDole if you were able to bring him on board
21 from Amazon? Do you remember anything about this
22 conversation?
23    A. I -- looking at this, I am refreshed that
24 there was some sort of conversation. I cannot

Page 58

1 remember any of the details.
2    Q. Okay. So just to put this on a
3 chronological timeline, Mr. McDole -- you worked
4 with Mr. McDole in -- at Amazon prior to December
5 2015 when you left. Correct? And you've
6 outlined for me all of the interactions you've
7 had with him; right? At Amazon.
8    A. What do you mean by worked with him? We
9 were employed by the same company.
10    Q. Right. And you outlined for me the only
11 two in-person interactions you had with him;
12 right?
13    A. That I remember.
14    Q. Right. And we talked about any other
15 texts or e-mails or phone calls that you
16 remember, and you told me everything else you
17 remember about that period when you both worked
18 at Amazon; is that correct?
19    A. I believe I have.
20    Q. Okay. And then we also talked about a
21 trip in December, December of 2017, right after
22 you left Amazon when he came to your parents'
23 house in Cohasset for two or three days.
24 Correct?

Page 59

1    A. I don't think it was December 2017.
2    Q. I'm sorry. December 2015, if I misspoke.
3       I meant December 2015 he came to your
4 parents' house in Cohasset for two or three days.
5 So far, so good?
6    A. That's correct.
7    Q. Okay. So now, 2 1/2 years later -- is it
8 2 1/2 or 3 1/2? '15, '16, '17, '18. 3 1/2 years
9 later, he is -- in July of 2018 you are
10 recruiting him to come work for you at Wayfair.
11 Is that true?
12    A. I don't know if it was exactly 3 1/2, but
13 it was July --
14    Q. The period between December of 2015 and
15 July of 2018 passed before you started recruiting
16 him to come to Wayfair; right?
17       MR. GOODMAN: Objection. That would be
18 2 1/2, Counsel.
19 BY MS. KAPPELMAN:
20    Q. Either way, the period between December
21 2015 and July 2018 is the period we're talking
22 about. Correct?
23    A. Are you -- sorry. You're saying we're
24 talking about December 2015 to July 2018? That's

Page 60

1 the period we're talking about?
2    Q. Yes. During that period that you've just
3 outlined for me, between the Cohasset visit and
4 your e-mails here trying to recruit Mr. McDole to
5 Wayfair, did you have any physical in-person
6 interactions with Mr. McDole?
7    A. No.
8    Q. Did you text with Mr. McDole during that
9 period between December 2015 and July 2018?
10    A. I can't remember.
11    Q. Did you have phone calls with Mr. McDole
12 between December 2015 and July 2018 when you
13 tried to -- when you recruited him to Wayfair?
14    A. I can't remember.
15    Q. So how did it come to be that 2 1/2 years
16 after the Cohasset visit at your parents' house,
17 when the two of you kissed, that you reached out
18 to him and asked him to come work for you at
19 Wayfair?
20    A. How did that come to be?
21    Q. Yes.
22    A. I believe he had reached out to me on
23 LinkedIn between December 2015 and July 2018.
24    Q. When? Was it soon after December 2015?

Page 61

1    A. I'd have to check the date, but it was
2 not soon after.
3    Q. Do you remember what year it was?
4    A. I don't remember the year. I have the
5 message. I'd have to look.
6    Q. So as you sit here today, Ms. Forsythe,
7 you can't recall -- other than him reaching out
8 to you on LinkedIn, you can't recall any other
9 communications you had with Mr. McDole between
10 the December 2015 visit to Cohasset and this July
11 2018 period when you're recruiting him to come to
12 Wayfair?
13    A. He had messaged me on LinkedIn sometime
14 in 2017.
15    Q. Other than that, can you think of any
16 other communication, text, e-mail, phone call
17 that you had with Mr. McDole between his Cohasset
18 visit and your trying to recruit him to Wayfair?
19    A. Sorry. Can I just ask you: Are you
20 asking if I remember the details of conversations
21 or if there might have been communication?
22    Q. Any communication. Do you remember any
23 communication with Mr. McDole between
24 December '15, when he visited you in Cohasset for

Page 62

1  two or three days, until July 2018 when you're
2  recruiting him to come work for you at Wayfair?
3      A.  When he reached out to me on LinkedIn in
4  2017.
5      Q.  And other than that, can you recall any
6  other communications?  That's my question.
7      A.  I believe we communicated, but I can't
8  remember when, what, or how.
9      Q.  When you reached out to him in July of
10  2018 to hire him to come work for you, did you
11  say anything about the fact that the last time
12  you'd seen each other you'd had a romantic
13  interlude at your parents' house in Cohasset?
14      A.  No.
15      Q.  Did you ever talk to Mr. McDole, during
16  the recruiting process to Wayfair, about the fact
17  that the last time you'd seen each other was when
18  you had a romantic interlude at Cohasset?  Did
19  you bring it up?  Did he bring it up?
20      A.  Sorry.  Can you say the question again?
21      Q.  Did either of you bring up the fact,
22  during the recruiting process in July of 2018,
23  that the two of you had had a romantic interlude
24  at your parents' house in Cohasset?  Did anybody

Page 63

1  mention it?
2      A.  I don't believe we did.
3      Q.  Okay.  And this is even though you were
4  hiring Mr. McDole to come work for you; right?
5  This was -- you weren't going to be peers.  He
6  was going to report to you.  Correct?  At
7  Wayfair.
8      A.  We had the same job level and title.
9      Q.  Okay.  So you didn't think he was
10  reporting to you when you hired him?
11      A.  That's not correct.
12      Q.  Okay.  So let's try that again.
13          Even though you were hiring Mr. McDole to
14  report to you, in the summer of 2018 you didn't
15  think it was important to talk about the fact
16  that the last time you'd seen each other you'd
17  had a romantic interlude at your parents' house
18  in Cohasset?
19          MR. GOODMAN:  Objection.  Argumentative.
20      BY MS. KAPPELMAN:
21      Q.  You can answer.
22      A.  I can answer or Bob can answer?
23          MR. GOODMAN:  You can answer.
24

Page 64

1  BY MS. KAPPELMAN:
2      Q.  You can answer.
3      A.  I can answer that?  What was the
4  question?
5      Q.  Even though you were hiring Mr. McDole to
6  report to you in July of 2018, you didn't think
7  it was important to discuss with him the fact
8  that the last time you'd seen each other was when
9  you had a romantic interlude at your parents'
10  house in Cohasset?
11      A.  I did not think that was important.
12      Q.  And he didn't bring it up either?
13      A.  I don't remember.
14      Q.  So he may have brought it up.  You just
15  don't recall?
16      A.  He may have brought it up.  I don't
17  recall.
18      Q.  Is it fair to say that you lobbied hard
19  to hire Mr. McDole in the summer of 2018?
20          MR. GOODMAN:  Objection.  Argumentative.
21      BY MS. KAPPELMAN:
22      Q.  You can answer.
23      A.  I don't know what "lobby hard" is.  I
24  didn't lobby any differently with McDole than

Page 65

1  anyone else I recruited.
2      Q.  Well, let's look at these e-mails.  They
3  were suggesting that he receive a certain bonus
4  and cash merit increase when they hired him, and
5  you actually asked for him to be paid more;
6  right?
7      A.  I'd have to read the e-mail.
8      Q.  Okay.  So let's do that.  Let's do that
9  because I want you to read the e-mails.  Start
10  here and let me know when you're done with this
11  one.
12          MR. GOODMAN:  I'll just send that one to
13  her.
14          MS. KAPPELMAN:  I don't want her to do
15  that actually.  Thank you, though, Bob.  I don't
16  want --
17          (Simultaneous crosstalk.)
18          MR. GOODMAN:  I want her to be able to
19  see the entire e-mail.
20          MS. KAPPELMAN:  Bob, I don't want her to
21  go off of the video to read the e-mail.  I want
22  her to stay on this.  So if she needs more time,
23  we'll take as much time as she needs to read the
24  document.

17 (Pages 62 - 65)

Page 78

1      What was your question again?
2      Q. The question is:  Did you see this EEOC
3  statement when it was filed?
4      A. I did.
5      Q. Okay.  And was it true and correct to the
6  best of your knowledge when you filed it with the
7  EEOC?
8      A. Yes.
9      Q. Is there anything in this EEOC charge
10  that explains that you and Mr. McDole had a
11  consensual -- a welcome romantic interlude at
12  your parents' house in Cohasset before you hired
13  him to Wayfair?
14      A. Can you say that again?
15      Q. Is there anything in this EEOC charge
16  that says that you and Mr. McDole had a welcome
17  romantic interlude at your parents' house in
18  Cohasset before you hired him to Wayfair?
19      A. No.
20      Q. Did you ever tell Mr. Witte that you and
21  Mr. McDole had had a consensual interlude at your
22  parents' house in Cohasset when you were trying
23  to hire him to report to you at Wayfair?
24      A. No.

Page 79

1      Q. What did you tell Mr. Witte about your
2  prior interactions with Mr. McDole when you went
3  to hire him in July of 2018?
4      A. Professional interactions or personal
5  interactions?
6      Q. The question is:  What did you tell
7  Mr. Witte about your prior interactions with
8  Mr. McDole when you were trying to hire him in
9  July of 2018?
10      A. I had told Witte that I had never worked
11  with McDole.  We were both employed by Amazon and
12  that McDole was a phenomenal operations manager,
13  incredibly smart, hardworking, really good at his
14  job, and I thought he would be great on the team.
15      Q. And you didn't think it was relevant that
16  Mr. McDole and you had a prior romantic
17  interlude before you were hiring him to report to
18  you?
19      A. No.
20          MR. GOODMAN: Objection.  Argumentative.
21  You can answer.
22  BY MS. KAPPELMAN:
23      Q. When you made your complaint -- and we're
24  going to get to your complaint of sexual

Page 80

1  harassment.  When you made your complaint of
2  sexual harassment to Mr. McKnight, did you tell
3  Mr. McKnight that you and Mr. McDole had had a
4  prior consensual interlude at your parents' house
5  in Cohasset?
6      A. I never made a complaint to Mr. McKnight.
7      Q. Did you ever tell Mr. McKnight that you
8  and Mr. McDole had had a prior sexual interlude
9  at your parents' house in Cohasset?
10      A. I never had a sexual interlude with
11  Mr. McDole.
12      Q. Did you tell him that you had kissed
13  McDole and had him to your parents' house in
14  Cohasset?
15      A. Did I tell who?
16      Q. Kory McKnight.  Same guy we've been
17  talking about.  Did you tell Kory McKnight that
18  you had had Mr. McDole, in 2015, to your parents'
19  house in Cohasset and that the two of you had
20  kissed and he had stayed over?
21      A. No.
22      Q. When Trevor Shaffer-Figueroa was
23  investigating your sexual harassment complaint
24  against Mr. McDole, did you tell him that you and

Page 81

1  McDole had spent three days at your parents'
2  house in Cohasset and had kissed in a welcome
3  consensual way?
4      A. I don't know if it was three days.  It
5  might have been two days.  I don't remember.
6      Q. Is that really your answer?  Is that
7  really your answer to my question, or are you
8  going to answer my question?
9          Did you tell Trevor Shaffer-Figueroa
10  about your welcome interaction with Mr. McDole in
11  December 2015?
12      A. No.
13      Q. Even though you had complained that
14  Mr. McDole was sexually harassing you and you
15  were participating in an investigation of that
16  sexual harassment, you chose not to tell
17  Mr. Figueroa that the two of you had consensual
18  kisses at your parents' house in Cohasset?
19          MR. GOODMAN: Objection.  Argumentative.
20  Object to the form.
21  BY MS. KAPPELMAN:
22      Q. You can answer.  What's the answer,
23  Ms. Forsythe?
24          Did you tell the investigator of your

21 (Pages 78 - 81)

Page 82

1  sexual harassment complaint against Mr. McDole
2  that the two of you had had a consensual
3  interlude at your parents' house in Cohasset?
4      MR. GOODMAN: Same objection.
5  BY MS. KAPPELMAN:
6      Q. You can answer.
7      A. Sorry. Can you say that again?
8      Q. We can have the court reporter repeat it
9  again if you didn't hear it.
10     A. Thank you.
11         MS. KAPPELMAN: Kim, you can read that
12 question again?
13         (Whereupon the prior question was read
14 back.)
15     A. Who's the investigator?
16 BY MS. KAPPELMAN:
17     Q. Trevor Shaffer-Figueroa. Do you remember
18 that investigation?
19     A. I do remember that. I --
20     Q. Right.
21     A. No, I did not tell Shaffer-Figueroa.
22     Q. Why?
23         MR. GOODMAN: Objection. Argumentative.
24

Page 83

1  BY MS. KAPPELMAN:
2      Q. Did he ask you what sort of interactions
3  you had had with Mr. McDole prior to coming to
4  Wayfair?
5      A. No. I don't -- he might have. I don't
6  remember.
7      Q. Okay. So let's go back to when you
8  recruited Mr. McDole to work at Wayfair. When
9  did he first start at Wayfair?
10     A. He started August -- July or August. I'd
11 have to check.
12     Q. 2018?
13     A. 2018.
14     Q. How would you describe Mr. McDole's
15 professional performance on your team?
16     A. Which -- like the duration of it?
17     Q. At the beginning when he first started.
18     A. His -- how would I describe it?
19 Inconsistent.
20     Q. Okay. Was he performing well for --
21 let's just take the first six months until
22 December of 2018. How did he perform?
23     A. Sometimes he was awesome. He was a rock
24 star some days. Other days he was ignoring his

Page 84

1  tasks and ignoring me. He was very inconsistent.
2      Q. When would you say the sexual harassment
3  that you've complained of started?
4      A. The sexual harassment or, like, the just
5  general harassment?
6      Q. Well, what we're here about is sexual
7  harassment. It's a legal term. So that's what
8  I'd like to know is when did the sexual
9  harassment start?
10     A. The first time he physically, sexually
11 harassed me, where he put his hands on me, was in
12 January, I think, of 2019.
13     Q. Okay. Is it fair to say that you were
14 commending his performance as late as March of
15 2019 to his new manager?
16     A. Looking at this e-mail?
17     Q. Well, you can look at the e-mail if you
18 want, but do you remember, as you sit here today,
19 that you were commending Mr. McDole's performance
20 as recently as March of 2019 to his new manager?
21     A. Let's see. I don't remember the date.
22     Q. Okay. Well, March 14, 2019, at
23 4:44 p.m., you say to Genaro Bugarin -- who is
24 Genaro Bugarin, by the way, for the record?

Page 85

1      A. He was the site director in Perris,
2  California.
3      Q. And Matt Witte was your manager; is that
4  right?
5      A. That is correct.
6      Q. And at this time you write to Genaro and
7  you say:
8          "Mike is going to knock it out of the
9  park in Lathrop and it makes sense to get him in
10 that building sooner rather than later."
11         Do you see that?
12     A. Sorry. Can I just read that?
13     Q. Just the last line is what I'm reading.
14     A. Did I see that line? Yes. I see that
15 line.
16     Q. And you wrote that. I'm not making it
17 up. That was your line about Mike McDole's
18 performance; right? That you thought he was
19 going to knock it out of the park.
20     A. I don't remember writing this e-mail.
21     Q. I didn't ask you if you remember writing
22 it, Ms. Forsythe. I'm asking if you told
23 Mr. McDole's new manager that you believed he was
24 going to knock it out of the park in March of

22 (Pages 82 - 85)

1  2019.
2     A.  Sorry.  This is a really stupid question.
3  This is assuming this is one of my e-mails;
4  right?
5     Q.  Are you really sitting here and saying
6  you don't think this is your e-mail?  Is that
7  your position, Ms. Forsythe?
8     A.  Yes.
9     Q.  Okay.  All right.  Well, assuming it's
10 your e-mail and we didn't just draft it out of
11 whole cloth from the server, because you don't
12 remember writing it, do you remember telling Mike
13 McDole's new manager that you thought he was
14 going to knock it out of the park in March of
15 2019?
16    A.  I don't remember telling Genaro that I
17 thought Mike would knock it out of the park.
18    Q.  Okay.  When did you -- did you complain
19 to somebody in January of 2019 that Mr. McDole
20 was sexually harassing you?
21    A.  No, I didn't.
22    Q.  And Mr. McDole, by the way, was reporting
23 to you; right?  I mean, you were his manager.
24    A.  That is -- in January 2019?

1     Q.  Yes.
2     A.  Yes.  That's correct.
3     Q.  And so you had the power to evaluate his
4  performance.  Correct?
5     A.  That's correct.
6     Q.  And you had the power to issue him verbal
7  warnings or written warnings; right?
8     A.  I --
9     Q.  As his manager, Ms. Forsythe.
10    A.  I don't know if I had to do it or my
11 manager had to do a written warning.
12    Q.  But the point being, you were his manager
13 and so it was -- the onus was on you.  If he was
14 doing something inappropriate, either
15 professionally or personally, his manager would
16 have been the one to correct it; right?
17    A.  It would depend.
18    Q.  Well, did you issue him any written
19 warnings in January of 2019 for inappropriate
20 behavior?
21    A.  No, I did not.
22    Q.  Did you sit down with him verbally and
23 tell him that his behavior towards you was
24 inappropriate?

1     A.  Yes, I did.
2     Q.  Okay.  You told him that you felt you --
3  he was subjecting you to unwelcome sexual
4  harassment in January 2019?
5     A.  I did not say that.
6     Q.  Okay.  Did you tell him in January of
7  2019 that he was subjecting you to unwelcome
8  sexual harassment?
9     A.  No, I did not.
10    Q.  Okay.  Did you formally evaluate him and
11 add his inappropriate behavior to any performance
12 evaluation that you gave to him as your
13 subordinate?
14    A.  What do you mean by "inappropriate
15 behavior"?
16    Q.  The fact that he sexually harassed you
17 you say in January of 2019.  Did you give him any
18 formal reprimand at all?
19    A.  No, I did not.
20    Q.  Did you give him any informal reprimand
21 at all during that period of time?
22    A.  Regarding what?
23    Q.  That behavior.  The alleged sexual
24 harassment in January of 2019.

1     A.  Yes, I did.
2     Q.  Okay.  What did you say to him about the
3  January 2019 incident that you claim is sexual
4  harassment?
5     A.  I didn't say anything about that specific
6  incident.
7     Q.  Okay.  In -- let's look -- are there
8  periods of time when you and Mr. McDole were
9  friendly and got along well?
10    A.  For the duration of us knowing each
11 other?
12    Q.  During this period from January 2019
13 until you brought your sexual harassment
14 complaint, were there periods of time when the
15 two of you got along well?
16    A.  Yes.
17    Q.  Okay.  Even though you claim he was
18 sexually harassing you?
19    A.  Yes.
20    Q.  Okay.  Can you look at that document that
21 we're going to mark?
22       (Exhibit No. 4 marked for
23 identification.)
24

Page 90

1  BY MS. KAPPELMAN:
2     Q.  Can you identify what this document would
3  be, Ms. Forsythe?
4     A.  It looks like a -- messages between me
5  and McDole.
6     Q.  And did you and McDole message each other
7  through a work chat, Slack, or something like
8  that?
9     A.  Yes.
10    Q.  Okay.  And at work an instant messenger
11 is called a Slack; is that right?
12    A.  We also had Skype at one point.
13    Q.  So looking at this can you tell whether
14 this is Slack or Skype?
15    A.  This was after Skype got disbanded, so
16 this looks like a Slack message.
17    Q.  So March 26, 2019, you and Mike McDole
18 were having a Slack conversation; is that right?
19    A.  It appears to be correct.
20    Q.  And is there a point at the bottom where
21 you say to him, "You're the best"?
22    A.  I can read that, yes.
23    Q.  Okay.  So is this the period of time
24 during which you say Mr. McDole was sexually

Page 91

1  harassing you?
2     A.  Can you scroll back to the top?
3     Q.  Sure.  The date is March 26, 2019, at
4  2:59 -- almost 3 o'clock p.m.  Is this the period
5  of time that Mr. McDole was allegedly sexually
6  harassing you?
7     A.  It was during that period of time.
8     Q.  And you tell him he's the best.
9     A.  That's what that says.
10    Q.  At some point did Mr. McDole tell you he
11 actually -- the sexual harasser -- that he
12 actually wanted to leave your team?  He didn't
13 want to report to you anymore?
14    A.  Yes.  He told me that.
15    Q.  And did you welcome that since he was
16 harassing you?
17    A.  Yes.
18    Q.  Okay.  Did you actually tell him you
19 didn't want him to leave?
20    A.  I did tell him that.
21    Q.  Okay.  So let me see if I can get this
22 straight.  Mr. McDole is sexually harassing you
23 and he tells you he wants to leave your team, but
24 you tell him you want him to stay; right?  Why

Page 92

1  did you tell the sexual harasser that you wanted
2  him to stay and not leave your team?
3     A.  I needed him to finish his project.
4     Q.  Okay.  Directing your attention to the
5  next exhibit, which I think is 5.
6        (Exhibit No. 5 marked for
7  identification.)
8  BY MS. KAPPELMAN:
9     Q.  Do you recognize this exhibit?  Is this
10 a -- Slack messages between you and Mr. McDole
11 from January 10, 2019?
12    A.  It looks like it is.
13    Q.  And you say to him, "Were you late
14 because you were interviewing," and he says,
15 "Yes."
16        And you say, "Don't leave."
17        Do you see that?
18    A.  Yes, I do see that.
19    Q.  All right.  So wouldn't you think that if
20 someone was sexually harassing you, you wouldn't
21 try to get them to stay?
22    A.  I can't answer that question.
23    Q.  Well, sure you can.  You've brought a
24 complaint alleging sexual harassment against

Page 93

1  Mr. McDole who reported to you, and here you're
2  saying you didn't want him to leave your team.
3  So explain to me why.
4     A.  I needed him to finish his projects.  I
5  was short-staffed.
6     Q.  I see.  Did you ever tell Mr. McDole that
7  he was up for a promotion and so he should stay
8  on your team so he could get that promotion?
9     A.  I don't remember.
10    Q.  I'm sorry, Ms. Forsythe.  You don't
11 remember if you ever told Mr. McDole that he was
12 up for a promotion and he should stay so he could
13 get it?
14    A.  I don't remember if I said he had a
15 better potential of getting promoted on my team
16 or another team.  I don't remember what I said.
17    Q.  In any event, at some point Mr. McDole
18 wanted to leave your team and he, in fact, did
19 leave your team; right?  He was no longer
20 reporting to you; right?
21    A.  At some point, that is correct.
22    Q.  So the guy that you say was trying to
23 sexually harass you actually asked to leave your
24 team so he didn't have to have interaction with

24 (Pages 90 - 93)

1  you; is that right?
2      MR. GOODMAN:  Objection.
3      A.  I don't know why he asked to leave my
4  team.
5  BY MS. KAPPELMAN:
6      Q.  Okay.  But he is the same guy you said
7  was trying to sexually harass you; right?
8      MR. GOODMAN:  Objection.
9  Mischaracterizes the evidence.
10     A.  Thank you.
11  BY MS. KAPPELMAN:
12     Q.  Mr. McDole is the person you said was
13  trying to sexually harass you; right?
14     A.  Mr. McDole is the person that I said was
15  trying to sexually harass me.
16     Q.  And Mr. McDole is the same one that
17  actually asked to leave your team; right?
18     A.  That is correct.
19     Q.  Okay.  And he left your team around
20  April 1, 2019; is that right?
21     A.  Yes.  That's correct.
22     Q.  Okay.  And so when he left your team,
23  where -- in April of 2019 where were you
24  physically located?

1      A.  For the day?
2      Q.  No.  Where were you physically working in
3  April of 2019?
4      A.  I had an office, like a desk space, in
5  Boston and I had a desk space in Hebron,
6  Kentucky.
7      Q.  And when he left, where did he go
8  physically?  Mr. McDole.
9      A.  He was still technically living in Texas
10  and he was commuting to California.
11     Q.  Okay.  So the two of you didn't have desk
12  space in the same physical location after April
13  2019; is that correct?
14     A.  Or before April 19th?
15     Q.  I'm just asking about after April 2019.
16  Correct?
17     A.  After April 19th we did not have desk
18  space together.
19     Q.  And after April 19th he was no longer
20  even reporting to you.  Correct?
21     A.  That is correct.
22     Q.  Okay.  Did you continue to interact with
23  Mr. McDole, whom you said was sexually harassing
24  you, after he left your supervision in April

1  2019?
2      A.  Professionally, yes.
3      Q.  So tell me how it would be that you would
4  interact.  How would your professional roles
5  overlap?
6      A.  I had multiple projects in the buildings
7  he was working in.
8      Q.  Okay.  So how often would you physically
9  be in the same space with Mr. McDole?  Was it
10  once a week?  Once a month?
11     A.  It was not as frequent as once a week,
12  but it was -- so it was more frequent than once a
13  week.  Less frequent than once every two months,
14  I'd say.
15     Q.  Okay.  And at some point did Mr. McDole
16  suggest that the two of you should have a meeting
17  with HR, human resources, at Wayfair?
18     A.  I suggested it.
19     Q.  Okay.  I'm asking you to look at a series
20  of e-mails and we'll start at the first one.
21          (Exhibit No. 6 marked for
22  identification.)
23  BY MS. KAPPELMAN:
24     Q.  The first one -- I don't know if you

1  recognize this e-mail string, but it purports to
2  be an e-mail between you and Mr. McDole dated
3  April 18, 2019.  Do you see that?
4      A.  I see that date.
5      Q.  He says:
6          "I fully support setting something up
7  with HR, Genaro, Matt, you, and me.  I think it's
8  absolutely necessary.  Let me know."
9          Do you see that?
10     A.  I see that sentence.
11     Q.  Okay.  So does this refresh your
12  recollection that the two of you were trying to
13  set up a meeting with HR in April of 2019?
14     A.  I was trying to set that up and he agreed
15  to it.
16     Q.  And this is after he left your
17  supervision; right?
18     A.  That's correct.
19     Q.  Okay.  And you say:
20          "Sorry I missed your call.  Reach out
21  next week."
22          Do you see that?
23     A.  I see that.
24     Q.  And I know you don't remember e-mails and

Page 98

1 you think maybe we made them up, but how about
2 these?  Do these refresh your recollection that
3 this is something that you --
4     A.  Yes.
5     Q.  -- and Mr. McDole you were talking about?
6        Okay.  So these you recognize; right?
7     A.  This was very traumatic for me.  I
8 recognize this.
9     Q.  Great.  So he says to you, April 19th,
10 2019:
11        "Completely understand.  I will
12 preliminarily reach out to members of the HR team
13 tomorrow to see if it's possible to arrange a
14 meeting."
15        Do you see that?
16     A.  I see that sentence.
17     Q.  So what was the meeting about?  Why did
18 you suggest a meeting and why was he reaching out
19 to HR for a meeting?
20     A.  I suggested a meeting because McDole was
21 incredibly aggressive and rude and demeaning and
22 bullying to me, and I could not handle it
23 anymore.  I had reached my -- a really difficult
24 point for me with him being aggressive and

Page 99

1 harassing me.
2     Q.  So you used the word harassment.  Was
3 this a meeting to talk about sexual harassment,
4 Ms. Forsythe?
5        MR. GOODMAN:  Objection.  Calls for legal
6 conclusion.  You can answer.
7 BY MS. KAPPELMAN:
8     Q.  You can answer, Ms. Forsythe.
9        (Simultaneous crosstalk.)
10 BY MS. KAPPELMAN:
11     Q.  Let me just -- you said aggressive
12 bullying, and I'm trying to understand if this
13 was about sexual harassment, this meeting on
14 April 19, 2019, you were talking about.
15     A.  The meeting never happened so I can't
16 tell you what I would have said.
17     Q.  I'm not asking you whether the meeting
18 happened.  You talked to Mr. McDole about the
19 need for a meeting and he agreed that you needed
20 a meeting.  Did you talk to him about the fact
21 that it was because he was sexually harassing?
22     A.  I never talked to him about why I wanted
23 an HR meeting.
24     Q.  Okay.  And you've just told me it was

Page 100

1 because he was bullying you and aggressive toward
2 you.  Are those the reasons you were calling for
3 a meeting or were there other reasons?
4     A.  I don't exactly remember the full range
5 of why I was calling that meeting.
6     Q.  And by this time, I think you said,
7 Mr. McDole was already sexually harassing you;
8 right?
9     A.  He had at this point, yes.
10     Q.  And you hadn't complained to anybody yet?
11     A.  No, I had not.
12     Q.  And you hadn't told Mr. McDole at this
13 point that he was doing anything unwelcome?
14        MR. GOODMAN:  Objection to form.
15     A.  I had told him at that point that he -- I
16 don't remember the exact conversation but that he
17 needed to not be so belittling, demeaning, rude,
18 aggressive.  That he needed to stop bullying and
19 harassing me.
20 BY MS. KAPPELMAN:
21     Q.  Got it.  Okay.
22        And why didn't the HR meeting happen even
23 though both you and Mr. McDole wanted it to?
24     A.  Why didn't it happen?  Mike never set it

Page 101

1 up.
2     Q.  Really?  Okay.
3        Do you recall telling McDole, "Before we
4 make ourselves look like children, since we can't
5 resolve our own issues, I'd like to work this out
6 without HR"?
7     A.  Yes.
8     Q.  So isn't that why the meeting never
9 occurred?  Because you told him that you didn't
10 want to go to HR and make yourselves look like
11 children, in a text message?
12     A.  I don't know why he didn't set it up.
13 You'd have to ask him.
14     Q.  No.  But I'm asking you.  Didn't you say
15 to him, "Before we make ourselves look like
16 children" -- quote, we can't resolve issues.  I'd
17 like to work this out without HR.
18     A.  Did I say that?  Yes, I said that.
19     Q.  So you didn't want to go to HR either at
20 that point in April of 2019?
21        MR. GOODMAN:  Objection.
22 Mischaracterizing evidence.
23     A.  I wanted to go to HR.
24

26 (Pages 98 - 101)

Page 102

BY MS. KAPPELMAN:

Q. But you said to him, "Let's try to work this out without HR"; right?

A. I did say that to him.

Q. Why would you say that to him if you really wanted to go to HR?

A. I didn't want to look bad at HR.

Q. So he was supposed to read your mind?

MR. GOODMAN: Argumentative.

A. I cannot say.

BY MS. KAPPELMAN:

Q. What exactly were you going to say to HR even though you never did it?

A. I can't tell you what I would have said.

Q. Okay. So let's look at -- the same day that McDole and you decided you were going to speak with HR, on April 18th, did you reach out to a recruiter to stop the company from paying McDole's relocation fees? Do you recall that? Ms. Forsythe, do you recall that?

A. I'm thinking. I don't know if they were relocation fees or if he was getting paid both out of California and Texas.

Page 103

(Exhibit No. 7 marked for identification.)

BY MS. KAPPELMAN:

Q. Okay. So who is Stella Karadimas, if you know?

A. I don't know.

Q. Well, you're writing an e-mail to her on April 18, 2019. Does this refresh your recollection that you know Stella Karadimas?

A. I don't know her. She's just a -- I don't know who that is.

Q. Okay. But do you see here that you wrote her on April 18th and you say:

"With regard to Mike McDole, can you give me a call, please?"

Was that your phone number, by the way?

A. Yes. That was my phone number.

Q. You say:

"He never relocated and I don't want to pay him relo."

Do you see that?

A. I see that.

Q. Okay. So the same day you're saying that you should call HR with Mr. McDole because he's

Page 104

bullying you, you're telling Stella Karadimas that you don't want to pay his relocation fees; right?

A. Those two aren't related. It's a financial decision.

Q. It's the same day. Who's bullying who here, Ms. Forsythe? The same day you say that he's bullying you, you're trying to take away his relocation fees, aren't you?

MR. GOODMAN: Objection. Argumentative.

BY MS. KAPPELMAN:

Q. When you see this e-mail, does it refresh your recollection that you knew a Stella Karadimas enough to write to her about relocation?

A. I did not know Stella.

Q. So why were you writing to her on April 18, 2019?

A. Because Mike was falsely taking money for a relocation he never did and that was affecting the company.

Q. So he never moved to Perris, California?

A. I don't know if he ever did. He might have.

Page 105

Q. Okay. Got it.

So in July, I guess -- were you still feeling that Mr. McDole was sexually harassing you in July of 2019?

A. Yes.

Q. So in July of 2019 do you remember having e-mails with Mr. McDole where you say you're looking forward to catching up with him?

A. I think he said that to me.

Q. Okay. And you say, if you're feeling -- but you don't go on. You say:

"Hi, Mike. Congrats on the promotion. We both know you're going to do a wonderful job in Perris. Just wanted to give you a heads-up that I will be on-site in Perris July 22nd to 23rd. Thanks. Emily."

Did I read that correctly?

A. You read that correctly.

Q. And this is the same guy you're writing to who you said has been sexually harassing you for seven months; right?

MR. GOODMAN: Objection. Mischaracterizes evidence.

27 (Pages 102 - 105)

Page 106

1  BY MS. KAPPELMAN:
2  　Q.  You can answer.
3  　A.  It was seven months.  Yes.
4  　Q.  And you're saying congratulations on the
5  promotion.  We know you're going to do a
6  wonderful job, and then you tell him you're going
7  to be on-site.  Why were you telling him that you
8  were going to be on-site in July of 2019?
9  　A.  I told every site director whenever I was
10 traveling to a site.
11 　Q.  Right.  But every site director wasn't
12 allegedly sexually harassing you in an unwelcome
13 way; right?
14 　　MR. GOODMAN:  Objection.
15 　A.  It was still the professional thing to do
16 because any site director -- if I'm visiting the
17 site, I tell them that I'm going to be there.
18 BY MS. KAPPELMAN:
19 　Q.  Did you tell every site director that you
20 knew they were going to do a wonderful job where
21 they were and congratulate them?
22 　　MR. GOODMAN:  Objection.
23 　A.  If they got promoted into it I would,
24 yes.

Page 107

1  BY MS. KAPPELMAN:
2  　Q.  At some point you sent a long document, a
3  14-page document, to Mr. Witte purporting to
4  memorialize all of your interactions with
5  Mr. McDole.  Do you remember that?
6  　A.  I remember sending the document.
7  　Q.  Okay.  How did it come to be -- why did
8  you send it to Mr. Witte?  Let's start with that.
9  　A.  I sent it to Mr. Witte because I felt
10 unsafe at work and I was overwhelmed and I didn't
11 know what to do.
12 　Q.  Okay.
13 　　MS. KAPPELMAN:  Kim, do you know what
14 number exhibit this is?  I'm sorry.  Or Emily,
15 Emily Miller, is this 6 or 7?
16 　　MS. MILLER:  I have it as 8.
17 　　(Exhibit No. 8 marked for
18 identification.)
19 BY MS. KAPPELMAN:
20 　Q.  So directing your attention to what's
21 been marked as Exhibit 8, Ms. Forsythe, I know
22 you don't recognize a lot of the e-mails we've
23 seen today, but how about this one?  It's dated
24 August 15, 2019, from you to Matt Witte.  Do you

Page 108

1  see that?
2  　A.  Can I read the whole thing before we talk
3  about it?
4  　Q.  Well, you can read this e-mail.  This is
5  the one I'm asking about, if you recognize it,
6  and then we'll go to other e-mails.
7  　A.  Okay.
8  　Q.  Do you recognize the 8/15/2019 e-mail at
9  the top of this document that you sent to Matt
10 Witte?
11 　A.  I don't.  I recognize that that -- like
12 the August 14th "Hi Matt.  Please don't share
13 this" --
14 　Q.  I'm not asking about that yet.  I'm not
15 asking about that yet.  See, I'm asking about
16 this one.  You say that --
17 　A.  I don't remember that.
18 　Q.  -- in August of 2019, about Mr. McDole,
19 the same person you say sexually harassed you,
20 "He's good in person, just via e-mail he has an
21 edge."
22 　　Do you see that?
23 　A.  I see that.
24 　Q.  So that's what I'm trying to understand.

Page 109

1  Why you would suggest that Mr. McDole is sexually
2  harassing you for eight months now at this point,
3  but what you say to your boss, Matt Witte, is
4  he's good in person?  Just via e-mail he has an
5  edge.
6  　　So which is it, Ms. Forsythe?  Was he
7  sexually harassing you for eight months in
8  person, or was he good in person and he just had
9  an edge via e-mail?
10 　　MR. GOODMAN:  Objection.  Argumentative.
11 BY MS. KAPPELMAN:
12 　Q.  You can answer.
13 　A.  I don't remember writing that e-mail.
14 　Q.  Well, I'm not asking if you remember
15 writing the e-mail.  I'm asking which was it?  As
16 of August 2019 was Mike McDole good in person but
17 had an edge over e-mail or, in fact, was he
18 sexually harassing you in person?  Which was
19 true?
20 　A.  I can't answer that question.
21 　Q.  Why?  You've got a sexual harassment
22 complaint against Wayfair claiming Mike McDole
23 had sexually harassed you for eight months.  So I
24 have a right to ask you which is true.  Was he

Page 110

1  good with you in person or did he sexually harass
2  you?
3      A. It was both. He was very bipolar.
4      Q. Well, you don't say that to your manager
5  here, Matt Witte, in August of 2019. You say
6  that he's good in person, but it's just via
7  e-mail that he has an edge; right?
8      A. That's what that says.
9      Q. In fact, Matt Witte asks you directly "Is
10  he bullying you in person or do you just feel it
11  over the e-mails," and that's your response.
12      What was Mr. Witte supposed to think your
13  concerns were when he got this e-mail in August
14  of 2019?
15      A. I don't know what he was supposed to
16  think.
17      Q. What did you want him to think when you
18  said he's good in person just via e-mail he has
19  an edge? What were you trying to convey there?
20      A. I needed help from Witte dealing with
21  McDole.
22      Q. Because he was bullying you by e-mail?
23      A. There was a lot of things.
24      Q. Why don't you say anything about the

Page 111

1  sexual harassment in this e-mail?
2      A. I was embarrassed.
3      Q. He asked specifically what it is you're
4  concerned about.
5      A. I was embarrassed by it.
6      Q. I see.
7      (Exhibit No. 9 marked for
8  identification.)
9  BY MS. KAPPELMAN:
10      Q. So here's what I'm going to do --
11  August 14th. This is the e-mail where you send
12  your 14-page complaint to Matt Witte; right?
13  August 14, 2019; is that correct?
14      A. That's correct.
15      Q. And you say:
16      "Please don't share this with anyone or
17  forward to anyone."
18      So it wasn't your intent to have
19  Mr. Witte give this to HR or anybody else for
20  that matter; is that correct?
21      A. I don't know what my intent was.
22      Q. Well, you say, "Please don't share this
23  with anyone or forward it to anyone"; right?
24  Isn't that what you say in this e-mail,

Page 112

1  Ms. Forsythe?
2      A. I said that. That's correct.
3      Q. And then you say:
4      "Was wondering if you had a chance to
5  talk to Mike about his professionalism, including
6  his aggression in e-mails. I'm also attaching a
7  summary of correspondence between me and Mike."
8      Do you see that? Is there anywhere in
9  there that you say to Mr. Witte that he's
10  touching you or there's unwelcome sexual
11  harassment?
12      A. In this little e-mail or in the
13  attachment?
14      Q. In this little cover e-mail about what
15  you want Witte to talk to Mike about.
16      A. I think aggression is sexual harassment
17  too.
18      Q. You think it is?
19      A. Yeah.
20      Q. So somebody can be aggressive and they're
21  always sexually harassing. Is that what you're
22  saying?
23      A. I'm not saying that.
24      Q. So before this, before August 24, 2019,

Page 113

1  had you complained to anyone at Wayfair that
2  Mike McDole was sexually harassing you?
3      A. No, I had not.
4      MS. KAPPELMAN: So I think this is a good
5  time to take a break because what I really want
6  Ms. Forsythe to do is read her 14-page complaint
7  that she attached. And so maybe we can e-mail
8  that to Ms. Forsythe, Emily Miller, because I am
9  not going to spend the deposition having her read
10  all 14 pages at once.
11      I'm going to have you focus on particular
12  entries. So why don't we take a break and
13  hopefully when we come back from lunch,
14  Ms. Forsythe will have read her 14-page
15  complaint.
16      How does that sound?
17      MR. GOODMAN: I will e-mail it to her.
18  It's in -- Emily Miller, is it Exhibit 11 in your
19  list?
20      MS. MILLER: That's correct.
21      MS. KAPPELMAN: All right. So let's take
22  a break, about 45 minutes.
23      THE VIDEOGRAPHER: The time is 11:53.
24  This is the end of Session No. 3 and we are off

Page 114

1 the record.
2 (Recess taken at 11:53 a.m.)
3 (Deposition resumed at 12:39 p.m.)
4 THE VIDEOGRAPHER: The time is 12.39.
5 This is the beginning of Session No. 4, and we
6 are now back on the record.
7 BY MS. KAPPELMAN:
8 Q. Ms. Forsythe, when we took a break for
9 lunch, we were looking at an e-mail that you had
10 sent to Mr. Witte dated August 4, 2019. Do you
11 recall that?
12 A. Yes.
13 Q. And that e-mail -- that August 4, 2019,
14 e-mail to Mr. Witte had a multi, multi-page
15 attachment to it that I asked you to review
16 during the break. Did you have an opportunity to
17 review it?
18 A. I did.
19 Q. Okay. Do you have a hard copy or is it
20 on a computer?
21 A. I printed it out.
22 Q. Perfect. Okay. That will make it
23 easier.
24 So first let's go back just so that we

Page 115

1 can ground ourselves on the e-mail to which it
2 was attached, Exhibit 8, and let me just look at
3 this for one minute.
4 A. Also, just so you know, I think -- I
5 don't think my page numbers are the same. So if
6 you want to just give me, like, the date when
7 you're referencing just because I --
8 Q. Okay. We'll do that.
9 So I want to just go back to the last
10 document we were looking at to ground ourselves.
11 So this August 14, 2019, e-mail to Matt Witte was
12 the one that attached your multi-page complaint;
13 is that correct?
14 A. That's correct.
15 Q. And this -- when you said "Please don't
16 share this with anyone or forward it to anyone,"
17 it was this multi-page complaint that you were
18 referencing; right?
19 A. That's correct.
20 Q. And you say in this, to Mr. Witte:
21 "I'm also attaching a summary of
22 correspondence between me and Mike."
23 And that was Mike McDole; right?
24 A. Correct.

Page 116

1 Q. Okay. So if we could then turn to the
2 document -- I think you said you printed it out
3 and it's a multi-page document. It's got what we
4 call Bates stamps on the bottom, which are
5 numbers that we put on the document for
6 identification, and starts Wayfair 000442 and
7 goes all the way down to Wayfair 000555. Do you
8 see that on your document?
9 A. I don't have that bottom section.
10 Q. Okay.
11 A. Like the -- I don't have the numbers. It
12 must have cut it off.
13 Q. So you can basically confirm that if it
14 started at Wayfair 442 and went to 455, it's
15 basically a 12-page document, and each page has
16 multiple entries with dates on them; is that
17 correct?
18 A. How many pages did you say it was?
19 Q. 12 pages, I think. It goes from Wayfair
20 44 -- 442 to 55. So I guess 13 pages.
21 A. To 55 what?
22 Q. To 55. 455. I mean, basically, it's at
23 least 10 but less than 15 pages, and each page
24 has multiple dates on them; right?

Page 117

1 A. It has multiple dates.
2 Q. And you prepared this?
3 A. I prepared that.
4 Q. And you attached it to the e-mail that
5 you sent to Mr. Witte on August 14, 2019; right?
6 A. That's correct.
7 Q. And this was your complaint about
8 Mike McDole's behaviors; right?
9 A. It was correspondence between me and
10 Mike.
11 Q. And you were asking Mr. Witte to
12 intervene as a result of this -- right -- with
13 Mike McDole.
14 A. I don't think -- I would have to look at
15 that e-mail I sent him.
16 Q. Well, without looking at the e-mail, what
17 were you asking Mr. Witte to do with this?
18 A. I don't remember what I asked him to do
19 with it.
20 Q. Okay. When did you create it?
21 A. I don't remember.
22 Q. Okay. Well, it starts off -- purports to
23 cover a period from September 15, 2018, to
24 August 4, 2019, when you -- right before you sent

1 it. So, you know, you see the first entry says
2 September 15, 2018? Do you see where I'm looking
3 here at the top of the page?
4     A. I do.
5     Q. So it purports to cover a period starting
6 September 15, 2018, and then if we go all the way
7 to the last page, the last entry seems to be
8 August 4, 2019. Will you agree with me?
9     A. That's correct.
10     Q. Okay. So did you take -- did you start
11 creating this in September of 2018
12 contemporaneous with the first entry, or did you
13 start creating it sometime after that but before
14 August 14th when you sent it?
15     A. I can't remember when I started creating
16 it.
17     Q. Was it on the first day that's entered
18 here, September 15th?
19     A. I can't remember.
20     Q. Well, how did you go about assigning
21 dates to the particular events that occurred?
22 How did you remember a year later what had
23 happened on an exact date?
24     A. When I made this document, I was looking

1 at e-mails, notes, one-on-one correspondence, and
2 text messages.
3     Q. So did you make it in August of 2019, the
4 month that you sent it, or was it made in a month
5 prior to the month that you sent it to Mr. Witte?
6     A. I can't remember.
7     Q. Did you start making it before the first
8 alleged sexual harassment incident in January of
9 2019 or after?
10     A. I can't remember when I started it.
11     Q. Why did you start it?
12     A. Why did I start it? I felt like I was in
13 a really bad spot because of the harassment from
14 McDole. I felt powerless. I felt like I didn't
15 know what to do. I was exasperated. I was
16 stressed.
17     Q. Did you -- I can't see you. Did you
18 finish your answer or are you still talking?
19     A. I finished.
20     Q. Okay. So I guess what I'm trying to
21 figure out is had you started creating this
22 record that we have here in front of us as
23 Exhibit 9 when you talked about meeting with HR
24 in April of 2019, or did you start creating it

1 after that?
2     A. I don't remember when I started creating
3 it.
4     Q. So you don't know if you had it in April
5 '19?
6     A. I have -- I don't know when I started
7 creating it.
8     Q. Did you keep it?
9     A. I'm sorry. Say that again.
10     Q. Was it on a laptop?
11     A. Yes.
12     Q. Was it on your work -- was it in your
13 work system or was it on a personal system?
14     A. I don't remember if it was, like, a
15 Google Docs I made or something I made at home.
16 I really don't remember.
17     Q. When did you first meet with a lawyer in
18 connection with this case?
19     A. I first called Bob -- I would say it
20 was -- I think it was in September 2019.
21     Q. Okay. So you first called Bob after you
22 delivered this to Witte in August '19; right?
23 You already had this created by the time you
24 called Bob.

1     A. I believe that is correct.
2     Q. Okay. So in this multiple-page --
3 whether it's 13, 14, however many pages --
4 complaint about Mr. McDole -- you've had a chance
5 to review it -- how many of these entries
6 reference sexual -- unwelcome sexual harassment?
7 Do you know?
8         MR. GOODMAN: Objection. Best evidence.
9 BY MS. KAPPELMAN:
10     Q. You can answer.
11     A. Can I count?
12     Q. Sure. How's it going, Ms. Forsythe? Are
13 you almost done?
14     A. No. I'm sorry.
15     Q. I think we took an hour so you could --
16 or 45 minutes so you could read the document
17 carefully.
18     A. Is that a question?
19     Q. Yeah. Are you re-reading the whole
20 document again or --
21     A. No. I'm just counting the instances.
22     Q. I actually don't want to waste the whole
23 day with you rereading your 14 pages again. So
24 if you're not almost done, we'll go at this a

Page 122

1  different way.
2      A.  Okay.  I'm not almost done.
3      Q.  I thought that's why we took a lunch
4  break.  So you could do this already, but let's
5  try something else.
6          Can you flip to 1/22, the date January
7  22nd?
8      A.  Okay.
9      Q.  It says:
10      "Mike and I had an in-person meeting in
11  Perris.  Uncomfortable situation where Mike was
12  sitting on one side of the table.  I was sitting
13  on the exact opposite."  Blah-blah.
14      "Mike scooted his chair around the entire
15  table, moved right next to me.  Our knees were
16  touching.  He put his hand on my leg.  I put my
17  chair back, put a space between us.  I felt
18  uncomfortable."
19      Do you see that?
20      A.  I see that.
21      Q.  Okay.  So that was one instance that you
22  wrote down about unwelcome sexual harassment; is
23  that right?
24      A.  Unwelcome physical sexual harassment.

Page 123

1  That's correct.
2      Q.  January 22nd.  Did you say anything to
3  Mr. McDole during that meeting to suggest that it
4  was unwelcome physical sexual harassment?
5      A.  No.
6      Q.  Did you complain to anyone at Wayfair
7  about it in January of 2018?
8      A.  No.
9      Q.  2019.  Thank you.
10      Okay.  So let's flip to the next page,
11  March 13th.  Do you see that?
12      A.  I do see that.
13      Q.  "Mike and I had another in-person meeting
14  in Boston."
15      And you go down the page and you say
16  again, at the bottom of the page, "Mike moved his
17  chair around the table and moved close to me so
18  that our knees and legs were touching.  I moved
19  my chair back and created space between us."
20      Do you see that?
21      A.  I see that.
22      Q.  Okay.  Is that another instance of
23  unwelcome sexual -- physical sexual harassment
24  that you're citing to?

Page 124

1      A.  That's correct.
2      Q.  Okay.  Did you tell Mr. McDole during
3  that meeting that you felt uncomfortable or that
4  it was unwelcome?
5      A.  I told him he needs to be more
6  professional in his behavior.
7      Q.  I don't see that.  Where is that in the
8  notes?
9      A.  It's not in the notes.
10      Q.  Why didn't you put it down in the notes?
11      MR. GOODMAN:  Objection.  Argumentative.
12  BY MS. KAPPELMAN:
13      Q.  You can answer.  Why didn't you put it
14  down in the notes?  You told him a lot of other
15  things.
16      You said, "I told him I didn't want him
17  to be unhappy on the team.  That I would talk to
18  Genaro."
19      You know, other things you told him.  Why
20  didn't you write down that you told him that he
21  needed to be more professional?
22      A.  I was embarrassed about it.
23      Q.  Okay.  Did you complain to anyone in
24  March of that year about this particular incident

Page 125

1  of unwelcome sexual harassment?
2      A.  Anyone at Wayfair?
3      Q.  Yes.
4      A.  No one at Wayfair.
5      Q.  Now, during this period, both January and
6  March, these two instances we've looked at, you
7  were Mike McDole's manager; right?  He reported
8  to you.
9      A.  That is correct.
10      Q.  Okay.  Did you issue him any warnings or
11  did you prepare any evaluations about this
12  behavior?
13      A.  About the sexual physical --
14      (Simultaneous crosstalk.)
15  BY MS. KAPPELMAN:
16      Q.  The January and the March incidents where
17  he sat too close to you.
18      A.  I did not.
19      Q.  Okay.  Did you reach out to HR and ask
20  them to intervene?
21      A.  I did not.
22      Q.  Okay.  So now I'm really -- I'm flipping
23  a number of pages all the way to 7/22.  It's an
24  entry that says "7/22.  On-site visit in Perris."

32 (Pages 122 - 125)

Page 126

1    And on my document it's Wayfair 000454.
2  Can you tell me when you're at that entry?
3    A. I am at that entry.
4    Q. Okay. In that entry you were having
5  lunch at a small table near human resources at
6  the Perris, California, site; is that correct?
7    A. That is correct.
8    Q. You say:
9    "Mike came over and sat down next to me.
10  I moved my lunch aside and turned to talk to him.
11  I was wearing a shirt with little spots all over
12  it and it had buttons running up the front in the
13  middle."
14    Do you see where I'm reading?
15    A. I see where you're reading.
16    Q. "Mike was staring at the buttons or a
17  spot. I asked him what was wrong, if I'd spilled
18  something on my shirt. He was looking very
19  closely at it. He reached down and touched my
20  buttons and a spot that was part of the shirt.
21  He said he couldn't tell if it was a spot or
22  lunch. I laughed it off."
23    Do you see that?
24    A. I see that.

Page 127

1    Q. Is that a third incident of unwelcome
2  physical touching that you refer to in this
3  complaint?
4    A. That is correct.
5    Q. And it's fair to say that this third
6  incident on July 22nd, Mr. McDole was not
7  reporting to you anymore. Correct?
8    A. That's correct.
9    Q. Who was he reporting to?
10    A. He was --
11    Q. Was it Genaro?
12    A. I can't -- I don't know when Genaro
13  was -- when Genaro left.
14    Q. Either way, did you complain to
15  Mr. McDole or tell him that you were
16  uncomfortable about what happened? You say here
17  that you laughed it off. Did you actually tell
18  him he made you uncomfortable and it was
19  unwelcome?
20    A. That physical contact was unwelcome?
21    Q. That's the question.
22    On July 22nd when you say you laughed it
23  off, did you actually tell Mr. McDole that it was
24  unwelcome?

Page 128

1    A. I did not tell him that.
2    Q. Did you tell him you were uncomfortable?
3    A. I did not tell him that I was
4  uncomfortable.
5    Q. Complain to anyone in HR in July --
6  around July 22nd, before you wrote this to
7  Mr. Witte in August, about this incident?
8    A. Sorry. Can you say that again?
9    Q. Yeah. Did you complain to anyone about
10  this July incident before you sent the
11  August 14th e-mail to Mike Witte?
12    A. Anyone at Wayfair or anyone outside of
13  Wayfair?
14    Q. Anyone at Wayfair.
15    A. I did not complain to anyone at Wayfair
16  about this incident.
17    Q. So those are the three incidents of
18  physical touching that I found in this 13-,
19  14-page complaint. Is there something else I'm
20  missing? Was there some other complaint about
21  physical touching by McDole that I missed when I
22  went through this document looking for it?
23    MR. GOODMAN: Objection to the question.
24

Page 129

1  BY MS. KAPPELMAN:
2    Q. You can answer.
3    A. About physical touching?
4    Q. Yes. Unwelcome physical touching.
5    A. I don't believe so.
6    Q. Okay. So you send this document. Where
7  were you when you sent it, by the way, to
8  Mike Witte?
9    A. I can't remember.
10    Q. Where was Mike Witte when you sent it to
11  him?
12    A. Matt Witte?
13    Q. Matt Witte. I'm sorry. Where was he
14  when you sent it to him?
15    A. He was either in Kentucky or the U.K.
16    Q. Was he oversees? Do you remember if he
17  was overseas in Germany when you sent this to
18  him?
19    A. I can't remember when he left.
20    Q. And what did Mr. Witte do after he
21  received this 14-page complaint from you?
22    A. What's the time frame?
23    Q. In August, after he received it, did
24  anything happen as a result of it? How's that?

Page 130

1    A. Yes.  He sent it to HR.
2    Q. And did somebody from HR reach out to
3  you?
4    A. He -- sorry.  He told me he sent it to
5  HR.  I'm assuming he sent it to HR because
6  someone from HR reached out to me.
7    Q. Bear with me one moment.  Let's look at
8  one more document.
9      (Exhibit No. 10 marked for
10  identification.)
11  BY MS. KAPPELMAN:
12    Q. Did you ever tell Mr. Witte that you were
13  happy with the response from HR to your
14  complaint?
15    A. I don't remember.
16    Q. All right.  Let's look at this exhibit,
17  which I believe is Exhibit 10.  Everybody will
18  correct me if I'm wrong.  It's an e-mail from
19  you.  Subject:  HR engagement, to Matt Witte.
20  Does this refresh your recollection that you
21  reached out to Matt on August 22nd, thanking him
22  for addressing your HR issue so promptly?
23    A. Yes.
24    Q. Okay.  So you were grateful that Matt

Page 131

1  sent along your HR issues promptly and
2  professionally; right?
3    A. I don't know if I was grateful, but I
4  said thank you.
5    Q. Well, you say "I really appreciate."
6      So you really appreciated that once you
7  disclosed the issues to Matt, he immediately
8  addressed them.  Did I read that correctly?
9    A. You did.
10    Q. And you said you appreciated his support;
11  right?
12    A. I said I appreciate his support.
13    Q. Right.  So you felt as though Matt
14  addressed your HR concerns with Mr. McDole
15  promptly and immediately addressed them and sent
16  them to HR; right?
17    A. No.  I didn't say that.
18    Q. Well, you say, "Thank you for addressing
19  my HR issues so promptly and professionally."
20      What part did I read wrong there?
21    A. That's not what you said.
22    Q. Okay.  So you were thanking him for
23  addressing your HR issues promptly and
24  professionally; right?

Page 132

1    A. That is correct.
2    Q. Okay.  So I think you said somebody from
3  HR reached out to you.  Who from HR reached out
4  to you?
5    A. I can't remember if Trevor was the first
6  person, but Trevor is the only person that comes
7  to mind.
8    Q. And what did -- when did Trevor reach out
9  to you?  How soon after you sent this e-mail, if
10  you know?
11    A. Within a week or two.
12    Q. Okay.  And did Trevor ask you what
13  happened between you and McDole?
14    A. Trevor asked me to explain the situation
15  and what was going on.
16    Q. And is it fair to say that you told
17  Trevor that you thought McDole was sexually
18  harassing you?
19    A. Yes.
20    Q. Is it fair to say that Trevor asked you
21  about any prior contact you had with McDole
22  before coming to Wayfair?
23    A. I don't remember that.
24    Q. Well, did you tell Trevor that you had

Page 133

1  worked with McDole at Amazon?
2    A. I don't remember if I told him that.
3    Q. Well, wouldn't that be relevant?  That
4  you knew him before you came to Wayfair?
5    A. I just don't remember if I said it or
6  not.
7    Q. Do you remember whether you told Trevor
8  that you had had -- you had invited McDole to
9  your parents' house for two or three days in
10  Cohasset and you guys had consensual kissing?
11    A. I did not tell Trevor that.
12    Q. Why wouldn't you have told Trevor that as
13  part of your story about McDole sexually
14  harassing you?
15      THE WITNESS:  Bob, you're muted.
16      MR. GOODMAN:  Same objection.
17  BY MS. KAPPELMAN:
18    Q. You can answer.  Why wouldn't you have
19  told Trevor Shaffer-Figueroa that you and
20  Mr. McDole had had a kissing interlude at your
21  parents' house in Cohasset before you recruited
22  him to Wayfair?
23    A. I was embarrassed about it.
24    Q. Okay.  But you weren't embarrassed about

1  bringing a sexual harassment complaint against
2  your colleague; right?  You knew that would have
3  ramifications against him, didn't you?
4      A. That wasn't a factor in my decision.
5      Q. So Mr. McKnight, was he your manager yet
6  when you made this complaint to Mr. Witte?
7      A. I don't believe so.
8      Q. So was Mr. McKnight involved at all?  Was
9  he interviewed as part of your investigation?
10     A. You would have to ask him.  I don't know.
11     Q. Did Trevor circle back to you and tell
12  you what he did for his investigation?
13     A. He told me parts of it.
14     Q. Okay.  So did he tell you he interviewed
15  McKnight?  Did you ask him to interview McKnight?
16     A. Which question do you want me to answer?
17     Q. Did you ask him to interview McKnight as
18  part of your investigation about Mr. McDole's
19  sexual harassment?  Did you say, "Please
20  interview Kory McKnight"?
21     A. Did I ask Trevor that?
22     Q. Yeah.
23     A. No.  I did not ask Trevor to interview
24  McKnight.

1      Q. Did Trevor say to you, "Who are the
2  people with relevant knowledge about this issue
3  that I should interview"?
4      A. I don't remember what Trevor said
5  specifically.
6      Q. Well, did he give you an opportunity to
7  suggest people who might have witnessed the
8  issues you complained about?
9      A. He did.
10     Q. And did you suggest Mr. McKnight as one
11  of the people that might have witnessed them?
12     A. I did not.
13     Q. Because Mr. McKnight wasn't your manager
14  yet; right?
15     A. I would have to check.
16     Q. Okay.  So when you talked to Trevor
17  Shaffer-Figueroa about your complaints of sexual
18  harassment, did you give him any more information
19  other than the three complaints that we just went
20  through that were contained in that 14-page
21  document, Exhibit 9?  One was January, one was
22  March, and one was July.
23         Were there any other incidents that you
24  told Trevor Shaffer-Figueroa about that gave rise

1  to your sexual harassment complaint against
2  Michael McDole?
3         MR. GOODMAN:  Objection.  Calls for a
4  legal conclusion.  You can answer.
5      A. I don't remember.
6         MS. KAPPELMAN:  So I just asked her what
7  she told Trevor.
8  BY MS. KAPPELMAN:
9      Q. Were there any other incidents of sexual
10  harassment, other than the three that you pointed
11  out in your complaint to Matt, which is Exhibit
12  9?
13         MR. GOODMAN:  Same objection.  You can
14  answer.
15  BY MS. KAPPELMAN:
16     Q. You can answer, Ms. Forsythe.
17     A. I also brought up the bullying and his
18  aggressive behavior.  I thought it was mental
19  sexual harassment.  It was incredibly --
20     Q. I'm sorry.  I'm going to stop you there.
21  Did you say "mental sexual harassment"?
22     A. Yes.
23     Q. Okay.  Go ahead.
24     A. That's the end.

1      Q. Okay.
2      A. I'm done.
3      Q. So you brought up his aggressive
4  behavior -- this is to Trevor -- because you
5  thought it was mental sexual harassment; is that
6  correct?
7      A. It was very dominant, aggressive
8  behavior.
9      Q. Yeah.  Okay.
10         And was this during the period between
11  April 1, 2019, when he wasn't reporting to you
12  and you were only in the same physical space
13  between once a week and once every two months?
14     A. Can you repeat that question?
15     Q. Sure.  I think we talked about how often
16  you and Mr. McDole were in the same physical
17  space after he stopped reporting to you in
18  April 2019.  Do you remember that testimony this
19  morning?
20     A. After he stopped reporting to me, yes.
21     Q. And you said after he stopped reporting
22  to you, you two were only in the same physical
23  location more than once a week but less than once
24  every two months.  Did I get that right?

Page 138

1   A. It ranged.
2   Q. Okay. So tell me how often you and
3 Mr. McDole were in the same physical location
4 after he stopped reporting to you April 1, 2019.
5   A. I'd have to look back and look at, like,
6 my travel log and stuff like that. Like, when
7 I was --
8   Q. You can imagine. Like, it wasn't every
9 day; right? Is that right?
10   A. I can't imagine. I'd need to look.
11   Q. It wasn't every day. That's easy; right?
12 You can answer that question.
13   A. What was the question?
14   Q. Were you in the same physical location
15 with Mr. McDole every day after he stopped
16 reporting to you April 1, 2019?
17   A. I was not.
18   Q. Were you in the same physical location
19 with him every week after he stopped reporting to
20 you April 1, 2019?
21   A. I'd have to check how much I was out in
22 Texas or California.
23   Q. So you think it's possible you saw him
24 once a week after April 1, 2019, as you sit here

Page 139

1 today, telling the truth under oath?
2   A. I'd have to check.
3   Q. Yeah. You just don't remember what it
4 was last year this time. How often you were
5 traveling to Perris, California?
6   A. Is that a question?
7   Q. Let's put it this way, Ms. Forsythe: How
8 many locations were you responsible for when you
9 were in your job last year in July of 2019?
10   A. Let me write it down. 13. About 13.
11   Q. All right. So you're responsible for 13
12 locations and you can't tell me whether or not
13 you were in Perris, California, once a week
14 during this period of time last year? In July of
15 2019.
16   A. What's the period of time? Is it just
17 July or --
18   Q. Let's talk about July. That's a good
19 time.
20   A. Okay.
21   Q. In July 2019, last year this time, would
22 you have been in Perris, California, in the same
23 physical location as Mr. McDole once a week?
24   A. That one week?

Page 140

1   Q. Well, July is not a week. It's a month.
2   A. The whole month? I'd have to look. Do
3 you mind if I check my Delta flight records?
4   Q. You know what? I think we're good with
5 that answer that you don't know. You're in
6 charge of 13 and you just can't tell me the
7 answers. I'm pretty good with that answer so
8 far. No worries.
9      Let's go on to the next set of questions.
10 Do you remember filing a complaint against
11 Wayfair in the United States District Court for
12 the District of Massachusetts, the case in which
13 we are currently having a deposition,
14 Ms. Forsythe?
15   A. I remember Bob filed it.
16   Q. Yeah. But he filed it on your behalf and
17 you had -- did you have a chance to review it for
18 accuracy before it was filed?
19   A. I did.
20   Q. Okay. And everything was true and
21 correct to the best of your knowledge before you
22 filed it in the federal court; right?
23   A. That's correct.
24   Q. Okay. And let's just look at paragraph 9

Page 141

1 of your complaint. You say that Mr. McDole asked
2 you to dinner without any pretense of the
3 invitation being work-related, and you said you
4 would meet with him only for a work-related meal
5 and then he didn't pursue the invitation. Do you
6 see that allegation?
7   A. Can I just read that No. 9?
8   Q. Please. Go ahead.
9   A. I have finished reading that.
10   Q. Isn't it true, ma'am, that you invited
11 Mr. McDole to dinner that day?
12   A. What day?
13   Q. March 14, 2019. In March you invited him
14 to dinner.
15   A. I don't remember that.
16   Q. Well, you remembered it enough to make
17 the allegation in your complaint that he invited
18 you to dinner and it was not something that was
19 welcome with you. Do you remember that?
20   A. I'm not sure about the dates. I might
21 have that confused.
22   Q. Okay. Well, let's take a look at this.
23   MS. KAPPELMAN: Is this Exhibit --
24 Emily -- 10? Emily Miller.

1      MS. MILLER: I have it as 11.
2      (Exhibit No. 11 marked for
3  identification.)
4  BY MS. FORSELMAN:
5      Q. Ms. Forsythe, is this an e-mail to you --
6  from you to Michael McDole, the alleged sexual
7  harasser, dated March 14, 2019, that same day
8  that you said he was inviting you to a dinner
9  that you declined?
10     A. I just see a message. I don't see an
11  e-mail. I just see the header. I don't see an
12  e-mail.
13     Q. I'm not asking you that. This is from
14  you to Michael McDole and the subject is dinner
15  and drinks; right?
16     A. That is what that says.
17     Q. Okay. And are you suggesting that there
18  was some other e-mail in there that you sent to
19  Mr. McDole about dinner and drinks?
20     A. Is this an e-mail --
21     MR. GOODMAN: Objection. Assumes facts
22  not in evidence.
23     MS. KAPPELMAN: It's not assuming any
24  facts not in evidence.

1  BY MS. KAPPELMAN:
2      Q. If I were to tell you that there's no
3  other entry on this, there's no other facts on
4  this, it's just you writing to Michael McDole
5  about dinner and drinks, would that refresh your
6  recollection that you were the one that asked him
7  to dinner and drinks on March 14th?
8      MR. GOODMAN: Objection. Harassing.
9      Counsel, there may have been another way
10  they made the invitation other than by Skype or
11  e-mail.
12  BY MS. KAPPELMAN:
13     Q. I'm just asking you: Why did you write
14  to Michael McDole on March 14th with a header
15  "Dinner and drinks"?
16     A. What's the e-mail? I'm not sure what I
17  wrote here.
18     Q. You didn't write anything. You just
19  wrote "Dinner and drinks." Does that refresh
20  your recollection that you were the one that
21  actually invited him for dinner and drinks on
22  March 14th? And it's not, as you said, in the
23  complaint.
24     A. That's not accurate.

1      Q. Okay. How about the week before? Did
2  you send him an e-mail about an event at Harpoon
3  Brewery?
4      MS. KAPPELMAN: Let's introduce this as
5  Exhibit 12.
6      (Exhibit No. 12 1marked for
7  identification.)
8  BY MS. KAPPELMAN:
9      Q. On March 7th, the week before you claim
10  Mr. McDole was trying to take you out for some
11  event personally that you didn't want to go out
12  on, didn't you send him this e-mail suggesting
13  that the two of you attend a Harpoon Brewery
14  event?
15     A. That's not accurate.
16     MR. GOODMAN: Objection. Assumes facts
17  not in evidence.
18     Counsel, you're using -- assumes facts
19  not in evidence.
20  BY MS. KAPPELMAN:
21     Q. Ms. Forsythe, why don't you tell me what
22  this e-mail is on March 7, 2019, from you to
23  Michael McDole sending him information about a
24  Harpoon Brewery event.

1      A. It looks like I sent him information
2  about a Harpoon Brewery event.
3      Q. And this is the same person who you said
4  was asking you to doing things personally in an
5  uncomfortable, unwelcome way. Why were you
6  pursuing him, sending him information about
7  social events if he's the one that is pursuing
8  you in an uninvited, unwelcome way?
9      MR. GOODMAN: Objection. Assumes facts
10  not in evidence.
11  BY MS. KAPPELMAN:
12     Q. You can answer, Ms. Forsythe.
13     A. Can you say the question again?
14     Q. Yeah. The same person who you filed a
15  federal complaint saying he was harassing you by
16  asking you out to dinner in March 2019, you're
17  sending him information about events at Harpoon
18  Brewery the week before. Can you explain that to
19  us?
20     A. I might have sent him an event for him to
21  go to without me. He was probably looking for
22  activities to do in Boston and I sent him that.
23  I was not living in Boston at the time, and I
24  wouldn't have gone with him.

37 (Pages 142 - 145)

Page 146

1    Q.  Well, why were you sending this to him at
2  all?  If he is approaching you in an unwelcome
3  way about personal issues and going out to
4  dinner, why would you send him this information
5  at all?
6    A.  He might have asked for it.  I can't
7  recall.
8    Q.  Okay.  Let's go back to your complaint
9  for a moment that you filed in federal court.
10  Let me just grab that.
11    Let's look at paragraph 13.  This is the
12  event that we just talked about which was --
13  occurred on July 22, 2019, in your complaint
14  which you filed with the federal court.
15    You talk about this event and you say
16  that Mr. McDole stared at your breasts, ran his
17  right hand down your blouse, beginning above your
18  cleavage, and moving toward her waist.  When she
19  moved away from him to avoid further contact, he
20  laughed and got up and walked away.
21    That's a little bit different than you
22  described it with Mr. Witte; right?  Remember we
23  talked about the polka-dotted shirt, touching the
24  polka-dot, laughing it off.  That's not what you

Page 147

1  wrote here in your complaint in the federal
2  court, is it?
3    MR. GOODMAN:  Objection.  Argumentative.
4  Best evidence.
5  BY MS. KAPPELMAN:
6    Q.  You can answer, Ms. Forsythe.  Why is it
7  different?
8    A.  It's not different.  They're just
9  different descriptions.
10    Q.  Okay.  But you would agree with me that
11  touching a polka-dot on a shirt is different than
12  running his right hand down her blouse beginning
13  above her cleavage and moving toward her waist.
14    Why is it that you told the federal court
15  something different than you told Matt Witte?
16    MR. GOODMAN:  Objection.  Assumes facts
17  not in evidence.
18  BY MS. KAPPELMAN:
19    Q.  You can answer, Ms. Forsythe.
20    MR. GOODMAN:  To the best of your
21  ability, Ms. Forsythe.
22    A.  I told the truth in both situations.  I
23  was less detailed with Matt Witte because he was
24  my boss and I was incredibly embarrassed.

Page 148

1  BY MS. KAPPELMAN:
2    Q.  Well, when you say "less detailed" --
3  what you said to him was you were wearing a
4  polka-dotted shirt.  McDole touched it and said,
5  "Is that a spot or is that your lunch," and then
6  you laughed it off.
7    Here Mr. McDole is touching your breasts
8  and running his right hand down your blouse,
9  beginning at your cleavage and moving toward your
10  waist.  There's no conversation about lunch,
11  about polka-dots, or about touching you in one
12  spot.
13    So it's a different discussion and I'm
14  wondering why that is.  Why you would tell the
15  court one thing and Mr. Witte another thing?
16    MR. GOODMAN:  Counsel, it's my complaint.
17  It's not -- she didn't draft it.
18    MS. KAPPELMAN:  She reviewed it for
19  accuracy.  She told --
20  BY MS. KAPPELMAN:
21    Q.  Is it not correct?  Is this paragraph 13,
22  that your lawyer filed with the federal court,
23  incorrect, ma'am?
24    A.  That is not incorrect.

Page 149

1    Q.  Okay.  So was it incorrect when you said
2  to Mr. Witte that all Mr. McDole had done was
3  touch a polka-dot on your shirt and ask if it was
4  a spot or lunch?
5    A.  I'd have to re-read what I said.
6    MR. GOODMAN:  Objection.
7  BY MS. KAPPELMAN:
8    Q.  You have to re-read it?  We just read it
9  five minutes ago.
10    A.  I'd have to re-read it.
11    Q.  Okay.  If that's your answer, I'll stick
12  with it.  I like it.
13    A.  It's the same story.
14    Q.  That same paragraph of your complaint to
15  the federal court you said something about --
16  McDole said something about the possibility of
17  you two dating and inviting you to dinner.  Do
18  you see there?
19    "McDole began to discuss internet dating
20  applications, speculated about the possibility of
21  him and Plaintiff dating, even while
22  acknowledging his conflicts with Plaintiff and
23  invited Plaintiff to spend the afternoon and go
24  to dinner with him."

38 (Pages 146 - 149)

1      Do you see that?
2      A. I see that.
3      Q. I didn't see that at all in your notes to
4  Mr. Witte on August 14th. Did you just remember
5  that as you were drafting the federal complaint?
6      A. No. I did not just remember that.
7      Q. Okay. At this point in time in July 2019
8  Mr. McDole didn't report to you; right?
9      A. That's correct.
10     Q. And he was living and working in
11 California; right?
12     A. I don't know if he was living there.
13     Q. You don't know if he was living in
14 California? Is that what you just said?
15     A. That's correct.
16     Q. You were living and working in Kentucky;
17 right?
18     A. And Boston.
19     Q. Right. Was he living in Kentucky or
20 Boston at the time?
21     A. No.
22     Q. Okay. Is there a company policy
23 prohibiting employees from dating each other? Do
24 you know?

1      A. I don't know.
2      Q. Okay. At this point when Plaintiff asked
3  you if you wanted to date, did you tell him that
4  his conduct made you feel uncomfortable and
5  unwelcome in July of 2019?
6      A. Am I the plaintiff or is McDole?
7      Q. You're the plaintiff. You're the one
8  that sued Wayfair.
9      A. Yeah. You just said when I asked the
10 plaintiff, and I didn't ask the plaintiff.
11     Q. When you asked McDole -- when McDole
12 asked you, the plaintiff, if you wanted to date
13 or go to dinner with him and you refused, did you
14 tell him it was unwelcome and you felt
15 uncomfortable in July of 2019?
16     A. No.
17     Q. So let's look at paragraph 15 just for a
18 minute. In paragraph 15 you say Kory McKnight
19 became your supervisor on August 5, 2019. Does
20 that refresh your recollection as to when
21 Mr. McKnight became your supervisor?
22     A. Kind of. Part of it was, like, official
23 and unofficial.
24     Q. Just one second. I'm sorry.

1      You just said part of it was official and
2  unofficial. So which is true? When you say on
3  August 5, 2019 -- in paragraph 15:
4      "On August 5, 2019, Plaintiff was
5  reassigned to the direct supervision of
6  Kory McKnight instead of Witte, who became
7  McKnight's immediate supervisor."
8      Is that true? Can we rely on that
9  statement?
10     A. I'm not sure how to answer that.
11     Q. What's confusing about that,
12 Ms. Forsythe? It's your statement and your
13 complaint against Wayfair. So what's confusing
14 about your own statement?
15     A. Are you asking if in the ordinary course
16 at Wayfair I was 100 percent reporting to
17 McKnight or if Matt --
18     Q. I'm asking if your statement in the
19 federal court complaint against Wayfair, in
20 paragraph 15, the first sentence, is true?
21         MR. GOODMAN: Objection.
22     A. Matt had reassigned me on
23 August 5th to Kory McKnight.
24 BY MS. KAPPELMAN:

1      Q. Thank you. And when did you learn that
2  Kory McKnight was joining the team?
3      A. I don't remember.
4      Q. And what was Mr. McKnight's new position?
5      A. A director.
6      Q. And where was Mr. McKnight going to be
7  geographically located?
8      A. He -- I'm not sure at that time. I know
9  where he was living, but I don't know if he was
10 being asked to relocate.
11     Q. Where was he living at that time, ma'am?
12     A. He told me he was living in Chicago.
13     Q. And how often did you and Mr. McKnight
14 interact in person during that first month of
15 August 2019?
16     A. I believe it was one time.
17     Q. And did Mr. McKnight approach you on your
18 performance and your communication issues during
19 that first month of August 2019?
20     A. In what context?
21     Q. In any context. Did he tell you that you
22 were having problems with communications and had
23 room for improvement and that other people were
24 complaining about you?

Page 154

1    A.  Which question are you asking me?  Those
2  are two questions.
3    Q.  Whichever one you want to answer.  Did he
4  tell you that you were having communications
5  problems and he was receiving complaints about
6  them?
7    A.  He said that I could improve my
8  communication.
9    Q.  Okay.  Did he give you any specific
10  instances in which you could -- in which you were
11  having problems with communications or
12  complaints?
13    A.  I wouldn't call them problems.  They were
14  his interpretation of my communication style, and
15  he gave me one or two instances.
16    Q.  Who's Rob Holtz?
17    A.  He is a associate director.
18    Q.  Okay.  Did Mr. Witte or Mr. McKnight tell
19  you that Mr. Holtz had written to them saying it
20  was getting to the point that he could barely
21  work with you?
22    A.  Yes.
23    Q.  Struggled to want help on any project
24  that you were involved in.  Did either of them

Page 155

1  tell you that Mr. Holtz was complaining about
2  you?
3    A.  No, they did not.
4    MS. KAPPELMAN:  Could we mark this as the
5  next exhibit?  Is that 12, Emily Miller?
6    MS. MILLER:  I have it as 13.
7    (Exhibit No. 13 marked for
8  identification.)
9  BY MS. KAPPELMAN:
10    Q.  Who is Christa Cabriales?
11    A.  I have no idea.
12    Q.  Really?  No idea who Christa Cabriales is
13  at all?
14    A.  No.
15    Q.  Okay.  So did Matt Witte or Kory McKnight
16  ever tell you that Christa Cabriales wrote to
17  them saying that she didn't appreciate the manner
18  in which you spoke to her?  It was really
19  unprofessional and unwarranted.
20    A.  Matt had mentioned that an employee in
21  Perris had contacted him and he never gave me her
22  name, never told me who it was.  He said, "She is
23  so dramatic.  It's not even worth bringing it up
24  to you."

Page 156

1    Q.  I see.  Did he say that she called you
2  outright rude?
3    A.  No.
4    Q.  Who is Jonathan Marcoux, M-a-r-c-o-u-x?
5    A.  He is a -- well, I mean -- right now or
6  during this e-mail?
7    Q.  Who was he?  Who was Jonathan Marcoux in
8  August -- I'm sorry -- during this e-mail?
9    A.  He was an industrial engineering manager.
10    Q.  Did you have any interactions with
11  Mr. Marcoux in which you remember him complaining
12  to Mr. Witte?
13    A.  I don't remember.
14    Q.  Okay.  Did Mr. Witte ever tell you in
15  April of 2019 that Mr. Marcoux had complained
16  about a conversation he had with you about
17  supporting the west region projects?
18    A.  No, he didn't.
19    Q.  Matt never told you that Marcoux had
20  complained about his interactions with you?
21    A.  No.
22    Q.  Okay.
23    MS. KAPPELMAN:  I'd like to mark this as
24  the next exhibit.  Is this 14 or 15?  Marcoux.

Page 157

1  Emily Miller?
2    MS. MILLER:  I have it as 15 if we're
3  also introducing the prior e-mail.
4    MS. KAPPELMAN:  Yes.  Christa Cabriales
5  e-mail can be 14 and Marcoux can be 15.  Thank
6  you.
7    MS. MILLER:  Exactly.  Perfect.
8    (Exhibit Nos. 14 and 15 marked for
9  identification.)
10  BY MS. KAPPELMAN:
11    Q.  And how about Arron Velarde,
12  V-e-l-a-r-d-e?  Who is he?
13    A.  He was the site director for Lathrop,
14  California.
15    Q.  And did Mr. Velarde have issues with you
16  that he complained to Matt Witte about?
17    A.  Not that I was aware.
18    Q.  Did he tell you that your nudges to
19  McDole are petty and that you should go through
20  him?
21    A.  He never said that.
22    Q.  Let's look at an e-mail from Arron to you
23  dated June 11, 2019.  Can you see that on your
24  screen?  Am I sharing it appropriately?

1    A.  Yes.  Thank you.
2       (Exhibit No. 16 marked for
3    identification.)
4    BY MS. KAPPELMAN:
5       Q.  He says in the bottom of his e-mail to
6    you on June 11th:
7       "My opinion it seems petty, and I'm just
8    trying to understand if this came from concerns
9    by Davina or if this is a concern of yours."
10      He would say, "I would ask that we
11   continue to push her into calling Mike or me to
12   help with such disconnects."
13      Did he tell you that your complaint to
14   Mike McDole in the e-mail below seemed petty to
15   him?
16      A.  Hold on.  I need to read this.  Can I see
17   the rest of this chain?
18      Q.  Sure.
19      A.  Hold on.  Like all the way from the
20   bottom.  Sorry.
21      Q.  You want to start at the bottom?
22      A.  Yeah.
23      Q.  We can start at the bottom.
24      A.  Okay.  Thanks.  Okay.  Can you scroll up?

1    Hold on one second.  Okay.
2       What was the question?
3       Q.  The question was:  Isn't it fair to say
4    that Arron Velarde told you that he thought your
5    e-mail dated June 11, 2019, to Mike McDole was
6    petty?
7       A.  That's not how I'm interpreting this.
8       Q.  Well, he says "In my opinion it seems
9    petty"; right?
10      (Simultaneous crosstalk.)
11   BY MS. KAPPELMAN:
12      Q.  I'm reading his e-mail correctly?
13      A.  Yeah, but I'm interpreting it
14   differently.
15      Q.  Okay.
16      A.  He thought it was petty that Davina
17   wanted her name on the slides.
18      Q.  He goes -- do you see where Arron Velarde
19   writes to Matt Witte and says:
20      "I'm only forwarding you this because it
21   relates to the weird tension I continue to see
22   from both sides.  If Emily truly wants things
23   like such added for the right intent, then as me
24   and I will ensure we are all driving the same

1    way.  I just wanted you to know."
2       So does that make it clear to you that
3    Arron Velarde was complaining about you to
4    Matt Witte?
5       A.  That's not how I'm interpreting that.
6    He's complaining about Davina wanting to get
7    added to the slide.
8       Q.  Okay.
9       (Exhibit No. 17 marked for
10   identification.)
11   BY MS. KAPPELMAN:
12      Q.  Do you recall in June of 2019 Matt Witte
13   asking to have a one-on-one meeting with you?
14      A.  I don't recall that, but I see the
15   e-mail.
16      Q.  Okay.  And when it says under "Accepted:
17   1x1," do you understand that to mean a one-on-one
18   meeting?
19      A.  I do.
20      Q.  And the agenda for the meeting that Matt
21   sent you is below; is that correct?
22      A.  Yeah.  I need to read it, though.
23      Q.  Feel free.  Okay.  And did this meeting
24   actually occur between you and your manager,

1    Matt Witte?
2       A.  It did.
3       Q.  And under "2. Attitude Perception," he
4    says:
5       "I want to give you very honest, open
6    feedback to help you out with communication to
7    keep things tight but positive."
8       Do you see that?  Did he actually give
9    you feedback about the perception of your
10   attitude?
11      A.  He did, but I don't remember what he
12   said.
13      Q.  And did he actually talk to you about how
14   things were going with Mike McDole in June of
15   2019?
16      A.  I don't remember.
17      Q.  Okay.  Well, it says it's an agenda item.
18   Did you use this as an opportunity to tell him
19   about any sexual harassment that had occurred
20   prior to June 11, 2019?
21      A.  I did not.
22      Q.  Even though he said, "How's it going with
23   McDole," you didn't tell him about the January
24   sexual harassment event or a March sexual

Page 162

1  harassment, which allegedly had predated this.
2  Correct?
3      MR. GOODMAN:  Objection.  Assume facts
4  not in evidence.
5  BY MS. KAPPELMAN:
6      Q.  You can answer, ma'am.
7      A.  Can you say the question again?
8      Q.  Sure.  Even though he asked you how was
9  it going with McDole here, you didn't use this as
10  an opportunity to tell him about the January
11  alleged sexual harassment event or the March
12  alleged sexual harassment event; right?
13     A.  I did not use this opportunity.
14     MS. KAPPELMAN:  So that was -- was that
15  15, Emily Miller?
16     MS. MILLER:  I have it as 17.
17     MS. KAPPELMAN:  So this should be 18?
18     MS. MILLER:  Correct.
19     (Exhibit No. 18 marked for
20  identification.)
21  BY MS. KAPPELMAN:
22     Q.  Who's Jeff Neuharth, N-e-u-h-a-r-t-h?
23     A.  He was another industrial engineer.
24     Q.  And did you have a desktop with

Page 163

1  Mr. Neuharth about the design of the Erlanger
2  platform?
3      A.  I don't remember.
4      Q.  Well, does this refresh your recollection
5  about it?
6      A.  Could you scroll to the bottom?  Sorry.
7      Q.  "Emily, just to let you know, I'm angry
8  about the design of the Erlanger platform and how
9  I was not able to review the design prior to
10  install."
11     Do you see that?
12     A.  Yeah.  I'm reading it.  Sorry.
13     Q.  Does that refresh your recollection that
14  Jeff Neuharth was angry at you because you didn't
15  let him review the Erlanger platform?
16     A.  He was not angry at me.  He was angry
17  about the design.
18     Q.  Okay.  But you're claiming he wasn't
19  angry at you, even though he complained to
20  Kory McKnight?
21     A.  He was angry about the design.
22     Q.  Right.  I'm asking that question.  Is it
23  your contention that Kory McKnight never talked
24  to you about this dustup with Jeff Neuharth?  Is

Page 164

1  that your contention?
2      MR. GOODMAN:  Objection.  Assumes facts
3  not in evidence.
4  BY MS. KAPPELMAN:
5      Q.  You tell me.  Did Kory McKnight never
6  talk to you about this dustup with Jeff Neuharth?
7  If the answer is, no, he didn't, he didn't.
8      MR. GOODMAN:  Objection.
9      A.  Of the design?
10  BY MS. KAPPELMAN:
11     Q.  I'm asking you if Kory McKnight ever
12  counselled you about this issue with
13  Jeff Neuharth.  Yes or no?
14     A.  It was a design issue.
15     Q.  And did Kory McKnight talk to you about
16  it?
17     A.  He might have talked to me about the
18  design issue.
19     Q.  Okay.  And he didn't talk to you about
20  your communications issues with Mr. Neuharth?
21     A.  No, he did not.
22     (Exhibit No. 19 marked for
23  identification.)
24

Page 165

1  BY MS. KAPPELMAN:
2      Q.  Okay.  And who is Melissa Malik?
3      A.  She is either a director or, like, one
4  step above a director.
5      Q.  Do you remember Kory McKnight speaking to
6  you about missing his call with Melissa Malik,
7  even though he asked you to join it?
8      A.  No.  I don't remember this.
9      MS. KAPPELMAN:  And this is what?
10  Exhibit 17, Emily?
11     MS. MILLER::  I have it as 19.
12     MS. KAPPELMAN:  19.  Okay.
13  BY MS. KAPPELMAN:
14     Q.  Exhibit 19 is the e-mail with
15  Kory McKnight, Matt Witte, cc'ing Melissa Malik.
16  So you don't remember missing a call with Melissa
17  Malik and getting counselled on it -- about it by
18  Kory McKnight in late August of 2019?
19     A.  I don't remember this.
20     (Exhibit No. 20 marked for
21  identification.)
22  BY MS. KAPPELMAN:
23     Q.  Okay.  Who is Allan Lyall?
24     A.  He was a, like, executive.  Either an SVP

1  A. I have no idea. I have hundreds of --
2  not hundreds but I have dozens of these letters.
3  Q. And look at the second to last bullet.
4  Did you direct Davina not to share information
5  with Mike and -- in project planning meetings?
6  A. I don't recall.
7  Q. So it's possible you did. You just don't
8  remember?
9  A. I don't recall.
10  Q. So would you say you got along well with
11  Arron Velarde or not?
12  A. That's really subjective.
13  Q. No, no. What would you say? I'm asking
14  for your subjective opinion about this person.
15  Did you believe you got along well with him?
16  A. I met him once. He was out on paternity
17  leave the entirety of the project. I have no
18  opinion on him.
19    (Exhibit No. 22 marked for
20  identification.)
21  BY MS. KAPPELMAN:
22  Q. Who is Brian McCormick?
23  A. He is a site director in Kentucky.
24  Q. Okay. Did you have any communications

1  with Mr. McCormick?
2  A. Infrequently.
3  Q. Okay. Mr. McCormick said that you were
4  arrogant, self-righteous, and spoke to him from a
5  point of superiority. Is that commensurate --
6  does that comport with your recollection of how
7  you guys got along? Did you get along with
8  Mr. McCormick, I guess is my question.
9  A. I didn't work with him enough to have a
10  relationship with him.
11  Q. Okay. So if he says you were arrogant,
12  self-righteous, and approached from a point of
13  superiority, you didn't have enough occasion to
14  work with him for him to even have that opinion?
15  A. I can't talk about his opinion. That's
16  his opinion.
17  Q. No, I'm not asking about it. Did you
18  work with him enough for him to formulate an
19  opinion?
20  A. I don't know.
21    MR. GOODMAN: Objection. Calls for
22  speculation.
23  BY MS. KAPPELMAN:
24  Q. Did you have an opinion about Brian

1  McCormick?
2  A. Not really.
3  Q. How about Frances Thunder? Did you
4  interact with Frances Thunder ever?
5  A. I did.
6  Q. Okay. Were there occasions where you
7  didn't get back to Frances Thunder and she had to
8  send you multiple e-mails and meeting requests?
9  A. I'm not sure.
10  Q. Okay. Well, here on August 29, 2019,
11  Frances Thunder writes to you in an e-mail:
12    "I've also sent you multiple e-mails and
13  meeting requests over the last couple of months
14  that I've not gotten any response to, and I very
15  much appreciate the same courtesy."
16    Do you see that?
17  A. I see that.
18  Q. Does that refresh your recollection that
19  Frances Thunder was trying to get you to respond
20  to e-mails and meeting requests?
21  A. I had hundreds of e-mails and hundreds of
22  meetings.
23  Q. In your complaint -- let's go back to
24  that for a minute. In your complaint, in

1  paragraph 15, you say that McKnight told you that
2  he had three former male colleagues at Walmart
3  who he wanted to recruit at Wayfair. Do you
4  recall that? That he had -- he told you he had
5  some former colleagues that he wanted to bring
6  over from Walmart?
7  A. I recall that he told me he had former
8  colleagues that he wanted to bring over.
9  Q. Well, here's what's interesting. Is that
10  a problem? Because you brought over, I think you
11  said, five folks from outside of Wayfair to
12  Wayfair who you thought were great. So what is
13  the problem with Mr. McKnight wanting to recruit
14  people from Walmart, or is there a problem?
15    MR. GOODMAN: Objection. Argumentative.
16  Objection to sidebar.
17  BY MS. KAPPELMAN:
18  Q. Is there a problem with Mr. McKnight
19  trying to recruit people from outside of Wayfair?
20  A. No. There's not a problem.
21  Q. Okay. Because you yourself recruited, I
22  think you said, five people from outside of
23  Wayfair; right?
24  A. I'd have to check the numbers.

1    Q.  Well, it was earlier today so you
2  probably wrote them down.  And you also recruited
3  Mr. McDole; right?
4    A.  I recruited Mr. McDole.
5    Q.  Right.  So it's -- there's not a problem
6  if Mr. McKnight was trying to recruit people he
7  knew; right?
8    A.  There is not a problem.
9    Q.  Did anybody that McKnight worked with at
10  Walmart actually join the team at Wayfair while
11  you were there?
12    A.  Not on industrial engineering.
13    Q.  Okay.  Did you and McKnight get along
14  when he was your manager?
15    A.  No.
16    Q.  And why would you say you didn't get
17  along?
18    A.  Personality clash.
19    Q.  Okay.  And was Mr. McKnight involved in
20  the investigation of your complaints to Mr. Witte
21  on August 14th?
22    A.  Involved in what capacity?
23    Q.  Any capacity.  I mean, as you sit here,
24  are you aware of any involvement that

1  Mr. McKnight had in the investigation of your
2  complaints to Mr. Witte on August 14th?
3    A.  Witte told me McKnight knew about the
4  situation, and that is the extent that I know of
5  his involvement.
6    Q.  I think you and McKnight had a particular
7  conflict in September, September 17, 2019.  Do
8  you happen to remember anything about that?
9    A.  Yes.
10    Q.  Tell me everything you remember about
11  that before I look at your notes.  What did
12  Mr. McKnight do that day that upset you?
13    A.  He was leaving me out of conversations
14  that related to my -- critical conversations that
15  related to my job, my function, and my team.
16    Q.  Okay.  So how did you talk to him about
17  that?
18    A.  I asked him if we could talk in person.
19    Q.  And where were you physically located
20  when you asked him if you could talk in person?
21    A.  In Kentucky.
22    Q.  And where was McKnight physically located
23  when you asked if you could talk in person?
24    A.  In Kentucky.

1    Q.  So were you in the same building?
2    A.  Yes.
3    Q.  So how did you get to McKnight to talk to
4  him in person?  Did you just walk down the hall?
5    A.  I can't remember if he drove to Hebron
6  where I was or if I drove to Erlanger where he
7  was.
8    Q.  Okay.  And what did you say to him and
9  what did he say to you when you had your meeting
10  to discuss these issues?
11    A.  I said I was really upset that he was
12  again leaving me out of critical conversations.
13  He was making it difficult for me to do my job.
14  He was excluding me from critical meetings and
15  initiatives he wanted to do.
16    I asked him to include me in everything.
17  He was calling my team directly and cutting me
18  out purposefully, and I asked him just to loop me
19  in.
20    I said, "Obviously, it's your team but
21  just please cc me when you make a critical
22  decision just so I know what's going on."
23    Q.  Anything else you said to him in that
24  meeting?

1    A.  Not that I remember.
2    Q.  Did you ever talk to McKnight about your
3  complaint of sexual harassment against McDole,
4  either in this meeting or any other meeting?
5    A.  I believe McKnight might have brought it
6  up that he knew and that --
7    Q.  When was that?  When did McKnight tell
8  you that he knew about the sexual harassment
9  complaint?
10    A.  Right around the time I met him.
11    Q.  And was that an in-person meeting in
12  which he told you he knew about the sexual
13  harassment complaint?
14    A.  I can't remember.  It was, like, one of
15  two things.  I'm just not remembering.
16    Q.  Did he say anything else to you during
17  this meeting that you don't remember about
18  knowing about the sexual harassment complaint?
19    A.  I'm sorry.  Could you say that again?
20    Q.  Did he saying anything else to you during
21  this meeting other than, I know about the sexual
22  harassment complaint?
23    A.  Yeah.  He said -- he said that what
24  McDole was doing was disgusting and he won't

1 tolerate that.
2    Q. And what did you say to that?
3    A. I don't remember.
4    Q. And did McKnight tell you, as part of the
5 conversation that you had in person on
6 September 17, 2019, that he was hearing concerns
7 about your communication and performance from
8 others?
9    A. Yes. He told me that.
10    Q. Tell me exactly what he said about that
11 during that meeting in September 17, 2019, in
12 person.
13    A. To the best of my recollection he said,
14 "I've been getting a lot of complaints about your
15 performance. I've been getting complaints about
16 your communication."
17    And I said, "This conversation we're
18 having is about you leaving me out of my
19 projects. I'm happy to have a conversation with
20 you about my performance at another time."
21    Q. And that same day, on September 17th,
22 when he was trying to have a performance
23 management conference with you, did you file a
24 complaint with talent development alleging

1 McKnight was retaliating against you?
2    MR. GOODMAN: Objection. Assumes facts
3 not in evidence.
4 BY MS. KAPPELMAN:
5    Q. Let's try it a different way.
6    On September 17, 2019, didn't you file a
7 complaint with talent development alleging
8 retaliation by McKnight?
9    A. I did.
10    Q. And what was the retaliation for? What
11 had you done that he was retaliating against you
12 for?
13    A. What I felt?
14    Q. No. What was he retaliating against you
15 for? Like, what was your protected activity that
16 he was retaliating against you for?
17    A. Filing the sexual harassment complaint.
18    Q. Oh, okay. So you think McKnight was
19 retaliating against you for your complaint about
20 McDole to Wayfair; is that right?
21    A. That's part of it.
22    Q. So how do you connect those two? How do
23 you know -- why do you think that what McKnight
24 did in the meeting on September 17th was

1 connected to the McDole complaint? How do you
2 connection those two?
3    A. I connect those two -- that McKnight had
4 told me he knew about my sexual harassment
5 complaint, and McKnight considered me a liability
6 and a troublemaker, and he didn't want anyone on
7 his team that was going to be a troublemaker.
8    And McKnight also wanted to hire his
9 former co-worker or colleagues, I guess, and he
10 told me he needed -- not in this conversation.
11 He told me previously he needed my Level 6 spot.
12 And so he was trying to get rid of me because of
13 my sexual harassment complaint to fill the spot
14 he wanted.
15    Q. Okay. And you know that how? Like, you
16 know the troublemaker part is the one I'm most
17 interested in. Did he ever tell you you were a
18 troublemaker? Did he use those words?
19    A. I don't remember ever -- him calling me a
20 troublemaker.
21    Q. Okay. And other than telling you he
22 thought McDole's actions were -- did you say
23 disgusting? What was the word you used?
24    A. I can't remember --

1    Q. Okay.
2    A. -- the exact word.
3    Q. What exactly did you say -- what exactly
4 did McKnight tell you after he told you he knew
5 about the complaint? He said he thought McDole's
6 actions were something. What were they?
7    A. He said despicable or disgusting or --
8    Q. So he said, "I know about the
9 complaint" -- McKnight says that -- "and McDole's
10 actions are despicable or disgusting."
11    So how do you get from that to you're a
12 troublemaker? I'm going to retaliate against
13 you. Is there some other step I'm missing?
14    MR. GOODMAN: Objection to sidebar.
15 BY MS. KAPPELMAN:
16    Q. You can answer.
17    A. What was the question?
18    Q. What am I missing? If all he said to you
19 was, "I know about the complaint and I think what
20 McDole was doing was disgusting and despicable,"
21 but you now tell me you think he said something
22 about troublemaker and I'm going to retaliate
23 against you.
24    And I'm trying to figure out if I'm

Page 182

1 missing a step because the only thing you told me
2 about, with respect to the McDole complaint, was
3 that McKnight said he thought McDole's conduct
4 was despicable or disgusting.  So where do you
5 get he thought you were a troublemaker for
6 bringing the complaint?  What do you base that
7 on?
8     A.  We had a conversation -- McKnight and I
9 had a conversation on 9/11 --
10     Q.  Yeah?
11     A.  -- where McKnight told me he had -- he
12 had a woman like me on his team who was asking
13 him for -- or he said -- what did he say?
14        He said, "I had a woman on my team who
15 is, like, very similar to you.  And you know what
16 happened to her?  She left the team."
17        And I took that as he was threatening me
18 and he didn't want me on his team.
19     Q.  All right.  What I'm trying to understand
20 is every conversation you had with McKnight about
21 the McDole sexual harassment claims.  And I know
22 you told me he said, "I know about it.  I think
23 what McDole did was disgusting and despicable."
24        Were there any other conversations that

Page 183

1 you had with McKnight about the fact that you had
2 brought a complaint of sexual harassment?
3     A.  Not that I recall.
4     Q.  Okay.  So where did you get this
5 opinion -- this idea that he thought you were a
6 troublemaker?  Did he ever say you're a
7 troublemaker for bringing a sexual harassment
8 complaint?
9     A.  I got that from when he told me that
10 threatening story about kicking a woman off his
11 team for bringing issues up.
12     Q.  Okay.  So just before you said, I had a
13 woman like you on my team and she left.  Is there
14 some more to that story that you're not telling
15 me?  What else did he say to you during that that
16 led you to believe that she had made some
17 complaint and that's why she left?
18        (Simultaneous crosstalk.)
19        THE COURT REPORTER:  Can you repeat the
20 end of the question?  I can only get one at a
21 time.
22 BY MS. KAPPELMAN:
23     Q.  Did McKnight actually say, "I had a woman
24 like you on my team.  She made a sexual

Page 184

1 harassment complaint," or something like that?
2 Because that's a part you left out of your story.
3        Tell me everything McKnight said, please,
4 Ms. Forsythe, in that conversation that led you
5 to believe he was talking about you as a
6 troublemaker.
7     A.  He said -- sorry.  Can I answer?
8     Q.  Yes.
9     A.  He said, "I had a woman like you on my
10 team and she complained and you know what
11 happened to her?  She left the team."
12     Q.  And this conversation happened on 9/11;
13 is that right?
14     A.  Yes.
15     Q.  With McKnight.
16     A.  9/10 or 9/11.
17     Q.  Did you record it in any way?  Did you
18 take any contemporaneous notes?  Did you write
19 any e-mails to anybody?  You know, so that we
20 could see that he made this threat to you?
21     A.  I'd have to check if I wrote it down,
22 like, immediately after it happened.
23     Q.  Did you tell anybody that McKnight had
24 threatened you for making a complaint on

Page 185

1 September 11th?
2     A.  Anyone at Wayfair?
3     Q.  Yeah.
4     A.  No one at Wayfair.
5     Q.  Okay.  Is there anything else upon which
6 you base your theory that McKnight was
7 retaliating against you for bringing the McDole
8 sexual harassment complaint, or have you told me
9 all the evidence you have that supports that
10 retaliation claim?
11        MR. GOODMAN:  Objection.  Invades the
12 attorney work-product privilege.  Argumentative.
13        MS. KAPPELMAN:  No, it really doesn't.
14 I'm asking for her evidence in support of her
15 retaliation claim.  If I --
16        (Simultaneous crosstalk.)
17        MS. KAPPELMAN:  Let me finish, Bob.
18        If there's any other evidence that she
19 has -- that she has that supports her claim of
20 retaliation that she hasn't already told me.
21        MR. GOODMAN:  And I, as her counsel, I
22 get to martial the evidence.  So I think my
23 objection is proper but you can go ahead.
24

47 (Pages 182 - 185)

Page 186

1  BY MS. KAPPELMAN:
2  Q.  You told me about one conversation you
3  had with McKnight where he said, "I'm aware of
4  the sexual harassment complaint.  I think what
5  McDole did was" -- disgusting or despicable.
6  Whatever word he used.
7  And then another conversation on
8  September 11th where McKnight said, "I had a
9  woman like you on the team.  She complained.  She
10  ended up leaving the team."  Something like that.
11  Are there any other conversations that
12  you rely on or evidence that you rely on in
13  support of your claim that Mr. McKnight's actions
14  were in retaliation for the McDole complaint?
15  MR. GOODMAN:  Same objection.
16  BY MS. KAPPELMAN:
17  Q.  You can answer, Ms. Forsythe.
18  A.  I -- just to correct, it was on 9/10, not
19  9/11.
20  No, there's not.
21  Q.  Did you ever send your August complaint
22  about McDole to Kory McKnight, or did you just
23  send it to Witte?
24  A.  I can't remember.  I don't remember

Page 187

1  sending it to McKnight but I could have.  I don't
2  remember.
3  Q.  Do you recall that McKnight actually took
4  action on August 15, 2020, to ask McDole not to
5  contact you directly anymore?
6  A.  I don't remember.
7  Q.  Do you recall that?
8  A.  I don't remember.
9  (Exhibit No. 23 marked for
10  identification.)
11  BY MS. KAPPELMAN:
12  Q.  Did you ever text with Mr. McKnight or
13  did you text with Mr. McKnight when he was your
14  manager?
15  A.  Yes.
16  Q.  I'm going to show you a text string
17  between you and someone else.  I'm going to start
18  at the bottom.  Actually, I think one starts at
19  the top, unlike the e-mail.  And it's from you,
20  Emily, and it says:
21  "Let's try and connect today.  I want to
22  talk to you about your trip to Perris."
23  P-e-r-r-i-s.
24  "Mike has reached out to me and wants me

Page 188

1  to call him.  I know there's some friction there
2  but wanted to talk to you before I talk to him."
3  Q.  Do you see that?  Is that Kory McKnight
4  writing to you and responding?
5  A.  I have no idea who's writing that.
6  Q.  You really don't remember, as you sit
7  here today, texting with someone about this
8  issue?
9  A.  I -- you're showing me Emily.  I don't
10  know who's texting that.
11  Q.  No, I know, Ms. Forsythe, but how many
12  people were you texting with about this -- these
13  issues?  I'm assuming that this is going to
14  refresh your recollection about who you were
15  texting with this.
16  "I'm at the airport now.  Someone pulled
17  the fire alarm.  Good grief.  They haven't
18  evacuated yet.  I board in 20 minutes.  I'll call
19  you when I get to O'Hare."
20  Is that refreshing your recollection at
21  all about this?
22  A.  Yes, it is.
23  Q.  Yes, it is?
24  A.  Yes.

Page 189

1  Q.  So who is it that you were texting with
2  here about Mr. McDole?
3  A.  I'm assuming it's McKnight.
4  Q.  And why are you assuming that?  Just so
5  I'm clear.
6  A.  Because it said O'Hare and he lived in
7  Chicago.
8  Q.  Other than that, it doesn't refresh your
9  recollection of having a conversation -- text
10  conversation with your manager, Mr. McKnight,
11  about Mike McDole; is that right?
12  A.  Can I read the whole thing?
13  Q.  Sure.  You can read the whole thing, but
14  so far we haven't refreshed your recollection
15  about the conversation; is that right?  Just
16  reading what we've read so far.
17  A.  That's correct.
18  Q.  So let's go further down.
19  A.  Wait.  Sorry.  Can you start at the top?
20  Q.  Well, we just did read the whole top.
21  You want to read the whole top again?
22  A.  Yes, please.
23  Q.  Okay.  We'll be here as long as you want.
24  I really have nowhere to go tonight, so we can

48 (Pages 186 - 189)

Page 190

1  read these 10 and 12 times.
2      A. And you're assuming I'm the white
3  conversation; right?
4      Q. See, these are your texts. So you're
5  going to read it and tell me. Okay? Because I
6  wasn't involved last year with my manager,
7  Kory McKnight, in this text string. So I'm
8  asking you about it. I'm not assuming -- making
9  any assumptions.
10      I'm hoping that it refreshes your
11  recollection about what happened between you and
12  your manager last year because I'm sure he will
13  remember. So I'd like to give you a chance to
14  talk about your recollection of it.
15      A. Okay. Can you scroll down? Okay. Can
16  you scroll down? Okay.
17      Q. So does this refresh your recollection at
18  all about this conversation you had with
19  Mr. McKnight or, no, it doesn't?
20      A. Yes, it does.
21      Q. Okay. So fair to say that you were
22  talking to Mr. McKnight about your concerns about
23  Mr. McDole; is that right?
24      A. In this conversation?

Page 191

1      Q. Yes.
2      "Mike has reached out to me and wants me
3  to call him. I know there's some friction but
4  want to talk to you before I talk to him."
5      Mike is Mike McDole; right?
6      A. I didn't send that blue text.
7      Q. I know you didn't send it, Ms. Forsythe,
8  but in the context of this conversation you
9  understood Mike to mean Mike McDole; right? When
10  it said "Talk to you about your trip to Perris,"
11  that was Perris, California.
12      And this is a conversation with Kory
13  McKnight about your relationship with Mike
14  McDole. Am I right or am I not right?
15      A. Can you repeat the question?
16      Q. The question is: Mike is Mike McDole in
17  this first bullet; right? This first --
18      A. That is correct.
19      Q. Okay. And it's you responding when you
20  say:
21      "Sounds good. What time are you free to
22  talk?"
23      Do you recall that?
24      A. I see that I said that.

Page 192

1      Q. Do you recall it, as you sit here?
2      A. No, I don't remember this.
3      Q. Do you remember telling Mr. McKnight,
4  "Thanks for talking. This was the first time in
5  months that I feel good about a lot of stuff and
6  having you here has removed a tremendous amount
7  of stress. I really appreciate your support"?
8      A. Yes, I remember.
9      Q. Do you remember sending that to
10  Mr. McKnight?
11      A. Yes.
12      Q. So at least as of August 15th at
13  6:45 p.m. Mr. McKnight was not retaliating
14  against you for bringing claims against
15  Mr. McDole; right?
16      A. I don't know what he was doing in the
17  background.
18      Q. Well, you're thanking him. You're
19  telling him it's the first time in months that
20  you feel good about a lot of stuff, and he's
21  removed a lot of stress. I'm just reading your
22  words. Is it fair to say that you didn't believe
23  that Mr. McKnight was retaliating against you on
24  August 15th for bringing a complaint against

Page 193

1  Mr. McDole?
2      A. That's not a fair assumption.
3      Q. Okay. So you think -- you did think that
4  as of August 15th, when you thanked him and told
5  him that you feel good about stuff now and that
6  he's removed stress and you appreciate his
7  support, that you still thought he was
8  retaliating against you for bringing complaints
9  about McDole; is that right?
10      A. Yes. That's correct.
11      Q. That's correct. Good. Okay.
12      And when -- he says:
13      "I just talked to him. If he needs
14  something for you or feels you're not able to
15  provide him with the info, I told him to call me.
16  I don't want any more drama. I told him we all
17  need to work together and that this building is
18  Wayfair's building."
19      When Kory says, "I talked to him," he
20  meant he talked to Mike McDole; right?
21      A. You'd have to ask Kory.
22      Q. I'm asking you. You participated in this
23  conversation and thanked him for what he did. So
24  is it fair to say you knew who he was talking

Page 194

1 about?
2      A. I assumed he was talking about McDole.
3      Q. So -- and you thanked him -- right -- for
4 getting in the middle and stopping the drama.
5      A. I said, "Thanks. Have a great rest of
6 the night."
7      Q. I'm going to ask you the same question
8 again. As of August 15th, when you had this
9 conversation with Mr. McKnight, you did not
10 believe he was retaliating against you for
11 complaining about Mike McDole; is that correct?
12      A. That is not correct. I believed he was
13 scheming --
14      (Simultaneous crosstalk.)
15 BY MS. KAPPELMAN:
16      Q. If that's your answer --
17      MR. GOODMAN: Let her finish her answer,
18 Counsel.
19 BY MS. KAPPELMAN:
20      Q. Finish your answer. I like it.
21      A. I said no. I believed he was conniving
22 and retaliating and incredibly chauvinistic, and
23 he was playing both sides.
24      Q. Got it. Okay.

Page 195

1      (Exhibit No. 24 marked for
2 identification.)
3 BY MS. KAPPELMAN:
4      Q. Now, on September 10th, did you ask
5 Witte -- Matt Witte if you could start looking
6 for another job?
7      A. Yes.
8      Q. And why were you -- why are you trying to
9 look for another job at this point,
10 September 10th?
11      A. I couldn't handle the stress of McDole.
12      Q. So you wanted to look for another job
13 within Wayfair or outside of Wayfair?
14      A. I said both.
15      MR. GOODMAN: Objection.
16 BY MS. KAPPELMAN:
17      Q. So just fair to say as of September 10th
18 you were looking for other jobs both in Wayfair
19 and you were also interested in jobs outside of
20 Wayfair; right?
21      A. That's correct.
22      Q. And you told Matt Witte that; right?
23      A. Yes.
24      Q. And here's an e-mail from you to

Page 196

1 Matt Witte saying "Do you mind if I start
2 looking"; right?
3      And that meant looking for other jobs;
4 right?
5      A. Hold on. I didn't finish it. What was
6 the question?
7      Q. When you said "Do you mind if I start
8 looking," in this e-mail to Matt Witte on
9 September 10th, it's looking for other jobs;
10 right?
11      A. That's correct.
12      Q. And do you remember speaking to someone
13 and asking for severance pay? That you wanted a
14 compelling severance package on September 19th.
15      MR. GOODMAN: Objection. Argumentative.
16 Assumes facts not in evidence.
17 BY MS. KAPPELMAN:
18      Q. You can answer. Do you remember asking
19 for a compelling severance package when you
20 talked to Trevor Shaffer-Figueroa on
21 September 19th?
22      A. I don't remember my exact words.
23      Q. But do you remember talking to Trevor and
24 asking him -- telling him you wanted to leave and

Page 197

1 you wanted Wayfair to give you a severance
2 package?
3      A. I don't remember my exact --
4      MR. GOODMAN: Objection. Assumes facts
5 not in evidence.
6 BY MS. KAPPELMAN:
7      Q. I'm not asking for your exact words,
8 Ms. Forsythe. Do you remember talking to Trevor
9 Shaffer-Figueroa and telling him you wanted a
10 severance package?
11      MR. GOODMAN: Same objection. If you're
12 not asking her about her exact words, then ask
13 her about the subject matter without purporting
14 to ask about her words.
15      MS. KAPPELMAN: I'd like the question
16 read back and I'd like it answered.
17      So, Kim, if you could read that question
18 back, I'd appreciate it.
19      (Whereupon the prior question was read
20 back.)
21      MR. GOODMAN: Same objections.
22 BY MS. KAPPELMAN:
23      Q. You can answer, Ms. Forsythe. Do you
24 remember asking Trevor Shaffer-Figueroa on

50 (Pages 194 - 197)

1 September 19, 2019, for a severance package?
2    A. I don't remember my exact words.
3    Q. I didn't ask for your exact words. Did
4 you ask for money so that you could sign a
5 release and leave Wayfair? How are those words?
6       MR. GOODMAN: Objection. Argumentative.
7 Objection. Assumes facts not in evidence.
8 Objection. Best evidence.
9 BY MS. KAPPELMAN:
10    Q. You can answer, Ms. Forsythe. Did you
11 ask for money in exchange for a release to leave
12 Wayfair?
13    A. I don't know how to answer that because I
14 don't know what I said.
15    Q. Well, here's a good question: In
16 September of 2019, which was less than a year
17 ago, did you know what the word "severance"
18 meant?
19    A. That's a complex definition.
20    Q. Did you know what it meant? Yes or no?
21 And -- did you know what it meant?
22    A. In which context?
23    Q. In the context in which you used it in
24 your phone call. Yes or no? Yes or no? Did you

1 know what "severance" meant?
2    A. Not --
3    Q. Ms. Forsythe --
4    A. Not in the correct context. I didn't
5 know what it meant.
6    Q. We're going to try to play this phone
7 call, and let me know if you hear it. If you
8 can't hear it, I'll figure it out. Can you hear
9 this?
10    A. I can.
11       (Whereupon a recording was played.)
12       (Exhibit No. 25 marked for
13 identification.)
14 BY MS. KAPPELMAN:
15    Q. Were you able to hear all of that
16 recording of your phone call with Trevor
17 Figueroa?
18    A. I was.
19    Q. Okay. So you asked Trevor -- let's start
20 again with the compelling severance questions.
21       Isn't it true that you asked Trevor
22 Shaffer-Figueroa for a compelling severance
23 package in your call on September 19, 2019?
24    A. I asked him to put together a compelling

1 severance package.
2    Q. Thank you. And when you said that, did
3 you understand what severance package meant?
4    A. No.
5    Q. Yes or no?
6    A. Not in the full context.
7    Q. Okay. And is it fair to say that Trevor
8 Shaffer-Figueroa presented you with a severance
9 package on September 23, 2019?
10    A. In -- I would have to look at my e-mails,
11 but I think it was something he e-mailed over.
12    Q. Okay. Is it fair to say that
13 Mr. Shaffer-Figueroa e-mailed you a severance
14 package on September 23, 2019?
15    A. I know Wayfair terminated me on that day.
16    Q. That's not my question. Did Trevor send
17 you an actual severance package on September 23,
18 2019? That's the question. Yes or no?
19    A. I'd have to look.
20    Q. Okay. What would refresh your
21 recollection?
22    A. Looking at the e-mail.
23    Q. Are you able to look at your e-mail now?
24    A. Yes.

1    Q. Okay. Let's take a pause so you can look
2 at your e-mail and see if Trevor Shaffer-Figueroa
3 sent you a severance package on September 23,
4 2019.
5       THE VIDEOGRAPHER: Do you want to do that
6 on or off the record when you say "pause"?
7       MS. KAPPELMAN: We can go off the record
8 while she looks and then back on the record when
9 she has her answer. I'm not sure how long it's
10 going to take her but I'll sit here.
11       THE VIDEOGRAPHER: The time is 2:18.
12 This is the end of Session No. 4, and we are now
13 off the record.
14       (Recess taken at 2:18 p.m.)
15       (Deposition resumed at 2:19 p.m.)
16       THE VIDEOGRAPHER: The time is 2:19.
17 This is the beginning of Session No. 5, and we
18 are now back on the record.
19 BY MS. KAPPELMAN:
20    Q. Ms. Forsythe, you've had an opportunity
21 to look through your e-mails. Is it true that
22 Trevor Shaffer-Figueroa presented you with a
23 severance package by e-mail after your
24 September 19, 2019, phone call?

Page 202

1    A. No.
2    Q. What's the date of the e-mail in which he
3  sent you a severance package?
4    A. It wasn't a severance package. It was a
5  severance agreement.
6    Q. Okay. And what's the date that he sent
7  you the severance agreement?
8    A. It was Monday, September 23, 2019.
9    Q. And you actually have the attached
10 agreement that he sent you?
11   A. It's a separation agreement. Yes, I have
12 it.
13   Q. And how many months were you going to get
14 paid pursuant to that separation agreement?
15   A. Hold on. Let me look. How many months?
16   Q. Yes.
17   A. Two months.
18   Q. Going back for a minute to the recording
19 we listened to during the course of this
20 deposition, you said on there that he should send
21 you the compelling severance package and you
22 would give it to your lawyer.
23     Is it fair to say then that by
24 September 19, 2019, you had already retained the

Page 203

1  services of Mr. Goodman?
2    A. What time?
3    Q. By the time you had this phone call that
4  we just listened to, you already had a lawyer;
5  right?
6    A. No, I didn't.
7    Q. So after the phone call you retained a
8  lawyer?
9    A. That's correct.
10   Q. Okay. So when you said, Send me a
11 compelling severance package and I'll hand it to
12 my lawyer, you didn't actually have a lawyer yet.
13   A. Right.
14   Q. Is your --
15     MR. GOODMAN: I would doubt this letter
16 was sent after notice of representation was
17 given. I raised the issue under Rule 408 with
18 your in-house counsel in Chicago at the time I
19 was involved.
20 BY MS. KAPPELMAN:
21   Q. Ms. Forsythe, are you the e-mail account
22 holder of Emily.a.forsythe@gmail.com?
23   A. Yes, I am.
24   Q. On September 18th did you e-mail

Page 204

1  proprietary Wayfair documents to that personal
2  Gmail account?
3    A. I'd have to check.
4    Q. Do you recall that after you had --
5  strike that.
6      Do you recall before that conversation
7  with Trevor Shaffer-Figueroa you sent yourself a
8  number of proprietary Wayfair documents to your
9  personal e-mail account?
10   A. After which date?
11   Q. Right before you had that call with
12 Trevor asking for a compelling severance
13 agreement that we just listened to. Do you
14 remember sending yourself 54 confidential,
15 proprietary Wayfair documents to your personal
16 e-mail address?
17     MR. GOODMAN: Objection. Argumentative.
18   A. Nothing I sent myself was confidential or
19 proprietary.
20 BY MS. KAPPELMAN:
21   Q. But you do remember now that you sent
22 yourself 54 documents in five e-mails to your
23 personal e-mail account on the 18th of September?
24   A. I don't remember the quantity.

Page 205

1    Q. And what was the nature of those e-mails?
2  Why were you sending 54 documents to your
3  personal e-mail address on September 18th?
4    A. I don't remember the quantity, but they
5  were documents that I had worked on or been a
6  part of or created.
7    Q. And you knew you were leaving on
8  September 18, 2019, so you were sending them to
9  yourself on your personal Gmail account; right?
10     MR. GOODMAN: Objection. Argumentative.
11 Assumes facts not in evidence.
12 BY MS. KAPPELMAN:
13   Q. You can answer.
14   A. That is correct.
15   Q. So why did you send yourself, all of a
16 sudden, on September 18, 2019, 54 Wayfair
17 documents to your personal e-mail account?
18   A. After Kory had threatened to fire me on
19 the 17th I was worried that he would terminate
20 me.
21   Q. So you wanted these Wayfair documents on
22 your personal e-mail; right? So you could have
23 them if you left.
24   A. That's not accurate.

52 (Pages 202 - 205)

1    Q. So what was in these 54 documents that
2  you were sending to your personal e-mail address?
3    A. I don't know if it was 54 documents.
4    (Simultaneous crosstalk.)
5  BY MS. KAPPELMAN:
6    Q. What did you send yourself?
7    A. Documents that I had created or been a
8  part of.
9    Q. Like what? Give us examples of the
10  documents you sent to your Gmail account that
11  day, on the 18th of September 2019.
12    A. I'd have to check.
13    Q. You don't know at all? You can't give us
14  a sense of what it was you were e-mailing
15  yourself that day?
16    A. You said it was 54 documents. That's a
17  lot of documents.
18    Q. It sure is. Can you remember a single
19  one?
20    MR. GOODMAN: Objection. Argumentative.
21    (Simultaneous crosstalk.)
22  BY MS. KAPPELMAN:
23    Q. Well, you remembered it was stuff you had
24  prepared. So what was it?

1    A. I'd have to check.
2    Q. You don't have any idea what it was that
3  you sent yourself on September 18, 2019? No
4  clue? I mean, no idea? That's what you would
5  say to a jury too; right?
6    A. I want to be accurate with what I tell
7  you.
8    Q. Right. And you have no sense of what it
9  was? Whether it was something that was
10  confidential, proprietary document to Wayfair,
11  letter, e-mails? What were you sending?
12    MR. GOODMAN: Argumentative. Asked and
13  answered.
14  BY MS. KAPPELMAN:
15    Q. Go ahead.
16    A. I know it wasn't confidential and
17  proprietary. They were documents I had created
18  and it was a range of documents, and I don't want
19  to misrepresent what I sent to myself.
20    Q. So you never created confidential
21  documents as part of your job at Wayfair?
22  Nothing that you ever created at Wayfair would
23  have been considered confidential?
24    A. I've created hundreds of documents. I

1  don't know.
2    Q. That's not the question. Are any of the
3  documents that you create with project plans and
4  budget confidential?
5    A. I'm not sure.
6    Q. Then how do you know the stuff you sent
7  to your Gmail account wasn't confidential?
8    A. None of it was marked confidential.
9    Q. I see. So that's why you think it wasn't
10  confidential because I wasn't marked
11  confidential; is that right?
12    A. That's correct.
13    Q. Did you check with anybody at Wayfair,
14  either in legal or HR, to ask them if it was okay
15  for you is send those documents to your personal
16  Gmail account?
17    A. No, I did not.
18    Q. Does Wayfair have any policies about the
19  information that you can send through servers to
20  your personal Gmail accounts?
21    A. I'm not sure.
22    Q. Do you know whether you were violating
23  any Wayfair policies when you sent all those
24  documents to your personal Gmail account right

1  before leaving the company?
2    MR. GOODMAN: Objection. Argumentative.
3  Assumes facts not in evidence.
4  BY MS. KAPPELMAN:
5    Q. You can answer.
6    A. I was not aware.
7    Q. Did you check -- before you sent all
8  those documents to yourself in your personal
9  e-mail account that you had created, did you
10  check to see if there was any policy Wayfair had
11  prohibiting that?
12    A. I checked that everything was not marked
13  confidential.
14    Q. That wasn't my question. Did you check
15  to see that -- whether or not you were violating
16  any Wayfair policies by sending those documents
17  to your personal account?
18    A. No.
19    Q. Okay. Do you know whether you could be
20  fired for sending documents to your personal
21  e-mail account if you were still employed and
22  they found out about it?
23    A. No. We did that all the time.
24    Q. Okay. So there was no policy that said

Page 230

1  Amazon; right?
2      A.  Right.
3      Q.  And they covered your relocation costs,
4  but you told me you still had to keep an
5  apartment in Cincinnati until March; right?
6      A.  Right.  That's correct.
7      Q.  Okay.  What was your rent in Cincinnati?
8      A.  It was 15 or $1,600 a month.
9      Q.  Okey dokey.  I'm just going to show you
10  two documents to get you to identify them for the
11  record.
12      (Exhibit No. 26 marked for
13  identification.)
14  BY MS. KAPPELMAN:
15      Q.  By the way -- a few documents.  Can you
16  see this document, ma'am?
17      A.  Yes.
18      Q.  Is this your offer letter from Amazon for
19  the new job?
20      A.  I'd have had to check the date.
21      Q.  Well, the date is 11/15/2019.  It's
22  addressed to you with an Amazon letterhead.  Are
23  you questioning that this is your real offer
24  letter?

Page 231

1      A.  No.
2      Q.  Okay.  Good.
3          So it says here your start date was going
4  to be January 6, 2020.  Is there some reason why
5  you didn't start January 6, 2020?
6      A.  I had to move down.
7      Q.  So it was your choice?
8      A.  Yes.
9      Q.  Okay.  So the -- but you got a job that
10  would have started January 6, 2020, but you
11  decided to postpone that for the move.  Is that
12  fair to say?
13      A.  I decided to postpone for the move, and I
14  was too emotionally distraught to start a new
15  job.
16      Q.  But Amazon was willing to start paying
17  you January 6, 2020, a new salary of $135,000;
18  right?
19      A.  That's correct.
20      Q.  Okay.  And you postponed the start a
21  little over a month.
22          It said you'd be eligible for a sign-on
23  payment of $40,000.  Did you actually get that?
24      A.  Not yet.  You get it after your first

Page 232

1  year.  I think you get it every month after --
2  there's, like, a time period with that.  It's not
3  a lump sum.
4      Q.  And then there's a second sign-on payment
5  of 33,000 you're entitled to; is that right?
6      A.  I think that's after -- yeah.  A year
7  later, but I've not received that.
8      Q.  Did Wayfair have the same sign-on
9  bonuses?
10      A.  I'd have to check my offer letter.
11      Q.  Okay.  And this is the nature of your
12  restricted stock option award that you would get
13  at Amazon; is that correct?
14      A.  That looks correct.
15      Q.  Okay.  Relocation benefits were paid to
16  you or expenses earned -- incurred on your behalf
17  would be treated as an advance, and are earned on
18  a prorated daily basis if you don't leave before
19  the first two years; right?  You don't have to
20  repay it if you stay for two years.
21      A.  Yes.
22      MS. KAPPELMAN:  And Emily Miller, which
23  number is this document?
24      MS. MILLER::  That's 26.

Page 233

1      MS. KAPPELMAN:  Thank you.
2      (Exhibit No. 27 marked for
3  identification.)
4  BY MS. KAPPELMAN:
5      Q.  Directing to your attention to what's
6  going to be marked as 27 for your deposition,
7  Ms. Forsythe, did you have occasion to answer
8  some questions that Wayfair sent to your lawyer,
9  and they're called interrogatories?
10      A.  Yes.
11      Q.  And did you review the responses before
12  they were submitted --
13      A.  Yes.
14      Q.  -- for accuracy?
15      A.  Yes.
16      Q.  Okay.  You name -- let me just -- bear
17  with me for one second.  I want to see something.
18          One of your witnesses in response to
19  Interrogatory No. 6, which asks for each and
20  every person with information that supports,
21  refutes, or undermines any of the claims, you
22  identify Jordan Stone, Mike McDole's sister.  Do
23  you see that?
24      A.  I do see that.

1 proprietary system?

2     A. I have no idea. I don't even -- I don't

3 know what the Storopack pack is. I've never

4 worked with anything with Storopack or TACH-IT.

5 I have no idea what this is.

6     Q. You've never even worked with this stuff

7 but you sent it to your home account?

8     A. I would have to check. I don't know what

9 that is.

10     MS. KAPPELMAN: We're going to mark this

11 as -- I think this is -- is this 30, Emily

12 Miller?

13     (Exhibit No. 30 marked for

14 identification.)

15 BY MS. KAPPELMAN:

16     Q. Another e-mail, Emily Forsythe, that you

17 sent to yourself on your personal e-mail address.

18 Emergency action plan draft, emergency action

19 policy, reporting an investigation policy,

20 emergency action for Linden, safety manual.

21     Why were you sending these things to

22 yourself in your personal e-mail address on

23 September 18th?

24     A. So I can only speak to, like, each line

1 item. I don't want to group the answer to

2 everything, but a majority of these I actually

3 created myself. They were my documents.

4     Q. I actually don't care that they were your

5 documents. I actually asked you why were you

6 sending to -- them to yourself on your personal

7 nonWayfair e-mail on September 18th.

8     A. I was sending them because I made them.

9 Most of them.

10     Q. Did you always send documents to your

11 personal e-mail address that you made at Wayfair?

12     A. Not always, but I had in the past.

13     Q. So why on September 18th are you sending

14 all of these documents in one fell swoop to your

15 e-mail address?

16     A. I felt that Kory was going to retaliate

17 and terminate me.

18     Q. And, again, did you check with anyone to

19 see if these were the kinds of document you were

20 allowed to send to your personal e-mail address?

21     A. I did not check with anybody with these

22 e-mails.

23     Q. Okay.

24     MS. KAPPELMAN: I'd like to mark this

1 next one as Exhibit 31.

2     (Exhibit No. 31 marked for

3 identification.)

4 BY MS. KAPPELMAN:

5     Q. Here's another e-mail that you sent to

6 yourself at your personal e-mail address. Do you

7 see that?

8     A. Yes, I see that.

9     Q. This is an -- originally an e-mail that

10 Kory McKnight sent to you on August 8, 2019, and

11 he says:

12     "Here's the examples we talked about

13 earlier this week. Please keep confidential."

14     Do you see that?

15     A. I see that.

16     Q. What were they examples of, Ms. Forsythe?

17     A. They were confidential documents that

18 Kory had sent himself from Walmart.

19     Q. Okay. And now you were sending them to

20 your own e-mail address on September 18, 2019?

21     A. Correct.

22     Q. Do you remember you told me that none of

23 the documents you sent to your personal address

24 were marked confidential, but here Kory McKnight

1 is saying to you "Please keep confidential." And

2 yet you sent it to your own personal address on

3 that day too; right?

4     MR. GOODMAN: Objection. Argumentative.

5     (Simultaneous crosstalk.)

6 BY MS. KAPPELMAN:

7     Q. You can answer, Ms. Forsythe. Is that

8 correct?

9     A. What was the question specifically?

10     Q. The question was: Despite the fact that

11 Kory McKnight told you to please keep these

12 confidential, you sent them to yourself on your

13 personal e-mail address along with a slew of

14 other documents on September 18, 2019; isn't it

15 that correct?

16     A. They are not Wayfair confidential.

17     Q. Oh, so when you told me they weren't

18 marked confidential, what you meant was they had

19 to be marked Wayfair confidential. They could be

20 marked confidential, but they had to be marked

21 Wayfair confidential for you to decide not to

22 send them to yourself. Is that -- am I

23 understanding that?

24     MR. GOODMAN: Objection. Harassing.

Page 246

1  Misstates her testimony.
2  BY MS. KAPPELMAN:
3     Q. You can answer. It does say "Please keep
4  confidential," doesn't it?
5     A. It does say "Please keep confidential."
6     Q. Okay.
7        MS. KAPPELMAN: I have no further
8  questions.
9           EXAMINATION
10 BY MR. GOODMAN:
11    Q. Ms. Forsythe, were these Walmart
12 documents, to your knowledge?
13    A. They were Walmart documents. Walmart
14 confidential documents that Kory had taken from
15 Walmart and sent to me, setting a precedent for
16 sending confidential information.
17    Q. Did -- were you aware of anybody in your
18 group being terminated for e-mailing any
19 documents to themselves to work on during their
20 employment with Wayfair, regardless of Wayfair --
21 or however Wayfair may have characterized those
22 documents?
23    A. No, that never happened.
24    Q. There was a question asked about your

Page 247

1  rent loss. Did you have to pay your rent in
2  Cincinnati through the end of March 2020 before
3  you could move?
4     A. I terminated my lease early and I had to
5  pay a penalty.
6     Q. Okay. Did it run through the end of
7  March 2020, if you remember?
8     A. That's correct.
9     Q. And your first day of your work in Amazon
10 in February 2020 was what?
11    A. My first day at Amazon was -- the second
12 time was February 10, 2020.
13    Q. For a month and approximately three weeks
14 you were -- you had paid an amount that was
15 considered rent on the Cincinnati apartment
16 without living there.
17    A. I had furniture there but I wasn't there.
18    Q. Okay. The landlord allowed you to keep
19 your furniture there because it had made you pay
20 rent through the end of March. Is that it?
21    A. Correct.
22       Wait. I'm sorry, Bob. Can you repeat
23 that question?
24    Q. Yeah. You were allowed to keep furniture

Page 248

1  in Cincinnati beyond the date of your move away
2  from Cincinnati because the landlord had made you
3  pay a penalty that went through the middle or end
4  of March, 2020?
5     A. No. I'm sorry. I kept my furniture
6  there because I was paying rent, and then I moved
7  end of February and then March was the month that
8  I had to pay rent. I, like, lost that month.
9     Q. I understand that, but you could keep
10 furniture there because you were still paying
11 rent for the property through the end of the
12 month of March.
13    A. Yes.
14    Q. There were questions about business
15 trips. The last day that you were at Walmart
16 were you on a business trip or planning to take a
17 business trip?
18    A. I was planning on going to Atlanta the
19 next morning.
20    Q. What was that for?
21    A. It was for a site visit for a project.
22    Q. And did you end up going on that business
23 trip to Atlanta?
24    A. No.

Page 249

1     Q. Why not?
2     A. The night before I was supposed to leave
3  Shaffer told me I was terminated.
4     Q. Do you recall whether there was any
5  uncertainty the morning of the proposed business
6  trip?
7     A. No. I -- oh, the morning of? The
8  Tuesday?
9     Q. Yes.
10    A. No, because I had already received the
11 termination letter Monday night. I went to work
12 Monday the 23rd because I --
13    Q. And after you got the termination letter,
14 did you later get a proposed separation agreement
15 from Mr. Shaffer-Figueroa?
16    A. The separation agreement was attached to
17 the letter he sent me -- the e-mail he sent me.
18    Q. All right. I stand corrected.
19       Were there any jobs that you were
20 offered -- who were the jobs that you were -- who
21 offered you jobs that you did not accept in
22 between your termination by Wayfair and your
23 first day at Amazon?
24    A. Give me a second. Okay. So I had a

Page 254

1 on his team in September?
2 A. I think he was just trying to let me know
3 that if I complained about stuff or if I asked
4 him to include me on stuff or if I made sexual
5 harassment claims, he'd eliminate me from his
6 team because he had done it before.
7 Q. In the conversation in September where he
8 gave you that example, had you made any
9 complaints beyond the complaints against McDole
10 that he told you he knew about in August?
11 A. No.
12 Q. Do you remember whether you initiated the
13 call or he made that? Where he gave you that
14 example. Or if he initiated that call?
15 A. He called me.
16 Q. And was there any purpose to the call, if
17 you remember, other than to give you that
18 example?
19 A. He called me because I had talked to
20 Matt Witte earlier that day about some of my
21 frustration with Kory, about Kory not including
22 me on stuff, and Kory purposely leaving me out
23 and being very exclusive. And Kory called me to
24 tell me that Matt had called him -- that Witte

Page 255

1 had called him, and he just wanted to make sure
2 that I knew how to behave on his team.
3 Q. Do you understand that sexual harassment
4 is just one form of sex discrimination?
5 MS. KAPPELMAN: Object to the form of the
6 question. Calls for legal conclusion. You can
7 answer.
8 A. Yes.
9 BY MR. GOODMAN:
10 Q. We have stated that Mr. McKnight engaged
11 in sex discrimination in retaliation, even if he
12 did not specially engage in the sexual harassment
13 himself. Correct?
14 A. Yes.
15 Q. There was a question about the
16 recruiting -- receiving recruiting effort by
17 Mr. McKnight of former employees of Walmart, and
18 you said you didn't end up recruiting per se.
19 Something about his statements and trying to
20 attract Walmart employees to Wayfair that was
21 different than recruiting by you and others --
22 multiple other employees of Wayfair.
23 A. He told me the first day I met him in
24 person that he has three guys, men, from Walmart

Page 256

1 that he wants to bring on, and then he proceeded
2 to ask me how much I made. And I told him I made
3 135 at my level.
4 And he said, "They're not going to work
5 less than 135. I only have your L6 spot left to
6 figure this out."
7 Basically saying I'm going to replace you
8 with a bro of mine, a man he worked with at
9 Walmart, and he needed my spot.
10 Q. And what was the exact or approximate
11 first day that you were supervised by
12 Mr. McKnight?
13 A. We met -- the first day we met was
14 sometime in August and we drove together from
15 Atlanta to Savannah. So we had a long time in
16 the car to talk.
17 Q. Do you recall the interrogatory answers
18 about potential witnesses that you were asked
19 about about half an hour ago?
20 A. I don't remember the names, but I know
21 what you're talking about.
22 Q. Was there individuals with whom you
23 shared your experience of sexual -- physical
24 sexual harassment by McDole around the time it

Page 257

1 occurred?
2 A. Yes, there were.
3 Q. And did you list those -- did you give
4 those names in your interrogatory answers, if you
5 recall?
6 A. I did.
7 Q. Did Mr. Witte or Mr. McKnight or
8 Mr. Shaffer-Figueroa tell you at any time that
9 the negative information or negative comments
10 about you were being solicited from other Wayfair
11 employees?
12 A. No.
13 Q. Did you have an occasion to give a
14 performance -- written performance review of
15 Mr. McDole while he was under your supervision?
16 A. Yes.
17 Q. Approximately when?
18 A. I gave him a verbal 30-, 60-, 90-day
19 review and I think -- I can't -- I don't think I
20 contributed to his annual review.
21 Q. So any reviews you gave him for 30, 60,
22 90 days was purely verbal?
23 A. Verbal, yeah. I think I also did his
24 written review. I'd have to check. I don't

1  appropriateness of you moving into another
2  position ever get to the point where you
3  discussed specific positions, whether at your
4  then same level or a level above?
5      A. I had reached out to the real estate team
6  to see if I could talk to them -- start talking
7  to them about moving over there.
8      Q. Who on the real estate team?
9      A. I can't remember.
10     Q. Did they have people at your same level
11 on their team at the time you reached out to
12 them?
13     A. Yes.
14     Q. And when you did that, how long had you
15 been in the senior manager position?
16     A. I'm sorry. When I did what?
17     Q. When you did that, how long had you been
18 in the senior management position? When you
19 reached out to the real estate team and reached
20 out to Mr. Witte about the untenability of the
21 situation on the engineering team?
22     A. I was an associate director at that time,
23 like, when I left Wayfair. I had been in that
24 role a little over a year.

1      Q. Was there any pattern of time in grade
2  for people at that level at Wayfair that you
3  observed when you were there?
4      A. Yeah. A year to a year and a half from
5  the associate director to director promotion.
6      MR. GOODMAN: Pass the witness.
7      MS. KAPPELMAN: I just have a few
8  follow-up questions.
9          FURTHER EXAMINATION
10 BY MS. KAPPELMAN:
11     Q. Ms. Forsythe, in response to your
12 attorney, Mr. Goodman's questioning, you
13 indicated that you had a sex discrimination claim
14 against Kory McKnight that is separate and
15 distinct from the sexual harassment and
16 retaliation claims you have; is that correct?
17     A. I don't think I stated that.
18     Q. You did. He said, he -- you believed
19 that Kory McKnight discriminated against you on
20 the basis of your sex, even if he didn't harass
21 you and you said yes. Do you remember that?
22     MR. GOODMAN: Objection to the extent it
23 misstates the testimony.
24

1  BY MS. KAPPELMAN:
2      Q. Okay. Well, let me just ask you this
3  then just in case that is what you said and we
4  read the tape back: Did anyone, including
5  Mr. McKnight, ever make any sexist remarks to you
6  that you're relying on in making a sex
7  discrimination claim against Wayfair?
8      A. Yes.
9      Q. What were those and who made them?
10     A. Kory said he had -- is bringing three men
11 and he needs my spot and then he -- and then he
12 also made that claim that he had a woman on his
13 team who was complaining and he -- she left the
14 team.
15     Q. Anything else? Let me just make sure I
16 get this straight. The sexist remarks that Kory
17 made were, one, he said he was bringing three men
18 in from Walmart and he needed your spot, and he
19 also said there was a woman on his team that had
20 made complaints and she had left.
21     Are there any other sexist complaints
22 upon which you rely in making your sex
23 discrimination complaint against Kory McKnight?
24     MR. GOODMAN: Objection to the extent it

1  invades the attorney work-product privilege. You
2  can answer.
3  BY MS. KAPPELMAN:
4      Q. You can answer.
5      A. Can I answer that?
6      Q. Yeah. Any other sexist remarks Kory
7  McKnight made?
8      A. Not that I can remember right now.
9      Q. Thank you. Are there any other sexist
10 remarks anyone else at Wayfair made that you're
11 relying on in bringing your sex discrimination
12 claim?
13     A. There was a lot of aggressive sexualized
14 behavior that I saw that would contribute to that
15 feeling.
16     Q. What? If you're relying on it for your
17 sex discrimination case -- in this case, I'd like
18 to hear what that was and by whom and when.
19     A. Sure. So I think the culture on the
20 industrial engineering team in Wayfair in general
21 was just very male dominated, very bro'y, very
22 boys club, very chauvinistic.
23     And a great example: I realized I was in
24 trouble when there was a going-away retirement

Page 266

1 party for Greg Konicki, who was, like, a VP of
2 distribution. And another man on the team at
3 this retirement party physically hoisted himself
4 on Greg and grabbed him and was, like, holding
5 him aggressively. And then he kissed him in
6 front of everybody and everybody is laughing.
7     And I just remember, like, holy shit.
8 Like, they are not going to take any type of
9 harassment claim seriously because they laugh at
10 harassment. They laugh at sexual harassment.
11    Q. Let me see if I can get this straight. I
12 just want to repeat the story back to make sure
13 I'm not missing anything.
14    You're relying on the fact that there was
15 a going-away party for Greg Konicki and one man
16 grabbed Greg and kissed him and people laughed at
17 it. Did I miss something?
18    A. Yeah. He held him forcibly when he did
19 it. He restrained him.
20    Q. And kissed him. And people laughed?
21    A. And took photos.
22    Q. And what did Greg say? Did Greg say it
23 was unwelcome?
24    A. Yes.

Page 267

1    Q. Okay. Greg is a male and the other guy
2 was a male; right?
3    A. That's correct.
4    Q. Okay. Anybody else other than the guy
5 kissing Greg in his going-away party -- anybody
6 else do or say anything to you that you rely on
7 in your sex discrimination case against Wayfair,
8 other than the two things you've told me about
9 Kory McKnight?
10    MR. GOODMAN: Objection to the extent it
11 invades the attorney work-product privilege. You
12 can answer.
13    BY MS. KAPPELMAN:
14    Q. If it supports your claim against
15 Wayfair, please do tell me.
16    A. I can't recall anything right now.
17    Q. So have you told me all of the remarks or
18 conduct that support your sex discrimination
19 claim in this case?
20    MR. GOODMAN: Objection. Argumentative.
21 We've also talked about the sexual harassment.
22 That's a second count.
23    MS. KAPPELMAN: I know.
24

Page 268

1    BY MS. KAPPELMAN:
2    Q. I'm not talking about sexual harassment.
3 I'm only talking about the sex discrimination,
4 separate and distinct from sexual harassment that
5 your lawyer talked about on cross.
6    So have you told me everything that
7 supports the claim of sex discrimination,
8 separate and distinct from sexual harassment?
9    MR. GOODMAN: Again, objection to the
10 extent it invades the attorney work-product
11 privilege. You can answer.
12    BY MS. KAPPELMAN:
13    Q. You can answer if it supports your claims
14 in this case. Go ahead.
15    A. Not that I remember right now.
16    Q. Are there any male employees that
17 Kory McKnight treated more favorably than you
18 that were in comparable positions?
19    A. Yes.
20    Q. Who was that?
21    A. Arron, the site director of Lathrop was
22 his buddy from when they worked together at
23 Tesla, and Kory would bend over backwards to get
24 Arron what he wanted.

Page 269

1    Q. So how did he treat Arron differently
2 than you in support of your sex discrimination
3 claims?
4    A. So Kory would undermine a direction I
5 took on a project and then go behind my back and
6 change things so that Arron would be happy.
7    Q. Can you give me a -- specific instances
8 in support of your claims in this case?
9    A. Yeah. So there was one situation where
10 we were installing a system in Lathrop and Arron
11 wanted it -- I think one direction or he wanted
12 it longer or shorter or something. He wanted to
13 change the design of the system after we had
14 already placed the order and were starting to do
15 the install. I think it was racking. I can't
16 remember.
17    And I told Arron, "Listen. We can't.
18 It's going to cost hundreds of thousands of
19 dollars to change this."
20    And Kory turns around, has a conversation
21 with Arron, and basically says, like, Don't
22 listen to Emily. I'll take care of you. We'll
23 do what you want. And it's just because they
24 were friends and he was a bro.

68 (Pages 266 - 269)

Page 270

1    Q. When you say he's "a bro," is that a
2 sexual harassment term that you're aware of?
3 What does "a bro" mean?
4    A. I don't think that's a sexual harassment
5 term.
6    Q. I'm sorry. I don't know what you mean
7 when you say he's a bro. What does that mean?
8    A. Like a brother in work. A business
9 brother.
10    Q. Is that a Wayfair term of art? I just
11 don't understand what you mean when you say he's
12 a bro. I'm not sure I understand what -- I
13 mean -- what you're saying.
14    A. They have a brotherly affection.
15    Q. So other than this instance where Kory
16 accepted Aaron's suggestion about changing the
17 system in Lathrop, were there any other instances
18 that you can point to where Kory McKnight treated
19 a male employee more favorably than you?
20    A. Not that I can recall.
21    Q. Okay. Thank you.
22    And just a couple of follow-ups. When
23 did Target give you the offer that you turned
24 down, and how much did they offer you?

Page 271

1    A. It was a verbal offer, so we never talked
2 money. Let me see. Hold on.
3    Q. Do you know what position it was for, so
4 we can look up the salary?
5    A. I can't remember. Hold on one second.
6 It was a lead project manager position.
7    Q. Okay. And you never talked salary.
8    When did they offer that to you and when
9 did you turn it down?
10    A. End of October, beginning of November.
11    Q. So a month and a half after you lost your
12 job at Wayfair. Why did you turn that job down?
13    A. It would have been a step down for me
14 with responsibility.
15    Q. But you don't know how much they were
16 going to pay you?
17    A. I don't.
18    Q. Did you ever ask?
19    A. I don't remember what -- they gave me a
20 range, and it was more about responsibility and
21 development.
22    Q. I'm not asking about what it was about,
23 but do you know whether the range was around
24 135,000?

Page 272

1    A. I have to check. I don't know.
2    Q. And the Intellimodus job that you turned
3 down, when did they make that offer to you?
4    A. They made that -- I don't remember when
5 they made it.
6    Q. Was it after Target?
7    A. It was after Target.
8    Q. But before you took the Amazon job?
9    A. It was before I took the Amazon job.
10    Q. And do you have any idea how much they
11 were willing to pay you?
12    A. That was around 110 base.
13    Q. And why did you turn that job down?
14    A. It was too small of a company. There was
15 no growth opportunity.
16    Q. And do you know if it was in November or
17 December? Do you have records of when you turned
18 that down and when it was offered?
19    A. I'd have to check my e-mail.
20    MS. KAPPELMAN: So Bob, I'd like to
21 follow up and get information for mitigation
22 purposes about how much -- what the range was
23 that Target was offering her in October and
24 November that she turned down, and how much

Page 273

1 Intellimodus was offering and when she turned
2 that down. Okay?
3    And that's it. Those are my last
4 questions.
5    FURTHER CROSS-EXAMINATION
6 BY MR. GOODMAN:
7    Q. Where were those jobs, Emily? The two:
8 Target and Intellimodus.
9    A. Target was in Minneapolis, and
10 Intellimodus was in Louisville, Kentucky.
11    MR. GOODMAN: Okay. Nothing further
12 here.
13    MS. KAPPELMAN: Nothing further.
14    THE VIDEOGRAPHER: The time is 3:46.
15 This is the end of Session No. 5, and we are off
16 the record.
17    THE COURT REPORTER: I'd just like to get
18 your orders on the record before we leave.
19    Mr. Goodman, would you like a copy?
20    MR. GOODMAN: Direct it to my office,
21 please.
22    MS. KAPPELMAN: I would like a mini
23 script as well, and if you guys could sync it,
24 Anthony and Kim. Sync the transcript to the