Exhibit 2

# Exhibit 2

1                                    Pages 1-126

2                                    Exhibit 1

3

4        IN THE UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6              C.A. No. 1:20-cv-10002

7

8   ***************************************

9   Emily Forsythe,

10          Plaintiff

11  vs.

12  Wayfair, LLC,

13          Defendant

14  ***************************************

15

16     Videotaped Deposition of Michael McDole

17         Wednesday, July 22, 2020

18            Via Videoconference

19

20      ------Kristen C. Krakofsky------

21            Court Reporter

22              VERITEXT

23            (800) 227-8440

24

25

                                    Page 1

1    A.   Yes.
2    Q.   And with Amazon?
3    A.   Yes.
4    Q.   Are you currently single?
5    A.   Yes, I am.
6    Q.   What was the nature of the training at --
7  sexual harassment training at 7-Eleven, Ashford, and
8  Amazon?
9         MS. KAPPELMAN:  Object to the form of
10  the question, aside from the fact that it's multiple
11  questions.
12         But go ahead and answer to the extent
13  you understand what he's looking for.
14    A.   I'm sorry.  The extent of the training?  Is
15  that what you asked me?
16    Q.   The nature and extent of the training --
17         MS. KAPPELMAN:  Same objection.
18         You can answer.
19    A.   I assume it's, you know, comprehensive
20  sexual harassment training, just that it's not
21  tolerated in the workplace.
22    Q.   Was it in person or online?  And you can
23  answer employer by employer.
24    A.   It's usually online by virtual training
25  sessions for companies, and then -- and then by the

Page 10

1  employer.
2    Q.   So you don't remember any in-person
3  training at Ashford, 7-Eleven, or Amazon?
4         MS. KAPPELMAN:  Object to the form;
5  mischaracterizes his testimony.
6         You can answer.
7    A.   I'm sorry.  Ask that again?
8    Q.   Do you remember any in-person sexual
9  harassment training at Amazon, 7-Eleven, or Ashford?
10    A.   No, I don't.
11    Q.   Have you had sexual harassment training at
12  Wayfair?
13    A.   Yes.
14    Q.   What is your current position at Wayfair?
15    A.   I'm a site director at one of the
16  fulfillment centers.
17    Q.   Which fulfillment center?
18    A.   In Perris, California.
19    Q.   I gather that's near Temecula?
20    A.   Correct.
21    Q.   What was the nature and scope of the sexual
22  harassment training at Wayfair?
23         MS. KAPPELMAN:  Object to the form.
24         You can answer if you know what he's
25  looking for.

Page 11

1    A.   I do not.  I would say it's similar to
2  other sexual harassment trainings.  Its -- and
3  bottom line being that it's not tolerated.
4    Q.   Purely online at Wayfair?
5    A.   Correct.
6    Q.   So when you say it's not tolerated, does
7  that mean that -- does it tolerate unconsented
8  touching of a female employee by a male employee?
9         MS. KAPPELMAN:  Object to the form of
10  the question.  Did you mean to say a female employee
11  by a male employee?
12         MR. GOODMAN:  I not only meant to say
13  that, that's what I said.
14         MS. KAPPELMAN:  Okay.  Object to the
15  form.
16         You can answer, Mike.
17    A.   Yes.  Unwelcome touching, whether it's male
18  to female or female to male, is covered as part of
19  the training.
20    Q.   And do you equate unwelcome with
21  unconsented?
22    A.   I'm sorry.  Do I equate unwelcome --
23    Q.   Are they the same thing?  Is unwelcome the
24  same as unconsented?
25    A.   I would say, yes, absolutely.

Page 12

1    Q.   Have you had any violence in the workplace
2  training at any of your employers since the Marine
3  Corps?
4    A.   Yes.
5    Q.   Has it also been online?
6    A.   Yes.
7    Q.   What have those trainings addressed in
8  terms of either verbal or physical bullying?
9         MS. KAPPELMAN:  Object to the form.
10         You can answer, Mike.
11    A.   I would say it's obviously a covered topic.
12  But as far as the specific curriculum, I could not
13  give you any more detail on that.
14    Q.   So you don't know what Wayfair's -- just to
15  focus on Wayfair, you don't what Wayfair's policy is
16  about verbal or physical bullying?
17    A.   No.
18         MS. KAPPELMAN:  Object to the form.
19         You can answer, Mike.  Go ahead.
20    A.   No, I am aware of their policy.  It's also
21  not tolerated.
22    Q.   Is there an overlap between unconsented or
23  unwelcome touching between sexes and physical
24  bullying --
25         MS. KAPPELMAN:  I'm going to object.

Page 13

4 (Pages 10 - 13)

1 It calls --
2         MR. GOODMAN:  Let me finish the
3 question, please.
4         MS. KAPPELMAN:  Well, you're asking --
5         MR. GOODMAN:  I want to finish the
6 question.
7         MS. KAPPELMAN:  You can do whatever
8 you want, but --
9         (Multiple parties speaking.
10 Interruption by the court reporter.)
11   BY MR. GOODMAN:
12   Q.   In terms of whether the company tolerates
13 it or not, do you understand that Wayfair not only
14 doesn't tolerate unwelcome or unconsented touching,
15 it does not tolerate physical bullying by a male of
16 a female or by a female of a male?
17   A.   I mean -- sorry.  You're asking if it's --
18 if both are untolerated?
19   Q.   Yes.
20   A.   Yes, they are.
21   Q.   And expression of dominance of a male over
22 a female by unconsented touching is a form of
23 bullying that is not tolerated by Wayfair; is that
24 correct?
25         MS. KAPPELMAN:  Object to the form of

Page 14

1 the question, Mike.
2         You can answer, Mike.
3   A.   I'd say in both cases.  Not simply just
4 male to female.
5   Q.   In other words, bullying can extend to
6 people of the same sex, but sexual harassment
7 involves people of different sex; correct?
8         MS. KAPPELMAN:  Object to the form.
9 It calls for a legal conclusion which is actually
10 not correct.
11   BY MR. GOODMAN:
12   Q.   You can answer.
13   A.   No, it's not correct.  I think sexual
14 harassment doesn't necessarily have to be just
15 opposite genders.
16   Q.   So what are you trying to say?  Let me
17 reask the question.
18         Under certain circumstances, can
19 unconsented touching also be -- involve bullying,
20 physical bullying?
21         MS. KAPPELMAN:  Object to the form of
22 the question; calls for legal conclusion.
23         Testify about what you know, Mike.
24   A.   I'm trying to understand your question.
25 You're asking if -- you're asking if unconsented

Page 15

1 touching constitutes physical bullying?
2   Q.   Whether it can, under certain
3 circumstances, constitute -- unconsented touching,
4 which is sexual harassment, can also involve
5 physical bullying.
6         MS. KAPPELMAN:  Same objection.
7   A.   Certainly.  It certainly can.  And that
8 can -- that can be man/woman or man/man.
9   Q.   There were several instances in early 2019
10 in which you sat next to Emily Forsythe with her
11 being closest to a wall; correct?
12         MS. KAPPELMAN:  Object to the form.
13         What was that question?  Can you read
14 that back, Kristen?
15         (Last question read.)
16         MS. KAPPELMAN:  Object to the form.
17         Go ahead and answer, Mike, if you
18 understand it.
19   A.   I would say, no, that's not correct.
20 That's her account of events, not mine.
21   Q.   So you recognize that as being -- as being
22 in her complaint in this case; correct?
23   A.   Correct.
24   Q.   Was there ever a time in January 2019 when
25 you were alone with Emily Forsythe in a meeting room

Page 16

1 in a facility of Wayfair in Perris, California?
2   A.   Yes, there was.  And if -- allow me to
3 elaborate that --
4   Q.   No.  That's my question.  Wayfair's counsel
5 is going to have a chance to ask you questions.
6         Were you having a conversation about your
7 performance?
8   A.   Yes.
9   Q.   Did you move from an end of the table or
10 the opposite side of the table to Emily's side of
11 the table?
12   A.   No.
13   Q.   So in any conversation you had in January
14 2019 with Emily in Perris in a meeting room, you
15 were not sitting on the same side of the table as
16 her?
17   A.   No.
18   Q.   Did you -- do you remember distinctively
19 the meeting that I'm referring to?
20   A.   I do, yes.
21   Q.   Did you touch her left side with your right
22 hand?
23   A.   No.
24   Q.   Did you touch it with your left hand?
25   A.   No.

Page 17

5 (Pages 14 - 17)

Page 18

1   Q.   Did she move away from you when you were
2   sitting in this meeting room after you moved closer
3   to her than you had been at some point earlier in
4   the meeting?
5        MS. KAPPELMAN:  Object to the form of
6   the question; mischaracterizes his testimony.  He
7   said he didn't do that.
8        You can answer.
9   A.   I'd say no.  We were on opposite sides of
10  the table.
11  Q.   So this is one of multiple instances I
12  expect to have occur during this deposition where
13  you say Emily Forsythe is a liar.  Correct?
14       MS. KAPPELMAN:  Object to the form of
15  the question.  Are you referring to this specific
16  instance?  Because you haven't asked him about any
17  other instances, so I'm not sure what you're even
18  saying.
19       MR. GOODMAN:  I'll ask the question
20  less rhetorically.
21       MS. KAPPELMAN:  Yeah.  And I'm going
22  to tell you not to answer because it's a
23  hypothetical --
24       (Multiple parties speaking.
25  Interruption by the court reporter.)

Page 19

1        MR. GOODMAN:  I'm reasking the
2   question.
3        MS. KAPPELMAN:  Okay.  Go ahead.
4   BY MR. GOODMAN:
5   Q.   Mr. McDole, is it your testimony that
6   Ms. Forsythe is lying about your conduct on
7   January 22, 2019, in her complaint?
8   A.   I will say that I believe she is mistaken
9   in her recount of events.
10  Q.   You deny that account; correct?
11  A.   Correct.
12  Q.   If that's the case, why are you hesitating
13  in -- to not call her a liar?
14  A.   I would say that, you know, part of my
15  argument is that she is very untrustworthy.  I would
16  not count her a liar.  I will give her the benefit
17  of the doubt in saying that she's just mistaken.
18  Q.   So when you say she's very untrustworthy,
19  are you telling the jury that she lies?
20       MS. KAPPELMAN:  There's no jury here,
21  Bob.
22       MR. GOODMAN:  I know.  But if this is
23  shown in a trial because he's unavailable, he's
24  beyond the subpoena range, I can ask that question
25  that way.

Page 20

1        MS. KAPPELMAN:  Okay.
2   BY MR. GOODMAN:
3   Q.   Are you telling the jury that Ms. Forsythe
4   is a serial liar who lies about many things?
5        MS. KAPPELMAN:  Object to the form of
6   the question.
7        You can answer, Mike.
8   A.   No, I'm not stating that.  I'm saying that
9   I personally find her to be untrustworthy.
10  Q.   In your understanding, has she just been
11  untrustworthy about her characterization of the
12  event on January 22, 2019?
13  A.   No, no.  This is an opinion formulated over
14  time.
15  Q.   Okay.  So from your standpoint, she has
16  made many statements either about you or about other
17  things that are -- that you regard as a lie?
18       MS. KAPPELMAN:  Object to the form of
19  the question.
20       You can answer.
21  A.   Yeah, I would regard them as untrue.
22  Q.   You worked with -- you worked with Emily at
23  Amazon prior to you both being at Wayfair; correct?
24  A.   Correct.
25  Q.   Please describe all the interactions you

Page 21

1   had during your joint employment by Amazon.
2        MS. KAPPELMAN:  I'm sorry.  I'm going
3   to object.  Bob, do you really want him to talk
4   about every interaction he had with her while they
5   were both employed at Amazon for a long period of
6   time?
7        MR. GOODMAN:  Well, it doesn't sound
8   like it's going to go very long, unless he has --
9   unless he's going to call Ms. Forsythe a liar for
10  saying that there were limited instances.  So yes, I
11  do want a narrative answer.
12  BY MR. GOODMAN:
13  Q.   What were your interactions as an employee
14  of Amazon with Emily as an employee of Amazon?
15  A.   So the very first interaction would have
16  been in the fall of 2015.  Emily Forsythe did send
17  me an email.  We worked in different department --
18  or different facilities at the time.  I did not know
19  who she was.  Had sent me an email asking if she
20  could tour our facility.  She was going to be
21  traveling and wanted to see if she could tour the
22  facility.  That was the very first introduction and
23  interaction.
24  Q.   What was your facility?
25  A.   I was outside of Cincinnati, Ohio in

6 (Pages 18 - 21)

1 Hebron, Kentucky.
2  Q.  All right.  And where was she working?
3  A.  She worked in Louisville, Kentucky.
4  Q.  All right.  Go to the next one, please.
5  A.  The next one was, I would say, several
6 weeks to a month afterwards.  I was down in
7 Louisville, and we had spent the day -- we'd spent
8 the day -- half the day, the morning together, so
9 had gone to one of the distilleries on the Whiskey
10 Trail.  It's Evan Williams.  I believe that's in
11 downtown Louisville.  And then had walked around one
12 of the parks in the local area.  And that was the
13 only interaction with her.
14        Shortly after that, she relocated to either
15 North or South Carolina, later that year.  And then
16 I believe in November/December time frame, she had
17 actually left Amazon.
18        So that was the only -- those two
19 interactions were the only interactions with her
20 while at Amazon.
21  Q.  Was there a time that you visited her in
22 Cohasset, Massachusetts?
23  A.  Yes.  In December of 2015.
24  Q.  How did that visit come up?
25  A.  She had texted me in the winter, either
Page 22

1 November or December.  I forget what it was.  But
2 telling me that she'd actually left Amazon and how
3 it was going, that she was moving back to Boston,
4 Massachusetts.  And through the course of talking,
5 kind of arranged -- she had suggested coming out to
6 Boston to visit and spend a few days, so I took her
7 up on that offer and went out there and spent a few
8 days.  It was, I'd say, in -- somewhere in between
9 December 15th and December 25th time frame.  I
10 forget the exact dates.  But it was at her
11 suggestion.
12  Q.  She also graduated from Highland Park High
13 School; correct?
14  A.  I don't know where she graduated, honestly.
15 I know she lived in the neighborhood for a brief
16 period of time, but I don't know where she
17 graduated.
18  Q.  So the two of you never had occasion to
19 discuss whether you both graduated from the same
20 high school?
21  A.  We did.  We did actually discuss it.  Going
22 back to our very first introduction, she had -- when
23 she had emailed while at Amazon to request a tour of
24 our facility, I had noticed -- we exchanged phone
25 numbers.  I had noticed that she had a 214 area
Page 23

1 code, which is Dallas, despite living in Kentucky.
2 And from there, the conversation led to the fact
3 that she was -- had spent time in that area.
4  Q.  Okay.  But you never -- you knew that she
5 had lived in Dallas for a period of time but never
6 knew that she graduated from the same high school;
7 right?
8  A.  Right.
9  Q.  What are her parents' names?
10  A.  I believe they are Carl and -- I forget
11 what it is.  I want to say something that starts
12 with an S or a C.  Like, Cheryl or Sherry, Cheryl.
13 This is -- I'm trying to remember from six years
14 ago.  I apologize.
15  Q.  How many days or hours were you in
16 Cohasset?
17  A.  Two and a half, three days.
18  Q.  Did you have a romantic interest in Emily
19 before you visited Cohasset?
20  A.  No, I did not.
21  Q.  Did you have a romantic interest in Emily
22 during or after you visited her in Cohasset?
23  A.  Briefly, for about a month after.  I'd say
24 for about a month after.  I know from prior
25 statements that you're aware that we had -- kind of
Page 24

1 had, like, a -- whatever you want to call it, a
2 romantic encounter on the last day of my visit
3 there.  And from there, you know, briefly
4 entertained the idea for about a month, but it was
5 clear that that was not going to lead anywhere.
6  Q.  You expressed interest, and she declined;
7 correct?
8  A.  Yes.  Well, I would like to say it was a
9 mutual interest.
10  Q.  Well, but the reason it didn't go anywhere
11 is that she ultimately declined to -- she declined
12 your romantic interest as expressed that next month;
13 correct?
14  A.  No, I don't believe that's correct.  I
15 believe the reason it did not go anywhere was
16 because she was still living in Boston, and I was in
17 Cincinnati, 1,000 miles away, and there was just no
18 room for any sort of relationship.  It was not
19 practical.
20  Q.  So you're denying that she declined to --
21 declined a continuing personal relationship in
22 January of 2016?
23  A.  No, I'm not denying that.  I'm simply
24 saying that it was kind of a mutual declamation.
25  Q.  How did you communicate in the last six
Page 25

7 (Pages 22 - 25)

1 days of December of '15 and month of January 2016
2 about a personal relationship?  Was it by phone?
3 Was it -- I don't gather it was in person.  By text?
4 By email?  How did you do so?
5     A.    Predominantly by text.
6     Q.    Was there any phone call in January 2016
7 between her and you?
8     A.    Not that I recall.
9     Q.    Do you remember in March of 2019 being
10 alone at a meeting with Emily at Wayfair
11 headquarters in Boston?
12     A.    I do.
13     Q.    She alleges in paragraph 8 of her complaint
14 that, again, as in January 2019, without her express
15 or implicit invitation of solicitation, you again
16 sat close to her to the point that she was
17 uncomfortable.
18     A.    No, that is not true.  We were, again,
19 sitting on opposite sides of the table.
20     Q.    And you never sat on the same side of the
21 table?
22     A.    No.
23     Q.    Or otherwise close to her?
24     A.    No.
25     Q.    And you deny that your legs touched hers at
Page 26

1 that time?
2     A.    Yes.
3     Q.    Or that she was sitting next to a wall?
4     A.    No.  She was -- a glass wall, yes.
5     Q.    Well, a glass wall is a wall; right?
6     A.    Yes.  And a room has four walls, so...
7     Q.    Was she sitting closer to a wall than you,
8 sir?
9     A.    No.  I was also sitting next to a wall.
10     Q.    Is it funny to you to accuse a woman of
11 lying?
12     A.    I am not accusing her of lying.  I believe
13 she's mistaken in her account of events that -- a
14 typical Wayfair meeting room is simply a table in a
15 small, compact room.  So no matter where you're
16 sitting, you're sitting next to a wall.  In this
17 particular meeting, we were on opposite sides of the
18 table.
19     Q.    Was this table -- was one end or side of
20 this table against a wall?
21     A.    Yes.  It's a horseshoe shape.
22     Q.    The table was horseshoe shaped, and one of
23 the short sides of one of -- one of the short ends
24 of one of the sides was against the wall?
25        MS. KAPPELMAN:  Object to the form of
Page 27

1 the question.  I'm sorry.  I don't understand what
2 you're saying.  Maybe somebody does.
3        MR. GOODMAN:  He said it was horseshoe
4 shaped.
5        MS. KAPPELMAN:  I understand.
6        MR. GOODMAN:  Quit with the sarcasm.
7        MS. KAPPELMAN:  No.  Honestly, I don't
8 think your question is making sense, so if you could
9 just try to rephrase that.
10     BY MR. GOODMAN:
11     Q.    Was it horseshoe shaped?
12        MS. KAPPELMAN:  He said yes.
13     A.    Yes.
14     Q.    Which end of the horseshoe, or which side
15 of the horseshoe was against the wall?
16     A.    I believe this is your question, but there
17 was the flat side.
18     Q.    The side -- the side that was perpendicular
19 to the other two parts of the table; correct?
20     A.    I'm sorry?
21     Q.    It was basically the two parts -- the two
22 parts of the table that came out to the third part
23 of the table.  It was the part -- it was the end of
24 the table that was against the wall with the two
25 horseshoes coming out from the wall.
Page 28

1     A.    I would say -- actually, this is a wall.
2 Like, this would be the table coming out from the
3 wall.
4     Q.    Okay.  So it was the opposite.  The common
5 side of the table was away from the wall.
6        MS. KAPPELMAN:  The open end of the
7 horseshoe?  Can we say it that way?  The open end of
8 the horseshoe was against the wall?
9     BY MR. GOODMAN:
10     Q.    That's a better way to say it.  The open
11 end of the horseshoe was against the wall, sir;
12 right?
13     A.    Correct.
14     Q.    And she was sitting on one side of the
15 horseshoe near the wall; correct?
16     A.    Correct.  And I was on the other.
17     Q.    And you deny moving over to her side and
18 having your legs touch hers and allowing no space
19 between the two of you so that she was forced closer
20 to the wall?
21     A.    Yes, I do.
22     Q.    When in your life have you ever touched
23 Emily Forsythe?
24        MS. KAPPELMAN:  I'm sorry.  What was
25 that question, Bob?
Page 29

8 (Pages 26 - 29)

1   BY MR. GOODMAN:
2   Q.   When in your life have you ever touched
3   Emily Forsythe?
4   A.   In December of 2015 in Cohasset,
5   Massachusetts.
6   Q.   And how had you touched her in December
7   2015?
8   A.   I would say our very first physical
9   interaction was when she kissed me.  Yeah, when she
10  kissed me.
11  Q.   Was there any other physical action in
12  December 2015 in Cohasset?
13  A.   Yes.  So later that evening -- it was the
14  last evening before I was going to return home.  I
15  was still staying at her parents' house and she
16  invited me into her bedroom and we made out, for
17  lack of a better term.
18  Q.   With clothes on?
19  A.   Yes.
20  Q.   How long was the encounter?
21  A.   An hour, maybe.
22  Q.   On March 14, 2019, the day after this
23  second meeting I'd asked you about, did you ask
24  Emily to dinner?
25  A.   No.  She had asked me.

Page 30

1   Q.   Did you make reference, in discussing going
2   out to dinner with her, that you would no longer be
3   on her team as of April 1, 2019?
4   A.   That is correct.  That was the date --
5   transition date for moving to a new team.
6   Q.   In what way did that date come up in
7   discussing whether you would go to dinner?
8   A.   I'm not sure I follow your question.  So
9   that was publicized -- the transition date was
10  publicized well in advance.
11  Q.   When you were discussing whether you would
12  go to dinner on March 14, 2019, I've already asked
13  you did the subject of your transition on April 1
14  come up.  I'm asking in what way did it come up?
15  A.   As a matter of fact, April 1st is a
16  transition date to a new team.
17  Q.   Did either of you discuss that you would go
18  out to dinner with one another only after April 1?
19  A.   No, no.  I was moving.  April 1st marks a
20  date in which I was moving to California.
21  Q.   So you're denying that you asked her to
22  dinner without any pretense of the invitation being
23  work related?
24      MS. KAPPELMAN:  I'm sorry.  Can you
25  just repeat the question?

Page 31

1   BY MR. GOODMAN:
2   Q.   You deny asking Emily to dinner without any
3   pretense of your invitation to dinner being work
4   related on March 14th.  Do you deny that, or do you
5   agree with that?
6   A.   I deny that in the sense that she had asked
7   me to dinner, and it was loosely work related in
8   terms of it -- you know, we -- still being on the
9   same team at that point in time.
10  Q.   Did you discuss anything -- any
11  work-related matter that you would be addressing at
12  dinner?
13  A.   No.
14  Q.   So it was -- you're saying it was work
15  related because you were both employed by Wayfair
16  and you were both on the same team as of March 14,
17  2019?
18  A.   I would say, yes, it was in that regard.  I
19  think at that point in time there was still some
20  semblance of a friendship that we were trying to
21  maintain, and the hope being that I would transition
22  to a new team.  We would not be interacting after
23  that point in time so that we can maintain a
24  positive working relationship.  It was work related
25  in that regard.

Page 32

1   Q.   When either of you discussed whether you
2   would go to dinner that night, did the subject of
3   any work topic come up?
4   A.   No.
5   Q.   Did you tell her that you were interested
6   in going to dinner with her when you were no longer
7   on her team?
8   A.   No.
9   Q.   Did she tell you that she was ready to go
10  to dinner with you when you were no longer on her
11  team?
12  A.   No.
13  Q.   Did you have dinner on March 14, 2019?
14  A.   No, no.  I declined the invitation.
15  Q.   Emily told you, didn't she, that she would
16  only work -- only meet you for a work-related
17  meeting; correct?
18  A.   No.  I believe that's incorrect.  Again,
19  she had sent the invitation for the dinner.
20  Q.   And in what form, sir?
21  A.   In email and in text.
22  Q.   Email and text?  Is that what you're
23  saying?
24  A.   Yes.  An actual calendar invite.
25  Q.   Did you ever complain about Emily to a

Page 33

1 third party in writing?
2    A.    No.  Not to third parties.  Not in --
3    Q.    Did you ever complain about Emily to
4 anybody besides Emily directly?
5    A.    I did, to her immediate supervisor at the
6 time, Matt Witte.  This was after having left her
7 team.
8    Q.    So you're saying you never complained to
9 Matt Witte before April 1, 2019?
10   A.    No.
11   Q.    How many times did you complain to
12 Mr. Witte about her after April 1, 2019?
13   A.    I would say once or twice.
14   Q.    This was in writing; correct?
15   A.    In person.  Not in writing.
16   Q.    Did you ever complain to Mr. Witte about
17 her in writing?
18   A.    No.  Not that I recall.
19   Q.    And you're saying you complained about her
20 to Mr. Witte twice verbally?
21   A.    Yes.
22   Q.    Ever complain to him by text?
23   A.    No.
24   Q.    Or by social media post?
25   A.    No.

Page 34

1    Q.    Did you complain to Emily about her in
2 communications with her in writing?
3    A.    I'm sorry.  I missed part of that.
4    Q.    Did you make complaints about Emily to her
5 directly in writing at any time in 2019?
6    A.    In text, yes.
7    Q.    In text?
8    A.    Yes.
9    Q.    Not in person or emails?
10   A.    In person, yes, during various meetings,
11 but in -- but not in email.
12   Q.    Have you retained all the texts from 2019
13 for you and Ms. Forsythe?
14   A.    I have not.  I deleted her number quite
15 some time ago.
16   Q.    When did you delete them?
17   A.    April of 2019, after I left her team.
18   Q.    Why?
19   A.    I had no interest in continuing
20 communication on a personal level with Ms. Forsythe.
21   Q.    So your contention is that you had no text
22 between you after April 1, 2019?
23   A.    No.  I would say after the first week of
24 April, not April 1st.
25   Q.    So if you were complaining about Emily to

Page 35

1 her by text, it would only be between you for a few
2 days that -- (Indecipherable.)
3          (Interruption by the court reporter.)
4    BY MR. GOODMAN:
5    Q.    Are you telling us that there are no texts
6 between you and Ms. Forsythe after the first week in
7 April that were ever sent or received?
8    A.    I couldn't give you an official date, but
9 yes, I deleted her number in April of 2019 to
10 completely break off any sort of personal
11 communication with her.
12   Q.    When did you complain -- did you complain
13 to anybody besides Mr. Witte in any manner about
14 Emily apart from the complaints you made to her
15 directly?
16   A.    No.
17   Q.    When did you complain to Mr. Witte about
18 Emily?
19   A.    I think the -- I had mentioned it in April
20 of -- mid-April of 2019, and then in person right
21 around April 30th or May 1st of 2019, and then two
22 times over the course of the summer.
23   Q.    When were the two times?
24   A.    In July, I believe, and then in August, in
25 very brief phone conversations.

Page 36

1    Q.    In July and August, you had brief
2 conversations with Mr. Witte; right?
3    A.    Correct.
4    Q.    What does "brief" mean?
5    A.    Brief means I knew I was currently in -- at
6 that point in time, I was in charge of the Perris
7 fulfillment center, and I knew that Emily was going
8 to be taking a trip to the facility.  And my brief
9 conversation with Mr. Witte was to say that I did
10 not trust her being in the building that I was
11 running.
12   Q.    And you did that twice in July and August?
13   A.    She was slated to visit on two separate
14 occasions.
15   Q.    Did she visit?
16   A.    She did.
17   Q.    Were the conversations in April and May --
18 in mid-April and the end of April with Mr. Witte
19 about Ms. Forsythe -- how would you characterize
20 them?
21        MS. KAPPELMAN:  Object to the form of
22 the question.
23        You can answer, Mike.
24   A.    I would characterize them as me expressing
25 my displeasure with her continuing to engage me

Page 37

10 (Pages 34 - 37)

1 after having left her team on April 1st and my
2 efforts to cease communication with her.
3    Q.    She was still in industrial engineering
4 while you were in operations after April 1st;
5 correct?
6    A.    Correct.
7    Q.    And the fact is that at Wayfair, industrial
8 operations people need to engage with operations
9 people from time to time; correct?
10    A.    Correct.  But in this context, it was
11 outside of that scope.
12         MR. GOODMAN:  Object to
13 responsiveness.
14    BY MR. GOODMAN:
15    Q.    How was it outside the scope?
16    A.    It was outside the scope in terms of -- she
17 was continuing to engage me on projects for her team
18 specifically, not those related to operations.
19    Q.    Not those what?
20    A.    Related to operations.
21         You are correct in saying that industrial
22 engineering does need to communicate with an
23 operations team, but this fell outside of that
24 scope.
25    Q.    So you're saying that even though you were

Page 38

1 not on her team after April 1st, she treated you as
2 if you were?
3    A.    Yes.  She would continue to ask me to
4 participate in her team's projects, meetings, things
5 of that nature.
6    Q.    So do I understand your testimony to be
7 that it was as if you hadn't even gotten off the
8 team?
9    A.    That's not necessarily true.  You know,
10 obviously I had left her team, but she was
11 continually engaging me sporadically.
12    Q.    Sporadically?
13    A.    Sporadically, yes.
14    Q.    As if you were still on her team?
15    A.    No.  I would say that if I were still on
16 her team, it would be more than sporadic.  This was
17 just sporadic engagements.
18    Q.    Were there projects you had been assigned
19 before April 1st that you did not complete as of
20 April 1st?
21    A.    There were a few, but it would have not --
22 it would not have been possible to complete before
23 April 1st.  These are long-term --
24    Q.    And what were those?
25    A.    So the industrial engineering team works on

Page 39

1 long-term capital expense projects over multimonth
2 timelines.  A lot of those were still halfway
3 completed by April 1st.
4    Q.    Were you exclusive -- were you the only
5 member of her team assigned to those projects?
6    A.    I was.  I was.  And some of those were
7 handed off to other individuals.
8    Q.    What other projects were not completed by
9 the time you left the team?
10    A.    That is it, just any sort of capital
11 expense installation that was in progress.
12    Q.    Did you communicate with Emily -- did you
13 send her emails after April 1st requesting
14 information from her?
15    A.    Yes, I did.
16    Q.    Were you verbally aggressive in any of
17 those emails?
18    A.    No.
19    Q.    Did you criticize her in any of those
20 emails?
21    A.    No.
22    Q.    Did you copy others on those emails
23 requesting information?
24    A.    Relevant parties, yes.
25    Q.    Well, you can't copy somebody on half of an

Page 40

1 email, can you?
2         MS. KAPPELMAN:  Object to the form of
3 the question.
4         You can answer, Mike.
5    A.    You're correct.  You cannot do that.  So
6 yes, I copied relevant parties on emails.
7    Q.    And did you criticize her for not providing
8 information in any of those emails?
9    A.    No.
10    Q.    Did you ever tell Emily that she had failed
11 you?
12    A.    No, I did not.
13    Q.    Did you ever tell Emily that she was not a
14 good person?
15    A.    I did, yes.
16    Q.    When did you do that?
17    A.    I believe it was in my last text
18 communication with her.
19    Q.    Okay.  What did you say to her?
20    A.    That I did not trust her with my career and
21 that I did not think she was a good person.
22    Q.    Have you ever told anybody that before?
23    A.    No.
24    Q.    Or since?
25    A.    No.

Page 41

11 (Pages 38 - 41)

1   Q.   Did Emily complain to you directly about
2 emails that were being sent to her in either their
3 tone or their substance?
4   A.   She had said it, yes.  Yes, she had brought
5 it up.
6   Q.   When?
7   A.   I believe this was in April, if it's the
8 one that you're referring to.
9   Q.   How did you respond to her complaint about
10 the tone or substance of the email?
11   A.   I suggested that we talk with her boss, my
12 boss, and an HR rep, which she declined.
13   Q.   Did you set up an HR meeting?
14   A.   I attempted to.  But that evening I was
15 contacted by Matt Witte after she had called him.
16   Q.   How did you attempt to set up an HR
17 meeting?
18   A.   I was in contact with an HR representative
19 at one of the facilities.
20   Q.   Who was that?
21   A.   It is Jeanie -- I can't remember her name.
22 She's no longer with Wayfair.  Gamero, Jeanie
23 Gamero.  G-A-M-E-R-O.
24   Q.   Gamero?  Like, G-A-M-E-R-O?
25   A.   G-A-M-E-R-O.

Page 42

1 following day, but I did not give any sort of
2 details.
3   Q.   Did she get back to you?
4   A.   No.  After Matt Witte had called me that
5 evening, I did not follow up with her.
6   Q.   You had originally said you thought you
7 needed to have a member of HR involved.  Why didn't
8 you follow up with her?
9   A.   It's after the conversation with Matt, who
10 said that he would kind of take care of things in
11 terms of talking with Ms. Forsythe.
12   Q.   Did you criticize Emily in the conversation
13 with Mr. Witte?
14   A.   I criticized some of the things that she
15 had done that I felt were inappropriate, yes.
16   Q.   Did you have another conversation with
17 Mr. Witte after the one in April about Ms. Forsythe?
18   A.   Yes.
19   Q.   When was that?
20   A.   Either last day of April, first day of May,
21 here at the Perris facility.
22   Q.   Was the result of that conversation that
23 you were not going to be assigned to projects on
24 which Ms. Forsythe was working after that date?
25   A.   I believe it's the opposite.

Page 44

1   Q.   Just to be clear, like Camaro.  Like the
2 car, Camaro, except with a G?
3   A.   Correct.
4   Q.   And did you email this Gamero or text her
5 or phone?
6   A.   I spoke to her in person.  She works
7 on-site here in the Perris facility.  Or did.
8   Q.   When did she leave?
9   A.   In August or September -- August or
10 September of 2019.
11   Q.   And out in Perris, you'll have the
12 last-known address and telephone number; correct?
13   A.   I'm sorry?
14   Q.   In Perris, somewhere in Perris, you'll have
15 her address -- last-known address and telephone
16 number; correct?
17       MS. KAPPELMAN:  We'll worry about
18 that.  That's something Counsel can ask us for.
19   BY MR. GOODMAN:
20   Q.   Are those records -- does Perris maintain
21 human resources records?
22   A.   I'm sure that they could find that
23 information, but the facility itself does not.
24   Q.   Okay.  So what did you say to Ms. Gamero?
25   A.   I had talked about setting up a meeting the

Page 43

1   Q.   You were going to be assigned to projects
2 on which she was going to be?
3   A.   No.  That she would not be assigned to
4 projects which I was working, that would have been
5 related to me or the operation that I was in charge
6 of.
7   Q.   I'm a little bit confused.
8       You were not going to be working the same
9 projects anymore?
10   A.   Correct.  And so the industrial engineering
11 team works on projects for operations.  So it is not
12 me -- it's not the case that I was not working on
13 her projects.  She was not working on projects for
14 my operation -- the facilities that I was managing.
15   Q.   Okay.  Did you lose it in that
16 conversation?
17   A.   No.
18   Q.   Did you raise your voice in that
19 conversation?
20       MS. KAPPELMAN:  Which conversation is
21 that?  With Mr. Witte or with -- is that what you're
22 asking?
23       MR. GOODMAN:  Yeah.  With Mr. Witte on
24 May 1st.
25       MS. KAPPELMAN:  Okay.

Page 45

1     BY MR. GOODMAN:
2   Q.   Did you raise your voice in that
3   conversation with Mr. Witte?
4   A.   No.
5   Q.   You were calm in that conversation with
6   Mr. Witte in discussing Ms. Forsythe?
7   A.   I would say I was upset, but I did not
8   raise my voice.
9   Q.   Would there -- do you know why -- would
10  there be any reason for Mr. Witte to be concerned
11  about your ability to psychologically keep it
12  together or emotionally keep it together based on
13  that conversation?
14  A.   No, there would be no concern from him
15  whatsoever.
16  Q.   Are you saying he didn't express that
17  concern, or you were sure that there wouldn't have
18  been any basis for him to be concerned about your
19  emotional stability after that conversation?
20  A.   I'm 100 percent certain that he would not
21  be concerned about my ability to maintain, like,
22  stable emotions after that conversation.
23  Q.   Did you have an encounter with -- with
24  Ms. Forsythe on July 22nd at Perris where you
25  touched her blouse?

Page 46

1   A.   No.
2   Q.   Did you meet with her on July 22, 2019?
3   A.   She came in to my office and stood in the
4   doorway on her way outside of the building.  It was
5   the only time I spoke to her that day.
6   Q.   Okay.  So she never even sat down in the
7   office?
8   A.   She sat down in the office, yes.  Not in --
9   yes, she sat down.
10  Q.   And how close during that encounter on
11  July 22, 2019 -- how far apart were you and
12  Ms. Forsythe?
13  A.   10, 12 feet.
14  Q.   And you never got closer to her than 10 or
15  12 feet?
16  A.   No.  I was sitting behind a desk.
17  Q.   Did you laugh at her during that encounter?
18  A.   No.
19  Q.   What was she wearing?
20  A.   I assume a blouse.
21  Q.   What kind of blouse?
22  A.   I honestly don't know.
23  Q.   Solid or pattern?
24  A.   I cannot tell you that.
25  Q.   Did you speak with her later that day?

Page 47

1   A.   No, I did not.  That was the only
2   conversation we had that day.
3   Q.   Did you speak with her at any time around
4   July 22, 2019, about internet dating applications?
5   A.   I did not, no.
6   Q.   Or about the possibility of you and her
7   dating?
8   A.   No.
9   Q.   Or did you invite her at any time around
10  July 22, 2019, to go to dinner with you?
11  A.   No.
12  Q.   Or to spend the afternoon with her?
13  A.   No.
14  Q.   Were you in a car with her at any time
15  around July 22, 2019?
16  A.   No.
17  Q.   Did you ever tell anybody at Wayfair or
18  outside Wayfair that you and Ms. Forsythe were
19  dating or had a personal relationship?
20  A.   No, no.
21  Q.   What's funny?
22  A.   The ludicrousness of the statement.
23  Q.   Because of your denials of any unconsented
24  touching?
25  A.   I'm sorry?

Page 48

1   Q.   Are they ludicrous to you based on your
2   denials of unconsented touching?
3   A.   No.  It's based on the notion that I would
4   be telling people at Wayfair that we were dating.
5   Q.   Did you ever talk to your sister about
6   Emily?
7   A.   No.
8        MS. KAPPELMAN:  Bob, I don't want to
9   interrupt your line of questions here, but when you
10  get to a good moment to take a comfort break, let me
11  know.
12  A.   For what it's worth, I have three sisters.
13  Q.   I thought you said you had one.
14  A.   One that lives in Dallas, two that live in
15  Austin.
16  Q.   What are their names?
17  A.   Jordan and Kimberly, 16 and 32 months
18  younger.
19  Q.   And why didn't you tell me about them
20  before?
21  A.   Your question was -- before was about
22  relatives living in Dallas.
23        MR. GOODMAN:  We can take a break now.
24        MS. KAPPELMAN:  Okay, thanks.  Five
25  minutes.  All right?

Page 49

13 (Pages 46 - 49)

1          MR. GOODMAN:  Yes.
2          THE VIDEOGRAPHER:  The time is now
3  12:09.  We're going off the record.
4          (Recess taken.)
5          THE VIDEOGRAPHER:  This is the
6  beginning of Tape 2.  Time is now 12:20.  Back on
7  record.
8    BY MR. GOODMAN:
9    Q.    Mr. McDole, did you ever make any false
10  statements to others at Wayfair in writing or
11  verbally about Emily?
12    A.    No.
13    Q.    Did Emily complain about any conduct of
14  yours -- conduct or statements of yours to employees
15  at Wayfair, if you know?
16          MS. KAPPELMAN:  If you know.
17    A.    Not that I'm aware of.
18    Q.    You never became aware of complaints about
19  you that she made to other employees of Wayfair?
20    A.    No.
21    Q.    Did you ever talk to Kory McKnight about
22  Emily?
23    A.    I did, yes.
24    Q.    When?
25    A.    In late July or early August of 2019.

Page 50

1    Q.    What was the context?
2    A.    Similar to the brief conversation with Matt
3  Witte.  Kory had just joined Wayfair, and Emily was
4  reporting to him.  I knew that she was going to be
5  coming on-site, and so I let Kory know that I was
6  not comfortable with her coming to the site.
7    Q.    On any of these visits to Perris, was she
8  scheduled to meet with you?
9    A.    No, she was not.
10    Q.    Did you ever -- was there ever a time
11  when -- strike that.
12          Was the facility near Dallas, south of
13  Dallas, that you worked at for a period of time at
14  Wayfair?
15    A.    Lancaster.
16    Q.    Was there ever a time when you and
17  Ms. Forsythe were both at the Lancaster facility?
18    A.    Yes.
19    Q.    Do you remember meeting with her alone in
20  that facility and raising your voice with her?
21    A.    No.  We did meet.  I was still reporting to
22  her at that time.  But I did not raise my voice at
23  any point in time.
24    Q.    Did you make any threats to her?
25    A.    No.

Page 51

1    Q.    Did you criticize her to her face?
2    A.    No.
3    Q.    Were you ever pursued by any representative
4  of HR about Emily?  And I'm excluding the
5  conversation you had with Ms. Gamero.
6    A.    The only conversation was when I was
7  approached in September or October of 2019, and they
8  were informing me of the sexual harassment
9  complaint.
10    Q.    Okay.  And was that -- you say September.
11  Was that before or after Emily was separated?
12    A.    I believe it was before, yeah.
13    Q.    Do you know how many days before?
14    A.    I'm not sure what her separation date was.
15    Q.    I'll represent her last full day of work
16  was September 23rd.  Was it before that?
17    A.    Yes.
18    Q.    Who contacted you?
19    A.    Trevor Shaffer-Figueroa.
20    Q.    And how many times did you talk, either in
21  person or over the phone, with Trevor?
22    A.    Twice, both in person, on succeeding days.
23    Q.    Was he located in Perris at the time?
24    A.    He works remotely in Palm Springs, but came
25  on-site for that interaction.

Page 52

1    Q.    How long did you meet with him on those two
2  days?
3    A.    About an hour on each day.
4    Q.    What did he ask you about?
5    A.    He asked me about working history, working
6  relationship with Emily throughout the course of
7  Wayfair.  And he was following up, asking
8  specifically about some of her -- some of her claims
9  for --
10    Q.    Asked some of the same questions I did?
11    A.    Yes, yes.  Regarding a meeting in January,
12  a meeting in March, and then, you know, meeting with
13  Matt Witte and so on.
14    Q.    Did he ask you about the meeting in July?
15    A.    No, he didn't.  I mean, I'm sure he did.
16  Quite honestly, I'd have to look at it, but --
17          Yes, actually, he did.  Because he did ask
18  specifically about meeting in July and then the
19  actual physical touching claim.
20    Q.    Do you know, was -- can you be more
21  specific about when he contacted you, please?
22    A.    It was -- I don't have specific dates.  I
23  could look at an old calendar, maybe, but it would
24  have been late August, early September, to my
25  knowledge.  Shortly after she filed the complaint,

Page 53

1  program.
2      Q.   And what is the usual -- what is the usual
3  progression from pathways operations manager to
4  senior operations manager?
5      A.   Roughly three years.  It's a three-year --
6  it's billed as a three-year leadership development
7  program.
8      Q.   Okay.  In other words, it's unusual,
9  according to you, for anybody to go from pathway
10 operations manager to senior operations manager in
11 less than three years?
12     A.   It's not unusual, but it's -- it's billed
13 as a three-year program; correct.
14     Q.   And a three-year program, according to you,
15 implies that you have to be in the same position for
16 the entire three years?
17     A.   You have the same title for three years.
18     Q.   For how many months were you in the Special
19 Operations command or Special Operations unit of the
20 Marine Corps?
21     A.   I'd say about six months.
22     Q.   What is the average tour of duty within
23 Special Operations within the Marine Corps for
24 enlisted personnel?
25     A.   The average tour of duty?

1      Q.   The average time in that position.
2          MS. KAPPELMAN:  Object to the form of
3  the question.
4          If you know.
5      A.   I could not tell you.
6      Q.   Six months is on the very short end of how
7  long people who get into the Marine Special Forces
8  stay there, isn't it?
9          MS. KAPPELMAN:  Object to the form of
10 the question.
11         You can answer if you know, Mike.
12     A.   No, it's not, because it's circumstantial.
13         In a Special Operations unit, they are
14 going to run you through specialized training that
15 takes anywhere from one to two years.  And if you
16 join a unit and you're not going to reenlist for
17 another four-year term, it is not worth their time
18 to keep you in a Special Operations unit.
19         So I joined midway through my four-year
20 contract and had already expressed my desire to go
21 back to school after my four-year contract.  So it
22 is not worth the military's time to invest two
23 years' of training into somebody that is going to be
24 leaving.
25         So it is not -- six months is not higher or

1  lower than average, or not unusual, by any means.
2      Q.   So you didn't even complete the training?
3  You did not even complete the Special Forces
4  training because you were in there for such a
5  limited period of time?
6      A.   I did not complete all of it.  That's --
7  but it's -- that's not how it's structured.  It's
8  structured as individual training.
9      Q.   The Special Forces training in the Marines
10 is individual training?
11     A.   So when you complete kind of a trial to
12 join the Special Forces team, you are part of that,
13 and then there are various training courses that can
14 stretch anywhere from one to two years.
15         So to answer your question, no, I did not
16 go through all of it.
17     Q.   What was your title within the Special
18 Forces?
19     A.   I was part of the enlisted rank, so I would
20 have been a corporal.
21     Q.   Were you ever referred to as a team leader
22 in Special Forces?
23     A.   Yes.
24     Q.   And was your position as a team leader in
25 Special Forces your last position before being

1  discharged?
2      A.   No.
3      Q.   So you cut short even that Special Forces
4  role; correct?
5      A.   I'm not -- yeah.  I'm not going to say it's
6  correct, no.
7      Q.   Your LinkedIn profile says that you were a
8  team leader in Special Forces from August 2005 to
9  July 2006; is that true?
10     A.   That's correct.
11     Q.   And you've already told us that the
12 training period for a Special Forces enlisted
13 personnel is one to two years; correct?
14     A.   Correct.
15     Q.   And then in your LinkedIn profile, you say
16 your last position was August 2006 to July 2007 as a
17 section leader in infantry; correct?
18     A.   Correct.
19     Q.   So why didn't you continue the Special
20 Forces role until you could -- why wasn't that
21 Special Forces role continued throughout the one- to
22 two-year period of training?
23     A.   I'm not sure I follow.
24         It was not continued because I was -- I had
25 already expressed, through our chain of command,

1 was a -- the same or similar team that she had just
2 joined.
3    Q.   But you were not employed with Wayfair at
4 the time?
5    A.   No, I was not.  Interviewing.
6    Q.   What was your LinkedIn message to her?
7    A.   I believe she messaged me when she saw that
8 I was applying for what would have been the same
9 team.
10    Q.   What was the substance of the message?
11    A.   Nothing, other than maybe tell me about the
12 company.  But I'm projecting.  I really don't --
13 have no idea what the substance of the message was.
14    Q.   You have no idea what?
15    A.   I don't recall what the substance of the
16 message was.
17    Q.   So you're contending that she initiated the
18 LinkedIn communication in early 2017?
19    A.   As far as I remember, yes.
20    Q.   But the one thing you do remember about it
21 is you wanted information about Wayfair?
22    A.   Certainly, yes.  I was applying to the
23 company.
24    Q.   And then you reapplied the following year?
25    A.   Yes, I did.

Page 94

1 not come after April.
2    Q.   It came before April?
3    A.   Correct.
4    Q.   And that was so you could finish certain
5 projects you were working on?
6    A.   Correct.
7         MS. KAPPELMAN:  Bob, do you need a
8 break or something?
9         MR. GOODMAN:  No, I don't.  I'm just
10 looking for something.
11    BY MR. GOODMAN:
12    Q.   For how long did you commute to California
13 after you took the position on April 1 -- in April
14 of 2019?
15    A.   What was the first part?  I'm sorry.
16    Q.   Did you commute to California for any
17 period of time after April 1, 2019?
18    A.   Yes.
19    Q.   For how long?
20    A.   Three months.
21    Q.   So through July 2019; is that fair?
22    A.   Correct.
23    Q.   What was the meeting that -- the HR meeting
24 that we discussed with the woman in Perris going to
25 be about?

Page 96

1    Q.   When you were interviewing, did you -- did
2 you know you were interviewing for a position on
3 Emily's team?
4    A.   Yes, I did.
5    Q.   Who did you -- who did you interview with
6 for that position?
7    A.   I interviewed with Emily herself, Matt
8 Witte, a gentleman name Greg Konicki, another
9 gentleman named Todd Phillips, I believe, was via
10 phone, and I believe that's it that was on the
11 panel.
12    Q.   Did you disclose a prior romantic interest
13 in Emily to any of the interviewers besides Emily?
14    A.   No.
15         MS. KAPPELMAN:  Object to the form of
16 the question.
17    BY MR. GOODMAN:
18    Q.   Do you remember Ms. Forsythe asking you to
19 remain on her team in April 2019 until you've
20 finished certain projects?
21         MS. KAPPELMAN:  Object to the form of
22 the question.
23         You can answer.
24    A.   No.  I know she had mentioned staying on
25 her team until July of 2019, but that request did

Page 95

1         MS. KAPPELMAN:  Jeanie Gamero?
2         MR. GOODMAN:  Yes, Ms. Gamero.
3    BY MR. GOODMAN:
4    Q.   What was it supposed to be about?
5    A.   It was about the fact that after taking
6 several steps to distance myself from Emily,
7 including physically moving across the country, that
8 she would continuously engage me.  And I got tired
9 of that, so I wanted to bring HR into the
10 conversation.
11    Q.   And this is a meeting you suggested in
12 response to a conversation with her; correct?
13    A.   Correct.  She had --
14    Q.   In which she complained about your being
15 aggressive and bullying with her; correct?
16         MS. KAPPELMAN:  Object to the form of
17 the question.
18         Michael, you can answer.
19    A.   She had -- she had stated -- or suggested
20 having a meeting between myself; my supervisor at
21 the time, Matt Witte, which was her supervisor at
22 the time; and herself.
23         And my response was that we should also
24 include HR into the conversation.
25    Q.   But what she was complaining about was your

Page 97

1 being aggressive with her and bullying her; correct?
2    A.   I do not -- that would be her -- her view.
3 I don't think --
4         (Multiple parties speaking.)
5         MS. KAPPELMAN:  Can you please not
6 interrupt him, Bob?  I'm going to ask you not to
7 interrupt him, and let him finish getting his
8 answers out, if only just for the court reporter to
9 get a good transcript.
10        Michael, could you please finish your
11 response.
12   A.   Sure.  I would say that would be her
13 account.  I would say my whole rationale for wanting
14 to include HR into the conversation was that I had
15 felt the same way, that she was harassing and
16 bullying me, and that's why I felt the need to bring
17 HR into the conversation despite the --
18        MR. GOODMAN:  Object to
19 responsiveness.
20   BY MR. GOODMAN:
21   Q.   You had not previously complained that she
22 was being aggressive with you or bullying you prior
23 to her complaining about that with you; correct?
24   A.   I had not complained, no.
25   Q.   Was it customary for industrial engineers

1 to give notice to a site director that they were
2 going to visit them before the industrial engineer
3 visited the site?
4    A.   I think it's customary for anybody that's
5 traveling to a site, regardless of team.
6    Q.   What is Harpoon Brewery?
7    A.   What?
8    Q.   Harpoon Brewery.
9    A.   I think it's a brewery owned by Harpoon.
10   Q.   By what?
11   A.   I believe it's a brewery in Boston,
12 Massachusetts.
13   Q.   Have you ever gone there?
14   A.   I have not, no.
15   Q.   Did you -- did Ms. Forsythe ever suggest
16 you go to Harpoon Brewery with her?
17   A.   Yes.
18   Q.   And when was that?
19   A.   I believe that was in March of 2019.
20   Q.   What was the context?
21   A.   That we were both going to be in Boston at
22 the time.
23   Q.   And what were you there for?
24   A.   I was there for a meeting with -- for a
25 project with Matt Witte to present to the executive

1 team.
2    Q.   And you did not know that -- Harpoon
3 Brewery, why didn't you go?
4    A.   I was working.
5    Q.   Any other reason?
6    A.   No.
7    Q.   Did you ever talk to Jordan about sleeping
8 with girlfriends?
9    A.   With my sister about sleeping with women?
10   Q.   With other women, right.
11   A.   No.
12   Q.   What does the term "STU" stand for at
13 Wayfair?
14   A.   STU?
15   Q.   Right.
16   A.   I'm sorry.  STU?
17   Q.   Yes.  Do you know what it means?
18   A.   I believe it's a single-threaded owner, or
19 single -- no, that's not it.  It's a
20 single-threaded -- I'm not sure what it -- is there
21 context other than just this?
22   Q.   Did you ever speak to Mr. -- to Victor
23 Davis about Emily?
24   A.   Yes, I did.
25   Q.   When?

1    A.   When he first came -- when he first joined
2 Wayfair, and I was reporting to him.
3    Q.   When was that?
4    A.   It would have been July/August of 2016.
5 I'm sorry.  2019.
6    Q.   What was his role?
7    A.   He was the regional operations director.
8 He was my immediate supervisor.
9    Q.   Did he have authority over Lathrop as well
10 as Perris?
11   A.   Yes, he did.
12   Q.   Do you know whether Emily dealt with him
13 during 2019 at all on an in-person basis?
14   A.   I cannot tell you, no.
15   Q.   Would somebody in his position have dealt
16 with IE personnel on a regular basis?
17   A.   In my position, yes.
18   Q.   No.  Somebody in Mr. Davis's position.
19   A.   Yes.
20   Q.   What are unloaders?
21   A.   They are large mechanical devices with a
22 conveyor belt that -- with a conveyor belt, so --
23 that kind of help you unload heavier materials off
24 trailers.
25   Q.   Do they push them up to the back of trucks

26 (Pages 98 - 101)

1 were -- your communications, written and verbal,
2 were not -- not at all tense until April 1, 2019?
3    A.   I'm sorry?
4    Q.   So do I understand by that that your
5 communications were not -- there was no tension in
6 your communications, no conflict in communications
7 until April 1, 2019?
8    A.   I would not say no conflict.  I mean, I
9 interviewed for roles outside of her team with the
10 express intent of distancing myself from her.  So I
11 would say no, it's not 100 percent no conflict.
12   Q.   Were there any communications -- written
13 communications in writing -- and I'll exclude verbal
14 communications.
15        Were there any communications in writing
16 that were -- that were tense or revealed conflict
17 before April 1, 2019?
18   A.   If -- not that I explicitly remember,
19 unless you have a specific example.
20        (Interruption by the court reporter.)
21        THE VIDEOGRAPHER:  The time is now
22 1:46.  We're off the record.
23        (Recess taken.)
24        THE VIDEOGRAPHER:  This is the
25 beginning of Tape 3.  The time is now 1:55.  Back on

Page 106

1    A.   At the time, I still wanted to get back
2 into operations, but a large part of my motivation
3 was to distance myself from Emily.
4        MR. GOODMAN:  Object to
5 responsiveness.
6    BY MR. GOODMAN:
7    Q.   So you didn't tell him the reason that you
8 told me -- (Indecipherable.)
9        (Interruption by the court reporter.)
10   BY MR. GOODMAN:
11   Q.   You didn't tell him anything about --
12 anything related to Emily when you explained your
13 motivation for seeking a new position; correct?
14   A.   No.  I find it to be a poor career move to
15 list that as the reason for wanting a transfer.
16   Q.   Poor career move to lie?  Is that --
17   A.   This was not a lie.  I think that's
18 twisting what I'm saying.
19   Q.   Poor career move to -- poor career move to
20 say that you wanted to move because you wanted to
21 get away from your supervisor; correct?
22   A.   Yes.
23   Q.   Did you ever have a conversation with Emily
24 about changing the tone of your communications with
25 her?

Page 108

1 record.
2    BY MR. GOODMAN:
3    Q.   Mr. McDole, I have a few more questions.
4        Did anybody in HR or in management outside
5 HR communicate with you in August or September 2019
6 that -- that wanted to have a conversation with you
7 and Ms. Forsythe and your respective immediate
8 superiors?
9    A.   No.  Not in August of 2019.
10   Q.   When did you interview with Mr. Bugarin for
11 the position at Wayfair?
12   A.   It would have been the first week or two of
13 January 2019.
14   Q.   And, again, why did you do that?
15   A.   I was looking to get off of Emily's team.
16   Q.   And is that the reason you gave to
17 Mr. Bugarin?
18   A.   No.
19   Q.   Okay.  So you lied to him, explaining why
20 you wanted to --
21        MS. KAPPELMAN:  Object to the form.
22        You can answer, Mike.
23   A.   No, I did not lie to him.
24   Q.   You did not lie to him because -- did you
25 give him any reason for wanting to change teams?

Page 107

1        MS. KAPPELMAN:  Asked and answered.
2        You can answer, again.
3    A.   No.
4    Q.   Did you ever go on a hike with Emily in
5 California?
6    A.   We did, yes.
7    Q.   And when did you do that?
8    A.   It was my very first week with Wayfair.
9 She had asked to go.
10   Q.   And what month was that?
11   A.   This would have been August of 2018.  First
12 or second week of August.
13   Q.   And where was it?
14   A.   It was here in Perris, California.
15   Q.   Did you ever cancel a dinner with Emily?
16        MS. KAPPELMAN:  Asked and answered.
17        You can answer again.
18   A.   If it's referring to the one in March of
19 2019, then yes, I declined it.
20   Q.   Did you decline it on the day that it was
21 scheduled?
22   A.   I did, yes.
23   Q.   Was there any occasion where you asked to
24 speak to Mr. Witte and Ms. Forsythe alone without
25 the presence of others?

Page 109

28 (Pages 106 - 109)

1   A.   No.  I asked to speak to Matt Witte alone,
2   but not the two of them together.
3   Q.   Did you ask -- did you tell Mr. Witte that
4   Emily needed to, quote, get out of the building?
5   A.   No.
6   Q.   So you were never, at the time we're
7   discussing -- I guess it was in March 2019 --
8   together with Mr. Witte and Ms. Forsythe in the same
9   room?
10   A.   I was in the same room, yes.  But my
11   request was to speak to just Matt.
12   Q.   Okay.  And right before you asked to speak
13   with just Mr. Witte, who was in the room?
14   A.   It was myself, Matt Witte, and Emily.
15       And then prior to that it was myself, Matt
16   Witte, Emily, Brittaney Skaggs, Brandon Mallory,
17   Keith Wertman, and Rob -- no, he was not there.  I
18   might be missing one other person, but it was about
19   six or seven others.
20   Q.   Did you ask them to leave the room?
21   A.   I did not ask anybody to leave the room.
22   It was at the conclusion of a meeting between all
23   six or seven of us, and I asked to speak to Matt
24   afterwards.
25       MS. KAPPELMAN:  Bob, do you need

Page 110

1   another break?
2       MR. GOODMAN:  I do not.
3       MS. KAPPELMAN:  Okay.  You've got five
4   of us sitting here.
5       MR. GOODMAN:  I understand.  I do not
6   plan discovery depositions like I plan my trial
7   testimony.  Sorry.  I have to sometimes look at
8   things to decide whether I'm going to ask a
9   question.
10   BY MR. GOODMAN:
11   Q.   Have you ever met with Trevor Shaffer
12   before September 2019?
13   A.   Yes.  He is the HR representative for the
14   Perris building.
15   Q.   And does he work in the Perris building?
16   A.   No.  He works in Palm Springs.
17   Q.   You said he worked in Palm Springs; right?
18   A.   Correct.
19   Q.   Did you ever make a disparaging comment to
20   Mr. Lowe about Ms. Forsythe coming to the Perris
21   facility?
22   A.   No.
23   Q.   Did you ever make a comment -- did you ever
24   talk to Brittaney Skaggs about Emily?
25   A.   I have -- not explicitly about Emily, no.

Page 111

1   In the context of projects in which she was
2   involved, yes.
3   Q.   Or outside that context?
4   A.   No, not outside that context.
5   Q.   Who was your predecessor site director?
6   A.   A gentleman named Hector Nunez.
7   Q.   Do you know why Trevor Shaffer asked you
8   whether you shared your screen or laptop monitor
9   with Emily?
10   A.   I'm sorry?
11   Q.   Do you know why Trevor Shaffer asked you if
12   you shared your laptop or your screen with
13   Ms. Forsythe?
14   A.   I'm sure because he was curious whether or
15   not we had shared a screen or laptop.
16   Q.   Do you know why he asked that?
17   A.   I have no idea.
18   Q.   Did Ms. Forsythe ever ask you to go out for
19   drinks?
20   A.   She did, yes.
21   Q.   Did she ever ask you to go out for drinks?
22   A.   Yes.  She asked me, yes.
23   Q.   When?
24   A.   A couple different times throughout our
25   time, including March in Boston.  March of 2019 in

Page 112

1   Boston, March of 2019 in Kentucky.  That would be
2   two instances.
3   Q.   Did that ever happen?
4   A.   No.  Neither time happened.
5   Q.   Excuse me?
6   A.   No.  Neither time.
7   Q.   Okay.  Did you ever ask her to go out for
8   drinks?
9   A.   No.
10   Q.   Has any of your sexual harassment training
11   at any of the companies addressed the effect of a
12   denial of sexual harassment by a male or a female --
13   the significance of a denial of sexual harassment on
14   the results of a sexual harassment investigation?
15       MS. KAPPELMAN:  Object to the form of
16   the question.  It makes no sense.  Could you please
17   rephrase it.
18       MR. GOODMAN:  I'm sorry you don't
19   think things make sense.
20       MS. KAPPELMAN:  Mike, do you
21   understand that?
22   A.   I interpret it as has any of the trainings
23   covered the meaning of "No means no."  Is that the
24   layman's terms of your question?
25   Q.   You can answer -- that's not exactly it,

Page 113

29 (Pages 110 - 113)

1 but you can --
2     A.    If that's --
3     Q.    -- interpretation.
4     A.    Well, it's -- I mean, it is your question.
5 If that's not the actual interpretation, then I also
6 don't understand the question because I obviously
7 misinterpreted it incorrectly.
8     Q.    Do you think that a denial of sexual
9 harassment by a male of a female ends a sexual
10 harassment investigation?
11     A.    No.
12     Q.    Why not?
13     A.    I mean, it's an investigation.  Simply a
14 denial does not end an investigation.
15     Q.    Is there a motive on the part of an alleged
16 sexual harasser to lie in the workplace, given the
17 fact that -- given the implications of a
18 verification of a claim of sexual harassment in the
19 workplace?
20         MS. KAPPELMAN:  Bob, I'm going to
21 object to the form of that question.  I'm going to
22 object to the question.  It makes no sense.  Is this
23 really the guy you want to ask that question to, if
24 you have a question about motives?
25         Please try to rephrase it to make

Page 114

1 of a problem to be knowingly incomplete, is it?
2     A.    I'm sorry?
3     Q.    Somebody that's preparing an analysis of
4 the problem should not knowingly delete relevant
5 information, should they?
6     A.    No.
7         Knowingly deleting relevant information, is
8 it?
9     Q.    Right.  Knowingly not including relevant
10 information.
11     A.    They shouldn't.
12         MR. GOODMAN:  I'll pass the witness.
13         EXAMINATION
14 BY MS. KAPPELMAN:
15     Q.    I just have a couple quick follow-up
16 questions based on your testimony today, Mr. McDole.
17         I believe you testified earlier today that
18 you interviewed for Wayfair first in 2017, and you
19 did not get that position.  Is that correct?
20     A.    Correct.
21     Q.    Okay.  And then I believe you testified
22 that you interviewed a second time in 2018 for a
23 position reporting to Emily Forsythe.  Did I get
24 that right?
25     A.    Correct.

Page 116

1 sense.
2     BY MR. GOODMAN:
3     Q.    Mr. McDole, at Wayfair, given their sexual
4 harassment policy, would someone who is accused of
5 sexual harassment have a motive to lie in order to
6 keep their job, given the no-tolerance policy?
7     A.    I would say that's not unique to Wayfair.
8 Right?  Anybody that's guilty of a crime or a
9 misdemeanor has a motive to lie to avoid getting
10 caught.  Is that right?
11     Q.    Do you have -- is there a -- does Wayfair
12 tolerate, in its analysis of a problem, particular
13 technical problem, manipulation of data?
14     A.    No.
15         MS. KAPPELMAN:  Object to the form of
16 the question.  What data, Bob?  What are we talking
17 about?
18         MR. GOODMAN:  I'm moving on.
19     BY MR. GOODMAN:
20     Q.    Have you been involved in discussions at
21 Wayfair where data was incomplete, and it prevented
22 you understanding the whole picture of a problem?
23     A.    I mean, certainly.  That's just a part of
24 everyday business, though.
25     Q.    And it's not appropriate for a discussion

Page 115

1     Q.    How did you learn about -- the second time
2 about the position available reporting to Emily
3 Forsythe?
4     A.    She had recruited me for that role.
5     Q.    So she reached out to you?
6     A.    She was building out her team on the
7 industrial engineering team and had recruited me to
8 the role.
9     Q.    How did she communicate with you to let you
10 know she had a role she wanted you to apply for?
11     A.    I began via -- it's either text or
12 LinkedIn.  I don't -- I'd have to look that up.  But
13 through one of those mediums.
14     Q.    Okay.  So it wasn't you reaching out to her
15 in 2018.  She actually sought you out for a position
16 reporting to her in 2018?
17     A.    Correct.
18     Q.    And -- strike that.
19         After she recruited you in 2018 to report
20 to her, did you ever discuss the fact that she was
21 advocating for a higher salary for you than what was
22 originally offered?
23     A.    Yes.  That was part of the bargaining.  So
24 advocating for, I think, not so much salary, but for
25 stock.

Page 117

30 (Pages 114 - 117)

1    Q.   Okay.  And when you say -- you then said
2  after you were hired, you went on a hike with her
3  soon after that in August 2018 in California.  Did I
4  get that correct?
5    A.   Correct.
6    Q.   And who asked who to go for a hike in
7  August 2018?
8    A.   So it was actually something that I had
9  done the day prior.  And I had said I was going to
10  do it again that evening, and Emily asked to tag
11  along.
12    Q.   Okay.  And was there anyone else, other
13  than you and Ms. Forsythe, who took that hike in
14  August of 2018 when you worked for her?
15    A.   No.
16    Q.   At some point you testified that in January
17  you interviewed for a new position.  January of 2019
18  you interviewed for a new position to leave
19  Ms. Forsythe's team.  Do you recall that testimony?
20    A.   Yes.
21    Q.   Why did you want to leave Ms. Forsythe's
22  team in January of 2019, specifically?
23         MR. GOODMAN:  Objection to form.
24    BY MS. KAPPELMAN:
25    Q.   You can answer.

Page 118

1    A.   I was really looking to -- to remove myself
2  from her team.  I was uncomfortable working on her
3  team any longer.  I did -- as I mentioned, I started
4  to lose trust in my career and development under
5  her.
6    Q.   When you asked to leave her team in January
7  of 2019, did you have any romantic or sexual
8  interest in Ms. Forsythe?
9    A.   No.
10         MR. GOODMAN:  Objection to form.
11    BY MS. KAPPELMAN:
12    Q.   Okay.  And in April of 2019, you actually
13  did transfer away from her team; correct?
14    A.   Correct.
15    Q.   And you moved across the country to
16  California, so you were also physically away from
17  her; correct?
18    A.   Correct.
19    Q.   And I believe you testified earlier today
20  that you asked Mr. Witte if he could -- what did you
21  say?  Figure out a way so the two of you wouldn't
22  have to engage with each other?
23    A.   Yes.  I had asked that she be reassigned to
24  projects not pertaining to the buildings that I was
25  working in.

Page 119

1    Q.   And why did you ask Mr. Witte to make sure
2  that the two of you didn't have to interact with
3  each other in April of 2019?
4         MR. GOODMAN:  Objection.
5    A.   Just -- just from history of finding, you
6  know, basically Emily to be untrustworthy.  And then
7  I could not get any assurance that some of the
8  projects in the building would be done under her.
9  So given the prior conflict, I had asked that he
10  take her and transfer her to another -- another
11  facilities project.
12    Q.   Did you know that by asking Mr. Witte that,
13  it was possible that you would not have to come in
14  contact with Ms. Forsythe again?
15    A.   That was the hope and the intention of the
16  ask.
17    Q.   Okay.  You understand, in this lawsuit that
18  she's brought against Wayfair, one of her
19  allegations is that you touched her three times
20  without her consent.  Do you understand that's one
21  of the allegations?
22    A.   Yes.
23    Q.   And that she infers that you had a romantic
24  interest in her, and that's why you did that.  Do
25  you understand that's her allegation?

Page 120

1    A.   Yes.
2         MR. GOODMAN:  Objection to form.
3    BY MS. KAPPELMAN:
4    Q.   And yet you were asking not to have to
5  engage with her as early as January of 2019;
6  correct?
7    A.   Correct.
8         MR. GOODMAN:  Objection to form.
9    BY MS. KAPPELMAN:
10    Q.   As part of Ms. Forsythe's testimony, she's
11  also alleged that you asked her out to dinner and
12  drinks and to engage with her personally, and she
13  was not interested.  Are you aware that that's part
14  of her allegations in this case?
15    A.   Yes.
16    Q.   Okay.  She also alleges that you were the
17  one that asked her for dinner and drinks in March of
18  2019, and she declined.
19         You've testified here today that, in fact,
20  it was her who asked you for dinner and drinks, and
21  you declined.  Do you remember that testimony?
22    A.   Yes, I do.
23    Q.   Did Ms. Forsythe -- if I wanted to look
24  this up, how would Ms. Forsythe reach out to you if
25  she wanted to ask you for dinner and drinks?

Page 121

31 (Pages 118 - 121)

1    A.   Certainly.  I think there are -- whether
2  it's chats, local chats, text, or actual calendar
3  invites that would corroborate that.
4    Q.   And if she sent you a calendar invite for
5  dinner and drinks in March of 2019, would that come
6  by email?
7    A.   Yes.
8    Q.   Okay.  And it would be an email from her to
9  you?
10    A.   Correct.
11    Q.   Okay.  And if she wanted you to meet her at
12  the Harpoon Brewery, would that come by email?
13    A.   Yes.
14        MR. GOODMAN:  Objection to form.
15   BY MS. KAPPELMAN:
16    Q.   From her to you?
17        MR. GOODMAN:  Same objection.
18    A.   Yes.
19    Q.   And do you, in fact, remember her sending
20  you an email asking you to go out to dinner and
21  drinks with her in March of 2019?
22    A.   I do, yes.  Multiple different instances.
23    Q.   Okay.  And do you, in fact, remember her
24  sending you an email asking you to meet her at the
25  Harpoon Brewery in March of 2019?

Page 122

1    A.   Yes.
2        MS. KAPPELMAN:  I've got nothing
3  further.  Thank you.
4        MR. GOODMAN:  Nothing further.
5        MS. KAPPELMAN:  Thanks, Mike.  Have a
6  good rest of your day.
7        THE VIDEOGRAPHER:  This concludes the
8  deposition.  The time is now 2:22, and we're now
9  going off the record.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1        I, Kristen C. Krakofsky, court reporter and
2  notary public in and for the Commonwealth of
3  Massachusetts, certify:
4        That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness was properly identified by
7  means of a Kentucky driver's license and put under
8  oath by me;
9        That the testimony of the witness, the
10  questions propounded, and all objections and
11  statements made at the time of the examination were
12  recorded stenographically by me and were thereafter
13  transcribed;
14        That the foregoing is a true and correct
15  transcript of my shorthand notes so taken.
16        I further certify that I am not a relative
17  or employee of any of the parties, nor am I
18  financially interested in the action.
19        I declare under penalty of perjury that the
20  foregoing is true and correct.
21                            of August, 2020.
22
23  Kristen Krakofsky, Notary Public
24  My commission expires October 25, 2024.
25

Page 124

1 Emily Forsythe v. Wayfair
2 Michael  McDole Job No. 4184653
3        E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Michael  McDole                 Date
25

Page 125

32 (Pages 122 - 125)