Exhibit 3

# Exhibit 3

1                                    Pages 1-190

2                                    Exhibits 1-8

3

4          IN THE UNITED STATES DISTRICT COURT

5           FOR THE DISTRICT OF MASSACHUSETTS

6                C.A. No. 1:20-cv-10002

7

8    *************************************

9    Emily Forsythe,

10             Plaintiff

11   vs.

12   Wayfair, LLC,

13             Defendant

14   *************************************

15

16       Videotaped Deposition of Matthew Witte

17            Tuesday, July 21, 2020

18              Via Videoconference

19

20        ------Kristen C. Krakofsky------

21              Court Reporter

22                VERITEXT

23              (800) 227-8440

24

25

                                     Page 1

BY MR. GOODMAN:

Q.   Do I understand correctly, Mr. Witte, that you came to Wayfair in mid-2016?

A.   I started August 1, 2016.

Q.   What has been your career progression at Wayfair?

A.   I started as an associate director, which is a Level 5, in August of 2016.  I was promoted to a director in, I believe, March of 2017, which is an L6, and have remained at that position.

Q.   And we're talking about the records in the industrial engineering division; correct?

A.   Yes.

Q.   What does industrial engineering do within Wayfair?

A.   Industrial engineering designs our facilities, designs the processes inside the facilities, looks after maintenance and upkeep of the operations, maintains the capital portfolio for all construction and new site launches related to the fulfillment space, essentially the warehousing, distribution, fulfillment centers that we have across the country.

Q.   Does warehousing, distribution -- I think I understand that.  Does the fulfillment center

include call centers?

A.   No, it does not.  I'm not involved in the call centers.

Q.   What does fulfillment center mean separate from warehouse and distribution?

A.   Sure.  So they're just different names for the same thing.  Traditionally, warehousing is storing and holding goods.  Typically distribution is fulfillment to stores or other retailers, and typically fulfillment is business to consumer.  So if you order a sofa, it ships out of one of our fulfillment centers.

Q.   I see.

Is Wayfair all directly to consumer?

A.   Primarily, we are directly to consumer.  We do have a business-to-business product line to outfit hotels, hospitals, and other businesses that are placing larger orders.

Q.   That was the part of the business that shipped items to Immigrations and Customs Enforcement in the incident which became somewhat controversial at Wayfair?

A.   That would have been the business-to-business channel, yes.

Q.   And Wayfair doesn't make any of the product

itself, does it?

A.   Wayfair is not a manufacturer.  We do have some white label brands where other manufacturers will make the product for us with the Wayfair logo on the product.  We are not actually a manufacturer.

Q.   Otherwise known as private label; right?

A.   Yes, private label.

Q.   When you were a director after March of 2017 -- well, when you were an associate director, did you have supervision over multiple sites or just one site?

A.   You didn't really have site-level supervision.  I had a function that I represented that served many sites.  When I joined the company, there were, I want to say, four to five fulfillment centers that were operating.  There's now fourteen.  And there's -- I think there's now 48 home delivery operations, which are small consolidation centers that are in major metropolitan areas.  So it's always been a functional role.  I was never in charge of a site.

Q.   So you're consulting -- the industrial engineering function consults with the site managers of each of these centers; correct?

A.   Yes, we do.

Q.   What was the difference in your responsibility between associate director for seven months and then as director since March 2017?

A.   The difference in scope didn't change.  I just did well in the role, and I was promoted.

Q.   Okay.  Did you have subordinates and associate directors?

A.   I had, at the time I was promoted -- I started the team with myself and then had a small team, one or two people, within the first three months.  And then I think when I was promoted I had a team of four.

Q.   And since you were promoted, have you been placed in supervision over more than four?

A.   Yes.  Until recently, we did a reorganization to effectively kind of streamline the way we were running a couple of groups internally.  At the height of the L6 position, I had around 168 reports in the organization.  Around 90 of them were front-line mechanics that actually took care of hardware in the buildings.

Q.   But they were also within the sphere of industrial engineering?

A.   They were in the maintenance function, which was part of industrial engineering at the

1 done -- have there been performance improvement
2 plans where employees weren't able to meet
3 expectations or if the employees were -- roles were
4 eliminated through reorganization, is that -- just
5 to clarify, do those count?
6    Q.   They -- those are involuntary separations;
7 right?
8    A.   I believe so.
9    Q.   Okay.  But -- if I may refer to
10 Ms. Forsythe as Emily, just for convenience?
11   A.   Yeah.
12   Q.   But Emily was not put on a PIP before she
13 was terminated; correct?
14        MS. KAPPELMAN:  Object to the form of
15 the question.  Emily resigned.
16        You can answer, Matt.
17        MR. GOODMAN:  Object to sidebar,
18 Counsel.
19        MS. KAPPELMAN:  You can answer, Matt.
20        MR. GOODMAN:  That's a false
21 statement.
22        MS. KAPPELMAN:  You can answer, Matt.
23        MR. GOODMAN:  -- termination, as you
24 know.
25        BY MR. GOODMAN:

Page 14

1    Q.   In any case, she was not on a PIP before
2 she was terminated, was she?
3        MS. KAPPELMAN:  You can answer, Matt.
4        Object to the form of the question.
5    A.   She was not on a PIP.
6    Q.   And her position was not eliminated,
7 justifying her termination; correct?
8    A.   The position was not eliminated.
9    Q.   So besides Emily, have you -- has anybody
10 under you, directly or indirectly, been terminated
11 since March of 2017, other than through alleged
12 nonperformance of a PIP or elimination of their
13 position?
14        MS. KAPPELMAN:  Object to the form of
15 the question.
16        You can answer, Matt.
17   A.   No, they have not.
18   Q.   How many other jobs besides -- how many
19 other employers besides Wayfair have you had since
20 you graduated college?
21   A.   I've worked at four separate companies.  I
22 started my career at United Parcel Service, then
23 went to a small business, Advanced Handling Systems,
24 around four years.  Prior to Wayfair, I worked at
25 Gap, Inc. for seven-something years.

Page 15

1    Q.   Have you had any employees directly under
2 your supervision at the prior employers terminated
3 other than under a PIP or an alleged elimination of
4 the position?
5        MS. KAPPELMAN:  Object to the form of
6 the question.  You can answer if you understand it.
7    A.   As I understand it, no.
8    Q.   Have you ever been sexually harassed at
9 work?
10   A.   No.
11   Q.   Are you aware of any employees at Wayfair
12 who have been subject to unconsented touching by
13 another employee at Wayfair?
14        MS. KAPPELMAN:  Object to the form of
15 the question.  I'm going to direct you not to
16 answer, as it's not relevant to this matter.  We can
17 go in front of the judge if we have to.
18        MR. GOODMAN:  What's the objection to
19 relevance?
20        MS. KAPPELMAN:  The objection is --
21 whatever happened at Wayfair that is not -- that has
22 not happened to Ms. Forsythe or anybody in her chain
23 is not relevant to this action.  It's beyond the
24 scope of discovery in this case, and I'm happy to
25 talk to a judge about it later.

Page 16

1        BY MR. GOODMAN:
2    Q.   Did Ms. Forsythe make a report of
3 unconsented touching by Mike McDole to you?
4    A.   She made a -- she made an email that I'm
5 sure you -- or a collection of documents that I'm
6 sure you have that she shared with me and asked me
7 not to share with anyone.  It was only sent as a
8 backup.  And when I read the document, deep in the
9 document there were references to touching.  And I
10 immediately, against Emily's wishes, launched a case
11 internally at Wayfair with our talent management
12 partners to investigate.
13   Q.   And there were multiple instances of
14 alleged unconsented touching in that email; correct?
15        MS. KAPPELMAN:  Object to the form.
16        Matt, you can answer.  Go ahead.
17   A.   Per Emily's email, Emily stated that there
18 were.
19   Q.   After the fact, she told you that she
20 appreciated the passing it on to HR; correct?
21   A.   Initially, she was upset that I did.  And
22 after about a week, she thanked me.
23   Q.   Did you understand that that was because
24 she was unburdening herself of something that had
25 been troubling her?

Page 17

5 (Pages 14 - 17)

1    Q.   Have you disciplined or remonstrated
2  subordinates that do not include an executive
3  summary in communications with you?
4        MS. KAPPELMAN:  Object to the form.
5        You can answer, Matt.
6    A.   My team writes a lot of what we call
7  "narratives" where we explain a business objective
8  that we're trying to solve that is either a process
9  change or a capital, and typically there is an
10 executive summary at the front of that narrative
11 that explains what we're talking about overall, and
12 then we provide further details in the document.
13 Very common sense process for my team.
14       MR. GOODMAN:  Object to
15 responsiveness.
16    BY MR. GOODMAN:
17   Q.   Emily wrote communications like that from
18 time to time to you; correct?
19   A.   Yes.
20   Q.   And followed the format that you're
21 suggesting was typical; correct?
22   A.   Yes.
23   Q.   But this wasn't a memo about process change
24 or a capital change, was it?
25   A.   No.

Page 22

1    Q.   Was Emily the only employee at Wayfair who
2  had brought to your attention incidents of
3  unconsented touching of an employee of one sex by an
4  employee of the other sex?
5    A.   Yes.
6    Q.   Did you have any prior experience dealing
7  with that kind of situation as a supervisor?
8    A.   At the employee level or at the
9  organizational level?
10   Q.   Did you have any experience with dealing
11 with that as a complaint by a director and direct
12 subordinate?
13   A.   No.  This was my first time.
14   Q.   Have you had any other occasion to address
15 that since?
16   A.   No.
17       MS. KAPPELMAN:  I'm sorry.  What's the
18 question, Bob?  Has he had any other occasion to
19 address what?
20       MR. GOODMAN:  That at Wayfair since.
21       MS. KAPPELMAN:  I'm going to direct
22 you not to answer.  It has nothing to do with this
23 case.
24       MR. GOODMAN:  Well, he already
25 answered.

Page 23

1        MS. KAPPELMAN:  And I move to strike
2  that.  It's not relevant.
3        Go ahead.
4    BY MR. GOODMAN:
5    Q.   Did you discuss with Emily stress you were
6  experiencing in your position at Wayfair at any
7  time?
8    A.   Yes.
9    Q.   You told her from time to time that you
10 were feeling overwhelmed; correct?
11   A.   Yes.
12   Q.   Can you explain the supervisory
13 relationship between Emily and Mr. Witte -- I mean,
14 excuse me, and Mr. McKnight as compared to the
15 relationship between you and Emily?
16       MS. KAPPELMAN:  Object to the form.
17       If you understand.
18   A.   When you say "the relationship," do you
19 mean the reporting relationship?
20   Q.   Reporting relationship, yes.
21   A.   Sure.  So I was Emily's direct manager when
22 she started on the team in 2017 until when Kory
23 started, which he started July 20th of 2018.  And
24 about a week after Kory was enrolled, I believe I
25 made the organizational shift to have Emily report

Page 24

1  directly to Kory after Kory had his first week of
2  onboarding.  And then Kory took over as direct
3  manager.
4    Q.   Right.  And you were still a director.
5        What was his position?
6    A.   Kory was a director.
7    Q.   Okay.  So he had the same title, but he was
8  a subordinate of yours?
9    A.   Yes.
10   Q.   And I think you said "July 2018."  You mean
11 July 2019, don't you?
12   A.   I'm sorry.  Yes, July 20, 2019.  Sorry if I
13 misspoke.
14   Q.   Is there a human resources representative
15 at Wayfair that has been consistently assigned to
16 the industrial engineering group of which you are a
17 part in the last two years?
18   A.   At what level?
19   Q.   Why don't you just -- do you know who the
20 VP of HR has been during the last two years?
21   A.   Yes.  Kate Gulliver.
22   Q.   All right.  Have you dealt directly with
23 Ms. Gulliver on any HR matters in the last two
24 years?
25   A.   I have not.

Page 25

1 desks in Boston. I had a, quote/unquote, desk for a
2 period of time that would frequently get moved
3 because you weren't a permanent employee in the
4 Boston area.
5        During Emily's time, when she lived in
6 Kentucky, I know she moved her hoteling desk around
7 at certain places.
8    Q.   What are you calling it?
9    A.   "Hoteling." Like a hotel desk. Just an
10 industry term.
11   Q.   Hoteling desk means what?
12   A.   It's a place you can work.
13   Q.   Okay. But she was not unique. There were
14 others who worked most of their time outside of
15 Boston but were Boston employees for that purpose;
16 correct?
17   A.   I think, just to clarify, Emily relocated
18 to Kentucky and was paid relocation money to move to
19 Kentucky -- which she found residence in Kentucky.
20 Emily, like myself, had other team members or direct
21 reports that lived in Boston. It was very frequent
22 for us to travel to Boston to go meet with our team
23 members to help them on projects, career
24 development.
25   Q.   Did some people under you not have Boston

Page 30

1 desks?
2    A.   Yes.
3    Q.   And do you know why some had Boston desks
4 and others did not?
5    A.   At the time, it was primarily based on the
6 scope of work and who your stakeholders were for
7 different aspects.
8        So, like, as example, my maintenance
9 associate director, same level as Emily, did not
10 have a desk because his primary stakeholders were in
11 the field in the fulfillment centers.
12   Q.   And Emily's stakeholders -- to use that
13 term that you're using -- some of them or all of
14 them were in Boston?
15   A.   Some were. Many were in the field.
16   Q.   And who were the ones in Boston?
17   A.   The finance team; the sales and operations
18 planning team, which deals with inbound and outbound
19 volume forecast to all of our fulfillment centers.
20 And the talent acquisition teams are in Boston.
21   Q.   Okay. What percentage of the industrial
22 engineering employees had that connection to
23 Massachusetts?
24        MS. KAPPELMAN: Object to the form of
25 the question.

Page 31

1        You can answer if you understand it.
2    A.   The connection to Boston in that similar
3 role?
4    Q.   Had the same connection to Boston that
5 Emily had with the desk in Boston, the stakeholders
6 in Boston, etc.
7        MS. KAPPELMAN: Object to the form.
8        You can answer, Matt, if you
9 understand it.
10   A.   As far as the engineering function that I
11 had, there was --
12   Q.   Right.
13   A.   Yeah. Let me think here a little bit. Are
14 you referencing, just to be specific, when Emily was
15 an employee in 2017 or 2018, or state now? Can you
16 just clarify?
17   Q.   Yeah. During her employment, what
18 percentage of the industrial engineering
19 organization had that connection with Massachusetts
20 that you're describing Emily had and that you may
21 have had for some period of time?
22        MS. KAPPELMAN: Object to the form.
23   A.   I think in, like, 2017, it was probably
24 Emily and myself.
25        In 2018, as we brought more senior leaders

Page 32

1 into the team -- remember the team went from 1
2 person to 160 in the course of three and a half
3 years. As we gained a bigger and larger team, there
4 was a larger percentage of people that would spend
5 more time in Boston to interact with all the
6 stakeholders.
7        Myself personally, until COVID, I was in
8 Boston at least three to four days every month.
9    Q.   And how many of those people like Emily had
10 begun their work with Wayfair in Boston? Or what --
11 either numbers or percentages, if you know.
12   A.   And then took relocation packages to move?
13   Q.   Right. You know, began their employment in
14 Boston, and then after that lived in another
15 location.
16   A.   I think just Emily, because Emily asked to
17 move to Kentucky.
18   Q.   Has Wayfair published an
19 antidiscrimination, including sexual harassment,
20 policy since you've been there?
21   A.   Yes.
22   Q.   What does it say, generally?
23        MS. KAPPELMAN: Object to the form of
24 the question.
25        You can answer if you know.

Page 33

9 (Pages 30 - 33)

1 to protect her against further sexual harassment;
2 correct?
3    Q.   And you wanted them to protect her against
4    A.   I was, at the time, turning it over to our
5 talent management partners who are, you know,
6 trained in the right method and process to
7 thoroughly investigate and take care of all
8 employees.
9    Q.   And you wanted them to protect her against
10 any further sexual harassment; correct?
11       MS. KAPPELMAN:  Object to the form.
12       You can answer, Matt.
13    A.   I wanted them aware and to launch an
14 investigation into the process.
15    Q.   Well, you didn't want them to encourage
16 sexual harassment of Emily, did you?
17       MR. GOODMAN:  Object to the form;
18 asked and answered.
19       You can answer again, Matt.
20    A.   No.  I would never encourage anyone --
21    Q.   You wanted to make sure that any sexual
22 harassment ceased by reporting it; correct?
23       MS. KAPPELMAN:  Object to the form.
24       You can answer, Matt.
25    A.   Yes, that's correct.
26    Q.   Do you, as a man of 38 years, understand

Page 38

1 that even in 2018, 2019, and 2020, females may have
2 a hesitation to report sexual harassment against
3 them?
4       MS. KAPPELMAN:  Object to the form of
5 the question.
6       Matt, you can answer.
7    A.   If you're asking my opinion, it's tough for
8 me to answer.  I'm not a female.  I know there's
9 different circumstances at times.
10    Q.   Can you elaborate on what you mean by
11 "different circumstances at times"?
12    A.   Sure.  I'm not in their shoes.  I don't
13 fully understand what's mentally going on in their
14 minds when that's happening, or if that's happening.
15    Q.   Is it your experience in life that female
16 sexual harassment, to the extent it exists, may be
17 more common than male sexual harassment at work?  In
18 other words, with the females being the targets of
19 sexual harassment versus males being the target of
20 sexual harassment.
21    A.   My personal work experience, this was the
22 first time I'd ever seen anything like this.
23    Q.   Well, I'm talking about your life
24 experience.  Is it your understanding that sexual
25 harassment of females is more common -- probably

Page 39

1 more common when it occurs at workplaces than sexual
2 harassment of male employees?
3       MS. KAPPELMAN:  Object to the form of
4 the question.
5       Matt, you can try to answer that if
6 you can.
7    A.   I think, like, if you look at data and
8 historical references, I think that would be, like,
9 an accurate societal statement.
10    Q.   All right.  Since you've been at Wayfair,
11 has anybody under your supervision self-reported
12 discriminatory comments to either you or HR?
13    A.   Just to clarify, discriminatory in general
14 or sexual harassment related?
15    Q.   Discriminatory in general.
16    A.   Not discriminatory.
17    Q.   And Mr. McDole -- just to make the record
18 clear, Mr. McDole did not self-report any arguable
19 unconsented touching of Emily to you or anybody else
20 that you know of; correct?
21       MS. KAPPELMAN:  Sorry.  Can you just
22 repeat that question?  I lost it.
23    BY MR. GOODMAN:
24    Q.   Just to make the record clear, Mr. McDole
25 did not self-report to you, or anybody that you know

Page 40

1 of, his concern that he may have touched Emily
2 without her consent?
3    A.   No.
4    Q.   Since you've been at Wayfair, has any
5 subordinate self-reported statements or conduct that
6 they were involved in because it was potentially
7 discriminatory?
8       MS. KAPPELMAN:  I'm going to object as
9 irrelevant.
10       But go ahead, Matt.  You can answer.
11 Maybe we can move on.
12    A.   As far as discriminatory comments?
13    Q.   Right.
14    A.   I did have one other.
15    Q.   Where it was a self-report?
16    A.   It was a self-report into a team lead, yes.
17    Q.   Okay.  What was the nature of the comment?
18       MS. KAPPELMAN:  I'm going to direct
19 you not to answer.
20       It's not relevant to this action.  So
21 if you want to talk to the judge later about that,
22 we can.  Beyond the scope of this case.
23       Let me just do a little voir dire.
24       Did it have to do with Mr. McDole?
25       THE WITNESS:  It did not have to do

Page 41

11 (Pages 38 - 41)

1 with Mr. McDole.
2        MS. KAPPELMAN: Did it have to do with
3 Ms. Forsythe?
4        THE WITNESS: Yes, it did.
5        MS. KAPPELMAN: Okay, never mind. I
6 withdraw my objection.
7    BY MR. GOODMAN:
8    Q.   And what was it?
9    A.   Emily had an employee in 2018, summer, that
10 asked what it would take to be promoted to an L3,
11 L4 -- from an L3 to L4, which at Wayfair is a
12 manager to a senior manager.
13        The complaint from Davina Heard -- is the
14 lady's name down in Atlanta, Georgia -- said that
15 Emily said people that are at the L4 in the company
16 have backgrounds from Harvard and other prestigious
17 universities and that it's really hard to be an L4.
18        Davina brought that to my attention and to
19 her manager, saying that she didn't feel
20 comfortable.
21    Q.   That was not a report by Davina of a
22 comment that she made that -- that was not a
23 report -- a self-report by Davina of any comment
24 that she made, was it?
25    A.   Before I answer, I can find out.  I have

Page 42

1    Q.   No.  I want to have the answer to this
2 question.  Okay?
3        Was Davina telling you that she had made a
4 statement that she was worried could be viewed as
5 potentially discriminatory by Emily or by anyone
6 else?
7    A.   Davina was concerned that she was
8 discriminated against by Emily.
9    Q.   But she wasn't concerned that she made a
10 statement that could be viewed as discriminatory;
11 correct?
12    A.   She considered it -- she escalated it to
13 her manager?  Is that your question?
14    Q.   No.  Mr. Witte, I'm going to trying make
15 this indelibly clear, because I do not, quite
16 frankly, understand your confusion whatsoever.
17        Did Davina say to you that she had said
18 anything to Emily or to anybody else that she was
19 worried Emily or anybody else would view as a
20 discriminatory statement by herself, Davina?
21    A.   I believe no, if I understand your
22 question.
23    Q.   That was my question at the outset.
24        What is -- so is L4 a higher-level position
25 at Wayfair than an L5 or L6?

Page 44

1 the emails.
2    Q.   Davina wasn't telling you something she
3 said that --
4        (Interruption by the court reporter.)
5    BY MR. GOODMAN:
6    Q.   Mr. Witte, my question was about a
7 self-disclosure.  Do you remember that question?
8    A.   Yes.  Self-disclosure by Davina.
9    Q.   Davina was not telling you about a comment
10 or statement that she made as being -- that she was
11 worried could be potentially viewed as
12 discriminatory, was she?
13    A.   Yes, she was.
14    Q.   What was the comment that Davina made that
15 she was worried could potentially be viewed as a
16 discriminatory comment by her, Davina?
17    A.   Davina felt that she potentially was being
18 discriminated because she didn't go to a prestigious
19 school, even though Emily told her that we graduated
20 from Harvard and Cornell.
21    Q.   What was the comment by Davina that she was
22 self-reporting -- that she was concerned could be
23 viewed as a comment -- as a discriminatory statement
24 by herself, that is, Davina?
25    A.   Am I allowed to look this up for you?

Page 43

1    A.   No.  L1 is a junior associate, typically
2 fresh out of school, and an L6 and is a director
3 level -- or L10 is the highest, the two founders of
4 the company.  So L10 is the most senior, L1 is the
5 most junior.  Actually, there's also an L0, just to
6 clarify.
7    Q.   Did you talk with Emily about her statement
8 about educational credentials?
9    A.   As in reference to Davina?
10    Q.   You said Davina claimed there was a
11 statement made about educational credentials for
12 certain level positions; right?
13    A.   Yes.
14    Q.   Did you discuss that with Emily?
15    A.   I did discuss that with Emily, told her it
16 was unacceptable.
17    Q.   Okay.  Do you remember what she said?
18    A.   I believe Emily said that her words were
19 twisted, and that's not what she meant.
20    Q.   Okay.  Were there graduates -- since you
21 mentioned two schools, at least, were there Harvard
22 and Cornell graduates in L3 or L4 -- I forget
23 whether it was L4 positions which were discussed,
24 but I recall L4.
25        Were there, in fact, at Wayfair, graduates

Page 45

1 of those institutions who were L4?
2     A.   I mean, Emily was an L4 from Cornell, and I
3 know -- I'm positive there's Harvard that are --
4 yeah.
5     Q.   And was -- as Davina reported it to you,
6 was the conversation about L4s?
7     A.   The conversation was what does it take to
8 become an L4, and I believe Emily referenced that
9 L4s at Wayfair are a high position.  Many typically
10 have MBAs or come from schools such as Harvard and
11 MIT and Cornell.
12    Q.   Is it true that many -- is it true that
13 either a plurality -- let me restate the question.
14         Is it true that many L4s at Wayfair have
15 MBAs?
16    A.   In the corporate office, I'd say it's
17 probably typical.  Out in the field it's not.  I
18 wouldn't say it's, like, a requirement to have an
19 MBA to be an L4.  I have many employees on my team
20 today that are L4s that do not have MBAs.
21    Q.   So some do, some don't?
22    A.   Yes.  But it's not a requirement.
23    Q.   And more at headquarters than in the field?
24    A.   It's more common in headquarters, I think,
25 to have the MBA, just because of the proximity to
                                                    Page 46

1 all the schools in the Boston area.
2     Q.   But Ithaca is not near Boston; right?
3     A.   No.  I'm grouping in Ivy League colleges
4 when I say that.
5     Q.   And Philadelphia is not near Boston, is it?
6     A.   I would guess Philadelphia is about a
7 four-hour drive.
8     Q.   Actually, more like six, but...
9     A.   Yeah, probably.
10        MS. KAPPELMAN:  Okie dokie.
11    BY MR. GOODMAN:
12    Q.   Did you and Emily discuss what Emily
13 recalled saying to Ms. Heard specifically, or did
14 you leave it as the discussion that you've already
15 testified?
16    A.   I remember discussing that it was
17 inappropriate.  It wasn't consistent with our values
18 as a company.
19        Emily, I believe, made a trip down with
20 herself and then her -- another person from the
21 team, met with talent management.  And then Davina
22 actually resigned shortly thereafter to seek
23 alternate employment.
24        MR. GOODMAN:  Object to
25 responsiveness.
                                                    Page 47

1     BY MR. GOODMAN:
2     Q.   Did you discuss with Emily the substance of
3 what she said to Ms. Heard, other than complain to
4 Emily that it was inappropriate and have her say, "I
5 was mischaracterized"?  Was there any further
6 discussion than that?
7     A.   I believe we discussed it for 30 minute on
8 a phone call.
9     Q.   Do you have a recollection --
10    A.   I asked -- Emily was going down to meet
11 with her to try to make sure things were smoothed
12 out.  I asked if Davina wanted to speak with our
13 internal talent management.
14    Q.   My question was do you remember any further
15 elaboration of what had absolutely been said than
16 her saying what your understanding is is not
17 correct?
18        MS. KAPPELMAN:  Object to the form of
19 the question.
20        Do you remember anything else about
21 the conversation, Matt?
22    A.   No.  I wasn't in the room for the
23 conversation.
24    Q.   And did Emily say anything -- did you and
25 Emily talk about it, other than your saying --
                                                    Page 48

1        (Interruption in the proceedings.)
2        THE VIDEOGRAPHER:  The time is now
3 11:07, and we're going off record.
4        (Recess taken.)
5        THE VIDEOGRAPHER:  This is the
6 beginning of Tape 2.  Time is now 11:12.  Back on
7 record.
8     BY MR. GOODMAN:
9     Q.   Other than your hearing from Ms. Heard,
10 telling Emily that what Ms. Heard reported was
11 inappropriate, and Emily saying what you heard from
12 Ms. Heard was not a correct characterization of the
13 conversation, was there any further discussion about
14 the substance of the conversation between Ms. Heard
15 and Ms. Forsythe?
16    A.   Yes, we did discuss it.
17    Q.   What did Emily tell you she had told
18 Ms. Heard?
19    A.   I actually found the email.  Can I -- I had
20 no idea how the emails -- I'm happy to read it to
21 you from Davina to Emily, what Davina's statement
22 was.
23    Q.   No.  I'm asking what did Emily say to you
24 about the way that the conversation went?
25    A.   Emily said that she didn't characterize
                                                    Page 49

13 (Pages 46 - 49)

1 that -- sorry.  She said that she didn't say those
2 things to Davina, that she wouldn't have said that
3 you can only be an L4 by coming from a school like
4 Harvard or having a top-tier MBA.
5     Q.   Did you talk with any HR representative
6 about this event?
7     A.   Yes.  Her manager -- Davina's manager at
8 the time, Steven Grimes, who reported to Emily, per
9 my direction, did meet with talent management, and
10 they asked Davina if she wanted to take it any
11 further.  And at the time she said no.
12     Q.   Okay.  Did anybody tell you -- did anybody
13 from HR ever tell you that there was a legal aspect
14 to either the characterization of the conversation
15 by Ms. Heard or by Ms. Forsythe?
16          MS. KAPPELMAN:  Object to the form of
17 the question.
18          You can answer, Matt.
19     A.   I had Steven Grimes meet with the talent
20 management team and document everything -- because
21 Davina resigned shortly after -- to make sure that
22 it was accurately represented on record.
23     Q.   Did anybody from HR tell you that they
24 thought there was a legal issue to the
25 characterization of the conversation by either

Page 50

1 Davina Heard or Emily Forsythe?
2          MS. KAPPELMAN:  Object to the form.
3          You can answer, Matt.
4     A.   Not me directly.
5     Q.   And you're not aware of anybody else being
6 told that, are you?
7     A.   No, I'm not.
8     Q.   At Forsythe (sic), have you been given any
9 sexual harassment training?
10     A.   Did you say have I been given any sexual
11 harassment training before Forsythe?
12     Q.   Online training or in person training?
13     A.   Sure.  Throughout my entire career.
14     Q.   I'm talking about at Wayfair.
15     A.   I can't remember, but I believe so, yeah.
16 There was code of conduct and sexual harassment
17 training.
18     Q.   But you can remember definitely being
19 trained at prior employers; correct?
20     A.   Yes.
21     Q.   At Wayfair, what training has occurred
22 about dealing with sexual harassment?
23     A.   There's annual training.
24     Q.   Is it in-person training in Boston?  What
25 does it consist of?

Page 51

1     A.   It's virtual training.  It's fairly
2 thorough.
3     Q.   Is it HR people on video?  Is it multiple
4 choice exams?  What is it?
5     A.   It's both of those.  It's reading, it's
6 assuming situations around what could be foreseen as
7 sexual harassment, off-conduct jokes, what's
8 appropriate, what's inappropriate.  It runs you
9 through many quizzes and different tests to evaluate
10 situations.
11     Q.   So one aspect of it is what constitutes
12 sexual harassment; right?
13     A.   Yes.
14     Q.   And that can include unconsented touching;
15 correct?
16     A.   Yes.
17     Q.   It can include comments negatively
18 stereotyping females; correct?
19     A.   Yes.
20     Q.   It can include bullying of females;
21 correct?
22          MS. KAPPELMAN:  Did you say
23 "bullying"?
24          MR. GOODMAN:  I said bullying, yes.
25          MS. KAPPELMAN:  I'm going to object to

Page 52

1 the form of the question.  It calls for a legal
2 conclusion.
3          Are you asking him to define sexual
4 harassment under the law, or what the training says?
5          MR. GOODMAN:  I'll restate it.
6     BY MR. GOODMAN:
7     Q.   Does the training indicate that sexual
8 harassment can include conduct such as disrespect by
9 a male of a female?
10          MS. KAPPELMAN:  Object to the form of
11 the question.
12          If you understand it, Matt, you can
13 answer.
14     A.   It's typically around actual sexual
15 harassment.  So touching, unwanted passes,
16 mentioning things that aren't appropriate that are
17 sexually oriented.
18          I don't think it -- I think bullying is
19 under -- it's under different policy around
20 discrimination.
21     Q.   So let me pull out, then -- ask more
22 broadly about sex discrimination.
23          There can be sex discrimination that is not
24 sexual harassment; correct?
25          MS. KAPPELMAN:  Again, this calls for

Page 53

14 (Pages 50 - 53)

1 end of June is Review Cycle 1. We typically start
2 the process of writing reviews for that cycle in
3 July. We deliver those reviews in August. And
4 subsequently from July until the end of December,
5 plus or minus a couple weeks based on year-end
6 calendar cycles. It's typically front half, back
7 half.
8        Review writing and calibration occurs for a
9 month after the reviews are written by the managers,
10 and then reviews are delivered typically four to six
11 weeks after the review cycle starts.
12 Q. So maybe -- probably -- probably February
13 those years?
14 A. Typically it's February and then August --
15 Q. Okay.
16 A. -- is when they're actually delivered.
17        But it's a thorough review cycle process
18 where you get stakeholder feedback, peer feedback,
19 upward feedback.
20 Q. Did you make observation to Emily about the
21 psychological or mental stability of McDole?
22 A. So I think when we -- stability may be
23 tough. He's a bit -- when I interviewed Mike -- so
24 just to clarify, when I interviewed Mike, there was
25 a -- like, a quirk in his personality.

Page 58

1 2019 they started to have some challenges around --
2 Emily would give a lot of tasks, and Mike would pick
3 some of the ones that he would want to do, is what
4 Emily would claim to me.
5 Q. Did you ever follow up with McDole about --
6 after you had discussions with Emily about what I
7 would call inconstancy with his projects?
8 A. Mike was concerned he was being
9 micromanaged at the time, at least in March. And
10 then -- go ahead.
11 Q. Did you ever talk with Mike about -- not
12 about the issue of the closeness of management, but,
13 to use your terms, doing what he wanted to do and
14 not doing what he didn't want to do? Did you talk
15 about that kind of problem?
16 A. Not directly with Mike.
17        At the time, it was an employee that needed
18 to get clear expectations from his manager.
19 Q. Did you ever tell Emily whether or not you
20 had spoken to him about that problem of inconstancy
21 of projects?
22 A. Did I tell Emily? I think I told Emily I
23 was going to talk to Mike and make sure I understood
24 his point of view to make sure it was fair.
25        And just for what it's worth, I've

Page 60

1        And I asked Emily about it, but Emily was a
2 big fan of Mike, had worked with him at Amazon, said
3 he would do great things, and assured that we
4 wouldn't have an issue and that he would -- he was a
5 worker, and he would come in and get a lot of work
6 done.
7 Q. I understand that he could -- he could
8 demonstrate very good performance from time to time?
9 A. I've never met anyone outwork Mike McDole.
10 Q. That worked what?
11 A. That would outwork Mike McDole.
12 Q. So hours of work? Are you referring to
13 hours of work?
14 A. Hours of work, deliverables that he was
15 able to achieve. Very dedicated.
16 Q. You and Emily had discussions about lack of
17 consistency with completing some projects and not
18 completing others. Do you remember that?
19        MS. KAPPELMAN: Object to the form.
20        You can answer.
21 A. Yeah. I think in -- let's see. Mike
22 started -- I want to say, like, October, September
23 of 2018, if that sounds correct.
24        And then the first three months it was
25 great. Emily loved him. And then I think in Q1 of

Page 59

1 experienced that quite often in teams, that managers
2 push to do things and people say, I can't get it all
3 done; I'm not successful. And we all talk about it.
4 Q. But what Mike told you, in response to your
5 discussion with Emily and in your communicating that
6 discussion to Mike was, I think I'm being
7 micromanaged. Was that the substance of his
8 response?
9 A. Yeah.
10 Q. Does Wayfair have an employee violence
11 policy?
12 A. Yeah. I mean, there's zero discrimination
13 of harassment and threats in general -- zero
14 tolerance.
15 Q. There's zero tolerance; right?
16 A. Yeah. Zero tolerance to all of that, yes.
17 Q. Does it have an employee antiviolence
18 policy?
19        MS. KAPPELMAN: If you know, Mike.
20        Objection. Again, if you want a
21 30(b)(6) about all the policies, we're happy to
22 provide one.
23 BY MR. GOODMAN:
24 Q. Were you ever made aware or did you ever
25 get trained on an employee violence policy?

Page 61

16 (Pages 58 - 61)

1   A.   I want to say workplace violence training
2 is part of the antidiscrimination, antiviolence
3 training.
4   Q.   Okay.  That's probably the most typical
5 terminology:  workplace violence.
6   A.   Yeah, absolutely.
7   Q.   How did you understand, based on that
8 training -- how broadly did you understand, based on
9 that training, that the notion of workplace violence
10 was understood at Wayfair?
11      MS. KAPPELMAN:  Is that really the
12 question?  Can the rephrase that, Bob?
13   BY MR. GOODMAN:
14   Q.   What was the scope of conduct by employees
15 that, as you understand it based on your training,
16 came under the rubric of workplace violence?
17      MS. KAPPELMAN:  Objection.  You can
18 answer, Matt.
19   A.   I believe it would be anything that's
20 threatening an employee's safety.
21      Just for what it's worth, I mean, we run
22 fulfillment centers with hourly employees.  We've
23 had people get in fights at buildings.  They've
24 had -- can be anything from a fight to the
25 discriminatory comments earlier around, you know,

Page 62

1 like, inappropriate behavior, making criticisms
2 towards people.
3   Q.   Did you think it was any -- did you think
4 it was anything other than conduct -- could conduct
5 be psychologically threatening and still be covered
6 by the workplace violence policy?
7      MS. KAPPELMAN:  If you know, Matt.  In
8 your opinion.
9   A.   I think, in my opinion, yes.
10   Q.   And at one point in the fall of -- in the
11 late summer to fall of 2019, Emily told you that
12 conduct of Mr. McDole toward her was something that,
13 at that point, had become psychologically
14 threatening; correct?
15   A.   I don't know if she said "psychologically
16 threatening" in her words.
17   Q.   Was that part of the substance of it, that
18 she was being overwhelmed by his conduct toward her?
19   A.   I think the email that I received from
20 Emily was she felt she was being bullied.
21   Q.   And that is one form of psychological
22 threat that could be covered by the workplace
23 violence policy; correct?
24      MS. KAPPELMAN:  Object to the form of
25 the question.

Page 63

1      You can answer, Matt.
2   A.   Yes.
3   Q.   So you never gave a written evaluation of
4 Mr. McDole?
5   A.   No, I did not.
6   Q.   Mr. McKnight may have given a written
7 evaluation of Mr. McDole; correct?
8   A.   No, he would not have.
9   Q.   Who would, since Mr. McDole came on, have
10 given him a written evaluation of the kind that you
11 gave Emily?
12   A.   I think Emily gave one.
13   Q.   Okay.
14   A.   And I believe the next would have been
15 Arron Velarde, A-R-R-O-N, V-E-L-A-R-D-E.
16   Q.   Okay.
17   A.   And then most recently, Brian McCormick.
18   Q.   And did Mr. Velarde have a common --
19 (Indecipherable).
20      MS. KAPPELMAN:  Did Mr. Velarde have a
21 what?
22      MR. GOODMAN:  Common prior employer
23 with Mr. McKnight.
24      MS. KAPPELMAN:  Common prior employer?
25      MR. GOODMAN:  Yes.

Page 64

1   A.   Yes.  I think they both worked at Tesla.
2      Sorry.  I had to dig for that one.
3   Q.   And Mr. McCormack is the current superior
4 of Mr. McDole?
5   A.   Not as of this moment.  They've
6 reorganized.  He's under Derek Sparks now.
7   Q.   During part of his employment with Wayfair,
8 was Mr. McDole living in Texas?
9   A.   Yes.
10   Q.   And Wayfair has a facility in Duncanville;
11 correct?
12   A.   Duncanville?  In Texas?
13   Q.   Yeah.  Where is the facility?
14   A.   Yeah, sorry.  Lancaster, Texas.  About 20
15 miles south of Dallas.
16   Q.   Sorry.  Next town over.  You wouldn't know
17 that, but...
18      Do you know who was the site director in
19 Lancaster?
20   A.   Yes.
21      At the time when Mike worked there, or
22 right now?
23   Q.   When Mike worked there.
24   A.   Jim DeSimone.
25   Q.   And who more recently?

Page 65

17 (Pages 62 - 65)

1    A.    Liz White.
2    Q.    Okay.  Did you ever talk with Mr. DeSimone
3 about Mike McDole?
4    A.    On a project level, or is Mike doing a good
5 job, or --
6    Q.    I guess any nonstrictly performance-related
7 conversations.
8    A.    Not that I recall, but...
9    Q.    Okay.  I'm going to -- we're going to try
10 the screen share here.  Let me just hit it, and...
11       I'm going to pull up Wayfair 195.  That's
12 the first page of the exhibit.  It happens to be the
13 only page in this Bates.  Do you see that, sir?
14       MS. KAPPELMAN:  Not yet, not yet.  But
15 we do see that you're opening it.
16       MR. GOODMAN:  It says it's open.
17       MS. KAPPELMAN:  Click on it again, if
18 you don't mind.
19       Did you see it open, Bob?
20       THE WITNESS:  You may have to drag the
21 window to your screen.  You might have to drag it
22 down.
23       MS. KAPPELMAN:  No.  He just needs to
24 click on it, actually, and then it'll open.
25       THE WITNESS:  I think it may have

Page 66

1 opened.  It's probably on a different screen on his
2 computer.  He probably just needs to drag it onto
3 the same one that the --
4       MR. GOODMAN:  I see.  Okay.  Let me
5 make that a full screen.  Now do you see it?
6       THE WITNESS:  Do you have a separate
7 window?  I assume you have two monitors?  It's
8 probably playing on another monitor.  Drag the
9 actual email onto this screen, and then it'll share
10 this screen.
11       MS. KAPPELMAN:  Right click on it and
12 drag it over.
13       That's the problem with two screens in
14 screen share:  It will share it, but it will share
15 it on the other screen.
16       Can you guys go off the record, and
17 we'll help him get this up.
18       THE VIDEOGRAPHER:  The time is now
19 11:37.  Back off record.
20       (Recess taken.)
21       THE VIDEOGRAPHER:  The time is now
22 11:47, and we're back on record.
23    BY MR. GOODMAN:
24    Q.    Okay.  Mr. Witte, can you see Wayfair 195?
25    A.    Yes, sir.

Page 67

1    Q.    Do you recall this email from Ms. Forsythe
2 to you -- from you to her?  You acknowledge the
3 email?
4    A.    I do remember it.  And I only remember it
5 because it was -- it was odd because I think Emily
6 rated him very highly and then quickly changed the
7 rating.
8    Q.    Okay.
9    A.    That's the only reason I remember it.  It
10 was -- he was doing really well, and then something
11 happened.  And then all of a sudden he wasn't, and
12 she wanted to add a bunch of things to his review.
13       MS. KAPPELMAN:  Can we call this
14 Exhibit 1, Bob?
15       MR. GOODMAN:  We can call it
16 Exhibit 1, yes.
17       MS. KAPPELMAN:  Witte 1, thank you.
18       (Witte Exhibit 1, email Bates-stamped
19 Wayfair 195, marked for identification.)
20    BY MR. GOODMAN:
21    Q.    And you told me, Mr. Witte, that she could
22 edit his review if she wanted to edit it before it
23 was delivered?
24    A.    Yes.
25       So the typical process at Wayfair is you

Page 68

1 write a review.  A group of kind of
2 cross-collaborative team group read everyone's
3 reviews.  We align reviews to make sure that there's
4 consistent feedback across the organization, that,
5 like, a manager can't say you're great while your
6 direct reports would say you're terrible.  You make
7 sure that it's consistent and fair.
8       And then once the initial review is
9 reviewed by a broader panel, reviews do open up
10 later to allow for edits to the review based on the
11 rating.
12       So this was after Emily wrote his initial
13 review and submitted it.  I don't remember, but I
14 think she submitted him as exceeding expectations,
15 and then she wanted to change it later.
16    Q.    Right.  And she said -- could you read the
17 second paragraph of her email, the one that begins
18 with the word "Since."  Read it into the record, if
19 you would.
20    A.    Starting with the whole thing?
21    Q.    No.  Just the paragraph that begins
22 "Since."
23    A.    "Since submitting the review, Mike's
24 performance has slipped and he's stopped working on
25 his assigned projects."

Page 69

18 (Pages 66 - 69)

1    Q.   Okay.  And when would she have submitted
2 the review for the preliminary look by others?
3    A.   It would have been in February.
4    Q.   This was February 7th, so --
5    A.   Oh, the initial review would have been
6 completed in January.
7    Q.   Okay.  So it might have been several weeks
8 after the initial review was completed?
9    A.   Yes.
10    Q.   Okay.
11    A.   But, like, again, the only reason I
12 remember this email specifically is that in January,
13 Emily would tell me verbally how great Mike was
14 doing, how many projects he did at peak, he's a
15 workhorse.
16         Emily stated in -- like, I'm just
17 referencing -- the only reason I remember this email
18 is that Emily was applauding how well Mike was
19 working in January around the review cycle.
20         I believe, during this review cycle, Mike
21 had rated himself a one.  Emily, I think, was rating
22 like a two, which is a very high bar at Wayfair.
23         And then after, like, several weeks, this
24 hit and I found it kind of odd, which is --
25    Q.   The last statement she makes conforms with

Page 70

1 your evaluation of his objective performance and her
2 own that she gives a strong performance; correct?
3    A.   Yeah.
4    Q.   So did you understand that -- and
5 paragraph 1 talks about an assignment given to him
6 that he just hasn't done.  Do you see that?
7    A.   I see that, yes.
8    Q.   And paragraph 2 talks about defensiveness
9 with constructive criticism?
10    A.   Yes.  I'm reading that, yes.
11    Q.   Including a refusal to make changes in one
12 thing or another?  That's the last line of
13 paragraph 2.  Do you see that?
14    A.   Yes, I do.
15    Q.   And in paragraph 3, kind of refusal to use
16 an agreed template, a team template?
17    A.   Yes.
18    Q.   Okay.  And then 4 is kind of the picking
19 and choosing the projects he's assigned to work on.
20 Do you see that?
21    A.   Yes, I read that.
22    Q.   And then 5, kind of difficult to have a
23 discussion with about projects they were working on
24 together.  Do you see that?
25    A.   Yes, I read that.

Page 71

1    Q.   Is it fair to characterize this criticism
2 of Mr. McDole as you perform well, but you're not
3 team-oriented, and you can be insubordinate by just
4 refusing to do things you're assigned?
5         MS. KAPPELMAN:  Object to the
6 characterization.  The document speaks for itself.
7 She was very clear about her concerns.  We all just
8 read them.  We don't need your restatement of her
9 concerns from February of 2019.
10         MR. GOODMAN:  Object to sidebar.
11    BY MR. GOODMAN:
12    Q.   You can answer.
13         Let me restate it.
14         You were both talking about somebody who
15 could perform well when they actually performed
16 their assigned tasks; right?
17    A.   Yes.
18    Q.   Okay.  But she observed some behaviors that
19 were related to things he did not do or want to do;
20 correct?
21         MS. KAPPELMAN:  Objection.  The
22 documents speaks for itself.
23    BY MR. GOODMAN:
24    Q.   You can answer.
25         THE WITNESS:  Lynn, am I allowed to

Page 72

1 answer?
2         MS. KAPPELMAN:  Yeah, yeah.  You can
3 answer.  He wants to know what his characterization
4 of the document says, so --
5    A.   Yeah.  So I think, as I read this, Emily
6 had a top-down management style, that she would kind
7 of inform her team what she wanted to do and how I
8 wanted to do it.
9         Mike built many of these reports on his own
10 and had an opinion on how to actually do this.
11         Emily would say, "This is how I want to
12 change it."  It wasn't always a collaborative
13 process.
14         So this is how I interpreted that, which is
15 where I didn't take -- that's why it surprised me.
16         At the same point in time, Mike was working
17 probably 70 or 80 hours a week, and Mike told me
18 that he was prioritizing to get done the work that
19 he could get done in verbal communication.
20    Q.   So did you discuss this email with
21 Mr. McDole?
22    A.   I don't think this email, because it was
23 still fairly early, and she was just updating his
24 review to reflect some comments and tendencies,
25 which I thought was fine.  If she's provided

Page 73

19 (Pages 70 - 73)

1  late August or early September, you had a
2  conversation with Mr. McKnight about a person named
3  Frances?  I forget the last name.  Do you recall
4  that?
5        THE WITNESS:  Do you want me to state
6  the name, Lynn?
7        MS. KAPPELMAN:  Sure.
8  A.  Frances Thunder, yes.
9  Q.  Do you remember discussing Frances Thunder
10 with Mr. McKnight in late August/early September in
11 reference to Emily?
12 A.  I do.  I actually remember discussing it
13 with Kory, I remember discussing it with Frances,
14 and I remember discussing it with Frances's manager
15 Gor Zakaryan.
16 Q.  Did you discuss it with Emily?
17 A.  Yes.  I believe, actually, Kory did because
18 she reported directly to Kory at the time.
19 Q.  Zakaryan is the name of the supervisor?
20 A.  Yeah.  That was Frances Thunder's
21 supervisor at that time.  And that's
22 Z-A-K-A-R-Y-A-N.
23        (Clarification requested by the court
24 reporter.)
25        THE WITNESS:  Gor, G-O-R.

Page 82

1  BY MR. GOODMAN:
2  Q.   Who was Frances Thunder, or who is Frances
3  Thunder?
4  A.   Frances Thunder, at the time, was part of
5  the sales and operations planning team.  She was the
6  lead for high-volume events back then, so she was
7  responsible for coordinating and orchestrating -- I
8  think coordinating and having a view -- a visibility
9  on capacity projects, available racking and storage
10 space across our fulfillment center network.
11 Q.   I'm going to show you what has been marked
12 as Exhibit 3, which is Wayfair 555.
13       (Witte Exhibit 3, email from
14 Ms. Forsythe to Mr. Witte Bates-stamped Wayfair 555,
15 marked for identification.)
16 BY MR. GOODMAN:
17 Q.   Do you see that?
18 A.   Yes, I do.
19 Q.   Can you tell me what the context of that
20 email was from Emily to you?
21       MS. KAPPELMAN:  Before you do, for the
22 record, it's a September 10, 2019, email from
23 Ms. Forsythe to Mr. Witte, dated -- time-stamped
24 3:35:42 p.m.
25       Go ahead, Matt.

Page 83

1  A.   Yeah.  So the email says, "Hi, Matt.  Can I
2  talk to you first before we talk to Kory about my
3  switching teams?  Do you mind if I start looking?"
4        At the time, Emily had entertained to me
5  that -- trying to think.  This is, like,
6  chronologically when she wanted to look at switching
7  to other teams internal to Wayfair, and she was also
8  exploring outside opportunities out of the company.
9  I asked her, you know, if it was anyone I knew
10 outside the company, and she said she wouldn't tell
11 me.
12 Q.   What do you mean, anyone you knew?  Anyone
13 that she was talking to about --
14 A.   Like, was it Target?  Was it Walmart?  Was
15 it Amazon?  Was it any of those -- like, just a
16 couple that I would know.
17 Q.   And were you also asking her about who she
18 was talking to within the company?
19 A.   I did not ask her what she talking about in
20 the company.  I actually didn't -- I didn't prompt
21 this discussion.  She prompted it on her own.
22 Q.   Do you remember, was there a discussion
23 prior to -- it sounds like can I talk to you first
24 before I talk to Kory.  It sounds like you had
25 talked to her about the notion of switching teams.

Page 84

1  Do you remember any call prior to September 10,
2  2019, about that switch?
3  A.   What day was September 10th?  Was that --
4        MS. KAPPELMAN:  What day of the week?
5  A.   Yeah.  I can't remember.  I remember, like,
6  a Wednesday or Thursday I was in Boston.  I remember
7  talking to Emily.  I can't remember if this is what
8  prompted that discussion, or if it was another one.
9  Q.   I think it would have been a -- might have
10 been -- actually could've been on a Monday, because
11 the 19th --
12       (Multiple parties speaking.
13 Interruption by the court reporter.)
14 BY MR. GOODMAN:
15 Q.   Go ahead, sir.
16 A.   Emily was working at our capital
17 forecasting team.  Kind of stood that up.  We didn't
18 have a great process within the financial structure
19 to look at the capital that we had in the network,
20 where we were spending money.  I knew that she had
21 interest in that work.  She -- I believe she had a
22 bachelor's in finance or something else from
23 Cornell.  But she had an MBA with a finance
24 concentration from Cornell, I think.  And I knew
25 that she liked finance.

Page 85

22 (Pages 82 - 85)

1 telling you that the investigation was closed.
2    A.   Yes, that's correct.
3    Q.    And then she was terminated a week later;
4 right? Her last day of work was September 23rd, a
5 Monday?
6    A.   I think so. You know the exact dates. I
7 believe that's --
8    Q.    And she worked that whole day; correct?
9    A.   The 23rd?
10    Q.    Right.
11    A.   I don't actually remember.
12    Q.    Do you know about the trip to Atlanta that
13 she was scheduled to take the next day,
14 September 24th?
15    A.   I think she had a -- I think she had booked
16 a flight after she met with Trevor. I don't
17 exactly -- to be totally honest with you, before you
18 go down the path of questioning, from the 23rd to
19 the 24th, I didn't have direct discussions with
20 Emily.
21    Q.    Say that again, please.
22    A.   I did not have a direct discussion with
23 Emily on September 23rd.
24    Q.    Did you have any discussion with her
25 after -- what was the last time you talked with

Page 94

1 Emily, if you can recall?
2    A.   It may have been the Thursday before. I
3 think I said hi in passing.
4    Q.    You were both in Kentucky on the Thursday
5 before, the 19th?
6    A.   Yes. From what I recall.
7    Q.    Did you know that Mr. Shaffer and
8 Ms. Forsythe were going to talk -- were talking that
9 day?
10    A.   No, I did not.
11       The actual investigation, when that
12 proceeded, was handled by talent management. I --
13 intentionally, the manager is not kept in the loop
14 of what's going on until the investigation is
15 concluded.
16    Q.    Part of -- after the -- after Emily made
17 her complaint, her formal complaint in mid-August, a
18 number of people were asked about their experiences
19 with Emily; correct?
20    A.   Yes. Or people had made verbal complaints,
21 and we asked them to document them.
22    Q.    Prior to -- prior to August 13th when she
23 submitted the complaint, had any verbal complaints
24 by other employees been communicated to her --
25    A.   Verbal complaints from other employees --

Page 95

1 like, did we have feedback from her?
2    Q.    Did you communicate all verbal complaints
3 about her -- that you characterize as verbal
4 complaints -- to her prior to August 14th?
5    A.   Sure, yeah, absolutely.
6    Q.    So you -- you're claiming that any verbal
7 complaint by another employee about her was made
8 known to her before August 14th?
9    A.   Yes. We had verbal complaints that came in
10 that we talked about beforehand.
11    Q.    Okay. And after August 13th, after she
12 made her complaint, any verbal complaints made prior
13 to August 14th or after August 14th, you requested
14 the employees put them in writing; correct?
15    A.   We did.
16    Q.    And these were complaints that didn't
17 overlap with any aspect of the chronology. In other
18 words, the chronology did not refer to her having
19 received verbal complaints from any particular
20 individuals.
21       MS. KAPPELMAN: Object to the form of
22 the question. I don't even understand it. But if
23 you're characterizing what the chronology says, the
24 document speaks for itself.
25       MR. GOODMAN: I'll restate it.

Page 96

1    BY MR. GOODMAN:
2    Q.    It was only after the formal complaint was
3 made in mid-August that verbal complaints previously
4 made or made after August 14th were requested to be
5 confirmed in writing; correct?
6       MS. KAPPELMAN: Object to the form of
7 the question. It's not clear still the way you
8 state it. I think I know what you're getting at,
9 but the way you ask is not clear at all.
10    BY MR. GOODMAN:
11    Q.    Did you or anybody else at Wayfair ask,
12 after August 14th, that verbal complaints previously
13 made or made after August 14th be confirmed in
14 writing?
15    A.   We did. But we were also -- we were
16 pulling together overall documentation of Emily's
17 performance in the prep to have a performance
18 improvement plan, and we pulled many old emails from
19 prior individuals who spoke about it.
20       There were issues in Parris, California;
21 Lathrop; interactions with our site in New Jersey.
22 All of that was getting documented into one form
23 that we could share with our talent partners for
24 documentation purposes.
25    Q.    Did you -- how many people were in your

Page 97

25 (Pages 94 - 97)

1 organization at this time?
2    A.   My entire organization at the time?  I
3 guess like 120 at that point in time, which probably
4 80 were maintenance employees.
5    Q.   Right.  So were all verbal complaints
6 against any employee under -- in that group of 120
7 people requested to be confirmed in writing?
8    A.   I never had any other employee that
9 received this many verbal complaints.
10    Q.   And what verbal complaints before
11 August 14th did you discuss with Emily?
12    A.   How she was disruptive.
13    Q.   From who?
14    A.   Oh, Arron Velarde; Genaro Bugarin, who is
15 the West Coast facility -- or ran the West Coast
16 region a long time ago.  There was members on her
17 team.
18    Q.   And who were they?
19    A.   So Steven Grimes and Davina Heard, who I
20 referenced earlier.  We had long discussions around
21 that one.  Joe Guardinio (phonetic), back to 2018,
22 had issues with Emily's management style and we were
23 able to smooth that out.
24    Q.   Any other verbal -- alleged verbal
25 complaints against Emily that you discussed with

Page 98

1 Emily?
2    A.   Melissa Malik, Bill Ayres.  Melissa Malik
3 ran the East Coast fulfillment center region.  Bill
4 Ayres ran the building in New Jersey called
5 Cranberry 3.  Allan Lyall had issues and feedback.
6 He is the head of supply chain today.  There was a
7 long list of people.
8    Q.   And your -- your testimony is that you --
9 before August 14, 2019, you communicated to Emily
10 every communication to you that you regarded as a
11 verbal complaint about her?
12    A.   I think I would have.  I mean, I want to
13 say in, like, the June time frame I actually had a
14 call with her and talked to her about her attitude
15 and her perceptions of operations based on a lot of
16 feedback.
17        And I think the thing that was really hard
18 for me -- Emily was a great employee for me in 2017
19 and '18, so I had a ton of loyalty.  I was a big
20 Emily fan.  But as she grew into the role over time
21 and she started to get direct reports and as the
22 pressure mounted, she had just become kind of
23 condescending to people at times or dismissive.
24        And there was a lot of examples.  Like, we
25 were going to shut the power off to a building to

Page 99

1 turn on a piece of sortation equipment, and she was
2 dismissive to the operations team that that even
3 mattered to them.  There was just lots of examples
4 of how, like --
5        Yeah.  So if your answer is directly did I
6 have a conversation with Emily before anything came
7 to me on August 14th around her attitude or
8 perception of work, the answer is unequivocally yes.
9    Q.   My question specifically was everything
10 which you regarded as a verbal complaint, did you
11 bring that up to her before August 14th?
12    A.   I think the big ones we did.  I'm not sure
13 if it was every single complaint.
14    Q.   And were there any other alleged verbal
15 complaints after August 14th which you also
16 discussed with her?
17    A.   The chronology is difficult.  So during an
18 investigation, we were not doing active performance
19 management with Emily, to make sure that she didn't
20 feel like it was a hostile work environment.  But
21 from the time the investigation started until Emily
22 left the organization, her attitude got worse by the
23 day and week.
24        We would have a discussion around Frances
25 Thunder, for example, that -- Frances thought she

Page 100

1 was being bullied by Emily and not being responsive.
2 We would tell Emily not to do that and that she had
3 to apologize to Frances.  And then moments later,
4 Emily would send an email to Frances or a -- a
5 Slack, I think was our internal text messaging
6 service -- and say, "Why did you copy my manager?  I
7 can't believe that."  Which we thought was further
8 hostile work environment type scenarios.
9    Q.   So you don't think after August 14th you
10 passed along any verbal critiques that --
11    A.   I personally didn't, but Kory was her
12 manager.  Kory absolutely did every day, every week.
13    Q.   Okay.  All right.  You're not aware of any
14 other employee among the 120 under your direct or
15 indirect supervision where verbal complaints were,
16 in each case, asked to be confirmed in writing by
17 the complaining party other than Emily; correct?
18        MS. KAPPELMAN:  Object to the form.
19 Object to the form.
20        If you know, Matt.
21    BY MR. GOODMAN:
22    Q.   In 2018.
23    A.   And so is your question before we put
24 someone on a performance improvement plan, if we ask
25 for feedback from a collective set of employees to

Page 101

26 (Pages 98 - 101)

1 help document so that we can articulate to the
2 employee where their shortfalls are?  Is that your
3 question?
4   Q.   No.  Let me restate the question.
5       Who asked people who allegedly complained
6 about Emily to turn their complaints into writing in
7 August 2019?
8   A.   I believe I did.
9   Q.   Okay.
10   A.   In charge of the overall function.
11       Very similar to -- we exited an employee in
12 New Jersey earlier this year for issues in not doing
13 his job, and we collected feedback from his peer
14 stakeholders around performance expectations to the
15 role, did they feel they were the right fit.  Very
16 common process to collect feedback on someone.
17   Q.   Did anybody beside you in your EIE
18 organization ask anybody to document complaints
19 against Emily in writing?
20   A.   I'm sure Kory McKnight did because he was
21 her direct manager.
22   Q.   Okay.  And do you remember when the first
23 time you requested -- or when was the first time you
24 requested a verbal complaint about Emily to be put
25 into writing?

Page 102

1 of all but the probative answer.
2       (Clarification requested by the court
3 reporter.)
4       MR. KAPPELMAN:  What he liked.  He's
5 objecting to all but the testimony he liked,
6 whatever that was.  He doesn't like it when the
7 witness gives his own story.  He objects to
8 responsiveness, which he won't be able to do at
9 trial, thank goodness.
10       MR. GOODMAN:  If you want to --
11 Counsel, Lynn, if you want to make predictions --
12       (Disruption in the audio.  Discussion
13 held off on the record.)
14       THE VIDEOGRAPHER:  The time is now
15 12:38, and we're going off the record.
16       (Recess taken.)
17       THE VIDEOGRAPHER:  Time is now 12:58.
18 Back on record.
19   BY MR. GOODMAN:
20   Q.   Did anybody inform you in August 2019 that
21 the complaint by Emily in mid-August required that
22 efforts be paused to begin some kind of performance
23 management exercise against her?
24   A.   I think, because of retaliation, we were
25 told to -- yes, we were actually told to do that,

Page 104

1   A.   I think it's that end of August time frame,
2 which is when her performance really went downhill.
3       It wasn't just performance.  Performance is
4 the wrong word.  It was, like, hostility at work, is
5 almost the right phrase that I would use.  It was,
6 like, combative with the operations team.  Like,
7 every day I was getting called by my partners that
8 were at the similar director level.  Like, every
9 day.  Emily is not working well with us.
10   Q.   It was after -- so it was like two weeks
11 after she made her complaint that you started asking
12 people to put their complaints in writing; correct?
13   A.   Yes.  But I think that's a separate thing,
14 to me, at least.  There was a sexual harassment suit
15 that was going -- not suit -- complaint that was
16 going on that -- to be very clear, Kory and I fully
17 supported a thorough investigation of that, which is
18 why when we read the documentation, we turned it in.
19       There was a separate issue around
20 combativeness and aggressiveness at work that we
21 were trying to have a documented conversation with
22 Emily on, which is why we were collecting peer
23 feedback, so that hopefully she could understand
24 that feedback and address the situation.
25       MR. GOODMAN:  Object to responsiveness

Page 103

1 to -- not to pause it.  We can collect it, we can
2 give her verbal feedback, but we couldn't start an
3 actual performance improvement plan.
4   Q.   I'm sharing with you 590.  Can you see 590
5 there?
6       (Witte Exhibit 5, email Bates-stamped
7 Wayfair 590, marked for identification.)
8   A.   Yeah.
9   Q.   This was an email sent after she complained
10 of retaliation; correct?
11       MS. KAPPELMAN:  Let the record reflect
12 this is an email from Matt Witte to C. Stark dated
13 September 18, 2019, at 9:49:06 a.m. in response to
14 an email sent from Candace Smith to Matt Witte of
15 the same date, September 18, 2019.
16   Q.   What was Ms. Smith talking about when she
17 said "anything with her"?
18   A.   From what I remember chronologically as
19 well, the prior email shown to me said -- I had
20 asked if Candace had -- if we completed the sexual
21 harassment investigation, and she said we had.  And
22 we were pulling together documentation to start a
23 performance improvement plan.
24       And then Candace informed us that Emily had
25 filed a retaliation complaint, and we were not able

Page 105

27 (Pages 102 - 105)

1 to proceed forward with that plan.
2   Q.   And she did not tell you between mid-August
3 and mid-September that the discrimination complaint
4 required itself a pause?
5      MS. KAPPELMAN:  Object to the form of
6 the question.
7      You can answer, Matt.
8   A.   We were told we were verbally allowed to
9 tell Emily anything, and we just weren't allowed to
10 launch -- we weren't allowed to have her on a formal
11 performance improvement plan during the
12 investigation.
13   Q.   And you used the word "launch".  Why?
14   A.   What word did I say?
15   Q.   Launch.
16      MS. KAPPELMAN:  Launch.
17   A.   Oh, launched.  I had started.  Just a --
18 find another synonym for started.  Begin.
19   Q.   So the same pause that -- HR did not tell
20 you to pause -- put a pause on anything with her in
21 mid-August, only you did that in mid-September;
22 correct?
23   A.   No.  They told us that we could not do a
24 formal performance improvement plan during any type
25 of sexual harassment investigation.  We also could
Page 106

1 not do a performance improvement plan while this
2 investigation was going on.
3   Q.   But that didn't prevent you from asking
4 people in late August to put allegedly verbal
5 critiques into writing.
6   A.   We were allowed to verbally talk to Emily.
7 We weren't allowed to give anything to Emily.  Or we
8 weren't supposed to give anything to Emily.
9   Q.   But, again, you didn't view whatever you
10 were told in August to prevent you from turning what
11 you claim were verbal criticisms into written
12 criticisms; correct?
13      MS. KAPPELMAN:  Object to the form of
14 the question.
15      You can answer if you understand it.
16   A.   We were doing -- we were -- so I think,
17 just to be clear, the comments weren't solicited in
18 general.  The comments were coming in to us in
19 emails and calls and other things, so we did
20 document everything that was going on with Emily.
21   Q.   But you didn't just document what you claim
22 were communications by others.  You actually asked
23 people to put previously allegedly only verbal
24 complaints into written form; correct?
25   A.   Yes, we did.
Page 107

1   Q.   And whatever pause that you were supposed
2 to take in August didn't prevent you from doing that
3 in late August, did it?
4   A.   That wasn't -- the way that it was
5 explained to us is we were not allowed to have those
6 discussions with Emily.
7   Q.   But you could -- behind the scenes, you
8 could do as much as possible, just so as long as you
9 didn't talk to Emily; right?
10      MS. KAPPELMAN:  Object to the form of
11 the question.
12      You can answer, Matt, again.
13   A.   We were documenting the complaints that we
14 had consistently coming in from Emily during that
15 time frame.
16   Q.   Without telling her that you were doing so?
17   A.   I mean, I think even Emily knew.  Like, we
18 had the Frances Thunder incident, for example,
19 during that time frame.  That was all documented in
20 email.  And even Emily had back and forth with
21 emails.
22   Q.   But all these requests to put allegedly
23 verbal complaints into writing, you were not telling
24 Emily that you were doing that when you were doing
25 that; right?
Page 108

1   A.   I don't recall.  I don't remember telling
2 her --
3   Q.   Okay.
4   A.   -- specifically we would do that.
5   Q.   Okay.
6   A.   It would've been like Emily telling --
7 maybe not this case with Mike.  But Emily documented
8 conversations on Mike without Mike knowing.
9   Q.   This was an email from somebody named
10 Victor Davis; correct?
11   A.   You have to share your screen.  I cannot
12 see it.
13      MS. KAPPELMAN:  Yeah, you're not
14 sharing it, Bob.
15      MR. GOODMAN:  Right there, Victor
16 Davis.  I'll make this Exhibit 6.  The prior one was
17 Exhibit 5.
18      (Witte Exhibit 6, email from Mr. Davis
19 to Mr. Witte Bates-stamped Wayfair 585 and 586,
20 marked for identification.)
21      BY MR. GOODMAN:
22   Q.   585 and 586 are an email to -- from
23 Mr. Davis to you; correct?
24   A.   Yes.
25   Q.   And this was a solicited email; correct?
Page 109

1    A.   Yes.
2    Q.   So let me clarify something.  When the
3  complaint of retaliation was made and you were told
4  you had to put a pause on anything, did that mean
5  that after that time you couldn't request -- you
6  couldn't solicit written statements?
7        MS. KAPPELMAN:  Object to the form of
8  the question.  You've mischaracterized what he was
9  told.
10        Go ahead and say again, Matt, what
11  they told you.
12    A.   We didn't get further clarification at that
13  level.
14    Q.   Well, let me just -- I'll bring that back
15  up.
16    A.   Yes, September 18th.
17        When was the investigation concluded, if
18  you can refresh my memory?  Was it 9/13 on the prior
19  file?
20    Q.   That was September 16th.  You're being told
21  that on September 16th.
22        So to go back to this --
23        MS. KAPPELMAN:  Is this the Victor
24  email?
25        MR. GOODMAN:  This is the Victor

Page 110

1  email.  Let me put the prior one up for a second.
2    BY MR. GOODMAN:
3    Q.   What was it -- looking at 590, which is
4  Exhibit 5, what was it that you were not supposed to
5  do because of the retaliation complaint?
6    A.   Start a performance improvement plan.
7    Q.   In your understanding, you could continue
8  to solicit written statements?
9    A.   No one told us we were not allowed to do
10  that.  I don't know if we should have or should not
11  have, but that was not explicitly stated.
12    Q.   Well, the word "anything" is very broad, is
13  it not?
14        MS. KAPPELMAN:  Object to the form of
15  the question.  Is the question whether the word
16  "anything" is broad?  Is that the question you just
17  asked?
18        MR. GOODMAN:  It is.
19        MS. KAPPELMAN:  Object to the form of
20  the question.
21        You can answer, Matt.
22        (Indecipherable.  Clarification
23  requested by the court reporter.)
24        THE WITNESS:  Mr. Goodman asked me if
25  "anything" meant any conversations with Emily.

Page 111

1        And I said that we internalized
2  that -- me being Kory, myself, and other members on
3  the broader operations team -- that we couldn't
4  start a performance improvement plan with Emily
5  until the retaliation complaint was completed.
6    Q.   "Anything" is an absolute statement.  The
7  opposite of anything is nothing; right?
8        MS. KAPPELMAN:  Oh, my God.  Object to
9  the form of the question.
10        Matt, you can answer these crazy
11  questions.
12    A.   I guess anything means that.  But this is
13  used in a phrase of statements similar to other
14  words that are used in phrases of statements.
15        This was meant from Candace as a
16  performance improvement plan when I verbally spoke
17  with her on the phone.  And you can clearly tell
18  this was sent from her phone and text message.  It
19  wasn't a well-written email that I would interpret
20  it exactly.
21    Q.   And she invited you to talk about it the
22  next morning; correct?
23    A.   Yes.
24    Q.   Did you just -- did you talk to her about
25  it, or did you just operate on your, quote,

Page 112

1  internalized interpretation?
2    A.   I believe I called her.  I believe.  Or I
3  called -- I think I called Candace.
4    Q.   And you talked to her before this email or
5  after this email?
6    A.   Well, before the email was the sexual
7  harassment complaint had concluded.  We had
8  documentation pulled together to review with Emily.
9    Q.   So you didn't talk with her about the pause
10  until after this email was sent?
11    A.   Pause.  On this email?
12        There was two pauses around performance
13  improvement plans for Emily, just to clarify.  There
14  was an original one during the sexual harassment
15  investigation, and there was a second one around a
16  retaliation complaint against Kory.
17        During those time frames, we were
18  instructed not to launch a formal performance
19  improvement plan, but we were told we were allowed
20  to give verbal improvement around improving her job
21  for fear of her saying that we were retaliating
22  against her as an employee.
23    Q.   So you didn't think the reference to
24  "anything" was significant.  You thought it meant
25  the same very specific thing that you had thought it

Page 113

29 (Pages 110 - 113)

1 meant before, just the PIP.
2       MS. KAPPELMAN:  Object to the form of
3 question.
4       If you understand what he means by "it
5 wasn't significant," go ahead and answer.
6   A.   I think I would say a pause on anything
7 meant the performance improvement plan with Candace,
8 and that's what we verbally spoke about.
9   Q.   And a pause on anything meaning -- that was
10 a conclusion you reached both in August and then
11 again in September?
12   A.   That meant a performance improvement plan.
13 We can still -- this was a verbal conversation.  I'm
14 doing my best to recollect this.  But from what I
15 remember almost a year ago was that we were told not
16 to put anything formally in writing around a
17 performance improvement plan, but we can certainly
18 document and discuss with Emily any issues around
19 her performance and expectations to fulfill her job
20 duties.
21   Q.   Do you know why -- did she send you a
22 similar email in September -- in August?  Excuse me.
23   A.   I don't think so.  Because at that point in
24 time, Emily -- Emily really started to go kind of
25 downhill in the end of September.  And the early

Page 114

1 advice from either Ms. Smith or Mr. Shaffer in
2 August, it was specific to you can't impose a PIP on
3 her; correct?
4   A.   Yes.
5   Q.   Okay.  And then in September, the word used
6 was "anything with her."  And you're saying you
7 didn't take that as meaning anything different than
8 what you had been told in August?
9       MS. KAPPELMAN:  Asked and answered.
10      You can answer again, Matt.  Truly,
11 same thing.  Go ahead.  Answer.
12   A.   Yeah.  The way that you're reading
13 "anything" here is a -- you're assuming that the way
14 that I'm internalizing anything, just to be clear,
15 is stop all communications with Emily Forsythe,
16 cease and desist, do not talk to her, do not engage.
17      That is not the way that we internalized
18 this because she was still working under our
19 direction managing multimillion dollar projects, and
20 we had to give her feedback on performance.
21      What I internalized this, based on my
22 verbal conversations with Candace, is that we were
23 not allowed to launch an official performance
24 improvement complaint.
25   Q.   Did you take her invitation to talk about

Page 116

1 issues that were, you know, coachable started to get
2 severe where every day we were getting called by our
3 stakeholders, at the end of August and early
4 September, especially around, you know,
5 confrontational or aggressive behaviors towards
6 their sites.  Those emails came to us.
7   Q.   You were not told to take a pause in
8 writing on anything, or using similar words, in
9 August, even if you were told in this email in
10 September after the retaliation complaint; right?
11   A.   Yeah.  But I don't think anything
12 represented what we internalized that as at the
13 time.
14   Q.   Okay.  So did you get verbal advice that
15 you -- I guess you got verbal advice from Ms. Smith
16 or Mr. Shaffer in August that you had to not pursue
17 a PIP?
18   A.   Yes.  But it did start in early August when
19 we found the sexual harassment.  Again, Kory and I
20 were advocating for Emily, which is why we turned in
21 the -- you can't even say it's advocating.  It's the
22 right thing to do.  But we wanted to see a thorough
23 investigation happen because if anything did happen,
24 we wanted it to come out.
25   Q.   So my question is when you got verbal

Page 115

1 it more in the morning?
2   A.   I think I answered you already on this, but
3 I believe I did.
4   Q.   But you don't remember anything different
5 than what you told me already?
6   A.   No.  I believe that she told me that there
7 was a retaliation complaint filed against Kory --
8 I'm sure we're going to talk about that later in
9 this session -- and that Emily had launched a
10 complaint on retaliation against the sexual
11 harassment.
12   Q.   But she didn't clarify what "anything with
13 her" meant in that subsequent morning conversation;
14 correct?
15   A.   If I -- I vaguely remember that it was --
16 you cannot go on a performance improvement plan
17 until this retaliation complaint is completed.
18   Q.   Okay.  Did you talk with Mr. Shaffer about
19 the issue of what the implications of her
20 retaliation complaint were?
21   A.   No, I did not.
22   Q.   In August, had the instruction to not
23 pursue a PIP come from both Shaffer and Smith or
24 just one of them?
25   A.   I believe it was just Candace, because I

Page 117

1 think Trevor was actually running the sexual
2 harassment investigation.
3    Q.   All right.  Can you see this one?
4    A.   Sure can, yes.
5         (Witte Exhibit 7, email from
6 Ms. Forsythe to Mr. McKnight and Mr. Witte Bates-
7 stamped Wayfair 1265 and 1266, marked for
8 identification.)
9 BY MR. GOODMAN:
10   Q.   I guess I didn't have to go back to the --
11        Do you remember getting this email, which
12 is Exhibit --
13   A.   I do.
14   Q.   -- Exhibit 7 at 1265 and 1266?
15   A.   I do remember it.
16        MS. KAPPELMAN:  So it's a
17 September 17, 2019, email from Emily Forsythe to
18 Kory McKnight and Matt Witte.
19 BY MR. GOODMAN:
20   Q.   So Emily sent it to both you and
21 Mr. McKnight?
22   A.   Yes.
23   Q.   Did Emily discuss with you her initial
24 conversation with Mr. Witte when he became her
25 superior about him wanting to bring on more and more

1 conversation he'd had with Emily because he -- it
2 was almost like he was yelled at and screamed at.
3 And Kory is a pretty strong personality, and I knew
4 something was wrong.
5        And then he said that Emily drove over
6 after he had conversations with Kelly and basically
7 erupted on him in the room, you know, pressuring
8 him, pushing on him.
9        And then this email came out about an hour
10 and a half later from Emily's private email.
11   Q.   Did you talk with him about going behind
12 her back?
13   A.   Yeah.  It's not behind her back.  He -- so
14 to be clear, Kelly, who's still employed on my team,
15 or employed on Kory's team, was having difficulties
16 managing a project in Lathrop to where Emily would
17 give her direction against what the site wanted, and
18 it was creating conflicts of scheduling how to do
19 things.  So Kelly reached out directly to Kory to
20 seek assistance to actually resolve the issue.
21        And a similar issue from the site.  The
22 site was very happy with Kelly's performance, happy
23 with the program, the way they were managing it, had
24 a difficult time with Emily.
25        So Kelly reached directly out to Kory

1 employees and suggesting he needed to have her not
2 be on his team to do that?
3    A.   No.
4         MS. KAPPELMAN:  Object to the form of
5 the question.  I think you meant did she talk to you
6 about a conversation with Mr. McKnight.  This is
7 Mr. Witte.
8 BY MR. GOODMAN:
9    Q.   Yes, I did.  Her initial conversation with
10 Mr. McKnight and that aspect of it.  Did she talk to
11 you about that?
12   A.   That he was trying to replace her with
13 Walmart employees?  Is that what you're asking me
14 specifically?
15   Q.   Yes.  Did she ever talk to you about that
16 before getting to this?
17   A.   No.
18   Q.   Did you talk with Mr. McKnight about this
19 after you both received it?
20   A.   I did.  I actually walked in on the room.
21 I think Kory, Emily, and myself were in our
22 Erlanger, Kentucky building because there was a
23 large project going on.
24        From what I remember, walking in on Kory,
25 he was almost shattered and shaking from the

1 because she felt she was in a hard spot, in this
2 specific email, which is why he reached out
3 directly.
4         If you're also asking me is it common to
5 call one or two levels down to make decisions with
6 junior working members of the team, it's entirely
7 common at Wayfair.  I do it all the time.  I had a
8 conversation yesterday with an L3 employee under an
9 L5 under an L4 and gave him direction on project
10 work.  It's very common.
11        MR. GOODMAN:  I object to
12 responsiveness.
13 BY MR. GOODMAN:
14   Q.   Did you have a discussion with him of all
15 the specific issues that are -- of going behind her
16 back that are raised in this email?
17        MS. KAPPELMAN:  Object to the form of
18 the question.
19        But go ahead and answer again.
20   A.   There's not an objection internally at
21 Wayfair to talking to an employee's employees to
22 review project schedules, deliverables, decisions.
23 That happens all the time.
24   Q.   I heard your nonresponsive answer.
25        MS. KAPPELMAN:  What's nonresponsive

1 about that, Bob? I'm going to stop you there.
2 You've got to stop with that. Just because you
3 don't like what he said --
4        He's responding to you about whether
5 he talked to Kory about going behind her back. And
6 he said no, because that's not unusual. And he went
7 into detail about that and said how he did.
8        You're playing games, and you need to
9 stop. His answers are his answers.
10      BY MR. GOODMAN:
11    Q.   Did you talk with Mr. McKnight about each
12 of the examples of that discussed in this email to
13 you and Mr. McKnight?
14    A.   I'm happy to walk through each of these one
15 by one.
16    Q.   Did you discuss it with Mr. McKnight after
17 you got the email? That's my question.
18    A.   Can we -- you're asking me to give you a
19 blanket answer. Can we review each of the issues,
20 and I can talk through the appropriate response?
21    Q.   No. I'll move on.
22        How soon after you got this email did you
23 have any discussion with Mr. McKnight about it?
24    A.   Probably within an hour of receiving it.
25    Q.   How many conversations with Mr. McKnight

Page 122

1 about this email did you ever have?
2    A.   How many times did we talk about this
3 email?
4    Q.   Yes.
5    A.   I don't know. Several.
6    Q.   Look at the last two sentences in the next
7 to last paragraph beginning, "You stated that you
8 don't think I'm a good fit." Do you see that?
9    A.   I do.
10    Q.   Did Mr. McKnight dispute that he said those
11 things to Emily?
12        MS. KAPPELMAN: Hold it, hold it.
13 When you say "those things," you're talking about
14 the sentence that begins, "You stated" --
15        MR. GOODMAN: The same last two
16 sentences of the next to last paragraph of the
17 email, yes. "You stated" and "you continued," those
18 two sentences.
19        MS. KAPPELMAN: Read those two
20 sentences before you answer, Matt.
21    A.   I also think those two sentences are
22 missing the broader context of the entire paragraph
23 from Emily.
24    Q.   I'm not asking you about the -- I'm not
25 asking you about the thing as a whole. I'm asking

Page 123

1 did he dispute saying the things that are attributed
2 to him in the last two sentences of the -- of that
3 paragraph beginning, "You went on to state."
4    A.   I know Kory. I know Kory well. Kory was
5 in the military, Kory worked for large automotive
6 companies, Kory worked for large aerospace, Walmart,
7 large companies.
8        They train you as a manager what you're
9 allowed to say and not to say. I know very well
10 that Kory would not have said that directly to
11 Emily. Kory does not ever make a case that we can
12 hire and fire people without involving talent
13 management.
14    Q.   So did he actually deny saying the things
15 attributed to him in those last two sentences to
16 you?
17    A.   Yes.
18    Q.   He said, I didn't say either of those
19 things?
20    A.   Yes.
21        MS. KAPPELMAN: Asked and answered.
22        You can answer again.
23    BY MR. GOODMAN:
24    Q.   So is it your -- was it your assumption
25 that he never spoke with Emily at any time about the

Page 124

1 prospect of removing her from his team?
2    A.   Not in the context of just firing her,
3 like, without a proper engagement of a talent
4 management person, if that's what you're asking.
5    Q.   The last two sentences of that paragraph do
6 not say that he told her he was going to do all that
7 without involvement of talent management, do they?
8        MS. KAPPELMAN: The document speaks
9 for itself.
10    A.   Exactly as it says.
11        MR. GOODMAN: Object to nonresponsive
12 comment.
13    BY MR. GOODMAN:
14    Q.   There was a reference to Ms. Frances
15 Thunder. Do you see that in the middle of the last
16 paragraph?
17    A.   Yes.
18    Q.   And Emily specifically speaks to that by
19 saying, "This is not the case, and Frances and I
20 have a good working relationship."
21        Do you see that?
22    A.   I do see that.
23    Q.   Did you talk with Frances on September 17th
24 or any day after September 17th to verify that?
25    A.   From what I remember of Frances, they did

Page 125

32 (Pages 122 - 125)

1 not have a good working relationship. Frances is
2 fairly amenable to a lot of people, and that was one
3 that did not work out well for Frances and Emily.
4       MR. GOODMAN: Object to
5 responsiveness.
6    BY MR. GOODMAN:
7    Q.   On or after September 17, 2019, did you
8 call Ms. Thunder and attempt to verify that
9 statement by Emily?
10      MS. KAPPELMAN: Asked and answered.
11 You can answer again, Matt. Just
12 because he objects doesn't mean it's the wrong
13 answer. Just give your testimony.
14    A.   I do not remember specifically calling
15 Frances after this date.
16    Q.   All right. And Emily's statement indicates
17 that Mr. McKnight had told her that she needed to
18 mend things with Frances, and then claimed that she
19 had not done that; right?
20    A.   Yes.
21    Q.   And she was disputing that; correct?
22    A.   Per her email, that's how I read that, yes.
23      THE WITNESS: Can I speak?
24      MS. KAPPELMAN: There's no question
25 pending, Matt. So unless you're answering the

1 question, there's no need to speak.
2       THE WITNESS: It's fine. It's around
3 Frances and engagement. There's emails around it.
4    BY MR. GOODMAN:
5    Q.   Again, you don't remember speaking with her
6 on or after that date you got this email from Emily?
7       (Clarification requested by the court
8 reporter.)
9    BY MR. GOODMAN:
10    Q.   I'm wondering if the last unsolicited
11 observation changes your testimony, that you do not
12 remember reaching out to Ms. Thunder on or after the
13 date of Emily's email.
14      MS. KAPPELMAN: Object to the form of
15 the question.
16 You can answer, Matt.
17    A.   I don't recall if I spoke to Frances or I
18 didn't speak to Frances.
19    BY MR. GOODMAN:
20    Q.   Looking at Wayfair 1273 and 1274, I'm not
21 sure that you're copied on all the emails. Do you
22 remember this series of emails? At least you
23 certainly -- I presume you remember the email that
24 begins at the bottom of 1273.
25    A.   Sure.

1    Q.   Correct?
2    A.   Yes.
3       MS. KAPPELMAN: And just so the record
4 reflects what we're looking at, it's an email from
5 Mr. Witte to Chris Stark dated September 19, 2019.
6    BY MR. GOODMAN:
7    Q.   And you talked about not wanting to do a
8 PIP; correct?
9    A.   At this point in time, Emily had become
10 hostile to work with, was having difficult
11 discussions with all stakeholders, and we were
12 looking for guidance around what we could do and how
13 we could do it.
14      MR. GOODMAN: Object to
15 responsiveness.
16      MS. KAPPELMAN: What is not responsive
17 about that, Bob?
18      MR. GOODMAN: I'm preserving the --
19 I'm preserving the objection.
20      MS. KAPPELMAN: No. What you're doing
21 is trying to bully the witness into not giving
22 answers you don't like, and we're not going to let
23 you do that. His testimony is -- his response is
24 his response. I'm not going to allow bullying.
25      MR. GOODMAN: I have a right to

1 preserve a --
2       MS. KAPPELMAN: You don't have a right
3 to bully a witness because you don't like his
4 response. You don't have that right.
5       MR. GOODMAN: I have a right to object
6 to nonresponsive when I think an answer is
7 nonresponsive.
8    BY MR. GOODMAN:
9    Q.   Why were you raising an issue of a --
10 strike that.
11 Stark was then your boss?
12    A.   Yes.
13      MS. KAPPELMAN: Matt, was Chris Stark
14 your boss?
15    A.   Yes. I said yes.
16    Q.   And you were told -- you had been told
17 several days earlier, maybe even a day earlier, that
18 you could not put her on a PIP in light of her
19 retaliation complaint; correct? That's your
20 interpretation; right?
21    A.   No. That was the "anything."
22    Q.   Right. That's your interpretation of
23 "anything."
24    A.   My interpretation of that was we couldn't
25 put her on a PIP until the investigation was

1 concluded.
2   Q.  Okay.  Is that why the investigation
3 took -- reportedly took about two hours?
4         MS. KAPPELMAN: Object to the form of
5 the question.
6   BY MR. GOODMAN:
7   Q.  Do you know why the alleged retaliation
8 investigation took hours, not even days?
9         MS. KAPPELMAN: Object to the form of
10 the question.
11  A.  Do I know -- I'm not in talent management.
12 I'm not trained to do an internal investigation.
13  Q.  Have you ever heard of a -- have you ever
14 been aware of any other discrimination or
15 retaliation investigation besides those related to
16 Emily?
17        MS. KAPPELMAN: Objection; lacks
18 foundation.  I direct you not to answer.  It has no
19 relevance to this case.
20        If you want to ask the investigator
21 why it took --
22        MR. GOODMAN: I'll restate the
23 question.
24  BY MR. GOODMAN:
25  Q.  At Wayfair, have you been aware of any

1 other retaliation or discrimination investigation?
2   A.  I have not.
3   Q.  And who is Allan Lyall in relation to Chris
4 Stark?  Is that a subordinate or a superior?
5   A.  Superior.
6   Q.  And so Mr. Stark is writing Mr. Lyall and
7 says, I want to talk about this.  I don't want to
8 put anything in writing; correct?  I don't want to
9 put more in writing.
10        There's some background information --
11  A.  Yeah.  That's what he wrote, yes.
12        MR. GOODMAN: This will be Exhibit 8,
13 which is 1275 through 1289.
14        (Witte Exhibit 8, summary Bates-
15 stamped Wayfair 1275 to 1289, marked for
16 identification.)
17  BY MR. GOODMAN:
18  Q.  Are you familiar with this document?
19  A.  I helped -- I was one of the contributors,
20 yes.
21  Q.  And when was the document written?
22  A.  I'd have to, like, find out the exact date
23 of when it started and when it came to a conclusion,
24 but it was sent in finality of pulling it together.
25 I want to say on the 19th for Stark.  The day it was

1 shared with Chris Stark, it was done.
2   Q.  Okay.  So it would have been -- that would
3 have been September 19th; right?
4   A.  Yeah.  Whatever -- Thursday, September 19th
5 at 1:18 I sent it to Chris.
6   Q.  That was the so-called background
7 information; right?
8   A.  Yes.  This was a summary of everything we
9 had.
10  Q.  Had you been told at this point that the
11 retaliation complaint had been investigated?
12  A.  I believe so.
13  Q.  What precipitated -- strike that.
14        Did anybody ask you to put together this
15 document?
16  A.  Did anyone internally in the company ask me
17 and Kory to put this together?
18  Q.  Yes.
19        MS. KAPPELMAN: I'm going to direct
20 you, if it was legal counsel that asked you to do
21 it, to identify that.
22        If it wasn't, go ahead and answer all
23 the questions he has about this.
24  A.  No, it was not legal counsel that asked for
25 this, from what I recall.

1        I believe this was just a summary of all
2 the interactions Kory and I had with Emily.
3   Q.  And who asked you to put this together?
4   A.  I'm pretty sure Kory and I did this on our
5 own.
6   Q.  Okay.
7        MS. KAPPELMAN: Bob, while you're
8 sorting through, I know you've noticed Kory
9 McKnight's deposition for 2:00, and he's going to
10 try to join the link.  Is it fair to say that you
11 won't be done with this deposition in 20 minutes and
12 ready to start Kory?
13        MR. GOODMAN: I can't specifically
14 estimate.  I'm getting to the end of one set of
15 questions I had, and the other questions may go
16 quickly.  It may not be right at 2:00.  It will not
17 be long after 2:00.
18        MS. KAPPELMAN: Okay.  At about ten of
19 two, we'll tell Kory what the status is so he
20 doesn't have to just sit.
21        MR. GOODMAN: Yeah.  If you just want
22 to tell him 2:30 our time, that's fine.  That way
23 you can take a little break if you need it.
24        MS. KAPPELMAN: Okay.
25        Em, if you'll just write Kory about

1 2:30 our time.
2        Sorry, Bob.  Go ahead.
3    BY MR. GOODMAN:
4    Q.   Do you remember inviting Emily for a
5 one-on-one meeting in June 2019?
6    A.   Do I have remember having a one-on-one with
7 Emily in June 2018?
8    Q.   Right.
9    A.   I'm not sure I remember specifically that,
10 but Emily and I had a weekly one-on-one, so I'm sure
11 we had one.
12    Q.   Has anybody who worked with Mr. McKnight at
13 Walmart come to work at Wayfair since Mr. McKnight
14 started?
15    A.   There are two employees that did work at
16 Walmart.  One is Mike Thayer.  The second is Eric
17 Moulds, but Eric Moulds was actually hired by a
18 gentleman named Sean Lane directly.
19    Q.   And who was the first one?  Mike who?
20    A.   Mike Thayer, T-H-A-Y-E-R.
21    Q.   Do you know when they were hired,
22 approximately?
23    A.   Mike would have been late September or
24 early October of 2019, I think.
25    Q.   Okay.  And Mr. Moulds?

Page 134

1    the question.
2        Go ahead.
3    A.   Yes.
4    Q.   And is Mr. Moulds -- is it M-O-L-D-S?
5    A.   Yes.
6        M-O-U-L-D-S.  Sorry.
7    Q.   Is he still working under Mr. Lane?
8    A.   As of right now, no.  He actually reports
9 to me, as of very recently.  Like, as of two days
10 ago.
11    Q.   Has he reported to Mr. McKnight?
12    A.   No, he has not.
13    Q.   Is Mr. Lane in the IE organization?
14    A.   Yes, he is.
15    Q.   Why didn't Mr. Moulds get hired to work
16 under Mr. McKnight?
17    A.   Because -- why didn't he?  It was the --
18    Q.   Right.  Why didn't he?
19    A.   Because it was Sean Lane -- it was his
20 hire.  It was his employee to do work for Sean, not
21 for Kory.
22    Q.   Okay.
23    A.   Just to be clear, I don't think Kory knew
24 that Eric Moulds was actually even being interviewed
25 at the company until he was on the interview panel.

Page 136

1    A.   Maybe around a similar time.
2        I can find the exact dates if you want it.
3 Lynn told me not to look things up.
4    Q.   And if you recall, when did Mr. McKnight
5 start?  Did you say in April?
6    A.   No.  July 20th.
7    Q.   July 20th, okay.
8    A.   July 29th I think is when Kory started.
9    Q.   These people -- and did Mr. Thayer take a
10 position under Mr. McKnight?
11    A.   He did.
12    Q.   Okay.  What was the level?
13    A.   L5.
14    Q.   When Emily was terminated, how many
15 subordinates, direct subordinates, did Mr. McKnight
16 have?
17        MS. KAPPELMAN:  Object to the form of
18 the question.
19        You can answer.
20    A.   I want to say he had three, including
21 Emily.
22    Q.   Okay.  And then -- so he had two after her
23 termination.  Then he had three again when
24 Mr. Thayer was hired?
25        MS. KAPPELMAN:  Object to the form of

Page 135

1 He wasn't referred or solicited.  He applied through
2 a normal process.
3        Eric and Kory actually didn't work together
4 at Walmart.  They knew each other from a company
5 called Symbotic Robotics a long time ago.
6    Q.   Okay.  Was there another -- so nobody else
7 from Walmart, besides Mr. Thayer, according to you,
8 has been hired by Wayfair to work with Mr. McKnight
9 at Walmart?
10    A.   Who worked directly for Kory, no.  That's
11 correct.
12    Q.   Did you tell Mr. Shaffer or Ms. Smith that
13 you had solicited written statements about Emily?
14        MS. KAPPELMAN:  Object to the form of
15 the question if you're done.
16        You can answer, Matt.
17    A.   I believe, yes.  It was part of the email,
18 so yes.
19    Q.   You told them that statements that they
20 were looking at had been solicited?
21        MS. KAPPELMAN:  Object to the form of
22 the question.
23        You can answer, Matt.
24    A.   I think -- yes.  You have the prior email,
25 but I think I said these are -- this is documented

Page 137

35 (Pages 134 - 137)

1  feedback on Emily.
2      Q.   I'm going to need to take a break to get
3  something to drink.  Hold on a second.  But I'm
4  going to ask one more question before that.
5           Do you remember a going away party for Greg
6  Konicki?
7      A.   Yes.
8      Q.   Did you attend the party?
9      A.   I did.
10     Q.   Did an individual, during the -- during the
11 party grab him and kiss him?
12     A.   Grab him and kiss him?
13     Q.   Yes.
14     A.   No.  It was a joke.  He didn't kiss him.
15     Q.   Did he pretend to kiss him?
16     A.   He leaned over to Greg.
17     Q.   Okay.  Who was the other individual?
18     A.   Mark Schmitz.
19     Q.   Were there female employees in attendance
20 at the retirement party?
21     A.   Yes.
22     Q.   And he mimicked kissing Mr. Konicki by his
23 actions?
24     A.   Yes, he did.
25     Q.   And people laughed?  I guess you laughed.

Page 138

1  You thought it was a joke?
2      A.   Yes.  I think everyone laughed.
3      Q.   What was the -- was anything said before or
4  after that to explain that it was a joke?
5      A.   Yeah.  I mean, it was a joke.  It was
6  definitely a joke.
7           I can't remember.  It was over a year and a
8  half ago, almost.
9      Q.   Did you think that was the -- that that was
10 a wise thing to happen in front of female employees?
11         MS. KAPPELMAN:  Object to the form of
12 the question.
13         You can answer, Matt.
14     A.   In hindsight no, probably not.
15     Q.   And by now you mean because of the
16 complaint of sexual harassment that Emily made,
17 or --
18     A.   No.  It's just looking back on that over
19 time, that was that appropriate?  Probably not.
20     Q.   I'll represent to you that the question was
21 asked of Emily, "And what did Greg say?  Did Greg
22 say it was unwelcome?"
23         And her answer was, "Yes."
24         Is that your recollection?
25     A.   I was sitting five away from Greg.

Page 139

1      Q.   Did you hear Mr. Konicki invite being
2  wrestled and having this purported kiss given?
3      A.   Do I remember him inviting it?  No.  I
4  think you have to ask Greg if he was offended by it.
5      Q.   Did Ms. Forsythe approach you in April of
6  2019 about how she was being dealt with by
7  Mr. McDole?
8         MS. KAPPELMAN:  Object to the form of
9  the question.
10     A.   Ms. Forsythe approached me about McDole, or
11 Mr. McDole approached me.
12     Q.   She recalls it as being April 18, 2019.  Is
13 that your recollection about the approximate time
14 that she asked to help you address Mr. McDole's
15 conduct toward her?
16     A.   I think that's approximate.  I was on
17 vacation, actually, that week, and I remember
18 talking to Emily in the evening.
19     Q.   Did you call Mr. McDole that evening?
20     A.   Yes.  I spoke to both of them that night.
21     Q.   When Emily called you for help, what did
22 she ask specifically?
23     A.   I think it was the -- I think it was
24 around, like, the similar documentations she had in
25 her email.  I'd have to read it to refresh myself.

Page 140

1  But it was around, you know, kind of not listening
2  to what she wanted to do.
3         And then I think Mike's issue with her was
4  around, like, perception of being bullied.
5      Q.   Okay.  So he thought -- so are you
6  suggesting that he thought he was being bullied?
7      A.   Yes.  That's what I said.  I think he even
8  stated something where -- I'm not going to be
9  bullied.  I'll go to talent management, or something
10 like that, if we can't work it out.
11     Q.   He was suggesting that he would complain
12 about her to talent management about her bullying?
13     A.   Yes.
14     Q.   After you talked with McDole, did you tell
15 Emily if she recalled that Mike was obsessed?
16     A.   Can you clarify?
17     Q.   She recalls that you told her you believe
18 that Mike was obsessed.
19     A.   Are you saying obsessed?
20         MS. KAPPELMAN:  I think he's tying to
21 say obsessed, O-B.
22     A.   Obsessed with Emily?
23     Q.   The recollection is that you were obsessed.
24 Did you say that -- obsessed with Emily?  Obsessed
25 with the issues that she was raising?  Did you say

Page 141

36 (Pages 138 - 141)

1 that to Mr. -- to Emily?
2    A.   I said upset, U-P-S-E-T, just to make
3 sure -- maybe I'm not talking clear.
4    Q.   You admit that you said to her he was
5 upset.  Are you denying saying that he was obsessed?
6         MS. KAPPELMAN:  So just to be clear,
7 he's saying you admit U-P-S-E-T.  Are you denying
8 that you told her that McDole was O-B-S-E-S-S-E-D
9 with her?
10        THE WITNESS:  Okay.  So thank you.
11   A.   I think I said upset.  I don't remember
12 saying obsessed.
13   Q.   She recalls you saying to her -- and I'll
14 ask you the same question.  Did you say that Mike is
15 mentally unstable after you talked with her about
16 your call with him?
17   A.   I don't remember exactly what we would have
18 said.  I think it would have been -- Mike could work
19 27 hours straight in a day.  He would do things like
20 that that some of us would find odd.  So there were
21 times where you'd wonder if -- yeah.  I don't know
22 how --
23   Q.   So that would be a kind of -- working
24 yourself to death was something that you think of as
25 mentally unstable?

Page 142

1         MS. KAPPELMAN:  Object to the form of
2 the question.
3         Matt, listen closely to the question.
4 Go ahead and answer.
5    BY MR. GOODMAN:
6    Q.   You can answer.
7    A.   Do I think it's mentally unstable to -- not
8 that it's mentally unstable.  I think it's odd.
9         And what I thought about with Mike, he was
10 a prior Marine, a recon Marine, so he was used to
11 working 30, 40 hours straight in his prior life and
12 prior role, which I later determined at the company.
13 But, you know, initially starting -- someone working
14 from 7:00 a.m. until, you know, noon the next day
15 straight was odd.
16   Q.   Okay.  Did you say to Emily, when you spoke
17 to her about your conversation with Mike, that Mike
18 was mentally unstable or words to that effect?
19   A.   I don't remember.  I could have said that,
20 but I don't remember.  I didn't document that
21 conversation.
22   Q.   She also recalls that you asked Emily if
23 she thought that McDole had PTSD or something else
24 mentally wrong with him.
25        Did you ask her a question, what she

Page 143

1 thought about -- whether she thought he had that
2 diagnosis?
3    A.   I vaguely remember that.
4         And I think if I was asking that, it would
5 have been in a supportive-type manner to make sure
6 that we weren't overwhelming Mike, because he did do
7 multiple tours of duty.
8         That's not to -- I just want to make sure
9 that's not coming out as, like, discrimination
10 against Mike.  It's a handicap, like anything
11 else -- a person dealing with a speech impediment,
12 that we make sure that we get verbal communications
13 from before we present.  It would be similar with
14 Mike, making sure we're not putting him into undue
15 situations.
16        MR. GOODMAN:  Object to
17 responsiveness.
18   BY MR. GOODMAN:
19   Q.   So you recall asking Emily whether she
20 thought he had some serious psychiatric problem?
21        MS. KAPPELMAN:  Object to the form of
22 the question.  That's not what he said.
23        You can answer again, Matt.
24   A.   I remember asking Emily if we -- it wasn't
25 like, do you think that?  It was more of an opinion.

Page 144

1 Do you think there might have been some PTSD or
2 something like that from his time overseas?
3    Q.   And you only said that to Emily after you
4 had that call with Mr. McDole.  You had not said
5 anything like that to her previously; correct?
6    A.   No.
7    Q.   You mean you had not said anything like
8 that to her previously; correct?
9    A.   Not that I recall.
10   Q.   And on the call with Emily, you told Emily
11 that you had told Mike that she would be taking over
12 certain of his projects.  Do you recall that?
13   A.   I think so.  Because I believe at the time
14 Mike was moving to the operations function.
15   Q.   So you -- do I gather you told Emily
16 correctly that you were taking back his projects,
17 which were within IE, and you're explaining that --
18 you recall doing so in anticipation of his moving to
19 the operations function; correct?
20   A.   Yes.  Mike was taking a role to be a senior
21 manager at a site -- it was the Lathrop, California
22 building -- to actually work and run operations, not
23 in a support group that I was managing that actually
24 built the infrastructure and processes.  So Mike was
25 taking a move to a new scope of work.

Page 145

37 (Pages 142 - 145)

1    Q.   But you took projects away from him to keep
2  within IE; correct?
3    A.   Sure.  They existed in my function.  They
4  didn't exist in general operations.
5    Q.   Okay.  Why did you take -- why did you take
6  the projects away from him and tell Emily -- why did
7  you take those projects away from him, and why did
8  you tell Emily that you had done so?
9    A.   Why did I take them away?  I took them away
10  because he was going to the operations function.
11       Operations' job is to manage employees to
12  move parcels.  The industrial engineering team's
13  function is to build physical infrastructure in a
14  building.
15       His new role didn't take it -- it was like
16  saying a teacher left second grade to go teach third
17  grade, and you took away her second-grade duties and
18  gave it to a new teacher.
19    Q.   Did you bring up concerns about the mental
20  stability, psychiatric condition of Mr. McDole to
21  HR?
22    A.   Not that I recall.
23    Q.   Why not?
24    A.   Because the conversations would go in
25  circles.  I'd have a good conversation with Mike.

Page 146

1  And then Emily would love Mike and she'd say he's
2  great, everything's great.  And then it wouldn't.
3       And it really only got escalated in the
4  April time frame from Emily around any issues with
5  Mike.
6    Q.   Well, if you had concerns about
7  Mr. McDole's psychological stability in what you
8  characterize as a benevolent and protective manner,
9  wanting to avoid discrimination against him as a
10  psychiatrically disabled individual, why didn't you
11  bring it to the attention of HR?
12       MS. KAPPELMAN:  You're putting words
13  in his mouth.  He has not said he had concerns about
14  him psychologically.  And I'm going to object to
15  that, and I'm going to ask him to answer again, very
16  clearly.
17    BY MR. GOODMAN:
18    Q.   You can answer.
19    A.   So what you're asking me is did I have
20  concerns over Mike and his mental well-being to be
21  an employee at Wayfair and to safely do so --
22    Q.   No, I'm not.  I'll reask the question.
23    A.   Thank you.
24    Q.   You've already indicated that you asked
25  Emily if she thought he had a psychological problem.

Page 147

1       MS. KAPPELMAN:  Objection to the form.
2    BY MR. GOODMAN:
3    Q.   Right?
4       MS. KAPPELMAN:  Objection to the form.
5  He said he asked if she thought he had PTSD.
6       MR. GOODMAN:  Well, PTSD is a
7  psychological problem, Lynn.
8       MS. KAPPELMAN:  You say it is.
9       Let's say what he said.  I don't want
10  you mischaracterizing his testimony.  It's
11  posttraumatic stress disorder from being in the
12  Marines.  That's what he said he thought Mike might
13  have, but he didn't know.
14    BY MR. GOODMAN:
15    Q.   And if you thought that, why didn't you
16  raise the issue with HR?
17    A.   I had never seen any behaviors from Mike
18  that warranted that.
19    Q.   But you had been told about behaviors from
20  Emily that warranted that, didn't you?  That's
21  why --
22       MS. KAPPELMAN:  Object to the form.
23       You can answer.
24    A.   I did not hear hostile behaviors from Mike.
25  I did not hear anything that was alarming or

Page 148

1  threatening.
2       As I told you before, Mike had some quirks
3  about him.  Mike liked to work 27-hour days that no
4  one else did, and wondered if there was just -- part
5  of his brain was still wired of how he operated from
6  his prior employer, which was the Marine Corps.
7    Q.   The conversation with Emily in the middle
8  of April was not just about quirks or working long
9  days, was it?
10       MS. KAPPELMAN:  Object to the form.
11    A.   Sir, I don't remember the entirety of the
12  conversation.  It was -- I was on vacation.  It was
13  in the evening.
14    Q.   So by the time you got back to work, had
15  you forgotten about the concerns that you and Emily
16  expressed about his psychological condition?
17       MS. KAPPELMAN:  Object to the form;
18  mischaracterizes his statement.
19       You can answer, Matt.
20    A.   I did take action.  I spoke to his new
21  supervisor.  And at the time, we determined that
22  Emily and Mike just weren't a good fit to work
23  together, but we didn't think there was anything
24  around hostility or issues.  Mike had feedback from
25  other stakeholders.

Page 149

38 (Pages 146 - 149)

**Page 150**

1  Q.   Mr. Bugarin -- was Mr. Bugarin his
2  supervisor?  B-U-G-A-R-I-N?
3  A.   B-U-G-A-R-I-N.
4  Q.   So you're saying that you talked to
5  Mr. Bugarin about Mr. McDole, and he was going to
6  come under the supervision of Mr. Bugarin and no
7  longer be under your -- no longer be in your
8  organization; is that correct?
9  A.   That is correct.
10  Q.   Did you bring up with Mr. Bugarin the issue
11  of his psychological well-being?
12      MS. KAPPELMAN:  I'm going to warn you
13  right now, Bob, that I think you're going to the
14  area of defamation for Mr. McDole.  And I'm going to
15  give you a fair warning that if it keeps up and you
16  keep mischaracterizing Mr. Witte's comments to
17  suggest that there's a psychological problem with
18  Mr. McDole, we will go to the judge for
19  clarification, and we will seek sanctions.  So feel
20  free to keep it up, but I think you're moving into
21  the area of defamation of a nonparty witness.
22      Go ahead, Matt.  You can answer.
23  A.   Can you repeat the question, Bob?
24  Q.   Did you report your conversation with Emily
25  and your conversation with McDole in mid-April to

**Page 151**

1  anybody else?
2  A.   I reported it to Genaro because they
3  were -- I think at that point in time Mike was
4  already moving to operations because Mike wanted to
5  get into operations.  Mike didn't move into
6  operations because he was ineffective in his role or
7  anything like that.  He wanted to get into
8  operations.  He wanted to have a chance to be
9  promoted to a site director and run a building.
10  Q.   So is Mr. Bugarin the only one you spoke to
11  about those conversations with Emily and Mr. McDole?
12  A.   I can't remember at this point in time.
13  Q.   In May 2019, did you have a -- did
14  Mr. McDole ask for a meeting with you and Emily?
15  A.   Yes.
16  Q.   Did you ask Emily to leave the meeting?
17  A.   I did.
18  Q.   Why did you ask Emily to leave the meeting
19  and continue without her?
20  A.   Mike was upset in that meeting.  I wanted
21  to make sure I understood Mike's forum without
22  having both of them in the room directly with each
23  other.
24  Q.   Did you tell Emily you didn't have time to
25  deal with this shit?

**Page 152**

1  A.   I may have said that.  I think I did say
2  that.
3  Q.   What did you mean?
4  A.   I think we were all under a lot of work and
5  a lot of stress at the time, and I think I made that
6  statement.  But then I immediately maintained
7  everything I was supposed to do as a manager.
8  Q.   Did you observe behaviors from him during
9  your meeting with him alone that had anything to do
10  with your comment about not having time to deal with
11  this shit?
12  A.   With Mike?
13  Q.   Yes.
14  A.   I'm sorry.  Can you --
15  Q.   Did you observe -- in your separate meeting
16  with him, did you observe behaviors which had
17  something to do with your saying you don't have time
18  to deal with this shit Emily?
19  A.   No.  I think at the time -- I want to say
20  the purpose of that meeting -- and we all flew out
21  to California -- was to talk about transition plan
22  and who would be assigned as, like, project owners.
23  We actually filled out a RACI chart, if you're
24  familiar with this, of, like, who's actually in
25  charge of project tasks.

**Page 153**

1      For the entire meeting, I thought we were
2  at a decent place.  Mike was then further upset, so
3  I did ask Emily to leave the room so I could talk to
4  Mike.
5  Q.   Did he continue to express upset or anger
6  after Emily left the room?
7  A.   I can't remember.  I think he was
8  initially, and then he calmed down and we had a
9  logical discussion.
10  Q.   Did you report his behavior in that
11  separate meeting with you to HR?
12  A.   I reported it to his direct boss at the
13  time, Genaro Bugarin.
14  Q.   And do you know if Mr. Bugarin did anything
15  about it?
16  A.   I think Mr. Bugarin left the organization
17  very briefly after that.
18  Q.   And you're not aware of him doing anything
19  with the information between the time you told him
20  and the time he left the organization; right?
21  A.   Not that I'm aware of, no.
22  Q.   You told Emily, after this conversation --
23  the conversations in May, to stay away from McDole,
24  didn't you?
25  A.   I may have.  I have a pretty sharp memory.

1 I don't remember everything from April of last year
2 if I didn't document it, write it down.
3    Q.   You had Mr. McDole succeed -- do I
4 understand correctly that Mr. McDole succeeded
5 Mr. Bugarin as head of the site?
6    A.   No.  That's incorrect.
7    Q.   Okay.
8    A.   Just to be clear, Mr. Bugarin ran the West
9 Coast of a region of multiple buildings.  It's like
10 the general manager of the West Coast operations.
11       Mike McDole has been serving as interim
12 site leader for that site, but he has not officially
13 been promoted to a Level 5 employee.  I think the
14 organization is still interviewing.  So Mike has not
15 officially taken Genaro's job.  That's a level
16 higher than -- it's actually two levels higher than
17 he's currently employed at.
18    Q.   When was he made acting site leader?
19    A.   I want to say it would have been like
20 October or November.  I can't remember.  I can find
21 out exactly.  It would take some time to search.
22    Q.   Is it acceptable for a man to run his hands
23 down a female coworker's blouse between her breasts
24 without consent of the female employee?
25       MS. KAPPELMAN:  Object to the form of

Page 154

1 the question.
2       You can answer as if this was a
3 hypothetical.  Answer.  It's a hypothetical.
4    A.   No, not acceptable.
5    Q.   After you were made aware of Mr. McDole
6 doing that and being involved in several other
7 instances of touching Emily without her consent, did
8 you take any action to counsel or discipline
9 Mr. McDole about unconsented touching?
10       MS. KAPPELMAN:  Object to the form of
11 the question; mischaracterizes everything that's
12 come before, including the August 14th complaint.
13       But feel free to answer with respect
14 to what you learned in the August 14th complaint and
15 what you did with that information.
16    A.   So per the August 14th complaint, when I
17 was notified of all of those issues per Emily, I
18 turned it over to talent management to launch an
19 internal investigation.
20    Q.   But did you ever counsel or discipline
21 Mr. McDole about unconsented touching of a female
22 employee after you got that complaint?
23    A.   No.  He was not my employee.
24    Q.   Did anybody at Wayfair counsel or
25 discipline him in that regard --

Page 155

1       MS. KAPPELMAN:  If you know.
2    BY MR. GOODMAN:
3    Q.   -- after that complaint?
4       MS. KAPPELMAN:  If you know.
5    A.   Not that I'm aware of.
6    Q.   As we sit here today, are you troubled by
7 the fact that three separate instances of
8 unconsented touching occurred without any counsel or
9 discipline of Mr. McDole?
10       MS. KAPPELMAN:  Object to the form of
11 the question; assumes facts that aren't in
12 evidence -- many facts that aren't in evidence.
13       You can answer, Mr. Witte.
14    A.   If it were true, of course anybody would be
15 upset by it.  But that was the purpose of the
16 investigation.
17       I also have to say that, you know,
18 Emily's -- Mike's first week of work they both went
19 hiking together in the woods in California on their
20 own, which I thought was odd.  But, like, I thought
21 they had a good relationship.
22    Q.   The first week of what, you said?
23    A.   I think Mike's first or second week of work
24 out in California, the two of them went hiking in
25 the woods together.

Page 156

1    Q.   What month was that?
2    A.   I want to say it would have been October of
3 2017 or November.
4    Q.   Which was about a year and a half before
5 any of the alleged unconsented touching began to
6 occur; correct?
7       MS. KAPPELMAN:  No.  It's the first
8 week of work in California.
9       THE WITNESS:  Yeah.
10       MR. GOODMAN:  October of 2017?
11       MS. KAPPELMAN:  No.
12       MR. GOODMAN:  Counsel, you know,
13 you're not allowed to answer --
14       MS. KAPPELMAN:  Well, you're
15 mischaracterizing his testimony, Bob.  I'm not going
16 to let the record reflect you mischaracterizing his
17 testimony.  That, I won't do.
18       MR. GOODMAN:  He said October 2017.
19    BY MR. GOODMAN:
20    Q.   When was it, Mr. Witte?
21    A.   October 2018.  I apologize.
22    Q.   So that was about six months before the
23 first alleged unconsented touching; correct?
24    A.   Yes.
25    Q.   Was there any delay between your getting

Page 157

1 the chronology of events from Emily and alerting HR
2 to it?
3    A.   I believe there was a four- to five-day
4 delay from when she sent me the email until I
5 actually got a chance to read the entire document.
6    Q.   And why was -- why did such a delay occur
7 concerning such a serious complaint?
8    A.   I think the way that Emily shared the email
9 with me was, FYI, here's an internal file on Mike
10 McDole.  The first five or six pages -- I was
11 traveling a ton.  I think I was traveling back from
12 California when I received the email, and then I had
13 a flight to Europe on Sunday.  I don't think I did
14 my work over the weekend.  And then I read it when I
15 got to Europe in the full context, and that's when I
16 notified talent management.
17    Q.   Did anybody ever ask you why you delayed in
18 getting it to HR?
19    A.   No, no one's ever asked me that.
20    Q.   Well, I just asked.
21    A.   Sure.
22         Oh, are you asking me why I delayed?
23         The first five pages of it were --
24    Q.   No.  But I'm the first person who's ever
25 said why did you -- for heaven's sake, why did you

Page 158

1 delay this?
2    A.   Yeah.  Because I told everyone I got the
3 email, read the first few pages of it.  When I read
4 the full thing is when I notified internal talent
5 partners.
6    Q.   In early September, Emily told you that she
7 was stressed out about the situation with Mr. McDole
8 and her complaint against him, didn't she?
9         MS. KAPPELMAN:  Object to the form of
10 the question.
11         You can answer.
12    A.   She may have.  I can't remember.
13         She actually told me at one point in time
14 she was relieved, so it was both.
15    Q.   But that was after you passed along her
16 complaint earlier; correct?
17    A.   Yes.
18    Q.   In the beginning of September when she
19 talked to you about this, you told her that Wayfair
20 eats people up.
21         MS. KAPPELMAN:  Object to the form of
22 the question.
23         You can answer, Matt.
24    A.   It's a tough work environment.  It's
25 challenging.  It's similar to Amazon or any other

Page 159

1 tech company like Google.
2    Q.   You're not disputing that -- that statement
3 to her; correct?
4    A.   Am I disputing I said Wayfair eats people
5 up?  No.
6         There was also a time in the summer when I
7 knew Emily needed a break, and I told her that she
8 needed to take a week off and reset.  It's important
9 to do those things.
10    Q.   But in this particular case, it was after
11 she told you she was stressed out about dealing with
12 the McDole situation; correct?
13    A.   I don't remember, sir.
14    Q.   Did you have work-related stress that may
15 have caused an eye injury that you discussed with
16 Emily?
17    A.   It could have been work-related stress, or
18 it could have been lifting related.  It's called
19 central serous retinopathy.  It's common for Type
20 A -- this is my doctor's quote, not mine.  This is
21 going to sound weird.  He said the common person
22 that gets it is a white male between the ages of 30
23 to 35 -- 30 to 50 with a Type A personality.
24    Q.   And what are the symptoms?  Because I --
25         MS. KAPPELMAN:  I'm going to direct

Page 160

1 you not to answer.  I'm going to direct you not to
2 answer, Matt.
3         This is not relevant to anything that
4 has to do with this lawsuit about sexual harassment.
5 So if you want to go to a judge about asking
6 Mr. Witte about his medical condition, I'm so happy
7 to do that.
8         Can you try to stay on topic?
9         MR. GOODMAN:  He shared it with
10 Ms. Forsythe, for heaven's sake.
11         MS. KAPPELMAN:  I don't care whether
12 he shared it with -- it doesn't mean it's relevant
13 to her claims of sexual harassment.
14    BY MR. GOODMAN:
15    Q.   What is so stressful about working at
16 Wayfair?
17    A.   What is so stressful?
18    Q.   Yeah.
19    A.   It's a fast, dynamic work environment.
20    Q.   Did you tell --
21    A.   It's growing at greater than 50 percent the
22 entire time I've been here.
23    Q.   Did you tell Ms. Forsythe in September 2019
24 that you didn't think you could last much longer?
25    A.   I think I told her that in the current

Page 161

41 (Pages 158 - 161)

1 region and role that I have it was going to be
2 difficult.
3        But that wasn't because of Wayfair,
4 necessarily. That was a family condition as well.
5 You have to understand. I have three small kids,
6 and I was on the road 60 to 70 percent of the time
7 and not seeing them grow up. It wasn't just I
8 couldn't handle the job. It was a broader family
9 situation of this what I want to do for the rest of
10 my life, not see my kids grow up?
11    Q. Did you consider -- in September 2010, did
12 you consider yourself -- well, in August and
13 September 2010 -- 2019, excuse me -- did you
14 consider yourself too overwhelmed to protect Emily
15 from future sexual harassment by McDole?
16        MS. KAPPELMAN: Object to the form of
17 the question. That's a crazy question.
18        If you even understand it, Matt, you
19 can answer. But it's an outlandish question.
20 Argumentative and outlandish.
21    BY MR. GOODMAN:
22    Q. You can answer.
23    A. No, I did not consider I would have been at
24 that point in time. There are always priorities at
25 work. You always take care of your people and make

Page 162

1 sure they're safe at work, you're doing the right
2 thing. That always comes to the top.
3        The next one -- and it's just a rank
4 prioritization. There's always things at this
5 company I'm not going to get to, but taking care of
6 someone's well-being and making sure they're being
7 effective with their role is the number one as a
8 manager. I do not think at any point in time I was
9 incapacitated for that.
10        MS. KAPPELMAN: It's 2:15, Bob, so --
11 we're going to take a 15-minute break between
12 depositions. If you still have to ask questions of
13 this witness, we're going to tell Kory McKnight not
14 to log in until later. So what's the story?
15        MR. GOODMAN: Well, I told you I
16 thought I'd be done by 2:30, and I still think
17 that's true, but you're cutting it off.
18        MS. KAPPELMAN: No, I'm not cutting it
19 off. I'm telling you we're going to take a break in
20 between the two depositions, and I don't want
21 Mr. McCormick to just sit around waiting for you.
22        So if you think you'll be done by
23 2:30, I'll tell him to log in at 2:45.
24        MR. GOODMAN: I would tell him to log
25 in at 2:45.

Page 163

1        MS. KAPPELMAN: Okay. Go ahead.
2        THE VIDEOGRAPHER: The time is now
3 2:11, and we're going off the record.
4        MR. GOODMAN: No, we're not going off
5 the record.
6        MS. KAPPELMAN: We're staying on the
7 record, Chris.
8        THE VIDEOGRAPHER: I'm sorry.
9    BY MR. GOODMAN:
10    Q. On the September 10, 2019, call, the issue
11 of Mr. McDole's mental stability again was discussed
12 between you and Emily; correct?
13        MS. KAPPELMAN: Object to the form of
14 the question.
15        You can answer again.
16    A. From what I remember, perhaps. I don't
17 remember the conversation.
18    Q. Did you say to her, as she recalls, that
19 you thought McDole had PTSD and that that may be the
20 reason he was crazy and unpredictable?
21    A. I don't recall saying that.
22    Q. You didn't bring up any concern about his
23 psychiatric condition to HR after September 10th
24 either, did you?
25        MS. KAPPELMAN: Asked and answered.

Page 164

1        You can answer yet again, Matt.
2    BY MR. GOODMAN:
3    Q. My earlier question was about March. So
4 I'm asking again, as of September 10th you didn't
5 raise an issue at that time, did you?
6    A. No. But -- no, I did not. He was not my
7 employee.
8        And also, he didn't have any feedback from
9 anyone else on his sites that was negative, short of
10 from Emily.
11        MR. GOODMAN: Object to
12 responsiveness.
13    BY MR. GOODMAN:
14    Q. Why did you tell Emily -- ever tell Emily
15 to stay away from Mr. McDole?
16    A. I don't remember that. I could have said
17 that. I don't remember if I did say that, or if I
18 didn't say that.
19    Q. Did you ever tell HR that -- anybody at HR
20 that Mr. McDole should not be alone with Emily?
21    A. Not that I remember.
22    Q. Did you tell Ms. Forsythe, as she recalls,
23 on September 10, 2019, that you were, so to speak,
24 pissed with him taking some of your team members?
25    A. Attempting to take them, yes, I did.

Page 165

42 (Pages 162 - 165)

1   Q.   Did you tell him that -- did you tell Emily
2   that you were concerned -- that you believed he had
3   lied about transferring people?
4   A.   I don't think he lied because I questioned
5   him after I talked to Emily.  But he definitely did
6   it.  He wanted to build a really good team, and I
7   had a smart group of people that worked on the site
8   at the time when the company was going through a
9   broader reorganization where we built a continuous
10  improvement team, many of which -- of my initial
11  industrial engineering team got recruited into those
12  roles.  I was upset that he tried to do it without
13  contacting me directly, yes.
14  Q.   So you may have told Emily that he lied,
15  but then you corrected that impression when you
16  talked to McDole himself?
17       MS. KAPPELMAN:  Object to the form of
18  the question.  That's not what he testified.  You're
19  mischaracterizing.
20  BY MR. GOODMAN:
21  Q.   I'm asking a separate question.
22       Did you -- is it possible that you told
23  Emily that he lied about transferring people but
24  then had a less harsh view of that after you spoke
25  with him?

Page 166

1   A.   That is correct.
2   Q.   Did Mr. McDole, during the time he and
3   Emily were both employed by Wayfair, treat Emily,
4   independent of her sex and his sex, professionally?
5   A.   I believe so, yes.
6   Q.   Did he treat her in a way that you would
7   want a male employee to treat a female employee,
8   whether they were subordinate and superior or peers?
9   A.   Are you talking from my observations?
10  Like, my direct interactions?  Or are you talking
11  about --
12  Q.   No.  Based on your direct observations and
13  all the information you had from either one of them
14  or talking to -- talking to both of them that --
15  that evening in April.
16  A.   So I think the early days we were totally
17  fine.  It was a good working relationship.  Both of
18  them -- not just Mike.  Both of them interacted with
19  each other from April, May, and June was
20  unprofessional, and I didn't like it.
21  Q.   Did you ever -- well, did you ever hear
22  Mr. McDole complain of unconsented touching of him
23  by Ms. Forsythe?
24  A.   Did I ever hear Mike complained that
25  Ms. Forsythe touched Mike?

Page 167

1   Q.   Without his consent, right.
2   A.   I have not heard that complaint.
3   Q.   But nevertheless, you believe that he, as a
4   male employee, treated Ms. Forsythe, as a female
5   employee, as you would -- as you think was
6   appropriate?
7   A.   From my direct interactions, I didn't have
8   anything that was inappropriate from a male versus
9   female.  They had work behaviors around attitudes
10  toward each other in collaboration that were both
11  nonprofessional, but nothing around, like, sexual
12  bias towards either party.
13  Q.   Well, once you got -- once you got the
14  complaint in August, you had a basis for changing
15  your opinion that the way he treated her was
16  appropriate, didn't you?
17       MS. KAPPELMAN:  Object to the form of
18  the question.
19       You can answer, Matt.
20  A.   I read the email in August.  Emily worked
21  for me at the time.  I wanted to make sure that she
22  had a thorough investigation against her, you know,
23  wishes, and I turned it over to talent management.
24  I wanted to make sure, if there was an issue, that
25  someone investigated thoroughly and they came back

Page 168

1   with, you know, a course of action.
2   Q.   And if you told Emily that you thought
3   Mr. McDole may be lying about transferring people,
4   did you report your concern about him lying to HR?
5       MS. KAPPELMAN:  Object to the form of
6   the question.
7       You can answer, Matt.
8   A.   I called Mr. McDole directly.
9   Q.   Okay.  But you didn't report it to HR;
10  correct?
11  A.   No.  There was -- I -- if every manager
12  ever reported to HR every employee issue, there's
13  not a point of a manager.  You pick up the phone and
14  you call and say, hey, what happened here?  This
15  doesn't make sense.
16       On that one specifically, I said, "Mike,
17  these people work on my team.  They're part of my
18  team.  If you want them for your site, that's fine.
19  They can apply for a role.  But we can't just
20  transfer an organization."
21       He said, "I'm sorry.  I understand."
22  Q.   So when you thought he lied, you called him
23  directly.  That's what you're saying; right?
24  A.   Yes.
25  Q.   But when you were informed that he had

Page 169

43 (Pages 166 - 169)

1  sexually harassed Emily, you didn't talk to him
2  directly; correct?
3      MS. KAPPELMAN:  Object to the form of
4  the question.  He got a complaint, and he turned it
5  over.  Please don't mischaracterize his testimony.
6      Matt, you can tell him again what you
7  did when you received the August 14th --
8      MR. GOODMAN:  No.  That's not my
9  question.
10     MS. KAPPELMAN:  For the fifth or sixth
11 time.
12  BY MR. GOODMAN:
13   Q.  You did not call Mr. McDole directly when
14 you got the complaint about sexual harassment;
15 right?
16   A.  No.  Nor would I.  I would turn it over to
17 the internal talent organization.  Because if he had
18 said, I didn't do that, and then I ended there, that
19 would have been the full investigation that our
20 company then took.
21   Q.  Did you express to Emily that you thought
22 Mr. McDole had violent tendencies?
23   A.  I don't remember violent tendencies.  I've
24 never seen a violent tendency out of Mike.  I saw
25 him raise his voice in a room one time.

Page 170

1   Q.  Were there team dinners that occurred
2  during Emily's employment?
3   A.  Sure.
4   Q.  Was there always alcohol at the team
5  dinners?
6   A.  I mean, there was typically alcohol at
7  Wayfair.  Wayfair has kegs of beer in the break
8  rooms at the corporate office.
9   Q.  Was there an instance in which Mr. Stark
10 got drunk?
11     MS. KAPPELMAN:  Mr. Who?
12     MR. GOODMAN:  Stark.
13     MS. KAPPELMAN:  Is this going to be
14 somehow relevant to the sexual harassment complaint
15 and retaliation complaint?  Because if it's not, I'm
16 going to direct him not to answer.  I think we've
17 had enough defamation of people that are nonparty
18 witnesses.
19     MR. GOODMAN:  Yes, it is directly
20 relevant.
21     MS. KAPPELMAN:  If it's not, I'm
22 warning you, I really am going to the judge about
23 your defaming nonparty witnesses.
24     So somebody -- Mr. Stark got drunk,
25 Matt.  Did Chris Stark ever get drunk?

Page 171

1   A.  Yes.
2   Q.  Did he get so drunk on one occasion that he
3  chased Chris Bell trying to kiss him?
4   A.  He was chasing him, not trying to kiss him.
5      I don't remember that.  That was -- I think
6  he chased him around the room in New Jersey.  I was
7  there.
8   Q.  Okay.  And you just don't remember the part
9  about trying to kiss him or pretend to kiss him?
10   A.  It was -- I don't think he would have
11 actually kissed him.  I'm not -- I don't remember.
12   Q.  Just, like, for the same reason Mr. Schmitz
13 only pretended to kiss Mr. Konicki?
14   A.  So Chris is German.  There's different
15 cultural things with German people.  The first time
16 I met Chris, he gave me a big hug and a kiss on the
17 cheek, and I thought it was odd.  But that was a
18 cultural thing that I later understood.  So I don't
19 take doing that as offensive after I got to know
20 him.
21   Q.  Were there any instances, other than the
22 two we identified, where one male pretended to show
23 aggression towards another male that you can recall
24 having occurred during Emily's employment by
25 Wayfair?

Page 172

1      MS. KAPPELMAN:  Object to the form of
2  the question.
3      Again, is this going to be relevant to
4  the sexual harassment claims in this case, or is it
5  just disparagement?
6  BY MR. GOODMAN:
7   Q.  The Schmitz/Konicki incident and the
8  Stark/Bell incident, any other instances --
9      MS. KAPPELMAN:  Well, those aren't
10 aggressions, so --
11  BY MR. GOODMAN:
12   Q.  Any other instances where one person
13 purported to kiss another against their consent?
14   A.  Not that I remember.
15   Q.  When did you find out that Emily had been
16 terminated?
17     MS. KAPPELMAN:  Object to the form of
18 the question.
19     You can answer.  When did you find
20 that Emily left?
21   A.  It would have been the morning of the --
22 was it the 23rd or 24th, was when I found out she
23 had left.
24   Q.  The day that she was going to Atlanta?
25   A.  The day that I was told that she resigned

Page 173

44 (Pages 170 - 173)

1 the company.
2   Q.   Okay.  Well, she didn't resign --
3       MS. KAPPELMAN:  Object to the form of
4 the question.  She did resign.  You can't
5 characterize what --
6       MR. GOODMAN:  Counsel, Counsel,
7 Counsel --
8       MS. KAPPELMAN:  You can't tell him
9 what she did or didn't do.
10      MR. GOODMAN:  You wouldn't be able to
11 do it at trial; you shouldn't do it in the
12 deposition.
13      MS. KAPPELMAN:  You cannot
14 characterize whether she resigned or not.
15   BY MR. GOODMAN:
16   Q.   Did you see her -- I think you've already
17 testified you saw her on the last full day she was
18 in the office.  Is that correct?  The 23rd?
19   A.   No.  I think it was on the Thursday that
20 week, which -- I'm not sure what date that would
21 have been.
22   Q.   The Thursday of the prior week?
23   A.   Yes, sir.  I believe she took that Friday
24 off.
25   Q.   And you were working in the same facility

Page 174

1 as her on the 23rd, the next Monday?
2   A.   I think I would have been.  I can't
3 remember.  I traveled 100-plus days a year last year.
4 I think I was in the office that day.
5   Q.   You just don't remember?
6   A.   No, I don't remember where I was on the
7 23rd.
8   Q.   Did you have any interaction with her on
9 the 23rd?
10   A.   Not that I remember.
11   Q.   Mr. Witte?
12   A.   What did you say?
13   Q.   You don't remember having any interaction
14 with her on the 23rd?
15   A.   It was either -- it was either on the 19th
16 or the 23rd.  I said, "Hi, Emily" when I passed her
17 upstairs, and that was the extent of my conversation
18 with her.
19   Q.   On August 4th, did Ms. Forsythe ask you to
20 talk to Mr. McDole about being aggressive --
21 August 4, 2019 -- before she made her formal
22 complaint?
23   A.   I think there -- there was an email, if I
24 remember, and I called Mike.  And it was -- it was --
25 you can mark it as aggressive or -- it was two

Page 175

1 professionals not working well together, is how I
2 interpreted it.
3   Q.   Did you tell him that the concern of Emily
4 was that he was being aggressive?
5   A.   I don't remember, sir.
6   Q.   But that was the nature of the request that
7 was made to you, to talk to him about his being
8 aggressive; correct?
9   A.   Yes.  But I think I also involved Kory in
10 that discussion.  I think Kory may have had that
11 call.
12   Q.   On August 27, 2019 -- well, your group
13 could use Slack as an internal texting device; right?
14   A.   Yes.
15   Q.   On August 27, 2019, in a Slack message, you
16 made a joke about people going to HR; correct?
17   A.   I don't remember.  Do you have it?  You
18 could it pull up, and I can remember it.
19   Q.   I don't know that I do.
20      You're not denying that, but you just don't
21 remember it?
22   A.   I don't remember the context.
23      Who did I say it to?
24   Q.   It was on a team Slack.  That's all I can
25 tell you right at this point.

Page 176

1       MS. KAPPELMAN:  Object to the form of
2 the question.
3   A.   I don't remember.
4   Q.   It would not be appropriate for you, as a
5 supervisor, or really anybody at Wayfair, to make fun
6 of somebody who complained to HR; correct?
7   A.   No.
8   Q.   You would agree with that?
9   A.   Yes, I would agree.  I would not do that.
10   Q.   Would it have been okay for Mr. McDole to
11 treat any female other than Emily Forsythe the way
12 she said he did?
13      MS. KAPPELMAN:  Object to the form of
14 the question.  I don't even know what you're asking.
15      But, Matt, try.  If you understand the
16 question, go ahead and answer.
17   A.   If you're saying the way that Emily
18 described the interaction with Mike, would that be
19 appropriate with any employee at Wayfair -- is that
20 your question?
21      No.  That would be inappropriate.
22   Q.   And I know your daughter is young.  But if
23 your daughter was in the workforce or if your wife --
24      MS. KAPPELMAN:  No.  You're not asking
25 that question.  Move on.  Move on.

Page 177

45 (Pages 174 - 177)

1        MR. GOODMAN:  What's wrong with the
2 question, Counsel?
3        MS. KAPPELMAN:  You're not asking it.
4 You want to go in front of a judge?  I'm happy to.
5 You're not going to talk about Mr. Witte's daughter.
6        Now, if you have any new questions that
7 are relevant to sexual harassment, go ahead and ask
8 them.  We're already a half an hour over with this
9 witness, and I'd really like to terminate so we can
10 take 15 minutes off before the next deposition.
11       So if you only have questions about
12 Ms. Witte's family members, hopefully we're done.
13   BY MR. GOODMAN:
14   Q.   Did you ever ask Mr. McDole specifically
15 about the incidents on January 22nd, March 13th, and
16 March 14th that involved him sitting next to her when
17 he originally was not sitting next to her, and that
18 involved him asking her to dinner without the
19 pretense of it being work-related?  Did you ever
20 specifically speak about those to Mr. McDole?
21       MS. KAPPELMAN:  Talking about the
22 allegations in the complaint.  Did you ever address
23 the allegations that Ms. Forsythe made?
24   A.   The only thing I ever asked of Mike --
25 after the newspaper article came out, I asked Mike if

Page 178

1 he was okay, and he said he was okay.  That was the
2 extent of our conversations on the case.
3   Q.   After that came out?
4        MS. KAPPELMAN:  The newspaper article.
5 When you called the newspaper, Bob, about your
6 lawsuit.
7   BY MR. GOODMAN:
8   Q.   So you never spoke to him about these
9 incidents until 2020; correct?
10   A.   I've still not spoken to Mike in detail
11 about any of these alleged incidents.
12   Q.   Did you ever speak to him about emails
13 concerning -- to or concerning Emily between April
14 2019 and August 2019 that Emily complained were
15 unprofessionally aggressive?
16   A.   Yes.  And I would -- I would talk to him
17 about those, and he would tell me all the things that
18 he had problems with.  It wasn't a one-sided story,
19 that Mike was just hostile towards Emily.  It went
20 both ways.
21   Q.   Well, the unconsented touching was one
22 direction, though; right?
23       MS. KAPPELMAN:  Object to the form of
24 the question.
25   A.   In Emily's email, it was one-sided.  I have

Page 179

1 no idea if it was one-sided.  Only the two of them
2 do.
3   Q.   Did you ever tell Emily that you thought
4 Mr. McDole was unable to control himself when he
5 attacked her?
6   A.   Maybe.  I think I might have said something
7 like that, but it was -- it was because he was really
8 upset with how he felt he was being portrayed and
9 worked with, which is why I asked her to leave the
10 room.  And uncontrolled wasn't, like, throwing
11 chairs, it was raising voice.  And he said he was
12 pissed off.
13   Q.   Okay.  Who is Jim Lowe?
14   A.   Jim Lowe is our western region maintenance
15 leader.
16   Q.   Did you ever talk to Mr. Lowe about
17 Mr. McDole?
18   A.   Yes.  I think -- I think after the
19 incidents.
20   Q.   Did you talk with him about his statement
21 to Emily that McDole was trying to sabotage her
22 career at Wayfair?
23   A.   I did talk to him about that.
24   Q.   And what was the substance of the
25 conversation on both sides?

Page 180

1   A.   The substance from that was that that was
2 not exactly what Jim said Mike said.  It wasn't that
3 he was directly trying to sabotage her career.
4        Emily, I remember talking to you about this
5 a while ago.  I actually have a hard time
6 recollecting this -- Emily Miller.  I'm not trying to
7 pull you into it, but I'd have to refresh myself on
8 the conversation.  I don't remember.
9        It wasn't the one-sided that he was trying
10 to sink her career, though, as the way it's stated.
11 It was more of a -- he was having difficulty working
12 with her.
13       MR. GOODMAN:  Okay.  Well, objection to
14 responsiveness.
15   BY MR. GOODMAN:
16   A.   Did you understand that Mr. McDole -- the
17 claim was that Mr. McDole said he was willing to
18 sabotage her career -- (indecipherable).
19       (Clarification requested by the court
20 reporter.)
21       MS. KAPPELMAN:  Ask the last question,
22 and then we're ending this deposition.  So go ahead.
23       MR. GOODMAN:  Counsel --
24       MS. KAPPELMAN:  You're already 35
25 minutes over.

Page 181

46 (Pages 178 - 181)

Page 182

1      MR. GOODMAN: I'm accommodating you by
2  trying to do two of them today.  Give me a break.
3      MS. KAPPELMAN:  You're not
4  accommodating me.  You're already 35 minutes over.
5      MR. GOODMAN:  Counsel, this is not the
6  first time you've had something like that happen.
7  Give me a break.
8      MS. KAPPELMAN:  It's not.  But we're
9  all sitting here waiting for you to finish, and you
10  keep going over stuff you've already gone over.
11  BY MR. GOODMAN:
12  Q.   Did you understand Mr. Lowe to have told
13  Emily that it was his opinion that McDole was trying
14  to sabotage her career as opposed to McDole
15  threatening that?
16  A.   What I remember of this conversation was
17  that Emily stated Jim said that Mike was trying to
18  sabotage her career.  When I called Jim directly, he
19  said that's not what happened.  It was not that
20  aggressive.
21  Q.   Is that the only conversation you had about
22  the subject with Jim Lowe?
23  A.   I called Jim back in -- I don't remember
24  exactly when.  December or January, something like
25  that.  And he was on vacation, and I spoke to him for

Page 183

1  about 10 minutes.
2  Q.   Did you ever talk with...
3      MR. GOODMAN:  Pass the witness.
4      EXAMINATION
5  BY MS. KAPPELMAN:
6  Q.   During the course of this deposition,
7  Counsel has repeatedly said that Emily Forsythe was
8  terminated by Wayfair.
9      Do you understand that she was terminated
10  or that she resigned, Mr. Witte?
11      MR. GOODMAN:  Objection.
12  A.   I understand that Emily asked Trevor for
13  a -- I understand, from the conversation with Trevor,
14  that Emily said, where do we go from here -- or
15  Trevor said, "Where do we go from here?"
16      And Emily said something about, "I'd like a
17  package," is what I understand.
18  Q.   And was that in keeping with her
19  discussions with you about looking for work elsewhere
20  outside of Wayfair?
21      MR. GOODMAN:  Object to the form.
22      MS. KAPPELMAN:  You can answer, Matt.
23  A.   She had told me prior to that, a few weeks
24  prior, that she was looking at outside companies
25  besides Wayfair.

Page 184

1  Q.   Okay.  Did you yourself ever confirm any of
2  the allegations that Ms. Forsythe made against
3  Mr. McDole of nonconsensual touching?
4  A.   No, I did not.
5      MR. GOODMAN:  Object to the form.
6  BY MS. KAPPELMAN:
7  Q.   So as you sit here today, do you know
8  whether they were true or not?
9  A.   I do not.
10      MS. KAPPELMAN:  Okay.  Nothing further.
11      EXAMINATION
12  BY MR. GOODMAN:
13  Q.   Mr. Witte, have you read Ms. Forsythe's
14  deposition transcript?
15  A.   No, I have not.
16  Q.   Have you listened to any recording of a
17  conversation with Mr. Shaffer?
18  A.   No.
19  Q.   Have you reviewed correspondence from
20  Mr. Shaffer sent on September 23, 2019, to
21  Ms. Forsythe?
22  A.   No.
23  Q.   Did you ever hear of or get any notice,
24  written notice, of resignation from Ms. Forsythe in
25  September of 2018?

Page 185

1  A.   No.
2  Q.   Did anybody ever tell you about any notice
3  period related to the separation of Ms. Forsythe's
4  employment either by involuntary termination or
5  resignation?
6  A.   There was a thudding in the background.
7  I'm sorry.  Can you repeat that?
8  Q.   Did anybody at Wayfair ever tell you that
9  there was a notice period tied to either any
10  resignation or termination of Ms. Forsythe?  A notice
11  period.
12  A.   No.  Not that I remember.
13  Q.   And you've heard of notice periods in
14  connection with people resigning as of two weeks
15  hence or being terminated as of that future date;
16  correct?
17      MS. KAPPELMAN:  Object to the form.
18      You can answer if you know.
19  A.   I've heard of both.  I've heard of people
20  resigning and packing their bags and leaving
21  immediately; I've heard two-week notice periods; I've
22  heard six-week notice periods.
23  Q.   And you didn't hear about any of those in
24  connection with Ms. Forsythe; correct?
25  A.   I heard Ms. Forsythe had resigned effective

47 (Pages 182 - 185)

1 immediately.
2    Q.   She resigned on -- what you heard was she
3 resigned effective immediately on September 19th?  Is
4 that what you're saying?
5    A.   I don't think it was September 19th.  I
6 would say it was the 23rd or 24th.
7    Q.   Okay.  But she worked -- she worked on the
8 23rd, so you're saying the resignation was delivered
9 after the last day she worked or on the last day she
10 worked?
11    A.   I wasn't in the room for the resignation
12 discussion.
13    Q.   Okay.
14    A.   Everything you're asking me is --
15    Q.   You know the last day was the day before
16 she was scheduled to go to Atlanta for a business
17 trip; correct?
18    A.   I guess you made me aware of that, and I
19 heard that before.
20    Q.   Okay.  And are you saying that you were
21 told she resigned on that day before she was going to
22 Atlanta?
23    A.   Yes.
24    Q.   Who told you that?
25    A.   Internal counsel, Mike Berendt.

Page 186

---

1       I, Kristen C. Krakofsky, court reporter and
2 notary public in and for the Commonwealth of
3 Massachusetts, certify:
4       That the foregoing proceedings were taken
5 before me at the time and place herein set forth, at
6 which time the witness was properly identified by
7 means of an Ohio driver's license and put under oath
8 by me;
9       That the testimony of the witness, the
10 questions propounded, and all objections and
11 statements made at the time of the examination were
12 recorded stenographically by me and were thereafter
13 transcribed;
14       That the foregoing is a true and correct
15 transcript of my shorthand notes so taken.
16    I further certify that I am not a relative
17 or employee of any of the parties, nor am I
18 financially interested in the action.
19    I declare under penalty of perjury that the
20 foregoing is true and correct.
21                              of August, 2020.
22
23 Kristen Krakofsky, Notary Public
24 My commission expires October 25, 2024.
25

Page 188

---

1    Q.   Did he tell you whether it was written or
2 oral on the 23rd?
3       MS. KAPPELMAN:  I'm going to direct you
4 not to answer to the extent that you had conversation
5 with internal counsel.  You've already divulged too
6 much, so -- that's privileged communications.
7       If you have anything else you want to
8 ask him that's not privileged communications, go
9 ahead, Bob.
10       MR. GOODMAN:  No further questions.
11       MS. KAPPELMAN:  No further questions.
12 You're done, Matt.
13       THE VIDEOGRAPHER:  This concludes the
14 deposition.  The time is now 2:39.
15
16
17
18
19
20
21
22
23
24
25

Page 187

---

1 Emily Forsythe v. Wayfair
2 Matthew Witte Job No. 4184620
3      E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Matthew Witte                 Date
25

Page 189

48 (Pages 186 - 189)