Exhibit 4

# Exhibit 4

1                                          Pages 1-91

2                                          Exhibits 1-2

3

4          IN THE UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF MASSACHUSETTS

6                C.A. No. 1:20-cv-10002

7

8    *************************************

9    Emily Forsythe,

10            Plaintiff

11   vs.

12   Wayfair, LLC,

13            Defendant

14   *************************************

15

16        Videotaped Deposition of Kory McKnight

17              Tuesday, July 21, 2020

18                Via Videoconference

19

20        ------Kristen C. Krakofsky------

21                Court Reporter

22                  VERITEXT

23                (800) 227-8440

24

25

                                              Page 1

1 employee because that's where she started and she
2 had a desk there?
3    A.   Yes.  I mean, Emily lived, I believe, in
4 Kentucky, similar situation.  She was originally, I
5 believe, in Boston and relocated to the Kentucky
6 area.
7    Q.   And were you also similarly working out of
8 Boston?
9    A.   Sorry.  Can you repeat that?
10    Q.   Were you also -- were you similarly working
11 out of Boston at some point or at the beginning?
12    A.   Yes.
13    Q.   What was your first day at Wayfair?
14    A.   July 29th.
15    Q.   Of last year; right?
16    A.   Of 2019, sorry.  Last year, 2019.
17    Q.   And were you working in Boston at some
18 point beginning in July?
19    A.   No.
20    Q.   Okay.  So you've never actually -- do you
21 have a desk in Boston?
22    A.   I do not.
23    Q.   So you may have misunderstood my question.
24 You've never worked out of Boston?  You never --
25       (Multiple parties speaking.

Page 6

1 Interruption by the court reporter.)
2          MR. GOODMAN:  I'll restate the
3 question.
4    MR. GOODMAN:
5    Q.   Mr. McKnight, you've really never lived in
6 Boston.  You've never actually worked in Boston.
7 You traveled from Boston to work for Wayfair;
8 correct?
9    A.   I've worked -- you know, meetings, you
10 know, spent some time there, but I've never owned an
11 apartment in Boston.
12    Q.   Okay.  How old are you today?
13          MS. KAPPELMAN:  What's the question,
14 Bob?  We can't really hear you very well.
15    BY MR. GOODMAN:
16    Q.   How old are you, Mr. McKnight?
17    A.   I am 50.
18    Q.   Who is your immediate prior employer?
19    A.   Jet.com.
20    Q.   What does Jet.com do?
21    A.   They're an e-commerce player, just like
22 Amazon.  They compete with Amazon.
23    Q.   They sell furnishings?
24    A.   Online, a variety of -- predominantly
25 grocery.  But, you know, Walmart.com had purchased

Page 7

1 Jet, so by default I became a Walmart.com employee
2 through Jet.com.
3    Q.   And I see you were at Jet.com from
4 October '16 to June 2019.  Correct?
5    A.   Correct.
6    Q.   And when did Walmart purchase Jet.com?
7    A.   They purchased Jet.com -- well, it was
8 officially approved by the SEC in September of 2016.
9    Q.   And what were you doing with Jet.com?
10    A.   I was a senior director managing a team of
11 design engineers and project managers managing
12 pretty much all of the network equipment, all the
13 automation equipment across Walmart.com and Jet.com
14 fulfillment centers.
15    Q.   Was that, again, warehousing distribution
16 and fulfillment?
17    A.   And automation, yes, exactly.
18    Q.   Okay.  And when you talk about automation,
19 what are you talking about?
20    A.   I'm talking specifically about carton
21 sortation, conveyance and sortation, moving product
22 from -- inbound, through the warehouse to put away,
23 from picking to shipping and sortation.
24    Q.   So you call it sortation, not sorting, huh?
25    A.   It's sortation, yeah.  Sorters are the

Page 8

1 physical devices that move product down certain
2 lanes, but it's sortation in general, is the term.
3    Q.   And you did that also at C&S Wholesale
4 Grocers; correct?
5    A.   Yes.
6    Q.   And for about six months, you worked at
7 Tesla; correct?
8    A.   Yes.
9    Q.   That was not a similar role, obviously.
10 What did you do at Tesla?
11    A.   No.  At Tesla I was a program manager for
12 the Model 3.
13    Q.   And what did you do at United Technologies?
14    A.   I was a program manager in electric systems
15 on the commercial business side.
16    Q.   What kind of product?
17    A.   Power distribution systems.  Secondary and
18 primary power distribution.
19    Q.   Under what circumstances did you leave
20 Walmart?
21    A.   I left Walmart to join Wayfair last year,
22 just about this time.
23    Q.   Were there any complaints against you at
24 Walmart?
25    A.   No.

Page 9

3 (Pages 6 - 9)

1   Q.   What prompted your leaving Walmart?
2   A.   Sorry?
3   Q.   What prompted your leaving Walmart?
4   A.   I'm sorry.  I didn't get that.
5   Q.   What prompted your leaving Walmart?
6   A.   My interest in Wayfair.  And I started
7 talking to Wayfair in March or -- I think late March
8 of 2019.  Just interested in the growth opportunity.
9 It's exciting.  It kind of reminded me of what Jet
10 was like when I started.
11   Q.   Was there anything critical in your
12 employment at Wayfair that led you to -- issues at
13 Walmart that led you to need to leave or want to
14 leave?
15   A.   At Walmart?
16   Q.   Yeah.  Was there any criticism of any
17 aspect of your performance that led you to need to
18 leave or want to leave Walmart?
19   A.   No.  I left for Wayfair because it was a
20 great opportunity.
21   Q.   You gave some Walmart documents to Emily
22 Forsythe; correct?
23   A.   I'm not sure what document you're referring
24 to.
25   Q.   Yeah.  There were some documents that

Page 10

1   Q.   You resigned without a severance?
2   A.   That's correct.
3   Q.   And it's your testimony that there were no
4 complaints about you or against you at Walmart when
5 you were there?
6       MS. KAPPELMAN:  Object to the form of
7 the question.
8       You can answer.
9   A.   No.
10   Q.   When did you first encounter Emily
11 Forsythe?
12   A.   I met Emily for the first time on
13 August the 5th of 2019, which was the week after I
14 started.
15   Q.   Is that when you -- that's when you met
16 her, you said?
17   A.   Yes.
18   Q.   Did you tell her how much money you made
19 the day you first met her?
20   A.   No.
21   Q.   Did you tell Emily that you would leave
22 Wayfair if the stock price dropped?
23   A.   No.
24   Q.   You're denying saying both of those things
25 or either of those things?

Page 12

1 related to Walmart that you asked her to -- you sent
2 to her, and you asked her to keep them confidential.
3 Do you recall those documents?
4   A.   So there's probably two documents.  One was
5 just a risk document, and the other one was an
6 action tracker.  Those were my documents that -- I
7 had developed those myself prior to Walmart.
8   Q.   Action tracker and what the other one was?
9   A.   Risk register.
10   Q.   R-I-S-K register?
11   A.   Yes.  And those were documents that I had
12 developed before.
13   Q.   Okay.  And are you -- are you sure that
14 those were documents you sent to Emily, or are you
15 speculating those were the documents?
16   A.   Those are documents I shared with my
17 implementation team since as well, so I believe
18 those are the documents.
19   Q.   Do you remember sending any other documents
20 besides those two to Emily or to anybody else at
21 Wayfair?
22   A.   No, I don't recall if there was something
23 else.
24   Q.   So did you then resign from Walmart?
25   A.   Yes.

Page 11

1       MS. KAPPELMAN:  Asked and answered.
2       You can answer again, Kory.
3   A.   Yes, I deny that.
4   Q.   Did you ask her the first time you met her
5 how much she made?
6   A.   No.
7       I would have access to that anyway.
8   Q.   And what level she was at?
9   A.   She was a Level 5.
10       And I have access to that through Workday,
11 so I would never ask anyone what I -- information
12 that I'm privy to already.
13   Q.   And your testimony is that she was a
14 Level 5 on the day you met her?
15   A.   Yes.  Until the day she resigned.
16   Q.   Did you discuss with her possibly needing
17 her spot for somebody else?
18   A.   No.
19   Q.   You disclosed that you had three coworkers
20 from Walmart that may be interested in Wayfair on
21 the day you met her.  You told that to her, didn't
22 you?
23   A.   I told her that I had one that was
24 interested that I was talking to.
25       And so when I came on board, there was a

Page 13

4 (Pages 10 - 13)

1 ton of opportunity.  We were hiring.  We had a
2 number of open roles, and I was basically told to
3 hire people that I know, references that I
4 personally worked with.
5        And when I met with Emily the second day,
6 we were together in Fort Wentworth.  And we started
7 talking about the team and the workload, and I
8 mentioned to her that I knew someone that could be a
9 good fit for the team.
10   Q.   And who was that?
11   A.   That was Mike Thayer.
12   Q.   And he's since come on; correct?
13   A.   He came on after Emily had left the
14 company.
15   Q.   Okay.  But you actually mentioned two
16 people to her when you first met with her.
17        MS. KAPPELMAN:  Object to the form of
18 the question.
19        You can answer, Kory.
20   A.   Yeah.  Mike is the only one that I brought
21 in that we interviewed, and he made it through the
22 interview process.
23        There were -- there was a candidate that
24 came later as an engineer.  He came through the
25 process, wanted too much money.  This was later on,

1 after Emily had left the company as well, and we
2 never extended -- we never met his expectations.
3   Q.   Who was that?
4   A.   This was Jon Cortellacci.
5   Q.   Okay.  Is that another person you talked
6 with her about?
7   A.   No, I never spoke to her about Jon.
8   Q.   You're saying you spoke to her about
9 Thayer.  Did you --
10   A.   Yes.
11   Q.   Did you identify by name or as one of the
12 three male coworkers anybody else besides Thayer?
13        MS. KAPPELMAN:  Object to the form of
14 the question.  Object to the form of the question.
15 Mischaracterizes his prior testimony.  He didn't say
16 he identified three people in that conversation.  He
17 said he identified one.
18        You can answer, Kory.
19 BY MR. GOODMAN:
20   Q.   Did you identify Mr. Thayer by name?
21   A.   I did.  In fact, I shared his resume with
22 Emily as well.
23   Q.   Did you identify anybody else either by
24 name or as coworkers of Walmart?
25   A.   I did not.

1   Q.   So when she says you mentioned three people
2 at Walmart who might want to come over to Wayfair,
3 you're saying she's lying about that?
4   A.   I'm saying I mentioned one person, and I
5 shared that resume with her.
6        She actually was -- she was a little put
7 off with the fact that he didn't go to a school that
8 she recognized, although he had 20-plus years' of
9 work experience, which I thought was a little bit
10 strange, but I just let that go.
11   Q.   Okay.  So she looked at his resume at the
12 time you handed it to her?
13   A.   Yes.
14   Q.   And then you had a discussion about that
15 resume at the time?
16   A.   I did, yeah.  She made some comments that
17 she didn't recognize the school.  And I didn't think
18 it was very applicable, but we never debated it,
19 discussed it at that point.
20   Q.   Did you recognize the school?
21   A.   Bishop University.
22        I mean, I'm originally from Canada, so I
23 wouldn't recognize a lot of schools, other than the
24 most popular schools here.
25   Q.   You're thinking it was in Canada?

1   A.   Sorry.  Can you repeat that?
2   Q.   You think it was in Canada?
3   A.   No, no, no.  I said I'm originally from
4 Canada, and I wouldn't recognize many of the U.S.
5 schools, as not being born here and not spending,
6 you know, the first 26, 29 years of my life here,
7 so...
8   Q.   So you didn't recognize it either?
9   A.   I did not, no.
10        And I knew -- I only knew Mike, actually,
11 for a short amount of time before that.  But he was
12 interested, and I had spoken to him about coming
13 over to Wayfair.
14   Q.   Did you talk with Emily in September of
15 2019 about having had a female person on a team in
16 one of your jobs who had complained and then later
17 resigned?
18   A.   No.
19   Q.   So you never talked with Emily Forsythe
20 about a female employee on one of your teams at one
21 of your employers?
22   A.   I don't recall, no.  If I -- I may have
23 spoken to her about some team members in the past,
24 but I don't recall that specifically.
25   Q.   Do you recall -- did you speak with Emily

1 about a team member -- a female team member under
2 you at some point who complained and then resigning?
3    A.   No.
4    Q.   In your position as a supervisor at various
5 companies, was there anybody besides Emily who made
6 a complaint of sexual harassment?
7         MS. KAPPELMAN:  Against Kory or
8 against anyone?
9 BY MR. GOODMAN:
10    Q.   Against someone at the company that you
11 had -- as supervisor, you had a responsibility.
12    A.   No, never.  Not in my 25 years of working.
13 I've never been involved in a sexual harassment case
14 of any kind.
15    Q.   Until Emily's; right?
16    A.   Correct.
17    Q.   Have you been involved with any others
18 since?
19         MS. KAPPELMAN:  Object to the form of
20 the question.
21         I'm going to direct you not to answer
22 as it's not relevant to this case.
23 BY MR. GOODMAN:
24    Q.   Do you, at work, refer to women from time
25 to time as girls?

Page 18

1 about -- formally complain about anything, whether
2 or not it was sexual discrimination or sexual
3 harassment?
4         MS. KAPPELMAN:  I'm going to object to
5 the form.
6         Can I just make it clear?  Are you
7 asking if he's ever had a female subordinate who
8 complained about anything?
9         MR. GOODMAN:  No.
10         MS. KAPPELMAN:  Okay.  Then I must not
11 have understood the question.  Can you rephrase it?
12 BY MR. GOODMAN:
13    Q.   Yeah.  The statement that's attributed to
14 you made a big deal complaining about something --
15 have you ever had, prior to Emily, a female
16 subordinate who made a big deal complaining about
17 something to you?
18    A.   No.
19    Q.   Did you have a conversation -- do you
20 recall the conversation on September 10, 2019, with
21 Emily?
22         MS. KAPPELMAN:  What conversation,
23 Bob?  Any conversation on September 10, 2019?
24 BY MR. GOODMAN:
25    Q.   Do you recall a conversation on

Page 20

1    A.   I refer to people as associates,
2 colleagues, employees.  I believe that would be --
3 no.  That would be like me referring to our
4 associates as boys.
5    Q.   I'll share the recollection with you, and
6 you can either acknowledge or -- admit or deny this.
7    A.   Sure.
8    Q.   Emily recalls that you said, "I used to
9 have a girl like you on my team, but she made a big
10 deal complaining.  And you know what happened to
11 her?  She resigned."
12    A.   That is not something that I said.  That
13 just seems a little absurd to me, but okay.  I have
14 not said that, no.
15    Q.   What's absurd about it?
16    A.   To what end would I be -- what is the
17 benefit to me if -- by making a statement like that?
18 I just -- I don't understand that, so -- that's not
19 something I would say.
20    Q.   Prior to August 10, 2019, had you ever had
21 a female subordinate who complained about
22 anything -- about any discrimination, even if it was
23 not a complaint of sexual harassment?
24    A.   No.
25    Q.   Have you had a female subordinate complain

Page 19

1 September 10, 2019, with Emily?  Yes or no?
2         MS. KAPPELMAN:  Kory, do you recall a
3 specific conversation that's tied to September 10,
4 2019?
5    A.   No, no.  I've had many conversations with
6 Emily, so I'm not sure which one you're referring
7 to.
8    Q.   Well, there was one that she made a record
9 of in an email to you and Mr. Witte; correct?
10    A.   That was not -- I believe that was
11 September the 17th.
12    Q.   Okay.  And so you do recall September 17th.
13 You just don't, as we sit here, recall
14 September 10th; correct?
15    A.   Correct.  I remember September 17th because
16 she had sent a document that was her attempt to
17 restate the conversation.
18    Q.   Did you ever respond to that email in
19 writing?
20    A.   I do not believe I did, no.
21         I did speak to Matt.  He was in the room
22 adjacent to me.  This was the last conversation I
23 believe I had with Emily.
24    Q.   Can you see that email on your screen?
25    A.   Yes, I can.

Page 21

6 (Pages 18 - 21)

1  Q.   The email that is marked Wayfair -- that is
2  Wayfair 1265 to 1266, which I'll mark as McKnight
3  Exhibit 1, that's the email you were talking about;
4  correct?
5        (McKnight Exhibit 1, email dated
6  September 17, 2019, from Ms. Forsythe to
7  Mr. McKnight and Mr. Witte, Bates-stamped Wayfair
8  1265 to 1266, marked for identification.)
9        MS. KAPPELMAN:  Just -- can you go to
10 the top for me for one minute, Bob?
11       For the record, it's a September 17,
12 2019, email from Emily Forsythe to Kory McKnight and
13 Matt Witte.
14    BY MR. GOODMAN:
15 Q.   That's the one you were just identifying;
16 correct?
17 A.   Yes, it is.
18 Q.   And you never addressed this in writing
19 with her?
20 A.   She's the one that sent it to me, so --
21 Q.   You never responded to her or refuted it?
22 A.   No.  I spoke to Matt immediately after
23 this.  He was in the room adjacent when she came in
24 and attacked me verbally and accused me of keeping
25 her uninformed and talking to her team members after

Page 22

1  Thayer actually -- you know, his name was actually
2  even mentioned, to be honest.
3  Q.   Okay.
4  A.   He was looking at --
5        MR. GOODMAN:  Object to
6  responsiveness.
7     BY MR. GOODMAN:
8  Q.   This email records a discussion with you
9  that, in large part, dealt with her concerns that
10 you were bypassing her improperly; correct?
11       MS. KAPPELMAN:  Objection.  The
12 document speaks for itself as to what it records.
13       But you can reflect your recollection.
14 A.   Yeah.  I mean, so the interesting thing
15 about this is I had followed up with her -- one of
16 her project managers regarding a schedule that Emily
17 was not willing to share with the site director.  I
18 was understanding the details that she was working
19 on in terms of the absolute dates.
20       I ran into one of her other project
21 managers on-site in Erlanger for the first time, and
22 he took me on a short tour of that site.  That was
23 not planned.
24       When Emily found out that I was talking to
25 Kelly, she was in Hebron at the time, and she asked

Page 24

1  we've had multiple discussions around the fact that
2  she's busy and I'm going to be talking to vendors
3  like I've done in my past and I continue to do today
4  as well.  If that means I have to speak to her
5  teammates directly, that's just -- that's the normal
6  part of the business that we're in.
7  Q.   And you talk about her concern that you
8  were bypassing her and -- you talk about her
9  concerns that you were bypassing her; correct?
10 A.   She brought that up.  She accused me of
11 intentionally keeping her out of the loop with her
12 teammates.
13 Q.   And verbally you had some discussion with
14 her about that?
15 A.   I had several discussions before where she
16 was telling me, "Do not talk to my venders, do not
17 talk to my team members without me directly
18 involved."
19       And I explained to her on a few occasions
20 that, "I'm sorry, Emily, to disagree with that, but
21 this is, you know, how we're going to -- we conduct
22 business when things are as busy as they are."
23       That's another reason why we were looking
24 to add another team member to the team, to take --
25 to split the work into two regions.  That's why Mike

Page 23

1  that I speak to her in person and basically demanded
2  that I, you know, not talk to her team directly.
3  And within 10 minutes, she was in Erlanger, which is
4  at least a 10-minute drive, knocking on the
5  conference room door that I was sitting in.  She
6  came in and just, you know --
7  Q.   And her conversation -- her email records
8  that conversation that you just testified to; right?
9        MS. KAPPELMAN:  Object to the form.
10    BY MR. GOODMAN:
11 Q.   You may disagree with what she said, but
12 that was her characterization of that conversation,
13 the one where she drove to Erlanger to discuss it;
14 correct?
15 A.   Yes.  This is her version of the --
16 Q.   I understand.
17       And then --
18       MS. KAPPELMAN:  I'm going to ask, Bob,
19 to completely finish his question before you start
20 to answer, Kory.  And I'm going to ask Kory to
21 completely finish your answer before Bob cuts you
22 off.  That way we'll have a clear transcript, and
23 I'll get a chance to object if I need to.  Thank
24 you.
25

Page 25

BY MR. GOODMAN:

Q.   If you look on the second page of that, there's a paragraph that begins, you changed the subject in that -- "You changed the subject at this point in the conversation."  Do you see that?

A.   Yes.

Q.   And it records some discussion you had about install schedule and Vic, a person named Vic. Do you see that?

A.   Yes.

Q.   Who is Vic?

A.   Vic was the regional director for the West Coast.

Q.   What's his last name?

A.   He's no longer with the company.

MS. KAPPELMAN:  If you don't remember, you don't remember.

A.   Davis, I think.  Vic Davis.

Q.   All right.  In the next to last paragraph, it says, "I then stated you were changing the subject, that this conversation was about how I needed you to not cut me out of my team."

Is that correct, that at one point she thought -- she brought up this issue of bypassing her and that you had changed the subject?  Or she

Page 26

And also, I told her that, you know, we needed to have a sit-down with our talent management team to determine what the next steps were.

This was -- she completely took me off guard by her -- the way that she, again, I believe, in my view, attacked me and accused me of something that was, quite frankly, not the case.  And I --

(Multiple parties speaking.)

Q.   Sorry.  Go ahead if you need to.

Did you ever reduce to writing any criticisms of her from you or others in a communication to her?

A.   So I was having almost daily conversations with my supervisor at the time, just explaining some of the challenges.  Matt was also getting calls from other leaders, including the regional directors, on her behavior.

So I was consulting with Matt quite frequently.  We had some communication through email back and forth, just about, you know, getting another person on the team to help with the workload, which I felt could help Emily take some of the stress off and some of the pressure.  And that was really the goal of expanding the team and the organization to align with the operation, because

Page 28

A.   So Emily was berating.  She was turning red.  She berated me.  She was completely disrespectful and out of line.  I was completely shocked with her approach and accusations.  I sat back, quietly listened to her, you know, accuse me of keeping her uninformed.  That's when I interjected.

She has not been forthcoming in terms of sharing information.  She's not been collaborative. She's been condescending to many of her peers in many other interactions she had.

I was really quite shocked at her, how she basically came and attacked me, that I was a little bit taken aback and had to sit and listen to what she was saying before I interjected and brought up a couple of things.  You know, one of them being feedback was not positive.  Not the first time I had that discussion with her.  I had been coaching her for a few weeks.

And for the record, I only worked with Emily for seven weeks, so it's a very short amount of time that I actually had interaction with her. But I had a lot of challenges with her interactions with others.  I brought that up.

Page 27

they're split into regions.  So we were following suit with that approach.

I thought that would help Emily, but she didn't really take very well to the criticisms and to the coaching, even though we would have many discussions around how she can approach things differently.  And she would agree with me, and she would go and do, quite often, the opposite.

MR. GOODMAN:  Object to responsiveness.

BY MR. GOODMAN:

Q.   My question was whether you had reduced to writing, in any communication with her, your criticisms of her or the criticisms of others.

MS. KAPPELMAN:  Just so you know, Kory, when Bob doesn't like your response, he says, "Object to responsiveness," which means nothing. You'll be able to testify at trial to what you believe and what you know.

MR. GOODMAN:  The judge can decide whether an answer you gave -- if we only use your deposition, the judge can decide whether the jury hears your --

MS. KAPPELMAN:  We're not going to just use his deposition.  Kory's going to be there

Page 29

1 to testify about every decision that was made, and
2 all of his deposition testimony will come in.
3        So that's why he does that, Kory. But
4 feel free to keep answering and telling your truth.
5        MR. GOODMAN: Object to sidebar and
6 coaching.
7    BY MR. GOODMAN:
8    Q.   In any case, did you ever reduce to writing
9 in a communication with Emily your criticisms of
10 her?
11   A.   There could have been coaching
12 opportunities that were back and forth between her
13 and I --
14   Q.   You don't remember --
15   A.   -- which is no different than --
16       MS. KAPPELMAN: Let him finish his
17 answer.
18       Which is no different than what, Kory?
19   A.   It's no different than if someone --
20 another team member on the team was having some
21 challenges with people, with interactions, that I
22 would offer the same level of coaching and
23 understanding and support.
24   Q.   I understand that. But did you put in
25 writing your criticisms of Emily in a communication

Page 30

1 with her at any time?
2    A.   Again, I think what I -- if I put something
3 in writing, it was, you know, in her best interest.
4 And I look at that more as a coaching opportunity.
5    Q.   And it was -- if you put something in
6 writing to her, it was the same kind of thing you
7 would do for any employee; correct?
8    A.   If the employee was having the same number
9 of challenges with interactions with other folks,
10 absolutely.
11   Q.   Okay. Did you, in a written communication
12 with anybody besides Emily, put your own criticisms
13 of Emily?
14   A.   There was dialogue verbally and in --
15 between correspondence or email with myself and Matt
16 that could be construed as criticisms.
17   Q.   Okay.
18   A.   I'm sure there were. Every day was
19 bringing new challenges. And, again, I would spend
20 time having the discussion and the dialogue with
21 Emily. She tended to be responsive, and she was
22 understanding of the circumstances. And we would
23 typically align and agree on next steps and path
24 forward, and then she would often do the opposite of
25 what we would discuss.

Page 31

1    Q.   All right. And you understood that she was
2 under stress with all the work at the time? You've
3 already indicated that; right?
4    A.   I think everybody is under stress when
5 you're delivering multimillion-dollar projects that
6 are behind schedule. It's just part of the nature
7 of the business.
8    Q.   And you also understood, as of mid-August,
9 that she was also under stress because of conduct of
10 which she complained in her August 14th formal
11 complaint; correct?
12   A.   My involvement in that, the complaint, was
13 to discuss with Matt the need to escalate it to
14 talent management. They took the case and did the
15 investigation. I was completely uninvolved in that.
16       (Multiple parties speaking.)
17       MS. KAPPELMAN: Let him finish,
18 please, Bob, really, before you interrupt him.
19       Go ahead, Kory.
20   A.   I was just going to say that I didn't know
21 when the case would end. I didn't know the process.
22 I wasn't asking the questions. I was dealing with
23 the workload that was in front of us.
24       And Emily seemed to be focused on work. I
25 didn't get the sense that the case was a major

Page 32

1 distraction for her.
2    Q.   Well, did you -- did you read the 14-page
3 summary of events?
4    A.   14-page summary of --
5    Q.   Did you read the complaint that's --
6 chronology of events that constitutes the formal
7 complaint?
8    A.   Yes.
9    Q.   Okay. And the -- it focused, to some
10 degree, on the unconsented touching by Mr. McDole
11 and other conduct of Mr. McDole; correct?
12   A.   I read that, yes.
13   Q.   And reading it, you understood that there
14 was stress from that direction in Emily's work life;
15 correct?
16   A.   I can only surmise.
17   Q.   Okay. I mean, if that was happening to
18 you, if you had been touched without your consent
19 or, in your view, bullied by another employee, that
20 would put you under some stress, would it not?
21   A.   If that were, in fact, true, then I would
22 agree with that.
23   Q.   So you think she -- are you saying that you
24 think Emily was lying about Mr. McDole touching her
25 without her consent on the three occasions that were

Page 33

1 highlighted in that memo?
2    A.   I never said that, and I have no opinion of
3 it, other than to escalate that and take her word
4 that the accusations happened.  And it was up to the
5 talent management team to investigate it fully.
6    Q.   Do you think -- do you think a woman has to
7 have a witness to an incident of unconsented
8 touching or the allegation of unconsented touching
9 to even be regarded as being true?
10    A.   I don't.
11    Q.   Okay.  There's a reference, in looking at
12 the last paragraph of this 1265 document, Exhibit 1;
13 where you ask her to mend things with Frances, the
14 employee named Frances.
15    A.   Yeah.  She had an altercation with Frances
16 dating back to August the 27th.
17         (Multiple parties speaking.)
18         MS. KAPPELMAN:  Let him finish,
19 please, Bob.  Let him finish his answer.  Don't
20 interrupt him.
21         Go ahead, Kory.
22    A.   Yeah.  So there was a -- there was a
23 confrontation.  I think there was a little bit of
24 history between the two ladies dating back sometime
25 prior.  There was not a lot of, you know,

Page 34

1 collaboration.  And apparently Emily said or did
2 something to upset Frances, that she escalated that
3 to her manager who called Matt and then Matt called
4 myself.
5         I spoke to Emily and asked that she
6 politely reach out and talk to Frances, apologize
7 for upsetting her, that it was unintentional.
8         Emily was a little bit frustrated with
9 Frances because she hadn't responded to her in the
10 past at other meetings.
11         Ultimately, Emily agreed that was the right
12 thing to do.  And then I saw some Slack messages
13 shortly after where she went after Frances and
14 basically said, "How dare you talk to my manager."
15 And that was completely unprofessional.
16         So very different outcome versus what we
17 discussed as far as how to handle that moving
18 forward.
19    Q.   After you got this email, did you make any
20 effort to verify the truth of the statement, "This
21 is not the case, and Frances and I have a good
22 relationship," as of this date in September?
23    A.   Sorry.  Are you asking me a question
24 specific to that paragraph?
25    Q.   There's parenthetical language in the next

Page 35

1 to last paragraph that says, "This is not the case,
2 and Frances and I have a good working relationship."
3         Did you make any effort with Frances to
4 verify that Emily was correct that any mending of --
5 mending of the relationship had occurred and that
6 she and Emily then had a good working relationship?
7    A.   At that point, we moved on.  It was an
8 incident.  I think ultimately in the end there
9 was -- Frances provided some form of commentary to
10 Matt at his request in terms of their interactions,
11 so that would have been provided to the talent
12 management team.
13    Q.   Did you make any effort individually or, to
14 your knowledge, Mr. Witte make any effort to verify
15 the statement, "This is not the case, and Frances
16 and I have a good working relationship," as of the
17 date of this email?
18    A.   Well, I saw the Slack messages, and that's
19 contrary to what Emily had written.
20    Q.   And the email and the Slack messages were
21 dated what day?
22    A.   This would have been August the 27th.
23    Q.   Okay.  And this email to you was dated
24 September 17th, so that was three weeks later.
25         So, again, did you make any effort to

Page 36

1 verify that three weeks later she had spoken to
2 Ms. -- she had spoken to Frances and they had a good
3 working relationship?  Did you try to verify that
4 was true?
5    A.   So there were a number of complaints from
6 other leaders that, quite honestly, kept me very
7 busy, that I didn't have to go back and circle with
8 Frances because there was a crisis almost at every
9 turn, it seemed.
10    Q.   So the short answer is no; right?  You
11 didn't go back to Frances and try to verify the
12 status of the relationship as of September 17th;
13 correct?
14    A.   Yeah.  So from my understanding, Frances
15 had a problem with Emily.
16    Q.   Sir, you did not go back after
17 September 17th and try to verify the truth of the
18 statement by Ms. Forsythe that she had mended things
19 and that they had a good working relationship as of
20 September 17th; correct?
21    A.   After -- this was the last time I spoke to
22 Emily, September 17th.
23    Q.   And you didn't speak to Frances about her
24 statement in the email after September 17th either,
25 did you?

Page 37

10 (Pages 34 - 37)

1    A.   Matt spoke to Frances.
2    Q.   And so was he saying that -- did he tell
3 you that he was trying to verify the truth of
4 Emily's statement in this email about Frances?
5    A.   Matt was collecting information from other
6 leaders that had similar challenges with their
7 interactions.
8    Q.   Is the short answer then no, that he didn't
9 tell you that that's what he was trying to do by
10 talking to her?
11        MS. KAPPELMAN:  Object to the form of
12 the question.
13            Kory, go ahead and answer.
14    A.   He didn't say specifically there.  But
15 there were several other peers and senior leaders
16 that had provided statements that are consistent
17 with the unprofessional, condescending,
18 unprofessional, you know, approach Emily has taken.
19    Q.   If you know, how many of the statements
20 you're referring to were made without a request
21 being made for those written statements to be
22 prepared?
23    A.   I'm not quite sure I understand the
24 question, other than the fact that some of the
25 leaders were already providing feedback to Matt and
Page 38

1 I.
2    Q.   Whose written statements are you talking
3 about?
4    A.   There was written statements from Frances
5 herself; Arron Velarde, who's a site director; his
6 boss, Victor Davis; Brian McCormick, who's a
7 regional director; Melissa Malik, who's a regional
8 director.
9            There could be some more, but that's the
10 few off the top of my head.
11    Q.   Were all of those requested to be prepared
12 either requested by you or Mr. Witte?
13    A.   Some of those were unsolicited.
14    Q.   Which of those were unsolicited?
15    A.   Arron's was unsolicited.  Mel had provided
16 feedback on several occasions prior.  I believe
17 Brian's was requested by Matt.  And Victor Davis's
18 was requested by Matt.
19    Q.   And who is Mel?
20    A.   Melissa Malik is one of the regional
21 directors of the operation.
22    Q.   Did you have a prior work relationship with
23 Mr. Velarde?
24    A.   No.
25    Q.   So Mr. Velarde worked at Tesla, but he
Page 39

1 didn't work directly with you.  Is that what you're
2 saying?
3    A.   I did not know Arron Velarde until I was
4 working at Wayfair.
5    Q.   Is there anybody who you worked with at
6 Tesla who was also working at Wayfair after you got
7 to Wayfair?
8    A.   No.
9    Q.   So no former coemployee of Tesla worked
10 with you after you came to Wayfair?  Just a former
11 employee -- just a former coemployee of Walmart?
12        MS. KAPPELMAN:  Asked and answered.
13            You can answer it a third time.
14    A.   No.
15    Q.   Did you tell Emily, as she states you
16 stated, "You don't think I'm a good fit for the
17 team" -- (Indecipherable).
18        MS. KAPPELMAN:  You broke up, Bob.
19            But I think he's trying to ask you
20 about the last two sentences of that big paragraph,
21 "You stated that you don't think I'm a good fit,"
22 and forward.  Did you tell her that?
23    A.   Yeah.  I don't recall specifically saying
24 "good fit."
25            What I recall saying was that -- very
Page 40

1 pointedly that I can't do this any longer, like
2 continue to go on like this.  "This is not working,"
3 is what I specifically said to her.  And I said,
4 "The next steps are we're going to have a
5 sit-down -- a formal sit-down with the talent
6 management team to determine next steps."  That is
7 what I said.
8    Q.   And by talent management team, next steps,
9 you meant whether or not she was terminated?
10    A.   No.  Definitely not.  I can't make that
11 decision.  That is a talent management decision
12 based on the facts that, you know, are presented to
13 them.
14    Q.   What were the possible next steps, sir?
15    A.   Possible next steps were to review the
16 documentation on the behaviors that I had been
17 documenting, as well as what Matt had documented, to
18 determine the next steps.  And the next steps would
19 be ultimately reviewed and decided upon with the
20 talent management team.
21    Q.   Yeah.  But that -- that's just talking
22 about talking.  What about actual steps?  What were
23 the steps that you were contemplating?
24    A.   I can't take steps against anyone.  That is
25 a talent management --
Page 41

11 (Pages 38 - 41)

1    Q.   What were the steps --
2         MS. KAPPELMAN:   You've got to let him
3  finish his answer, Bob.  Seriously, I'm going to
4  enforce this because the guy has a right to finish
5  his testimony and his answer.
6         So, Kory, you can't what?  You started
7  to say "I can't take."
8    A.   I can't -- I mean, the next steps were to
9  have a sit-down to review the documented
10  interactions that were, you know, problematic.  That
11  was the next steps.
12        Beyond that was the responsibility and
13  would be determined by the talent management team.
14  If they wanted to take any action from that point,
15  that is on the talent team.
16        Unfortunately, we didn't get to that point
17  before Emily resigned the following week.
18        MR. GOODMAN:   Object to
19  responsiveness.
20   BY MR. GOODMAN:
21   Q.   You were not in any meeting at which she
22  allegedly resigned, were you?
23   A.   I was informed after the fact.
24   Q.   Okay.  And what date were you informed?
25   A.   I believe it was Tuesday morning, which

Page 42

1  would have been the 24th or the 25th.
2    Q.   What date were you told that she, quote,
3  resigned?
4    A.   I believe the 24th or the 25th of
5  September.  It was the week after the last
6  interaction.
7    Q.   She took a PTO day off on the 20th;
8  correct?
9    A.   Yes.  I recall that, yes.
10   Q.   And she gave you notice of that; correct?
11   A.   Correct.
12   Q.   And then she came -- she was at work on the
13  23rd, that Monday; correct?
14   A.   I was not in Kentucky.  I recall that she
15  was traveling to Atlanta.
16   Q.   And she was going to travel to Atlanta on
17  Tuesday; correct?
18   A.   Yes.  I believe that's correct, yup.
19   Q.   And she was told not to go to Atlanta;
20  right?
21   A.   Not by myself.
22   Q.   By somebody; correct?  Somebody said, "Do
23  not go to Atlanta; you're fired"?
24   A.   I believe so.
25        I can't say that, no.  I was not involved

Page 43

1  in that discussion.
2    Q.   To be clear, you were told that -- you know
3  that somebody told her not to go to Atlanta;
4  correct?
5    A.   I was informed after -- I believe it was
6  Tuesday morning -- that she's no longer with the
7  company and that she resigned.
8    Q.   Who informed you of that?
9    A.   That would have been talent management.
10   Q.   Okay.  Who in talent management?
11   A.   That would have been Mike Behrendt.
12        (Clarification requested by the court
13  reporter.)
14        MR. GOODMAN:   B-E-H-R-E-N-D-T.
15   BY MR. GOODMAN:
16   Q.   And do you know somebody named Aaron
17  Berland?
18   A.   Sorry.  What was the name?
19   Q.   Aaron.  First name A-A-R-O-N.  Last name
20  begins with a B.  Did you know anybody fitting that
21  description at Tesla?
22   A.   No.
23   Q.   And, again, nobody who ever worked at Tesla
24  also worked at Wayfair when you were there?
25        MS. KAPPELMAN:   Object to the form of

Page 44

1  the question.
2         You can answer, Kory.
3    A.   I was at Tesla for six or seven months in
4  2016.  No, I was not -- I didn't know anyone at
5  Wayfair that had worked at Tesla when I was at
6  Tesla.
7    Q.   Were you friends at Wayfair with anybody
8  named Arron?
9    A.   At Tesla?
10   Q.   No.  At Wayfair.  Is there anybody in your
11  area named -- I think it's A-R-R-O-N, who you are
12  friendly with at Wayfair?
13   A.   Yeah.  Well, the only Arron is Arron
14  Velarde that I knew when I was working at Wayfair.
15   Q.   Okay.  And had you ever worked with him
16  before you got to Wayfair?
17        MS. KAPPELMAN:   Asked and answered
18  four times.
19        You can answer again, Kory.
20   A.   No.
21   Q.   Did you -- were you friendly with Arron
22  outside work at Wayfair?
23   A.   Sorry.  Can you repeat that question?
24   Q.   Were you friendly with him outside work at
25  Wayfair?

Page 45

1    A.   No.  I had never met him in person before
2 Emily resigned.
3    Q.   Again, you've never seen a resignation
4 letter; correct?
5    A.   I'm going by what I was informed of.
6    Q.   And you were not party to any conversation
7 involving any resignation; correct?
8    A.   Only after the fact.
9    Q.   Have you had any discrimination and
10 harassment retaliation training at Wayfair?
11    A.   Yes.
12    Q.   What do you understand -- the
13 discrimination -- sex discrimination, does that
14 encompass expressing a preference for male employees
15 over female employees?
16        MS. KAPPELMAN:  Object to the form of
17 the question.  You're asking him to come to a legal
18 conclusion.
19        Are you asking him what the training
20 says?
21 BY MR. GOODMAN:
22    Q.   Everything is based on the training, sir.
23        MS. KAPPELMAN:  You're asking him a
24 legal conclusion.  So you can ask him what the
25 training says or what he understands.
Page 46

1        BY MR. GOODMAN:
2    Q.   Based on the training, is it your
3 understanding that discrimination encompasses -- sex
4 discrimination encompasses expressing preference to
5 a female over male employee?
6        MS. KAPPELMAN:  Female over male, or
7 male over female?
8        MR. GOODMAN:  Male over female.
9 Excuse me.
10    A.   Sexual harassment training doesn't -- it
11 doesn't discuss, you know, who you hire.  It doesn't
12 discuss whether we hire males or females.
13    Q.   It doesn't discuss -- it doesn't address --
14 also address sex discrimination, only sexual
15 harassment?
16    A.   The purpose of the training is sexual
17 harassment.
18    Q.   Have you ever gotten any sex discrimination
19 or other discrimination training at Wayfair?
20    A.   Just sexual harassment training.
21    Q.   How much interaction did you have with
22 Emily in August 2019?
23        MS. KAPPELMAN:  Object to the form of
24 the question.
25        If you can quantify it, Kory.
Page 47

1    A.   You have to repeat the question.  I only
2 caught "August 19th."
3    Q.   How many conversations did you have with
4 Emily in August 2019?
5    A.   I don't understand your question.  I had
6 conversations with people all the time.  So if
7 you're looking for a specific number, I don't know.
8 I can't answer that.
9    Q.   I'm sorry.  Did you say the Velarde
10 complaint was solicited -- requested to be put in
11 writing?
12    A.   Sorry, Bob.  I didn't --
13    Q.   Did you or Mr. Witte request that
14 Mr. Velarde put any complaint in writing?
15    A.   I did not.
16        Arron had reached out to me, though, in --
17 a couple of times.  He had called me a couple of
18 times.  I had touched base with him.  And he had
19 sent some emails as well, just in terms of his
20 interactions with Emily, which were not positive.
21    Q.   Okay.  But you don't recall asking -- apart
22 from Mr. Witte, you don't recall asking Mr. Velarde
23 to put anything in writing; correct?
24    A.   I don't recall.  I know he had sent me --
25 reached out to me directly, asking to not involve
Page 48

1 Emily in projects in his building, which -- yes.
2    Q.   Do you know if Mr. Witte requested him to
3 put anything in writing?
4    A.   I don't know.  I can't answer for Matt.
5    Q.   Had anybody -- did either you or Mr. Witte
6 request a woman named Christa Cabriales to put a
7 complaint in writing?
8    A.   I've never heard that name before in my
9 life.
10    Q.   What about a person named Jonathan Marcoux,
11 M-A-R-C-O-U-X?  Did either you or Mr. Witte request
12 Mr. Marcoux to put something in writing?
13    A.   I don't know Mr. Marcoux.  Never met him,
14 never seen the name before.
15    Q.   Did you discuss the proof of a written
16 complaint by Arron Velarde with Mr. Witte?
17    A.   I had discussions with Arron regarding his
18 interactions with Emily.
19        MR. GOODMAN:  Objection to
20 responsiveness.
21        BY MR. GOODMAN:
22    Q.   Did you ever discuss a written complaint
23 with him or with Mr. Witte?
24    A.   I discussed with both, yes.
25    Q.   His written complaint?
Page 49

13 (Pages 46 - 49)

1    A.   His -- no, not the final formal complaint
2  that was submitted.  But complaints in general, yes.
3    Q.   Did you make any effort to determine the
4  truthfulness of the -- what you're calling the final
5  written complaint by Mr. Velarde?
6    A.   Yes, absolutely.
7    Q.   How did you -- how did you try to verify
8  the truthfulness of his communication?
9    A.   I spoke very openly with Kelly Brieg, who's
10 Emily's project manager that was managing a sorter
11 project in Lathrop, and they spoke to Emily directly
12 about her unwillingness to share project schedules
13 with our operations partners.
14       (Clarification requested by the court
15 reporter.)
16       MS. KAPPELMAN:  How do you spell that,
17 Kory?
18       THE WITNESS:  It B like Bravo, Romeo,
19 India, echo, gulf.
20       MS. KAPPELMAN:  B-R-I-E-G.
21       THE WITNESS:  Correct.
22   BY MR. GOODMAN:
23    Q.   Did you talk with Mr. Velarde about Davina?
24 I'm forgetting her last name right now.  Davina.
25 Anybody named Davina?

1    A.   Jeff Neuharth is a senior project manager
2  that was reporting to Emily.
3    Q.   I apologize.
4       Did you ever talk with Jeff Neuharth about
5  Emily?
6    A.   No.  Not that I recall.
7    Q.   Did you and Mr. Witte request that he put
8  any statement in writing?
9    A.   I did not.
10    Q.   Who is Melissa Malik?
11    A.   Melissa Malik is an operations regional
12 director.
13    Q.   Did you ever communicate with Emily
14 concerning Ms. Malik?
15    A.   I spoke to Emily about Melissa, and I've
16 spoken to Melissa about Emily.
17    Q.   Did you ever talk with Allan Lyall about
18 Emily?
19    A.   Yes.
20    Q.   What was the subject of any conversation
21 with Emily about that?
22    A.   It was around schedules and not providing
23 dates, firm dates, and also not supporting the daily
24 peak readiness calls.  Emily had decided that she
25 was not going to attend the meetings because it was

1    A.   I did not -- Davina was an employee, an
2  associate before I started at Wayfair.
3    Q.   Did Mr. Velarde's statement refer to Davina
4  in any way?
5    A.   His formal statement may have had Davina in
6  there.
7    Q.   And you're not aware of anybody making an
8  effort to verify the truthfulness of his statement
9  to the extent it referred to Davina; correct?
10    A.   Correct, yeah.
11    Q.   Do you know a person name Jeff Neuharth?
12    A.   Yes.  Jeff is her -- one of her senior
13 project managers.  He's still working with
14 Walmart -- I'm sorry, with Wayfair, and he's on our
15 team today.
16    Q.   Did you and Mr. Witte ever discuss a woman
17 name Christa Cabriales, C-A-B-R-I-A-L-E-S?
18       MS. KAPPELMAN:  Asked and answered.
19       You can answer again, Kory.
20    A.   I've never heard of her name before until
21 now, so the answer is no.
22    Q.   Who is Jeff Neuharth?
23       MS. KAPPELMAN:  We just went over
24 this.
25       But you can go over it again, Kory.

1  a waste of her time.
2    Q.   A meeting with who?
3    A.   This was the daily readiness calls with
4  Melissa.  I asked Emily to -- this was early on.
5  This was August the 27th, going back to the 27th.  I
6  asked Emily to participate in daily scheduled calls
7  to provide updates to her operations partners, and
8  she pretty much refused to attend the meetings.  She
9  deleted the -- the series of meetings.  And when she
10 finally got on three days later after Mel had called
11 Matt and myself and complained about not having
12 support, Emily basically told Melissa that she
13 doesn't have time for the meeting, even though I had
14 asked her three times to attend.
15    Q.   Who is Victor Davis?
16    A.   Victor Davis was the West Coast regional
17 director of operations.
18    Q.   Do you know whether Victor Davis had any
19 prior dealings with Mr. McDole?
20    A.   Well, Victor Davis was the regional
21 director for the West Coast, Arron Velarde reported
22 to Victor, and Mike McDole reported to Arron.
23       MR. GOODMAN:  Object to
24 unresponsiveness.
25   BY MR. GOODMAN:

**Page 54**

1 Q. Was there any prior -- were there any prior
2 dealings between McDole and Victor Davis, if you
3 know?
4 A. I'm not aware, no.
5 Again, my history goes back seven weeks
6 total of interaction.
7 Q. Was Mr. Velarde ever on paternity leave
8 when he was at Wayfair and you were also at Wayfair?
9 A. Yes.
10 Q. Do you know how many face-to-face dealings
11 Ms. Forsythe had with Mr. Velarde before he went on
12 paternity leave?
13 A. I did not know Arron before he went on
14 paternity leave.
15 Q. So you don't know the answer to my
16 question, necessarily?
17 MS. KAPPELMAN: No. I think it's
18 pretty clear that he doesn't know how many face-to-
19 face meetings Mr. Velarde had with Ms. Forsythe
20 before he went on paternity leave because he's never
21 met Mr. Velarde and he wasn't involved in the
22 meetings.
23 Q. Do you believe that his paternity leave was
24 before you started?
25 A. When I first knew of Arron Velarde, it was

**Page 55**

1 regarding the sorter project and Emily not sharing
2 the schedule with his team. He was on paternity
3 when I got involved with trying to understand the
4 deliverables for Lathrop. That's when I was
5 introduced to Arron for the first time. And he was
6 off on maternity leave -- paternity leave, sorry.
7 And he was still engaging via email and phone calls,
8 even though he was off, technically.
9 Q. And he didn't tell you what his dealings
10 with Emily had been before he went on leave?
11 A. I did not know him before he went on leave.
12 Q. All right. But he didn't tell you about
13 what the dealings with her had been before he went
14 on leave in your conversation with him; is that
15 correct?
16 A. He had described some interactions with
17 Emily that were not favorable: that she was
18 condescending and noncooperative, not collaborative,
19 not sharing information, intentionally withholding
20 information. That is the -- one of my first
21 dealings with Arron was him describing his
22 interactions with Emily.
23 MR. GOODMAN: Object to
24 responsiveness.
25 BY MR. GOODMAN:

**Page 56**

1 Q. Did he tell you how many dealings he had,
2 how many face-to-face interactions he had with Emily
3 before he went on leave?
4 A. He did not.
5 Q. Did you ever talk with Brian McCormick
6 about Emily?
7 A. Only when Matt had requested feedback on
8 Emily from Brian.
9 Q. So Matt requested him to give a statement?
10 A. Yes.
11 Q. Have you told us about -- do I recall you
12 only asked one person to give a statement and that
13 any other statements that were requested were
14 requested by Mr. Witte?
15 A. I was not requesting people to provide
16 statements other than what I provided myself and was
17 documenting myself. I did not solicit people for
18 feedback.
19 Q. Okay. Did Emily ever address with you by
20 email her dealings with Ms. Thunder, which I've told
21 you she was having communicating?
22 MS. KAPPELMAN: Object to the form of
23 the question.
24 You can answer if you understand it.
25 A. I'm not quite sure I understand, like,

**Page 57**

1 the --
2 Q. Did Emily ever describe in writing
3 difficulty she was having communicating with
4 Ms. Thunder?
5 A. No. Not to me, no.
6 Q. Ms. Forsythe recalls that in your first
7 conversation with her after she told --
8 (Indecipherable).
9 (Clarification requested by the court
10 reporter.)
11 BY MR. GOODMAN:
12 Q. Ms. Forsythe has recollected that you asked
13 her what she made and then made a remark about
14 people at Walmart that might be interested in coming
15 over to Wayfair that were not going to work for less
16 than 135. "I only have your L6 spot left to figure
17 this out."
18 MS. KAPPELMAN: "I only have your L6
19 spot to figure this out," is what he said.
20 BY MR. GOODMAN:
21 Q. Did you say that to her, or words to that
22 effect?
23 A. No. Absolutely not. And she's an L5. I
24 was an L6.
25 Q. You were what?

1    A.   I am an L6.  I was hired as an L6.
2    Q.   Did you say that about an L5 position?
3    A.   She was an L5.  I wouldn't ask her for what
4 she makes when I have access to that information in
5 Workday.
6    Q.   And was this -- the first day you spoke
7 with her, how close was that to the first day you
8 actually worked at Wayfair?  Or was it the first
9 day?
10          MS. KAPPELMAN:  Asked and answered.
11   A.   It was one week after.  I met her one week
12 to the day after.
13   Q.   Had you looked at Workday to look up
14 people's salaries during any part of the prior week?
15   A.   No.
16   Q.   I'm putting up a document that starts with
17 Wayfair 1275, and it identifies you as a
18 contributor.  Did you help write that?
19   A.   Yes.
20   Q.   And why did you help write that?
21   A.   I was documenting the interactions, as I
22 stated, because we were going to have a sit-down
23 with the talent management team to determine what
24 the next steps were to address the behaviors and the
25 performance issues.

Page 58

1    Q.   Okay.  And this is -- when was this
2 written?
3    A.   This was written around the week of the
4 16th.
5    Q.   September 16th; right?
6    A.   Yes.
7          MR. GOODMAN:  I'll make this
8 Exhibit 2.  This is 1275 through 1289.
9          (McKnight Exhibit 2, document Bates-
10 stamped Wayfair 1275 through 1289, marked for
11 identification.)
12   BY MR. GOODMAN:
13   Q.   Did anybody request you to put this thing
14 together?
15   A.   I was documenting the interactions.
16   Q.   Did anybody request you and Mr. Witte to
17 create this document?
18   A.   No.  This was something that Matt and I
19 were putting together as the performance and the
20 behaviors were becoming, quite honestly, more
21 difficult to -- every day it was a big challenge for
22 the team, and we needed to have a formal sit-down to
23 decide what was best for Emily.
24   Q.   When was the first day you say you started
25 collecting this information?

Page 59

1    A.   This was -- I believe I started to write
2 this around the 16th of September, but I had
3 documented --
4    Q.   The first day that --
5          MS. KAPPELMAN:  Please don't interrupt
6 Kory.  I really would like him to finish his
7 complete answer.
8    BY MR. GOODMAN:
9    Q.   Are you finished?
10          MS. KAPPELMAN:  You said you had
11 documented it, and then you got cut off.
12   A.   These were documented interactions.  I
13 believe I started to collect all of this information
14 the week of the 16th.
15   Q.   But the information you record on the first
16 page of this exhibit is dated back to August 27th;
17 is that correct?
18   A.   It's correct that the date of the incident
19 was August 27th.  But that -- all of the information
20 was there.  It was a matter of just collecting
21 information.
22   Q.   Right.  So you were collecting -- so you
23 were accumulating information between the 27th and
24 the week of the 16th; correct?
25   A.   The system is a repository of information.

Page 60

1 It collects the data by its very nature.  I was
2 simply collecting some pieces of this that were
3 demonstrating the unprofessional and condescending
4 behavior, and that's what the purpose of this
5 document was.  It was a collection of interactions.
6    Q.   And the information that you were
7 collecting started -- the first entry -- the first
8 such piece of information was as of August 27th;
9 correct?
10   A.   That's when I saw the first real, you know,
11 warning signs is what I stated.
12   Q.   And that was at -- and that was about 13
13 days after Emily had made her formal complaint of
14 sexual harassment and other misconduct by
15 Mr. McDole; correct?
16   A.   That is correct.
17   Q.   Did Mr. McDole ever move his residence to
18 California from Texas?
19   A.   I don't know.  I didn't really know Mike
20 McDole at all.
21   Q.   Do you know if he ever got what I gather is
22 called a "relocation bonus" at Wayfair?
23   A.   I don't know.  That was before my time.
24   Q.   Before you first met with Emily -- strike
25 that.

Page 61

16 (Pages 58 - 61)

1    On August 17th when you had that
2 conversation with Emily where you say she drove to a
3 facility where you were at, Mr. Witte had informed
4 you of her sexual harassment complaint; correct?
5    A.   Are you referring to September 17th?  I
6 think you said August the 17th.
7    Q.   Let me restate that, then.
8         Yeah, September 17th you knew about the
9 sexual harassment complaint, that it was made in
10 August; correct?
11   A.   I did, yes.
12   Q.   And when did you first know that?
13   A.   Matt and I were traveling.  I believe it
14 was the third week I had joined Wayfair.  We were
15 traveling in the UK together at another site.  Matt
16 had shared a document with me that Emily had
17 prepared.  It was really, really late, probably
18 after midnight, before I first read it.  And when we
19 met in the morning, we both agreed that we needed to
20 escalate this to talent management together.  And so
21 we scheduled that appointment that morning, and we
22 had a discussion with them late -- very late our
23 time in the UK.
24   Q.   And sometime in August 2019 after that
25 occurred, you told Emily that what was described as
Page 62

1    MS. KAPPELMAN:  Asked and answered.
2         You and answer again, Kory.
3    A.   I completely stayed out of the topic.  It
4 was not in my hands.  It was in the hands of the
5 talent management team.  And my focus was on
6 delivering the projects that were in front of us.
7         And Emily did not appear to be distracted
8 by the investigation.  And I know for a fact that
9 she had thanked Matt for escalating it to talent
10 management.
11        MR. GOODMAN:  Okay.  Object to
12 responsiveness.
13   BY MR. GOODMAN:
14   Q.   So you're saying -- what I'm hearing is
15 that sometime between September 17th -- excuse me --
16 August 14th and August 27th, you think that
17 Ms. Forsythe began to conduct herself in a way that
18 was objectionable?
19        MS. KAPPELMAN:  Object to the form of
20 the question.
21        You can answer, Kory.
22   A.   Yes.  So that would have been my third
23 week, roughly -- third to fourth week with the
24 company is when I started to see some challenges
25 with her just taking some simple direction.
Page 64

1 having been done by Mr. McDole was either disgusting
2 or despicable; correct?
3    A.   That is not correct.
4    Q.   Did you tell Emily that you had any -- did
5 you express any opinion of the alleged sexual
6 harassment -- excuse me -- unconsented touching and
7 bullying by Mr. McDole?
8    A.   I did not.  I never had any discussion with
9 Emily about the accusations.  That was only with the
10 talent management team.
11   Q.   So if she said that you said that it was
12 disgusting or despicable, intolerable, you would
13 deny that?  You deny that; correct?
14   A.   That's correct.
15   Q.   Did you think it was disgusting,
16 despicable, or inappropriate, what was described
17 as -- the conduct of his that was described?
18   A.   I thought it was completely inappropriate
19 if it were absolutely true, and that's why we
20 escalated it to talent as soon as we found out.  We
21 did not wait, even though we were overseas.
22   Q.   But you never expressed any sympathy to her
23 about the conduct by telling her that you thought it
24 was inappropriate or disgusting or despicable;
25 correct?
Page 63

1    Q.   Are you aware of any -- anything that --
2 anything in her life, personal or work life, after
3 she made her formal complaint, sex discrimination
4 and sexual harassment, to conduct herself sometime
5 over the course of the next 12 days prior to
6 August 27th in a different way than she had before?
7         MS. KAPPELMAN:  I'm going to object to
8 the question.  I'm not even sure I understand what
9 it is.  It meandered for a while.
10        So what is it you're asking, Bob?
11   BY MR. GOODMAN:
12   Q.   Do you know anything in Emily's personal
13 life or work life that would have led to her
14 conducting herself in a different way after
15 August 14th but prior to August 27th when you say
16 you started taking notes on her?
17   A.   So the system was obviously documenting
18 interactions.  Again, I went back and collected
19 information in September.  The intent was not to
20 document interactions.  Those were, by default,
21 systematically available.
22        I did not see any noticeable difference in
23 Emily's behavior after the fact.  I believe even
24 three-plus weeks in, she sent me a text saying how
25 happy she was that I was on the team, and she felt a
Page 65

17 (Pages 62 - 65)

1 great amount of stress relief. And I did provide
2 that to Lynn.
3         MR. GOODMAN: Object to
4 responsiveness.
5    BY MR. GOODMAN:
6    Q.   Are you aware of anything in her personal
7 or work life which would have led her to engage in
8 conduct subject to criticism in late -- beginning in
9 late August 2019 of a kind she had not previously
10 perceived?
11        (Clarification requested by the court
12 reporter.)
13    BY MR. GOODMAN:
14    Q.   Was there anything in her personal or work
15 life that you know that happened between August 14th
16 and August 27th that would have led to her suddenly
17 being criticized for her manner of communication?
18        MS. KAPPELMAN: Object to the form.
19 She wasn't suddenly criticized.
20        But go ahead, Kory.
21    BY MR. GOODMAN:
22    Q.   If you know.
23    A.   Yeah. I saw no noticeable change in how
24 Emily was, you know, basically conducting business
25 until we had an opportunity to start participating

Page 66

1 in daily calls and she just refused to follow the
2 simple direction and request to participate in the
3 meetings after three repeated attempts to have her
4 respond to that.
5    Q.   And when was that, sir?
6    A.   August the 27th.
7    Q.   Okay. Again, my question is was there
8 anything that you're aware of -- and the answer may
9 be nothing -- anything you're aware of in her
10 personal or work life that would have caused a
11 change in her approach to work in late August 2019?
12    A.   I'm not aware of anything in her personal
13 life that could have caused her to behave the way
14 she did.
15    Q.   Anything in her work life during the
16 same --
17    A.   Or her personal life.
18        And I felt it was inappropriate for me to
19 talk about the investigation that was ongoing as
20 well, so I refrained entirely the entire time.
21    Q.   Did you have a conversation on
22 September 11th with Emily?
23    A.   I could have.
24    Q.   I'll tell you what her recollection is.
25 "McKnight told me he had a woman like me on his

Page 67

1 team, was asking -- a woman on his team who was,
2 like, very similar to you. You know what happened
3 to her? She left the team."
4    Q.   Did you say that to her on September 11th?
5    A.   No.
6    Q.   You're deny saying anything like that to
7 her on September 11th?
8    A.   I don't recall saying anything like that.
9    Q.   Are you denying it, or you just don't
10 recall?
11    A.   I'm denying it. I don't recall ever saying
12 anything about this matter.
13    Q.   If the conversation happened on
14 September 10th, would you equally deny it?
15    A.   Are you saying I had the same
16 conversation --
17    Q.   No. I'm saying I see that there's -- there
18 was some uncertainty of whether it was the 10th or
19 the 11th. If it was on the 10th, not the 11th, do
20 you also deny saying anything like that?
21    A.   I deny saying anything, yes, of the such.
22        (Interruption by the court reporter.)
23        THE VIDEOGRAPHER: The time is now
24 4:35. We're off record.
25        (Recess taken.)

Page 68

1        THE VIDEOGRAPHER: This is the
2 beginning of Tape 2. Time is now 4:42. Back on
3 record.
4    BY MR. GOODMAN:
5    Q.   Ms. Forsythe was asked by Wayfair's lawyer
6 about a text you sent her in August when you said,
7 "Mike has reached out to me and wants me to call
8 him" -- (Indecipherable).
9        (Interruption by the court reporter.)
10    BY MR. GOODMAN:
11    Q.   The text stated, among other things, "Mike
12 has reached out to me and wants me to call him. I
13 know there's some friction. I want to talk to you
14 before I talk to him."
15        Do you remember sending that text?
16    A.   Yes, I do.
17    Q.   What was the context of you sending that
18 text to Emily?
19    A.   So Mike had heard that Emily was traveling
20 to the site and reached out to me and asked that she
21 not be involved in his site, and so I wanted to
22 understand why. I understood that there was some
23 history prior. Neither of them got into the
24 details.
25        My focus was entirely on keeping it

Page 69

18 (Pages 66 - 69)

1  professional and respectful and giving me an
2  opportunity, as a new leader, to come in to make
3  things right for the team, to support Emily, and to
4  support the company.
5      Q.   Was this before or after you became aware
6  of her August 14th complaint?
7      A.   This was before.  This was my first
8  interaction with Mike McDole.
9      Q.   Did you end up talking with Ms. Forsythe
10 before you talked with Mike, as contemplated?
11     A.   I believe so.  I spoke with both of them.
12     Q.   Did you speak to her first, as you said you
13 would?
14     A.   I might have, yes.
15     Q.   Do you remember what she communicated to
16 you?
17     A.   She just basically said that they had a
18 relationship prior, and she didn't get into all the
19 details.
20         I wasn't really interested in understanding
21 all of those details, other than the fact that I
22 wanted to support her as a PM, and I wanted him to
23 respect her and what we were doing in his building,
24 which is a Wayfair-owned site.  And I wanted to make
25 sure that she was okay with going there and that I

Page 70

1  with her?
2      A.   Yeah.  I don't recall.  From what I recall
3  there was -- there wasn't any major, you know,
4  conflict of any sort or confrontation that I recall.
5      Q.   Okay.  And when you told her you had her
6  back, is that when she said that "You've relieved
7  some stress for me.  I appreciate it"?
8      A.   I think it was -- it was very closely
9  related to that time frame.
10     Q.   Did Mr. Witte talk to you about
11 Ms. Forsythe expressing to him that she may want to
12 look for -- transfer to another team within Wayfair
13 in early September?
14     A.   Yes, he did.
15     Q.   Did he tell you that she -- that that was
16 because of the stress of dealing with Mr. McDole?
17     A.   No, he did not say that.
18         I recall having a conversation and
19 providing Emily with feedback from Melissa, and
20 Melissa was not happy that Emily blew off her
21 meetings.  I provided that feedback to Emily.  She
22 didn't take the feedback very well.  And I think
23 shortly after that, it could have been a day later,
24 she was asking Matt to potentially switch teams.
25         MR. GOODMAN:  Object to

Page 72

1  had her back.  And that was the essence of the
2  discussion.
3      Q.   And you referred to a prior relationship.
4  What did she tell you precisely?
5      A.   She told me that they had gone out to lunch
6  one time, and that was it.
7      Q.   Gone out to lunch while they were working
8  together at Wayfair?  Is that your understanding?
9      A.   Yes.  That's what she stated.
10     Q.   And then you talked to him after that?
11     A.   I spoke to him after that and asked that he
12 give me a chance.
13         He complained that Emily was not
14 professional, that she didn't communicate the
15 schedules, and that she was not sharing information
16 with him.
17         And I told him that -- just give me a
18 chance.  I will work to make sure that we support
19 him as a partner and that Emily would support the
20 project.
21         And Emily agreed to the same context in
22 discussion, and she traveled out to the site after a
23 discussion I had with both.
24     Q.   Do you know anything more about the visit
25 that she made to the site after that conversation

Page 71

1  responsiveness.  I haven't asked a question.
2      BY MR. GOODMAN:
3      Q.   Does Wayfair follow a procedure that
4  contemplates counseling and warnings and then a
5  performance improvement plan in that order?
6          MS. KAPPELMAN:  Again, I'm going to
7  object.  This witness is here in his personal
8  capacity.  He's not a 30(b)(6).  If you have any
9  questions about Wayfair's policy or progressive
10 discipline policy --
11     BY MR. GOODMAN:
12     Q.   Based on your experience at Wayfair, does
13 it have a policy that contemplates counseling,
14 warnings, other disciplinary notices followed by a
15 performance improvement plan?
16         MS. KAPPELMAN:  If you know.
17         THE WITNESS:  Sorry, Lynn.  What was
18 that?
19         MS. KAPPELMAN:  If you know.
20     A.   Yeah, no.  I mean, the first line of,
21 obviously, interaction is with the supervisors.  So
22 the supervisor is there to coach and mentor and
23 support the associates.  That's what I'm here for.
24 That's what I was there for her.  That's what I was
25 doing the entire time.

Page 73

19 (Pages 70 - 73)

1     I think as you progress along that path, if
2 things continue to escalate or become unresolved, I
3 think, you know, the step before, like, you get to a
4 PIP, obviously you have to have documented
5 interactions, and then you have a formal sit-down.
6     At that point, it's really up to talent
7 management whether they think that a PIP is the
8 right tool.  They may not chose to go that avenue.
9 They may have more discussions with the employee,
10 the associate, and then give them another
11 opportunity.
12   Q.   Yeah.  But based on your experience, what
13 is the latter from the first interaction to the most
14 serious prior to termination?  What is the latter?
15     MS. KAPPELMAN:  I'm going to object.
16 You know, to the extent you want information about
17 Wayfair's policies on progressive discipline, I'm
18 happy to produce a 30(b)(6) witness.  That's not
19 this guy.  He's here --
20     (Multiple parties speaking.)
21     Let me finish with my objection.
22     He's here in his individual capacity
23 based on his personal knowledge as a manager in this
24 case, not his knowledge of Wayfair's performance
25 improvement planning system.

Page 74

1 with the immediate supervisor.  If things don't
2 improve, the next step would be to have a formal
3 review and sit down and go through the
4 documentation, at which point I think the -- before
5 termination would come a PIP.  So a performance
6 improvement plan would be the next step,
7 effectively.
8   Q.   So there's no -- are you aware of whether,
9 based on your training and experience, Wayfair
10 provides any disciplinary actions, written
11 disciplinary actions, prior to what you're calling
12 the formal review and PIP?
13     MS. KAPPELMAN:  Again, this fellow is
14 not in HR at Wayfair.  It's not a 30(b)(6)
15 interview.  He is just a manager who's been there
16 for 12 months and may or may not know about
17 Wayfair's procedures and policies and formal
18 disciplinary procedures.
19     So, Kory, with that, whatever you
20 know.
21     MR. GOODMAN:  If he doesn't know, he's
22 perfectly free to state it.
23     BY MR. GOODMAN:
24   Q.   Based on your training and experience, is
25 there a step between coaching and what you're

Page 76

1   BY MR. GOODMAN:
2   Q.   Have you, since coming to Wayfair, had to
3 address performance management issues?
4   A.   I've never put anyone on a PIP in my
5 career, no.
6   Q.   What do you understand is Wayfair's
7 approach to performance management based upon
8 training and experience at Wayfair since you
9 started?
10     MS. KAPPELMAN:  Same objection.  This
11 is more appropriate for a 30(b)(6) witness.
12     MR. GOODMAN:  I can ask him --
13 Counsel, I can ask him about his own training, and I
14 can certainly ask about his own experience.  So
15 that's -- I'm limiting it to that right now.
16   BY MR. GOODMAN:
17   Q.   What is your understanding of the latter of
18 performance management from least intervention to
19 termination at Wayfair based upon your training and
20 experience at Wayfair?
21     MS. KAPPELMAN:  Same objection.
22     You can answer, Kory.  Whatever you
23 know.
24   A.   Sure.  My understanding is obviously
25 coaching, like I said.  First line of interaction is

Page 75

1 calling a formal review that involved a written
2 disciplinary notice?
3   A.   Not that I'm aware of.
4     And even when I spoke to talent management
5 toward the end of September, the week of the 16th,
6 there was no mention of a formal written action
7 taken.
8   Q.   Okay.  What was discussed the week of the
9 16th of being a possible performance management
10 step?
11   A.   What was discussed was the opportunity to
12 have a sit-down and review the documentation.
13   Q.   Okay.  And you never scheduled that with
14 Emily; correct?
15   A.   I did not.
16   Q.   And you're not aware of Mr. Witte doing so;
17 correct?
18   A.   I'm not aware of that, and I don't
19 believe --
20     (Multiple parties speaking.)
21     MS. KAPPELMAN:  Let him finish his
22 answer, Bob.  He hadn't finished his answer.
23   A.   It was not scheduled, to my knowledge.
24   Q.   Did you ever tell Emily that negative
25 comments were being solicited from other Wayfair

Page 77

20 (Pages 74 - 77)

1 employees about her -- that statements critical of
2 her were being solicited from other Wayfair
3 employees?
4    A.   I had told her that I had received feedback
5 on her performance on the 17th of September.
6    Q.   You told her that you had written feedback
7 or just feedback generally?
8    A.   Just feedback that I'd received from other
9 peers and leaders.
10    Q.   You didn't tell her that you had written
11 statements; correct?
12    A.   I don't recall if I did.  It was in the
13 same meeting that she came in and was very upset and
14 surprised me with her behavior.
15    Q.   Right.  And you didn't tell her that any
16 statements, written statements, has been solicited
17 therefore; correct?
18    A.   No.
19         And, again, I was documenting the
20 interactions.  They were documented systematically.
21 It was just -- I was collecting the interactions
22 myself.  I was not soliciting.
23    Q.   Did you ever criticize Mr. Witte for
24 soliciting statements?
25    A.   I did not.

Page 78

1         Matt was aware of the behavioral problems
2 all along.  I spoke very openly with Matt, and
3 seeked his understanding and guidance as well.  So
4 he was very informed of the interactions and
5 witnessed them himself.
6    Q.   Do you remember a situation where
7 Mr. Velarde wanted a system installed in the Lathrop
8 facility and Ms. Forsythe expressed a concern of the
9 cost that it was going to -- that Wayfair was going
10 to incur to change some equipment?
11    A.   Yes, I'm aware of the cost -- the change
12 order that she was able to provide for delaying the
13 system installation.
14    Q.   And did you then approve the change that
15 she was concerned about the cost of?
16    A.   I don't recall I had access at that time to
17 approve POs.  I don't believe I did.  I think that
18 was still going through Matt at the time.  I
19 didn't -- I questioned the value that she was
20 suggesting.  I don't believe we even paid what the
21 vendor was -- she claimed was asking for that delay.
22    Q.   I'm not -- is this the same issue that
23 there was -- where she objected that there was going
24 to be a cost of hundreds of thousands of dollars to
25 make a change?  Are we talking about the same issue?

Page 79

1    A.   I believe so, yeah.  This is delaying the
2 sorter installation in Lathrop, which is what the
3 site was asking for.
4    Q.   Okay.  And did you end up delaying that?
5    A.   Yes, it was delayed.
6    Q.   Okay.  And Mr. Velarde wanted it to be;
7 correct?
8    A.   Yes.  It was to help the operation move
9 their outbound receiving function, which Emily
10 was --
11    Q.   Why did Mr. Velarde want it delayed?
12    A.   Because he was operating in the space.
13    Q.   And why did you approve it being delayed?
14    A.   Because it wasn't necessary to be installed
15 when the schedule was originally documented to be
16 installed -- detailed to be installed.  It wasn't
17 critical that the project went live on the date that
18 it was scheduled to go live, so we were working with
19 the site to push the date out.  I think it may have
20 been a couple of weeks.  It wasn't substantial.
21         There was an unwillingness on Emily's part
22 to delay the schedule at all, and that was the rub
23 that the operations team did not like.  And she just
24 was not being -- yeah, she was just not being a good
25 business partner.

Page 80

1         MR. GOODMAN:  I didn't ask a question,
2 sir.  Object to responsiveness.
3    BY MR. GOODMAN:
4    Q.   Did you have any in-person dealings with
5 Mr. McDole before Emily was terminated?
6         MS. KAPPELMAN:  Object to the form of
7 the question.
8         You can answer, Kory.
9    A.   I just met him one time at a directors'
10 meeting in Boston.  It would have been around my
11 third week with the company.  It was very brief.  I
12 spoke to him for two minutes as we were introducing
13 ourselves to a number of people.  That was the only
14 time I had met Mike in person.
15    Q.   Have you had any direct interactions with
16 him since?
17    A.   Yes.  We support his site, and we're doing
18 several million dollars of equipment installation in
19 his building.
20    Q.   What is your overall assessment of
21 Mr. McDole based on your dealings with him since
22 Emily was terminated?
23    A.   He's a site director for the Perris II
24 building.  Seems to be doing a fine job.
25    Q.   Did Mr. Witte ever express concerns

Page 81

21 (Pages 78 - 81)

1 about -- his concerns about Mr. McDole's
2 psychological stability to you?
3   A.   No.
4   Q.   Who was managing Mr. McDole in September
5 2016?
6   A.   That was before my time.  I don't know.
7   Q.   Do you know who Glenn Roberts is?
8   A.   Can you repeat the name?
9   Q.   Do you know of the name Glenn Roberts?
10   A.   I do not.
11   Q.   Kyle Hester?
12   A.   Yes.
13   Q.   Who is Kyle Hester?
14   A.   Kyle Hester is vice president of MHS
15 Global, which is one of the vendors that Wayfair
16 does a lot of MAG business with.
17   Q.   What is M and G?
18   A.   MHS.  It's the name of the material
19 handling --
20   Q.   You said M and G business?
21   A.   No.  MAG:  material handling equipment.
22   Q.   Mr. McKnight, are you aware that Mr. McDole
23 made remarks suggesting that he was ready to fight
24 Mr. Hester?
25   A.   I am not.

Page 82

1   Q.   You don't remember any Slack conversations
2 in which Mr. Witte suggested that somebody should
3 not go to HR?
4   A.   For what purpose?  I need to understand
5 what the content is.
6        Does Matt joke on Slack?  I'm sure he does.
7 But I don't know what you're specifically referring
8 to.
9   Q.   How is Slack used at Wayfair?  Is it on a
10 daily basis?
11   A.   Slack is one of the primary tools that the
12 teams use to communicate.
13   Q.   Is it used in preference to an email to
14 communicate with others on your team?
15   A.   My preference is to talk on the phone.
16        Slack is a tool.  It's one of many tools.
17 It's fast.  Faster than waiting for email responses.
18 If I need something quicker, I'd call people
19 directly.
20        We'll also use text -- text numbers with
21 our cell phones.
22   Q.   Did you ever observe any horseplay at
23 Wayfair meetings in which one male attempted to --
24 or pretended to try to be kissing another male?
25   A.   Never.

Page 84

1        MS. KAPPELMAN:  Bob, do you need a
2 break or anything?
3        MR. GOODMAN:  I'm going through my
4 notes.  I may have some questions.
5        MS. KAPPELMAN:  Okay.
6   BY MR. GOODMAN:
7   Q.   Have you seen the charges of discrimination
8 which Ms. Forsythe filed?
9   A.   The only document that I had seen was the
10 one that was published in the Boston Globe.
11   Q.   Have you been to any Wayfair team dinners
12 where people got drunk?
13   A.   Where people got work?
14   Q.   Drunk.
15        MS. KAPPELMAN:  Drunk.  Where people
16 got drunk at a Wayfair dinner.
17   A.   If they were -- I'm not aware if they were.
18 Possibly.  I mean, I don't recall.
19   Q.   Did Mr. Witte ever contribute to a Slack
20 conversation at Wayfair where he made -- he joked
21 about somebody going to HR?
22        MS. KAPPELMAN:  Object to the form.
23        If you understand that question, Kory,
24 go ahead and answer it.
25   A.   I don't.

Page 83

1   Q.   How would you regard that if you observed
2 it at a Wayfair meeting?
3        MS. KAPPELMAN:  Object to the form of
4 the question.  It's a hypothetical question, which
5 is not appropriate for a lay witness.
6        But go ahead and answer, Kory.
7   A.   It depends, I guess.  If they're friends
8 and they're joking around, then -- you know, it can
9 be construed as inappropriate.  But, I mean, if
10 they're good friends, I mean --
11   Q.   If they did it in front of female
12 employees, would that be inappropriate?
13   A.   It's probably not appropriate behavior in
14 general, I would say.  It's not professional.
15   Q.   Did you expect HR to investigate the sexual
16 harassment complaint of Ms. Forsythe fully?
17        MS. KAPPELMAN:  Object to the form of
18 the question.
19   A.   Yes.
20   Q.   Do you know whether they asked her about
21 who she told about the incidents of sexual
22 harassment and when they occurred?
23        MS. KAPPELMAN:  Do you know -- does he
24 know what HR asked Emily?  Is that your question?
25        MR. GOODMAN:  Yes.

Page 85

22 (Pages 82 - 85)

1    A.   No.  I was not involved, like I said, at
2  all, other than bringing it to HR's attention
3  initially.
4    Q.   But you expected that they would perform a
5  comprehensive investigation of the allegations;
6  correct?
7    A.   Yes.
8    Q.   And that would include verifying the
9  allegations of unconsented touching; correct?
10   A.   Correct.
11        MS. KAPPELMAN:  Object to the form.
12   BY MR. GOODMAN:
13   Q.   Do you know why they would -- do you
14 know -- strike that.
15        Is there any reason that they would limit
16 the investigation insofar as it dealt with
17 unconsented touching?
18   A.   Bob, he doesn't know.  He wasn't involved
19 in the investigation.
20        Why is this an appropriate question
21 for this witness?  I'm really waiting for you to tie
22 this in.  He has testified three times he wasn't
23 involved in the investigation.  He's not in HR.  Why
24 are you asking him those questions?
25   BY MR. GOODMAN:

Page 86

1  question.
2    BY MR. GOODMAN:
3    Q.   Did the training discuss the -- did it
4  indicate that investigations would occur if sexual
5  harassment allegations were made?
6    A.   Yes.
7    Q.   Did it describe any limitations on those
8  investigations?
9    A.   What the training does is it teaches you to
10 observe and identify the signs and what the
11 necessary steps are to escalate that to the talent
12 management team.  From that point on, it's up to the
13 talent management team to investigate.
14        MS. KAPPELMAN:  All right, Kory, I bet
15 we'll get a question soon.
16        MR. GOODMAN:  Pass the witness.
17        MS. KAPPELMAN:  I have nothing
18 further.  Thank you, Kory, for your time.
19        THE WITNESS:  Thank you.
20        MS. KAPPELMAN:  Tomorrow is at 11:00;
21 right?
22        MR. GOODMAN:  Yes.
23        THE VIDEOGRAPHER:  This concludes the
24 deposition.  The time is now 5:15, and we're off the
25 record.

Page 88

1    Q.   Sir, do you know any reason why HR would
2  not reach out to every witness to alleged
3  unconsented touching or witness to complaints about
4  alleged unconsented touching?
5        MS. KAPPELMAN:  I'm going to direct
6  him to not answer.  He's not an HR expert.  He's not
7  even an HR representative.  He testified he was not
8  involved in the investigation.
9        If you have more questions for this
10 witness based on his personal knowledge, please ask
11 them.  But please do not ask him questions that are
12 not based on his personal knowledge, training, or
13 experience.
14   BY MR. GOODMAN:
15   Q.   You had your sexual harassment training.
16 We've already talked about that, Mr. McKnight;
17 right?
18   A.   Yes.  Provided by Wayfair, yes.
19   Q.   Did that training talk about investigation
20 of sexual harassment allegations?
21        MS. KAPPELMAN:  How to conduct an
22 investigation?  Is that your question?  Did the
23 training tell you how to conduct an investigation?
24 Is that the question?
25        MR. GOODMAN:  No.  I'll restate my own

Page 87

1        I, Kristen C. Krakofsky, court reporter and
2  notary public in and for the Commonwealth of
3  Massachusetts, certify:
4        That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness was properly identified by
7  means of an Illinois driver's license and put under
8  oath by me;
9        That the testimony of the witness, the
10 questions propounded, and all objections and
11 statements made at the time of the examination were
12 recorded stenographically by me and were thereafter
13 transcribed;
14        That the foregoing is a true and correct
15 transcript of my shorthand notes so taken.
16        I further certify that I am not a relative
17 or employee of any of the parties, nor am I
18 financially interested in the action.
19        I declare under penalty of perjury that the
20 foregoing is true and correct.
21                          of August, 2020.
22        _Kristen C. Krakofsky_
23  Kristen Krakofsky, Notary Public
24  My commission expires October 25, 2024.
25

Page 89

23 (Pages 86 - 89)