Exhibit 5

# Exhibit 5

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4    EMILY FORSYTHE,               §

5                                  §

6              Plaintiff,          §

7                                  §

8              V.                  §  C.A. NO. 1:20-cv-10002

9                                  §

10   WAYFAIR, LLC,                 §

11                                 §

12             Defendant.          §

13

14

15   Remote Videotaped Deposition of TREVOR SHAFFER-FIGUEROA,

16   a witness called on behalf of the Defendant, taken

17   pursuant to the Massachusetts Rules of Civil Procedure,

18   before Lori Atkinson, Notary Public in and for the

19   Commonwealth of Massachusetts and Professional Shorthand

20   Reporter, conducted via Zoom on Monday, July 27, 2020,

21   commencing at 11:00 a.m.

22

23

24     JOB NO. TX 4195485
```

Page 1

**Page 6**

1   Q.  Are there members of the family also live there?
2   A.  Yes.  My husband lives here as well.
3   Q.  What is his name?
4   A.  Raphael Figueroa.
5   Q.  As we sit here today, you are employed by
6   Wayfair; correct?
7   A.  I am.
8   Q.  What is your title?
9   A.  Senior manager, talent management.
10  Q.  And at Wayfair talent management is the name that
11  many companies use for human resources, correct?
12  A.  Yes.
13  Q.  Have you ever held another position at Wayfair?
14  A.  No.
15  Q.  What does Mr. Figueroa do?
16  A.  He is a massage therapist and a personal trainer.
17  Q.  I understand that Rancho Mirage is a suburb of a
18  larger community in California, correct?
19  A.  It is a small community just outside of Palm
20  Springs.
21  Q.  Is there a Wayfair facility there?
22  A.  No.
23  Q.  So you are working remotely because -- not going
24  to Wayfair and Mr. Figueroa?

**Page 7**

1   A.  I'm sorry?
2   Q.  The employees of Wayfair are not also in Rancho
3   Mirage or nearby, correct?
4       MS. KAPPELMAN:  I can't hear your question,
5   Bob, can you sit a little closer to the microphone.
6   Q.  The employees with whose employment you deal at
7   Wayfair are not also in Rancho Mirage; correct?
8   A.  That is correct.
9   Q.  You are working remotely because of your marriage
10  to Mr. Figueroa and his working in the area, correct?
11  A.  No.
12  Q.  Does he have massage therapy patients in Rancho
13  Mirage or nearby?
14      MS. KAPPELMAN:  Objection to the form of.
15      Trevor, you don't need to answer these
16  questions.  They have nothing to do with the case.
17  BY MR. GOODMAN:
18  Q.  Why you are working remotely?
19  A.  Currently I'm working hundred percent remotely
20  due to COVID.
21  Q.  Prior that?
22  A.  Prior that my role was 50 percent remote and
23  50 percent travel to the sites that I support.
24  Q.  Why were you working remotely to any extent

**Page 8**

1   during the pre-COVID period?
2   A.  Those are the requirements and stipulations of my
3   job.
4   Q.  How near is the nearest Wayfair facility?
5   A.  The Paris campus is approximately 50 miles from
6   my home.
7   Q.  Next nearest.
8   A.  City of Industry is approximately 70 miles from
9   my home.
10  Q.  What about Lathrop?
11      MS. KAPPELMAN:  I think his question is how
12  far is it from your home?
13      THE WITNESS:  Thank you.
14  A.  I'm not sure of the exact number of miles.  It is
15  a flight from Palm Sprints to Sacramento so it is about
16  an hour and a half away by air?
17  Q.  Are there any facilities besides Paris, City of
18  Industry, Lathrop -- are there any facilities besides
19  Paris that you have dealt with in your role?
20  A.  Yes.
21      THE COURT REPORTER:  I'm sorry, Mr. Goodman,
22  I'm really having a hard time hearing you.
23      MR. GOODMAN:  Let me move this.  Is that
24  better.

**Page 9**

1       THE COURT REPORTER:  That's better.
2   BY MR. GOODMAN:
3   Q.  What facilities are you dealing with in terms of
4   employees whose employment you are having any role in
5   besides Paris?
6   A.  Currently I support Paris, San Leandro, Lathrop
7   City of Industry, Oceanside, Portland, Kent, Washington,
8   Las Vegas and Phoenix.
9   Q.  How long have you in been in the human resources
10  field?
11  A.  Since May of 2003.
12  Q.  When you began in the human resources field, what
13  was your first position?
14  A.  I was a recruiter for the Department of Children
15  and Families in Jacksonville, Florida.
16  Q.  Did you consider yourself an HR professional at
17  that time?
18  A.  Yes.
19  Q.  What makes one an HR professional?
20      MS. KAPPELMAN:  In your opinion, Trevor.
21      THE WITNESS:  Thank you.
22  A.  Functioning primarily in the field of human
23  resources full-time.
24  Q.  My two paralegals function in the role of the law

3 (Pages 6 - 9)

1 all the time but they are not legal -- they are not
2 legal professionals just by virtue of that.
3     Is there anything that makes you a professional
4 as opposed to just somebody working in the field?
5     MS. KAPPELMAN: Object to the form of the
6 question.
7     You can answer, Trevor, if you understand
8 it.
9 A. I don't. It is a bit vague.
10 Q. In order to be an HR professional is there
11 anything else besides working in the field that is
12 required?
13     MS. KAPPELMAN: In your opinion, Trevor.
14 A. My opinion, no.
15 Q. No formal education of an HR professional is
16 required?
17 A. It would depend on the role that one was employed
18 in.
19 Q. What circumstances would formal education be
20 required for somebody to consider themselves an HR
21 professional?
22     MS. KAPPELMAN: In your opinion, I guess, is
23 all of this.
24 A. Sure. Any job description that was written by

Page 10

1 the employer to require that education.
2 Q. How many of the positions in the HR field that
3 you've held since you began with your first job for the
4 Department has HR education, formal education, been a
5 requirement?
6 A. A bachelor's degree has been required in every
7 job I've held since obtaining a bachelor's degree.
8 Q. Not specifically in HR?
9 A. No.
10 Q. A master's degree in HR or Ph.D. in HR; correct?
11 A. I have not held a position that required an
12 master's or Ph.D. in human resources.
13 Q. Are you aware of any position at Wayfair that
14 requires a master's or Ph.D. in HR?
15 A. No, I'm not.
16 Q. When did you get your bachelor's?
17 A. I'm sorry.
18 Q. When did you get your bachelor's?
19 A. 2002.
20 Q. Would you agree with me that professionals
21 properly understood and learned rules and applied rules
22 in a logical manner?
23     MS. KAPPELMAN: I'm sorry, can you read that
24 question back.

Page 11

1 BY MR. GOODMAN:
2 Q. I will restate it.
3     Would you agree with me that a professional
4 properly applies in a logical manner?
5     MS. KAPPELMAN: A professional what?
6 Wrestler?
7 Q. Any kind of professional? Medical professional?
8 An HR professional?
9     MS. KAPPELMAN: Professional wrestler, Bob,
10 would be applying rules.
11     MR. GOODMAN: Yes. Blanket professional.
12 You have rules and you apply them in a logical manner.
13     MS. KAPPELMAN: I object to the form. If
14 understand that question, Trevor, take your best shot.
15 A. I'm sorry, would you repeat the question?
16 Q. Is this profession, as your understand, learn
17 rules about a particular field and then apply in
18 different circumstances in a logical and objective
19 manner?
20     MS. KAPPELMAN: Object to form.
21     You can answer that, Trevor. Go ahead.
22 A. No.
23 Q. So when you have a discrimination policy
24 anti-discrimination or anti-retaliation --

Page 12

1     THE COURT REPORTER: I'm sorry, I didn't hear
2 that word. I'm still having a little bit of a problem
3 hearing you?
4 Q. You have dealt with anti-discrimination,
5 anti-retaliation policy for all the employers for whom
6 you've worked; correct?
7 A. No.
8 Q. In your HR role you have not dealt with those
9 kinds of policies?
10 A. In HR I have, yes.
11 Q. So since 2003, correct?
12 A. Since 2203, what?
13 Q. Since 2003, you've dealt with anti-discrimination
14 anti-retaliation policies in the course of doing your
15 job; correct?
16 A. That is correct.
17 Q. They've establish rules; correct?
18     MS. KAPPELMAN: Object to form.
19 BY MR. GOODMAN:
20 Q. The policies, the anti-discrimination
21 anti-retaliation policies established rules; correct?
22     KAPPELMAN MS.: Object to form.
23     You can answer, Trevor.
24 A. Rules can be interpreted from those policies that

Page 13

1    A. In what way was I involved in? I'm sorry.
2    Q. How could you have been involved in her
3  employment on the morning of Tuesday, September 24,
4  2019, if you were not aware that she had a business trip
5  planned to Atlanta that morning?
6    A. I don't understand the connection.
7    Q. What did you do on the morning of September 24,
8  2019, with respect to Ms. Forsythe's employment?
9    A. I believe the email that I sent accepting her
10 resignation was actually sent on Monday not Tuesday
11 morning. I could be mistaken.
12   Q. Are you retracting the testimony that you had
13 some involvement on Tuesday morning?
14   A. No.
15   Q. So what involvement did you have on Tuesday
16 morning?
17   A. I apologize, I thought you said Friday, the 19th.
18   Q. I said Tuesday September 27th several times.
19   A. Tuesday morning, I don't recall having direct
20 interaction with Ms. Forsythe.
21   Q. Did you have interaction with anyone concerning
22 her employment?
23        MS. KAPPELMAN: On Tuesday the 24th.
24        THE WITNESS: Tuesday the 24th.

Page 18

1    A. That's not correct.
2    Q. You are not aware that she -- she had worked for
3  Wayfair on September 23rd the Monday?
4    A. I'm aware that she was employed with Wayfair.
5    Q. Did she take Monday off?
6    A. Not to my knowledge.
7    Q. And between on Friday, Saturday, Sunday, and
8  Monday was she communicating with other Wayfair
9  employees about Wayfair business?
10        MS. KAPPELMAN: If you know.
11   A. I don't know.
12   Q. Was that your understanding, sir?
13        MS. KAPPELMAN: Again, asked and answered.
14        You can answer again, Trevor.
15   A. Yeah, I don't know.
16   Q. Did anybody tell her employment was -- prior to
17 the evening of September 23rd, did anybody tell
18 Ms. Forsythe her employment with Wayfair had ended?
19   A. Her resignation was accepted to my recollection
20 on the evening of the 23rd. Prior to that, I'm don't
21 know that she would have had any communication that I'm
22 aware of.
23   Q. But she was employed by Wayfair Friday, Saturday,
24 Sunday, and Monday; correct?

Page 20

1        MS. KAPPELMAN: Yes.
2    A. I believe so, yes.
3    Q. With who?
4        MS. KAPPELMAN: To the extent you had
5  interaction with counsel for Wayfair then it is
6  protected by the attorney-client privilege and I'm going
7  to direct you not to respond. If you had interaction
8  with anyone other than counsel for Wayfair, inside or
9  outside, go ahead an answer, substantively. Okay.
10   A. I can't respond.
11        MR. GOODMAN: He can identify whether he had
12 communications with counsel. What is protected is the
13 substance of those. Are you directing him not to answer
14 whether he had any communications with another Wayfair
15 employer on Tuesday, September 24th?
16        MS. KAPPELMAN: No, I'm directing him not to
17 get into the substance of any communication with inside
18 or outside counsel.
19        But if he had communications with counsel,
20 then he can say that.
21   A. Yes, I had communication with counsel on Tuesday
22 morning.
23   Q. You were aware that Ms. Forsythe had worked the
24 prior day, correct?

Page 19

1    A. Yes.
2    Q. And what you are calling her resignation was tied
3  to a conversation that you had with her the prior
4  Thursday; correct?
5    A. Yes.
6    Q. She never conceded in a conversation with you or
7  in any writing in which you are aware that there had
8  been any resignation communicated in a call on Thursday
9  September 19, 2019, did you?
10   A. I'm sorry, I don't understand the question.
11   Q. You didn't hear anything from Emily on Friday,
12 Saturday, Sunday, Monday conceding that she had resigned
13 on Thursday, did? You.
14   A. That's not correct.
15   Q. On Friday what did she say or write to you on
16 Friday that conceded that she had resigned, sir?
17   A. We didn't speak on Friday we spoke on Thursday.
18   Q. Sir, please listen to my question.
19        MS. KAPPELMAN: He is listening to your
20 question and he is responding.
21   Q. Sir, when I said Friday, Saturday, Sunday and
22 Monday did I say Thursday?
23   A. I don't recall. But the court reporter would
24 probably have that.

Page 21

6 (Pages 18 - 21)

1  Q. On Friday, Saturday, Sunday, Monday did you have
2  any written or verbal communications with Ms. Forsythe
3  director or indirectly?
4  A. I believe Friday morning she sent me a message.
5  But I don't recall if it was Friday morning or Thursday
6  evening indicating that she wanted to take Friday off.
7  Q. Did you get any message about her wanting to take
8  Monday off?
9  A. Not that I recall.
10  Q. In your experience at Wayfair how many employees
11  whose employment you were addressing resigned --
12  resigned?
13      MS. KAPPELMAN: Objection to the form of the
14  question.
15      If you understand that Trevor, answer it.
16  A. I don't fully.
17  Q. Since you have been at Wayfair how many employees
18  whose employment you were actively addressing by
19  speaking them or -- I will say by being in written or
20  verbal communication about their employment have
21  resigned during the process of those communications?
22  A. I have no idea.
23  Q. Have any allegedly done so beside Ms. Forsythe?
24  A. Have any employees resigned?

Page 22

1  Q. Was it a written communication to somebody else?
2  A. I wouldn't have that information.
3  Q. How did you find out about that resignation?
4  A. The employee told me that resigned.
5  Q. The past tense; correct?
6  A. Yes.
7  Q. Did they tell who they communicated that to?
8  A. No.
9  Q. There are no other resignations that happened
10  while you were discussing somebody's employment with
11  them or investigating a complaint by them besides that
12  one and Ms. Forsythe, according to you?
13  A. At Wayfair, no.
14  Q. Has it happened at any prior employer?
15  A. Yes.
16  Q. On how many occasions?
17  A. I would have to approximate.
18  Q. Okay, you may.
19  A. Five.
20  Q. How many of the five provided a written letter of
21  resignation for themselves put resignation into an HRIS
22  system?
23  A. I don't recall. Not all of them.
24  Q. Those who did not did they verbally communicate a

Page 24

1  Q. While you were in the middle of verbal or written
2  communications with them about their employment?
3  A. Employees have resigned to me.
4      But if you are asking if anyone has resigned
5  during the course of an investigation, no.
6  Q. When employees resign to you, how many occasions
7  has that occurred?
8  A. Technically I see every resignation in the field
9  because I receive an email notification when anyone
10  enters a resignation into our HRIS system.
11  Q. In other words, the employees can put that into
12  the HRIS system?
13  A. That is an option for them, yes?
14  Q. Ms. Forsythe never did that; correct?
15  A. Not to my knowledge.
16  Q. Let me go back my question.
17  A. Okay.
18  Q. How many employees during your time at Wayfair
19  when you are in communication with them about their
20  employment whether or not it's in the course of an
21  investigation or not have resigned?
22  A. One that I can recall.
23  Q. Was that a written resignation communication?
24  A. Not directly to me.

Page 23

1  resignation?
2  A. Yes.
3  Q. Did they use the word resign or quit?
4  A. No.
5  Q. What word did they use to convey their
6  resignation?
7      MS. KAPPELMAN: All of them? Each of them?
8      MR. GOODMAN: There is only four or five? I'm
9  not asking for name. I'm asking for circumstances.
10  A. Of the two specifics that I can recall one said
11  something along the lines of, "I'm out of here." The
12  other one used more colorful language.
13  Q. That's two of four or five.
14      Did the others give a written communication that
15  they were resigning?
16  A. Not that I recall.
17  Q. They just verbally communicated it?
18  A. As I recall, yes.
19  Q. Ms. Forsythe did not use the term quit or resign
20  from Thursday September 19, 2018 with you, did she?
21  A. I don't recall her using either of those words.
22  Q. She didn't use the same colorful term that
23  somebody else would use in a prior employer, whoever
24  that was; correct?

Page 25

7 (Pages 22 - 25)

1    A.  No.  Her language was always appropriate with me.
2    Q.  That was the colorful term that was used?
3    A.  In the previous incident?
4    Q.  Yes?
5    A.  While I was investigating an incident with
6    Aarons, one of my previous employers, an associate
7    grabbed his items off the table and told me to go "F"
8    myself.
9    Q.  This notion of telling Ms. Forsythe four days
10   after September 19th, that her purported resignation was
11   being accepted was not one that originated in your head,
12   did it?
13         MS. KAPPELMAN:  Object.
14         To the extent it arose out of conversations
15   with Wayfair's inside or outside counsel, I'm gong ti
16   direct you not to answer.
17         MR. GOODMAN:  I'm asking about any
18   communication.
19         MS. KAPPELMAN:  You are.
20         MR. GOODMAN:  Then you are waiving it.  Let
21   me reask the question.
22   BY MR. GOODMAN:
23   Q.  Did that idea of accepting a purported
24   resignation four days after the fact was that Mr.

Page 26

1    Q.  Saturday?
2    A.  No.
3    Q.  Friday?
4    A.  You are referring to the call about sending an
5    email.
6    Q.  The video call?
7    A.  Yes.
8    Q.  It was on Friday?
9    A.  Yes.
10   Q.  Did you have any communications with Mr. Berendt
11   after Friday before Tuesday morning?
12         MS. KAPPELMAN:  After Friday the 20th but
13   before Tuesday the 24th.
14         MR. GOODMAN:  Right.  So the next three
15   days.
16   A.  Yes, I was.
17   Q.  When was last call?
18   A.  I believe it was on Monday evening.
19   Q.  Minutes before you communicated with
20   Ms. Forsythe?
21   A.  Within minutes of I believe you contacting me
22   directly.
23   Q.  Minutes before that?
24   A.  Minutes after.

Page 28

1    Shaffer your idea?
2    A.  No.
3    Q.  What was the name of the attorney or attorneys
4    you were talking to between September 19th, and
5    September 24, 2019 about Emily Forsythe?
6          MS. KAPPELMAN:  You can identify their
7    names.
8    A.  Mike Berendt.
9    Q.  Anybody else?
10   A.  There were others in the conversation.  Are you
11   asking me if there were other attorneys present?
12   Q.  When you say there were others in the
13   conversation, do you mean over the phone?
14   A.  No.  I believe it was a video call.
15   Q.  By title or by the nature of their position who
16   were the other employees?
17         MS. KAPPELMAN:  I'm sorry, what is the
18   question, Bob.
19         MR. GOODMAN:  Let me ask it in two ways
20   Q.  Were the other employees on this video call, was
21   the video call on Monday the 23rd.
22   A.  No.
23   Q.  Was it on Sunday?
24   A.  No.

Page 27

1    Q.  What was the time relative to your sending that
2    communication to Ms. Forsythe on Monday evening?  Was it
3    before or after?
4    A.  My conversation with Mike was after me sending
5    the communication and after you calling me.
6    Q.  Which came first your communications or counsel
7    calling?
8          MS. KAPPELMAN:  I think what he is asking
9    which came first, you sending the communication to Emily
10   Forsythe or your conversation with Bob Goodman, her
11   lawyer.
12   A.  I sent the email after which I received
13   communications from Mr. Goodman.
14   Q.  Prior to Wayfair have you ever conducted an
15   investigation for discrimination or retaliation?
16   A.  Yes.
17   Q.  When was the first employer you did that for?
18   A.  The State of Florida.
19   Q.  Did you do that for every employer?
20   A.  No.
21   Q.  Which ones did you not do it for?
22   A.  St. Vincent's Medical Center in Jacksonville,
23   Florida and Solantic Urgent Care also in Jacksonville,
24   Florida.

Page 29

8 (Pages 26 - 29)

1    A.  That seems like a broad generalization.

2    Q.  If you are being thorough then why don't you test
3  the credibility of what people have told you or the
4  credibility of what people have told you by speaking
5  with the complainant, him or herself, to find out what
6  others have said are a credible positions or even
7  possible positions?

8    A.  I apologize, I'm still not understanding what you
9  are asking.

10    Q.  If you had a witness say, "I saw the complainant
11  on such and such a day in such and such a place.

12    And you never went back to the complainant, you
13  might miss the fact that the complainant was halfway
14  across the country on that very day and not at the place
15  that the witnesses said; correct?

16    MS. KAPPELMAN:  Object to the form of the
17  question.

18    Trevor, if you understand what he's getting
19  at.  Go ahead and answer.

20    THE WITNESS:  I think I'm beginning to.

21    A.  If new information is presented during the course
22  of the witness interview, it may be appropriate to
23  circle back to the complainant.  I think that's what I
24  understand your question to ask.

Page 34

1    MR. GOODMAN:  I object to the part that is
2  not responsive.

3    Q.  So you go back to the complainant some of time
4  but not all of the time is that what I'm gathering?

5    A.  Depending on the nature of the information; yes,
6  correct.

7    Q.  What type of information justifies your going
8  back to the complainant to complete the investigation
9  with the professional?

10    MR. GOODMAN:  Object to the form of the
11  question.  You almost had a good question there, Bob.

12    Go ahead, Trevor.

13    A.  As an example I would circle back to a
14  complainant if a witness provided new information for
15  which the complainant could either provide context or
16  that would allow me to better understand the
17  complainant's original statement that directed me to
18  that witness.

19    But I would not necessarily reveal all of the
20  details that a witness provided to me as that could
21  potentially violate the confidentiality of the
22  investigation.

23    THE COURT REPORTER:  Excuse me, I take one
24  minute.  The battery on my computer is low.

Page 35

1   1    THE VIDEOGRAPHER:  We are going off the
2   11:45  2  record.  The time is      a.m. eastern
time we are

3   3  going off the record.  This is the end of media file
4   4  one.

5   5    (Pause in the proceedings.)

6   6    THE VIDEOGRAPHER:  We are back on the
7   11:47  7  record.  The time is      a.m. eastern
time.  This is

8   8  the beginning the of media file number two.

9   9  BY MR. GOODMAN:

10   10    Q.  Mr. Shaffer, how many minutes did you take to
11   11  investigate the retaliation claim of Ms. Forsythe that
12   12  was made on September 19, 2019?

13   13    A.  How many minutes?

14   14    Q.  Yes?

15   15    A.  I don't recall.

16   16    Q.  Do you remember how many hours?

17   17    A.  I do not.

18   18    Q.  Ms. Forsythe did make a complaint retaliation
19   19  that day, did she not?

20   20    A.  She did.  I'm sorry on which day?  I don't recall
21   21  the exact date.

22   22    Q.  It was the date of a conversation that
23   23  Mr. Berendt later thought could justify a resignation
24   24  claim; correct?

Page 36

1    MS. KAPPELMAN:  Object to the form.

2    I don't want you to answer that question
3  because it asks for the substance of any conversation
4  that you had with inside counsel Mr. Berendt, I'm
5  directing you not to answer.

6  BY MR. GOODMAN:

7    Q.  It was the same day as the conversation that
8  Wayfair later used to suggest that Ms. Forsythe had
9  resigned; correct?

10    MS. KAPPELMAN:  Same objection.

11    Try it again, Bob.

12  BY MR. GOODMAN:

13    Q.  Was it that Thursday, sir?  That Thursday prior
14  to her last day?

15    A.  Did Ms. Forsythe make?

16    Q.  Make or claim a retaliation that same day?

17    A.  I believe it was either that Thursday or Friday.
18  Excuse me, the Thursday or Wednesday the night before.
19  I don't recall which.

20    Q.  You communicated to her on September 19, within a
21  few hours that you had you had rejected the complaint,
22  correct?

23    A.  I didn't reject the complaint, no.

24    Q.  You told her the complaint -- in your view the

Page 37

1  complaint was unfounded; correct?
2      A.  No.  I said that I was unable to substantiate the
3  claim of retaliation?
4      Q.  Who did you speak to about the complaint besides
5  Emily?
6          MS. KAPPELMAN:  That is the retaliation
7  complaint we are talking about, Trevor?
8          MR. GOODMAN:  It is.
9      A.  The individual that she complained about.  I
10 spoke to the accused and I spoke to Candice Smith.
11     Q.  Ms. Smith was not a witness to any aspect of the
12 complaint, correct?
13         MS. KAPPELMAN:  Object to the form of the
14 question.
15         You can answer, Trevor.
16     A.  I believe the complaint came via email that she
17 that also received.
18     Q.  She was not a witness to any of the actions that
19 were the basis of the complaint of retaliation, was she?
20         MS. KAPPELMAN:  Object to the form of the
21 question.
22         You can answer, Trevor.
23     A.  There were no witnesses according to Ms.
24 Forsythe.

Page 38

1  question.  Object to the word dismissed.
2          You can answer, Trevor.
3      A.  I didn't dismiss anyone's claim.  I did find that
4  the allegation was unsubstantiated.
5      Q.  Now it is just you could not substantiate, it was
6  actually it was unsubstantiated.  Do I understand that
7  correctly.
8      A.  I was not able to substantiate the allegation.
9      Q.  Could you not substantiate?  You were not able to
10 substantiate it?  Or it wasn't substantiated?  Which one
11 did you communicate to her?
12     A.  All three of those synonymous and I would use
13 those interchangeably.
14     Q.  By your best estimate, how many hours was it
15 between overseeing that complaint and your telling her
16 one of those three things or all of those three things?
17     A.  I honestly don't recall.  It was within a 24-
18 hour period but I do not recall it took from the time
19 that I received until the time that I communicated to
20 her that the allegation was unsubstantiated.
21     Q.  Did you ever conduct and investigation of a
22 discrimination or retaliation claim and concluded within
23 less than a 24 hour period?
24     A.  Yes.

Page 40

1      Q.  Well, two people were involved in the event which
2  she claimed was retaliatory, correct?
3      A.  That's correct.  The complainant and the accused?
4      Q.  Ms. Smith is your boss; right?
5      A.  That is not correct.
6      Q.  That is Ms. Smith's relation to you in the HR
7  function?
8      A.  Currently there is no relationship.
9          At the time she was the person to whom my boss
10 report.  So she was my skip level.
11     Q.  Second line of report?
12     A.  Yes.
13     Q.  At any of your other places of employment have
14 you dismissed a retaliation complaint or a discrimination
15 complaint within several hours?
16         MS. KAPPELMAN:  Object to the form of the
17 question.  Assumes facts not in evidence.
18         You can answer.
19     A.  I honestly don't recall the timelines of any of
20 those investigations.
21     Q.  This one, so that we are clear, you got the
22 complaint on one day and dismissed it, the
23 communication, with Emily the same day, correct?
24         MS. KAPPELMAN:  Object to the form of the

Page 39

1      Q.  What were the circumstances?
2          MS. KAPPELMAN:  I'm going to direct you not
3  to answer to the extent that it is not relevant to this
4  case, to these parties.
5  BY MR. GOODMAN:
6      Q.  You can answer it to the extent it is relevant.
7          MS. KAPPELMAN:  I'm not sure how it could be
8  relevant if it was a different investigation, Bob.  I'm
9  going to direct him not to answer.
10         MR. GOODMAN:  You said to the extent.
11         MS. KAPPELMAN:  Well, it is kind of obvious
12 that the extent is that it is a different investigation
13 involving different people so it is not relevant to this
14 one.
15         MR. GOODMAN:  Are you instructing him not to
16 answer then whether he has ever had a shorter
17 investigation of a discrimination or retaliation at any
18 time in his HR career?
19         MS. KAPPELMAN:  No, I don't think that was
20 the question.  You can ask him that question.  You
21 already asked him that but you can ask him again.
22     Q.  Have you ever had a shorter investigation of a
23 discrimination, retaliation complaint during any other
24 part of your career besides that one?

Page 41

11 (Pages 38 - 41)

1   A.  Yes.
2   Q.  What were the circumstances?
3       MS. KAPPELMAN:  Again, I'm going to direct
4   not to answer about the circumstance of any
5   investigation --
6       MR. GOODMAN:  You are not allowing me a
7   follow-up question, counsel.
8       MS. KAPPELMAN:  I will put my objection on
9   this record.  What you are asking him about is
10  investigations that involve people, private parties that
11  are not parties to this action.
12      And it is not relevant or proportional and
13  they have a privacy right and a confidentiality right
14  beyond that.
15      MR. GOODMAN:  I'm not remotely asking for
16  names.  Counsel, you are precluding the witness from
17  addressing whether there was any similarly short
18  investigation at any time in his HR career.  Even though
19  I'm not asking about anybody specific.
20      MS. KAPPELMAN:  I allowed you to ask the
21  question if he had a shorter investigation.  He
22  responded to that question.  You asked a very
23  generalized question.
24      If you want to ask a more specific question

Page 42

1   that doesn't invade the privacy rights of other people,
2   perhaps that won't be objectionable so why don't you
3   give it a try.
4   BY MR. GOODMAN:
5   Q.  Did that ever happened at Wayfair that there was
6   a shorter investigation?
7   A.  That I conducted, no.
8   Q.  Or that you are aware of anybody in HR at Wayfair
9   conducting?
10  A.  I would only have direct line of site to those
11  investigations that were conducted by individuals that
12  report to me but to the extent that I can answer it with
13  those individuals, no.
14  Q.  Your subordinates or peers at regional HR?
15  A.  I would prefer the word team.  But yes, they
16  are subordinate to my role.
17  Q.  Have you ever worked for Wayfair in Boston other
18  than on a business trip?
19  A.  No.
20  Q.  Do you understand that concept of Wayfair
21  employees in locations other than Boston maintaining a
22  desk in Boston?
23  A.  I'm not aware of that.
24  Q.  Are you aware of the concept at Wayfair of a

Page 43

1   headquarters employee?
2   A.  Yes.
3   Q.  What does that mean?
4   A.  An employee who is based out of Boston.
5   Q.  Do you know why Ms. Forsythe maintained a work
6   location and phone number at the Boston headquarters
7   during her employment at Wayfair?
8   A.  Do I know why she did that?
9   Q.  Yes?
10  A.  No, I do not.
11  Q.  Do you know why she was permitted to do that?
12  A.  No, I do not.
13  Q.  You claim to have conducted an investigation of
14  the sexual harassment complaint by an Emily cornering
15  Mike McDole?
16  A.  Yes, that's correct.
17  Q.  What words did you use to tell Ms. Forsythe what
18  the conclusion of your investigation was?
19  A.  I don't recall the exact words that I used when
20  speaking to her.
21  Q.  Was it one of these three things that you walked
22  about before?
23      MS. KAPPELMAN:  Object to the form of the
24  question.

Page 44

1   BY MR. GOODMAN:
2   Q.  These three passive ways of saying that I'm
3   objecting to merit of the complaint?
4       MS. KAPPELMAN:  Object to the form of the
5   question.  He never said I am objecting to the merit of
6   the of complaint.  Are you talking about the ways he would
7   phrase that a complaint was unsubstantiated.
8       MR. GOODMAN:  I will ask the question,
9   counselor.
10  Q.  Did you phrase it in one of the three ways you
11  referred to a few minutes ago.
12      MS. KAPPELMAN:  Object to the form.  If you know
13  what he is talking about perhaps he can be a little more
14  specific.  But if you know what he is talking about, be
15  clear?
16  A.  I don't recall the exact words that I used when
17  speaking to Ms. Forsythe to tell her that the
18  allegations were unsubstantiated.
19  Q.  The substance of the allegations of sexual
20  harassment were by Mr. McDole were unsubstantiated;
21  correct?
22  A.  Yes.
23  Q.  That was because he denied the allegations;
24  correct?

Page 45

12 (Pages 42 - 45)

1   A. Are you asking me --
2   Q. He denied allegations of unconsented touching of
3   Emily?
4   A. Yes, he denied that.
5   Q. You did not give him a lie detector test;
6   correct?
7   A. No, I did not.
8   Q. Why not?
9   A. Why did I not give someone a lie detector test?
10  Q. Right?
11  A. I'm not qualified to do so nor has it ever been
12  part of an investigation for which I have been
13  responsible for.
14  Q. You didn't arrange for that either, did you?
15  A. No, I did not.
16  Q. Did you communicate the allegations of sexual
17  harassment to Mr. McDole using the precise words of the
18  complaint by Ms. Forsythe or did you put it in your own
19  words?
20  A. Both.
21  Q. So you read or showed him her complaint?
22  A. No.
23  Q. Then when you say both, I can imagine your own
24  words part. What words of Ms. Forsythe did you use?

Page 46

1   Mike had been suggestively inappropriate or flirtatious
2   with her and that this witness would substantiate that.
3   Q. Again, focusing on the instances of unconsented
4   touching was there anything other than Mr. McDole's
5   denial which led to you to conclude that the incidence
6   of unconsented touching could not be substantiated?
7   A. Yes.
8   Q. What was it?
9   A. There was no other available evidence.
10  Q. At Wayfair when a woman is touched by a man
11  without her consent, with the two of them alone, her
12  claims can never be, in your terms, substantiated;
13  correct?
14      MS. KAPPELMAN:  Objection to the form.
15      You can answer.
16  A. No, that is not correct.
17  Q. Well, in any instance of physical sexual
18  harassment were there are no third-party witnesses, how
19  can a -- let me ask it this way:  Does the alleged
20  harasser have to admit to unconsented touching for it to
21  be substantiated at Wayfair?
22  A. Not necessarily.
23  Q. When you have an allegation of physical sexual
24  harassment at Wayfair by a man or a woman and the two

Page 48

1   A. I don't recall exactly.
2   Q. Did you talk about the location of the incidence
3   to Mr. McDole that were alleged?
4   A. Yes.
5   Q. Did you talk about the timing?
6   A. In approximations, yes.
7   Q. Did he say that "I was not in that place on that
8   -- around that time in response to any of the
9   allegations as you have described them to him?
10  A. Not that I recall.
11  Q. Besides Mr. McDole's denial was there any other
12  basis for the claim that Emily's complaints of
13  unconsented touching were unsubstantiated?
14  A. I'm sorry, can you repeat the question.
15  Q. Besides Mr. McDole's denial of unconsented
16  touching was there anything else that led you to tell
17  Emily has her claims of un consented touching were
18  unsubstantiated?
19  A. Yes.
20  Q. What is that?
21  A. During my initial conversation with Ms. Forsythe
22  she indicated that a witness was -- an individual was a
23  witness not to the allegation of touching but to the
24  nature of their relationship.  And that she felt that

Page 47

1   are alone at the time of the alleged physical sexual
2   harassment, how can a claim be substantiated other than,
3   based on your testimony, when a male alleged harasser
4   admits to the unconsented touching?
5   A. I'm sure there are several ways but one what
6   somewhat readily available way to confirm that would be
7   through CCTV footage.  We have security cameras at all
8   of our buildings and DVRs that record activities.
9   Q. Did you have a CCTV with a view of the locations
10  that Ms. Forsythe specified to you at the time she
11  specified to you in the locations she specified to you?
12  A. I would have had her complaint arrived earlier.
13  Q. So is it say it takes -- the CCTV system, closed
14  circuit system at Wayfair cover every inch of the
15  offices?
16  A. I have no knowledge of the CCTV system in Boston.
17  Q. Do you have no knowledge of it in Paris?
18  A. I do.
19  Q. Does it cover every inch of the facility?
20  A. No.  But it did cover the area that she described
21  the incident occurred.
22  Q. Being what area?
23  A. There is an open office area -- sort of difficult
24  to describe -- but just off the warehouse floor.

Page 49

1   Q.  Are you saying there is no part of that open
2   office area that would not be reflective in a closed
3   television -- closed circuit television viewpoint?
4   A.  No.  I'm saying the area where she alleged the
5   incident occurred is covered by CCTV.
6   Q.  When you say covered is that every inch of it?
7   A.  Of the area that she described, yes.
8   Q.  So in order for a female at Wayfair to have a
9   complaint of one consented substantiated it has to be on
10  film or the person has to admit it; is that what I'm
11  understanding?
12       MS. KAPPELMAN:  Objection to form.
13       You can answer, Trevor.
14  A.  No.  I said that is one example.
15  Q.  What is another example, sir?
16  A.  Reporting the incident within a timely fashion.
17  Q.  Well, you asked Ms. Forsythe whether she reported
18  the incident of unconsented touching to anyone?
19  A.  Did I ask her that?
20  Q.  Yes.
21  A.  Yes, I did.
22  Q.  Did you speak to that persons to whom she made
23  contemporaneous complaint of unconsented touching
24  whether or not they were at Wayfair or not?

Page 50

1   A.  She didn't make one.
2   Q.  She didn't tell you that she didn't make one to
3   anybody, did she?
4   A.  I asked her during the course of the conversation
5   who she reported these allegations to and she said no
6   one until she sent the email to Matt Witte that launched
7   this investigation.
8   Q.  Did you ask her who at Wayfair she reported to;
9   correct?
10  A.  Yes.
11  Q.  You didn't ask her who outside of Wayfair she
12  reported to, did you?
13  A.  No.
14  Q.  You know what the Me Too movement is; correct?
15  A.  I'm familiar with it, yes.
16  Q.  Have you conducted any sexual harassment
17  investigation since August and September 2018?
18  A.  No, I have not.
19  Q.  Why didn't you ask Ms. Forsythe in August or
20  September of 2019 whether she had made an individual
21  call it an outcry to anyone -- whether she had made an
22  outcry to anyone at the time of these alleged incidence
23  of unconsented touching?
24       MS. KAPPELMAN:  Object to the form.

Page 51

1        You can answer, Trevor.
2   A.  I'm not sure I understand.
3   Q.  You didn't ask in August of 2019, after you got a
4   complaint among other things, physical sexual harassment
5   by Mr. McDole whether she complained to anyone at all
6   about the incidence unconsented touching, did you?
7   A.  As I recall my question to her was:  Did you
8   report this to anyone?
9   Q.  By that you meant did you report it to anyone in
10  HR or chain of command, right?
11       MS. KAPPELMAN:  I didn't -- that
12  mischaracterizes his testimony.  He said, Did you report
13  anything to Wayfair.  That's what he said.
14  BY MR. GOODMAN:
15  Q.  Have you ever discussed or in your sexual
16  harassment training at Wayfair or elsewhere that
17  employees, whether or not a female, may be hesitant to
18  make complaints of physical harassment?
19  A.  Yes.
20  Q.  And is it appropriate in light of that to rule a
21  complaint of physical harassment unsubstantiated because
22  it is not on film or because the individual who
23  allegedly the harass the employee did not admit doing
24  so?

Page 52

1   A.  That is a bit of a hypothetical.
2   Q.  Knowing that employees may hesitate claims of
3   physical harassment is it appropriate to tell them that
4   the complaint is not substantiated unless it is on film
5   or the harasser admits the act?
6   A.  It could be.  It would depend on the
7   circumstances.
8   Q.  It could be appropriate?
9   A.  Depending on the circumstance it could be
10  appropriate.
11  Q.  Depending on what circumstances.  What
12  circumstances would make telling a person that the claim
13  is unsubstantiated because it is not on TV or the
14  harasser doesn't admit it?
15  A.  The absence of other evidence or information and
16  the credibility of the accused.
17  Q.  Does HR -- did you ever tell Ms. Forsythe that
18  you did not find her credible?
19  A.  Did I ever tell Ms. Forsythe that I did not find
20  her credible?
21  Q.  Yes.
22  A.  No, I did not.
23  Q.  Why didn't you ask her whether anybody outside
24  Wayfair -- she had reported the unconsented touching to

Page 53

14 (Pages 50 - 53)

1 anybody outside of Wayfair?
2   A. I don't know that I ever asked anyone that
3 question.
4   Q. You have known for at least the last five years
5 that one part of people being reluctant to report sexual
6 harassment is that they are fear retaliation; correct?
7   A. That is one reason people hesitate to report,
8 yes.
9   Q. But if they tell a family member or friend about
10 being sexual harassed generally speaking a family member
11 or friend does not have the power to effect them
12 economically in the same way as an employer; correct?
13   A. Okay. Yes.
14   Q. When is the first time that you spoke with or met
15 Ms. Forsythe?
16   A. The first time I ever spoke with her was the
17 first time I interviewed her regarding this
18 investigation. I never met with her personally.
19   Q. You never met her personally?
20   A. Not that I'm aware of.
21   Q. Is there any other employee at Wayfair who might
22 have been separated during the course of dealings with
23 you other than Ms. Forsythe who you never met?
24   A. I'm sorry can you repeat the question.

Page 54

1   Q. Anybody else at Wayfair -- who was been separated
2 from Wayfair while dealing with you about their
3 employment who you never met?
4   A. Yes.
5   Q. How many occasions?
6   A. A few, less than five.
7   Q. Would those circumstances involve misconduct by
8 the employee?
9   A. Yes.
10   Q. All of them?
11   A. No.
12   Q. The cases that involve misconduct, you have told
13 of somebody's misconduct and saw their termination based
14 on representations about that misconduct by others?
15   A. I have been witnesses to separation for folks but
16 I have not -- for associates that I have not met
17 personally as a result of their conduct.
18   Q. But in those cases were actually their
19 terminations in person?
20   A. I have witnessed in person separation and I have
21 been present via video. So in-person and both remotely.
22   Q. You have only had phone conversations and emails
23 with Ms. Forsythe; correct?
24   A. Yes, and conversations over Slack, which is an

Page 55

1 instant messaging platform.
2   Q. Besides the instances of termination for
3 misconduct, and what other circumstances that you have
4 not ever been in the same room or seen the employee who
5 is separated?
6   A. Layoffs or reductions in force.
7   Q. Any other cases in which individuals made
8 discrimination or retaliation complaints while they were
9 separated without you ever meeting them?
10   A. No. I never had anyone else resign during the
11 course of an investigation or at the sum of an
12 investigation, no.
13      MR. GOODMAN: Object to responsiveness.
14 BY MR. GOODMAN:
15   Q. Why do you feel the need to adopt Mr. Berendt's
16 language?
17      MS. KAPPELMAN: Object. What did you just
18 say?
19   Q. Why do you feel to use language of resignation
20 that you did not originate yourself?
21      MS. KAPPELMAN: I'm going to direct you not
22 to answer. Calls for the substance of communication
23 that you had with inside counsel.
24 BY MR. GOODMAN:

Page 56

1   Q. What advantage based on your HR experience did
2 Wayfair gain by calling Ms. Forsythe's separation a
3 resignation?
4      MS. KAPPELMAN: Objection to the form of
5 question.
6      You can answer.
7   A. What advantage did Wayfair gain by?
8   Q. What advantage did it think was gaining by
9 calling her separation a resignation on September 24,
10 2019?
11      MS. KAPPELMAN: Object to the form of
12 question.
13      You can answer, Trevor.
14   A. Did accurately describe what happened?
15      MR. GOODMAN: Object to form.
16      Object to responsiveness.
17      MS. KAPPELMAN: You can't just object
18 because you don't like the testimony.
19      That's not how it works.
20      MR. GOODMAN: I can object to the
21 responsiveness if I think it is correct.
22      MS. KAPPELMAN: You really can't. You can't
23 object if you don't agree with the testimony. That's
24 not how it works. At least not in Massachusetts. Maybe

Page 57

15 (Pages 54 - 57)

1 Texas you can.
2        MR. GOODMAN:  That's your characterization.
3 BY MR. GOODMAN:
4    Q.  You didn't tell anybody between Thursday,
5 September 19th and Tuesday, September 24th, that
6 Ms. Forsythe told she that was resigning on Thursday,
7 did you?
8        MS. KAPPELMAN:  Objection.  Direct him not
9 to answer only to the extent that there were
10 conversations with counsel.  If you had conversations
11 with somebody outside or in-house counsel feel free to
12 respond.
13    A.  There were others present but the conversation
14 was with counsel.
15    Q.  You've already testified that it wasn't your --
16 the idea did not originate with you so I will move on.
17        MS. KAPPELMAN:  Objection.  He didn't
18 testify to.
19    A.  I believe I testified that the communication did
20 not come from me.  I don't know that I have.
21        MS. KAPPELMAN:  I have your testimony.
22 BY MR. GOODMAN:
23    Q.  You trying to retract it?
24        MS. KAPPELMAN:  He is not trying to retract

Page 58

1 it.  We will stand on his testimony.
2 BY MR. GOODMAN:
3    Q.  Did the notion of characterizing Ms. Forsythe's
4 separation as a resignation originate with you?
5        MS. KAPPELMAN:  Again, I'm going to direct
6 him to answer to the extent that you are asking him for
7 the substance of communications that he had with
8 in-house or outside counsel which he has said are the
9 only people he spoke to between Thursday and Monday
10 about Ms. Forsythe.
11        If that is not clear, I want to make it as
12 clear as I can on the record about why I'm directing him
13 not to answer.
14 BY MR. GOODMAN:
15    Q.  When did you first talk with counsel about
16 Ms. Forsythe after Thursday?
17    A.  After Thursday?  I spoke to counsel on Thursday.
18    Q.  Okay.  Prior to speaking counsel, did you tell
19 anybody that your position was that Ms. Forsythe had a
20 resigned in a conversation with you?
21    A.  Yes.
22    Q.  Who did you tell?
23    A.  Candice Smith.
24    Q.  All right.  We are going to take her deposition.

Page 59

1 What words did you use?
2    A.  Her own.
3    Q.  She didn't use the word resign or quit, we've
4 already talked to about that.
5        What words of hers did you use to convey to
6 Ms. Smith -- what words of hers did you convey to
7 Ms. Smith?
8    A.  That she was requesting a severance package.
9    Q.  Did Ms. Forsythe express frustration to you that
10 her situation at Wayfair seemed to offer -- strike that.
11        When did you talk to Ms. Smith about it on
12 Thursday?
13    A.  As soon as I hung up with Ms. Forsythe.  I don't
14 recall the exact time.
15    Q.  Did you communicate with Ms. Forsythe about your
16 conversation with her on Thursday at any time on Friday?
17    A.  I had scheduled an appointment with her for
18 Friday and that's why she communicated with me that she
19 would be taking the day off.
20    Q.  You don't know why she communicated with you
21 about why she was taking the day off, do you?
22        MS. KAPPELMAN:  Object to form.
23        You can answer.
24    A.  She indicated she was stressed.

Page 60

1    Q.  He didn't say, I'm taking a day off because you
2 asked to talk to you, did she?
3    A.  No.
4    Q.  Did Ms. Smith -- who originated the idea of you
5 talking to her on Friday?
6    A.  Who originated the idea of me to talking to whom.
7    Q.  To Ms. Forsythe on Friday?
8        MS. KAPPELMAN:  Again, if this is the
9 substance of the counsel's communication with you, I'm
10 directing you not answer.
11    A.  I can't answer the question.
12    Q.  Did you communicate with her on Saturday about
13 your conversation with her on Thursday?
14        MS. KAPPELMAN:  Her meaning Ms. Forsythe.
15        MR. GOODMAN:  Ms. Forsythe.
16    A.  I don't recall speaking to her on Saturday.
17    Q.  Same question on Sunday.
18    A.  I don't recall speaking to her on Sunday.
19        MS. KAPPELMAN:  Ms. Forsythe on Sunday.  I
20 want the record to be clear.
21    A.  Sure.
22    Q.  Same question for Monday prior to your emails
23 with her?
24        MS. KAPPELMAN:  Did you communicate with Ms.

Page 61

1  approached her inappropriately?
2    A.  Ms. Forsythe indicated that Brittaney Skaggs had
3  made a comment about it appearing that the two of them
4  were occasionally flirtatious with each other.
5  Ms. Skaggs did not make an allegation against Mr.
6  McDole.
7    Q.  That Mr. McDole being flirtatious with Ms. Skaggs
8  or Ms. Forsythe?
9    A.  Ms. Forsythe.
10    Q.  Brittaney Skaggs -- according to Ms. Forsythe,
11  Brittaney Skaggs had made a comment that Mr. McDole and
12  Ms. Forsythe being flirtatious with one another.
13      Is that your statement?
14    A.  According to Ms. Forsythe Brittaney Skaggs had
15  made a comment to Ms. Forsythe about the two of them
16  appearing to quote, unquote like one another.
17    Q.  The two of them Ms. Forsythe and McDole?
18    A.  That's correct, yes.
19      But Ms. Forsythe did not allege that Ms. Skaggs
20  had been approached by Mr. McDole for clarification?
21    Q.  You clarified it.
22    A.  Okay.
23    Q.  And you claim to have discussed that Ms. Skaggs;
24  correct?

Page 66

1    A.  I did, yes.
2    Q.  When?
3    A.  I don't recall the date.
4    Q.  Who did you talk to about the claim of sexual
5  harassment -- who did you talk about the August 13th
6  complaint by Ms. Forsythe with besides Mr. McDole?
7    A.  Are you asking who the witnesses were?
8    Q.  Who did you spoke to?  Who you spoke to after she
9  made that formal complaint that complained that several
10  instances of unconsented touching as well as other
11  harassing behavior by Mr. McDole?
12    A.  Prior to the investigation formally beginning I
13  spoke to Candice Smith, Matt Witte, Orian McKnight,
14  Marcy Axelrad.  And then during the course of the
15  investigation, Mr. Berendt, Ms. Forsythe, Brittaney
16  Skaggs, James Lowe, Mr. McDole and a recruiter by the
17  name of Stella.  I apologize I forgot her last name.
18    Q.  Why did you speak with the recruiter?
19    A.  Following my conversation with Mr. McDole or
20  during that conversation, he indicated that she had
21  reached out to him because some of Ms. Forsythe's
22  actions troubled her and they were in regards to
23  Mr. McDole.
24    Q.  Was she an inhouse recruiter?

Page 67

1    A.  Correct.
2    Q.  What were the matters that supposedly troubled
3  her?
4    A.  She was approached by Ms. Forsythe regarding the
5  payment of Mr. McDole's relocation money.
6  And Ms. Forsythe alleged to the recruiter that Mr. McDole
7  Was in violation of his transfer agreement, which would
8  ordinarily trigger the clawback clause in the agreement.
9    Q.  Did he get a relocation bonus three months before
10  he actually moved to California?
11    A.  I don't know the timeline off the top of my head.
12    Q.  Did you look into whether he got a relocation
13  bonus months before he moved to California?
14    A.  I know that he received a relocation bonus I
15  don't know -- not relocation bonus.  That he received a
16  relocation stipend.  I don't know the timeline.  I don't
17  recall it.
18    Q.  Did you try to find out whether he had moved to
19  California at the time that he received the relocation
20  stipend?
21    A.  I knew that he was living in California at the
22  time.
23      MR. GOODMAN:  Objection to responsiveness.
24  BY MR. GOODMAN:

Page 68

1    Q.  Did you investigate whether he had moved his
2  residence to California at the time that he received the
3  relocation stipend?
4    A.  Yes.
5    Q.  What did you determine?
6    A.  He had not changed his physical address at the
7  time which was not yet a violation of the agreement.
8    Q.  Did you share that detail with Ms. Forsythe?
9    A.  No.  That matter had already been looked into
10  prior to me hearing of it.
11    Q.  He had not gotten an apartment or house in
12  California, is that what you are saying?
13    A.  I believe at the time he was at an extended stay
14  facility.
15    Q.  Did you ask him whether he was or whether he was
16  staying with his parents?
17    A.  When he communicated the information to me, he
18  shared with me that he was staying at an extended stay
19  in California.
20    Q.  Did you ask him whether he was staying with his
21  parents after you got a relocation bonus?
22    A.  No, I did not.
23    Q.  If he wasn't in California, but got his
24  relocation bonus before he moved to California, would

Page 69

18 (Pages 66 - 69)

1 Ms. Forsythe be concerned that he was improperly
2 receiving a relocation bonus?
3    A. I can't speak to why she would be concerned.
4    Q. Did you ever ask her?
5    A. No.
6    Q. So Mr. McDole brought this up, you talked to
7 Stella about it but you never talked to Ms. Forsythe
8 about it?
9    A. No. As I said the matter had already been
10 resolved.
11   Q. How was it resolved?
12   A. This information was brought to me after the
13 after the fact.
14      Mr. McDole was speaking in terms of something
15 that happened in the past. So when I spoke to the
16 recruiter she forwarded me information that she had
17 escalated the situation to her manager. Because the
18 building that Mr. McDole was supposed to be permanently
19 assigned to the construction of it had been delayed, it
20 was deemed by recruiting that he was not in violation of
21 his agreement and that recruiting had already
22 communicated that to Ms. Forsythe.
23   Q. So but the deferral of the opening date of the
24 facility would have been problematic?

Page 70

1    A. Potentially.
2    Q. What did you talk to Mr. Lowe about?
3    A. What did I talk to who?
4    Q. What did you talk to Mr. Lowe about, Jim Lowe.
5    A. Ms. Forsythe listed him as a witness to a meeting
6 in which Mr. McDole had allegedly conducted himself
7 inappropriately by raising his voice towards Ms.
8 Forsythe.
9    Q. When did you speak with Mr. Lowe, approximately?
10   A. I don't recall the date, it was within a week to
11 perhaps ten days of initiating the investigation perhaps
12 a little longer.
13   Q. Did you speak to Mr. Lowe about anything else
14 besides that one meeting?
15   A. I asked in general terms what he knew about their
16 interactions.
17   Q. Anything else?
18   A. I asked him if either of them had ever behaved
19 inappropriately towards each other?
20      MR. GOODMAN: When you say each other, you
21 mean Ms. Forsythe and McDole; correct?
22      THE WITNESS: Correct. Apologies.
23 BY MR. GOODMAN:
24   Q. Anything else?

Page 71

1    A. Not that I recall.
2    Q. What was his response to the question about
3 either behaving inappropriately?
4    A. As I recall, all of Mr. Lowe's responses were
5 essentially the same that the two of them appeared to
6 not get along. That he was not aware that either of
7 them was to blame, so to speak.
8    Q. Did you ask him what he thought about Mr. McDole?
9    A. What he thought about him?
10   Q. Yeah. In general terms.
11   A. No.
12   Q. Did you ask him why he believed Mr. McDole would
13 be in conflict with Ms. Forsythe?
14   A. I don't recall.
15   Q. Did you talk to Ms. Skaggs about?
16   A. Similar to Mr. Lowe the conversation began rather
17 broadly asking about their interactions and what she
18 witnessed. She indicated that again they appeared to
19 not to get along.
20      MS. KAPPELMAN: "They" McDole and Forsythe.
21      THE WITNESS: Yes.
22   Q. Anything else?
23   A. I asked her specifically about a comment that
24 Ms. Forsythe alleged that Ms. Skaggs made towards her.

Page 72

1    Q. Earlier about their being?
2    A. The comments from Ms. Forsythe was that Ms.
3 Skaggs had said to Ms. Forsythe, "I think he has a crush
4 on you." With regard to Mr. McDole.
5    Q. Did you quote with Ms. Skaggs?
6    A. I used the quote with Ms. Skaggs.
7    Q. Did she deny discussing Mr. McDole with
8 Ms. Forsythe?
9    A. No.
10   Q. What did she say she told Ms. Forsythe?
11   A. She indicated to me that she told Ms. Forsythe
12 that they acted like a couple who bickered.
13   Q. Anything else?
14   A. That they appeared not to get along with each
15 other and she was not aware of why that was.
16   Q. Who is Ms. Axelrad?
17   A. Marcy Axelrad is the director of talent
18 management for North America. Global director of talent
19 management.
20   Q. Is she above Ms. Smith?
21   A. Yes.
22   Q. In Ms. Forsythe's complaint there is an
23 allegation that I will to you read some or all of which
24 was part of her August 2019 complaint and ask you

Page 73

19 (Pages 70 - 73)

1 whether you looked into this. It says, Between April 1,
2 2019 and August 13, 2019, McDole sent a series emails to
3 plaintiff seeking information that he knew that she did
4 not have in an aggressive manner and criticized her,
5 including emails that did not provide any new
6 information.
7       Did you look into that issue?
8   A. Yes.
9   Q. Did you verify that he sought information from
10 her?
11  A. I reviewed the emails that she was referring to.
12  Q. Did you inquire whether in fact she had the
13 information that he was requesting.
14  A. I don't recall.
15  Q. Is it appropriate for one employee -- did you
16 also look into text on April 11th in which Mr. McDole
17 complained to Ms. Forsythe that failed him as a leader
18 and was not a good person.
19  A. I don't recall seeing those text messages.
20  Q. Did you talk to Mr. Witte about his visiting with
21 Mr. McDole by telephone in April of 2019?
22  A. I'm sorry? Did I talk to Mr. Witte?
23  Q. Visiting by telephone with Mr. McDole on April
24 2019 after Ms. Forsythe complained about Mr. McDole's

Page 74

1 aggressive email and suggested they discuss or
2 communicate the issue.
3   A. I don't remember.
4   Q. Mr. Witte did not tell you about the temperament
5 that was exhibited by Mr. McDole in a telephone call in
6 April 2019 during your investigation?
7   A. I don't remember that issue coming up.
8   Q. Did you ever ask Mr. Witte what he thought of the
9 temperament or stability of Mr. McDole based on the
10 August 14, 2019, complaint?
11  A. No.
12  Q. Did you talk to Mr. McDole about a meeting with
13 -- did you talk with Mr. Witte about a meeting with Mr.
14 McDole on May 1, 2019 after the August 14, 2019
15 complaint was made?
16     MS. KAPPELMAN: Objection to form of the
17 question. I think the question is: Did you talk --
18 after you got the investigation, did you talk to Witte
19 about a May 1st meeting.
20  A. I believe so but I don't remember the dates of
21 the meeting what we discussed, so it is possible.
22  Q. You understood from the August complaint of Ms.
23 Forsythe that Mr. Witte had told Ms. Forsythe that he
24 knew Mr. McDole's communications with her with him about

Page 75

1 Ms. Forsythe had been in template.
2      MS. KAPPELMAN: Object to form.
3    You can answer?
4   A. Mr. Witte had communicated to me that he
5 struggled with the way that the two of them communicated
6 with each other.
7   Q. So according to you, Mr. Witte never said
8 anything about -- specific about Mr. McDole's
9 communication to him, Mr. Witte about Emily?
10  A. I'm sorry, can you repeat the question.
11  Q. It is your testimony Mr. Witte never
12 characterized as inappropriate communications to him,
13 that is Mr. Witte, by Mr. McDole concerning Emily?
14  A. Did I did Mr. Witte ever complain about
15 communication from McDole to Witte?
16  Q. Yes.
17  A. Not that I recall.
18  Q. What details did Ms. Forsythe provide you about
19 the July 22, 2019, encounter at the Paris facility where
20 he touched her breast?
21     MS. KAPPELMAN: Object to the form of the
22 question.
23     Go ahead, Trevor.
24  A. So Ms. Forsythe indicated to me that she and

Page 76

1 Mr. McDole were meeting in the open office area. I
2 don't recall what they were discussing. I don't know
3 that she even shared with me the specifics, it was a
4 work-related conversation. She alleged at the end of
5 that conversation Mr. McDole stood and reached towards
6 -- when we were discussing it over the phone she
7 indicated that Mr. McDole reached towards her shirt and
8 touched her shirt on her chest.
9      When that conversation concluded I then
10 received an email where she clarified that what she
11 meant to say was not that he touched her shirt but that
12 he actually touched -- I'm going to quote her because I
13 feel it is appropriate -- she said that he touched her
14 boob.
15  Q. So after you had those two communications you
16 understood that he put his hand between her breasts;
17 correct?
18     MS. KAPPELMAN: Object to the form of the
19 question.
20     You can answer, Trevor.
21  A. I understood based on her email to me, she
22 alleged that he touched her breast.
23  Q. Plural or singular?
24  A. I don't recall if she said boob or boobs. I just

Page 77

1  remember the use of the word.
2  Q. Did she describe what he did after he did that to
3  her?
4  A. No, she did not.
5  Q. She told you what she was wearing, correct?
6  A. She indicated it was a shirt with some sort of
7  dots, perhaps pokkadots.
8  Q. You talked to Mr. McDole about that incident?
9  A. I talked to him about that alleged accident,
10 correct.
11 Q. Was there any detail that Ms. Forsythe conveyed
12 to you about that incident that you did not convey to
13 Mr. McDole in getting him to respond to you?
14 A. I don't believe I used the exact words that she
15 used. Other than that I asked him if he had any
16 physical contact with her in that meeting and he denied
17 that. I said, "So you never touched her on her chest?
18 Under her shirt? Around her shirt?"
19      He said, "No." He never physically touched her
20 during that meeting.
21 Q. Did you tell her what she had said about him
22 touching her shirt and -- touching her shirt on one of
23 the spots on the shirt?
24 A. Yes.

Page 78

1  broadly had he ever had any inappropriate physical
2  contact with Ms. Forsythe.
3  Q. Did you discuss -- did you ask Mr. McDole whether
4  he ever discussed internet dating applications with
5  Ms. Forsythe?
6  A. I believe so, yes.
7  Q. What was his answer?
8  A. I don't recall. I believe he said that they
9  joked about it.
10 Q. Did you ever ask whether he speculated about the
11 possibility of him and Plaintiff dating in July of 2019?
12 A. Yes.
13 Q. What was his answer?
14 A. He denied that allegation.
15 Q. Did you ever ask him whether he had invited
16 plaintiff to spend any part of the day with him in July
17 of 2019?
18 A. Yes.
19 Q. What was his answer?
20 A. That they had invited each other to lunch from
21 time to time when they were both in the same location
22 and that they did go on a walk while during her visit.
23      MR. GOODMAN: Objection to responsiveness.
24 Q. I'm asking about July of 2019.

Page 80

1  Q. Did you ask him if he engaged in any questionable
2  conduct after he walked away from her on that occasion?
3  Did you ask about any other conduct after walking away
4  from him?
5      MS. KAPPELMAN: You are screwing around with
6  your pronouns a little bit. You are saying her's
7  instead of him's. It is a little confusing with the
8  questions.
9  Q. Did you ask McDole about any other conduct on his
10 part that could have been seen as inappropriate after he
11 walked with away from Ms. Forsythe on that occasion?
12 A. No. I asked him if he had any physically
13 inappropriate contact with her and he said, No, I didn't
14 apply a timeframe.
15 Q. You didn't ask -- did you ask him specifically
16 about the January and March events in Boston and Paris?
17 A. Yes.
18 Q. Or just the general question that you just
19 stated?
20 A. Both.
21 Q. Did you ask him about those two events did you
22 ask about those events before you got to the July event?
23 A. I don't recall. I asked about the instances as
24 they had been reported to me specifically. Then I asked

Page 79

1      Did ask you him about inviting Plaintiff to spend
2  time with him during the afternoon and dinner at any
3  time in July of 2019?
4      MS. KAPPELMAN: Can I stop you. Not did he
5  ask in July but did Trevor Shaffer ask McDole about an
6  incident that may have occurred in July, is that what
7  you are asking about.
8      MR. GOODMAN: The latter is fine, yes.
9  A. I'm sorry. Did ask McDole about?
10 Q. Him asking Emily to spend the afternoon and go to
11 dinner with him in July of 2019?
12 A. Yes, I did ask that.
13 Q. What was his answer?
14 A. That he did not do that.
15 Q. Did you ever ask Mr. McDole about him telling
16 anybody that he and Ms. Forsythe were dating?
17 A. I'm sorry can you repeat the question.
18 Q. Did you ever ask Mr. McDole whether at any time
19 he told individuals, told others, that he and Emily were
20 dating?
21 A. No.
22 Q. Did Ms. Forsythe complain at the beginning of
23 August of the continually aggressive email by McDole to
24 her and about her?

Page 81

21 (Pages 78 - 81)

1    A.  She complained about emails from Mr. McDole, yes.
2    Q.  Did you do anything or -- did you or Mr. Witte or
3  Mr. McKnight do anything to stop that?
4    A.  Yes.
5    Q.  What did do you to stop it?
6    A.  My recommendation following the investigation was
7  that there would be a conversation from each of their
8  respective leaders about how they should communicate
9  with one another.
10    Q.  That was after August 13th and that was after the
11  formal complaint was made, correct?
12    A.  Correct.
13    Q.  Prior to that, did you or Mr. Witte or Mr.
14  McKnight do anything to remedy the continuing complaints
15  by Ms. Forsythe about emails directed to and about her
16  by Mr. McDole?
17        MS. KAPPELMAN:  I think object to form.  I
18  think you know that Bob from the testimony today that
19  Mr. Shaffer-Figueroa didn't ever speak to Ms. Forsythe
20  until after her August complaint, right?
21        THE WITNESS:  That's correct.
22    Q.  You may know the answer without having been
23  involved, do you know if -- I will restate it without
24  reference to you.  Did Mr. Witte or Mr. McKnight ever do

Page 82

1  anything to remedy the complaints by Ms. Forsythe even
2  before August 14th continuing aggressive emails about
3  her and to her from McDole?
4        MS. KAPPELMAN:  Objection to the form of the
5  question.  Assumes facts not in evidence.  You can
6  answer, Trevor.
7    A.  The only conversations I'm aware of between Mr.
8  Witte and Mr. McDole towards Ms. Forsythe with regard to
9  emails were in reference to her own emails and her own
10  style of communications that they had received
11  complaints about.
12    Q.  You aware of complaints by Ms. Forsythe about
13  emails of McDole prior to -- you became aware after
14  August 14th of complaints by Ms. Forsythe of emails by
15  Mr. McDole; correct?
16    A.  I became aware after her August complaint,
17  correct.
18    Q.  You are not aware as a result of investigating
19  that or in any other way aware of any action taken by
20  Witte or McKnight to remedy that complaint by
21  Ms. Forsythe; is that correct?
22        MS. KAPPELMAN:  Object to the form.  Object
23  to the form.
24        Trevor, you can answer.

Page 83

1    A.  Ms. Forsythe resigned her employment prior to
2  being able to those issues.
3        MR. GOODMAN:  Object to the responsiveness.
4  BY MR. GOODMAN:
5    Q.  You are not aware of any action by Witte or
6  McKnight to remedy the problem with aggressive emails by
7  McDole at any time, are you?
8        MS. KAPPELMAN:  Object to form of the
9  question.  Assumes facts not in evidence.
10        You can answer, Trevor.
11    A.  I don't know that emails between the two of them
12  were ever described as aggressive by anyone but
13  Ms. Forsythe
14        Again, there was conversation between myself, Mr.
15  McKnight, Mr. Witte about and Mr. Davis, who is the
16  person who at the time Mr. McDole reported to about
17  having communication with them about the way they
18  communicated with one another.
19        And at that time when I made that recommendation
20  Mr. Witte and McKnight revealed to me that they had
21  concern about the way that Ms. Forsythe communicated in
22  writing in general
23    Q.  You can't communicate with any of them about
24  allegedly aggressive emails from McKnight to Ms.

Page 84

1  Forsythe; is that correct?
2        MS. KAPPELMAN:  I think you just said
3  McKnight to Ms. Forsythe.  Is that what you meant?
4        MR. GOODMAN:  Let me restate it.
5  BY MR. GOODMAN:
6    Q.  You didn't communicate with McKnight or Witte or
7  Davis about aggressive emails form McDole to or about
8  Emily Forsythe; correct?
9    A.  I communicated with all of those people about the
10  style of communication.  I did not describe it as
11  aggressive.
12    Q.  Did that include emails from Mr. McDole to or
13  about Emily Forsythe?
14    A.  Yes.
15    Q.  Did you ever tell Mr. McDole that?
16    A.  Yes.
17    Q.  When did -- you told Mr. McDole that he should
18  change his means of communicating with Ms. Forsythe?
19    A.  No.
20    Q.  What did you tell him Mr. McDole?
21    A.  That following the resolution of the
22  investigation for which he was the accused there would
23  be conversation about his communication style.
24    Q.  When did you tell him that?

Page 85

22 (Pages 82 - 85)

Page 86

1  A. I don't recall the exact date.
2  Q. Was it on or before September 24, 2019?
3  A. It would have been before.
4  Q. You never actually did that?
5      MS. KAPPELMAN: Objection.
6      What was the question.
7  BY MR. GOODMAN:
8  Q. Did you never actually did that, did you?
9      MS. KAPPELMAN: Did what?
10 BY MR. GOODMAN:
11 Q. Talk to Mr. McDole about his style of
12 communication?
13     MS. KAPPELMAN: Objection. Asked and
14 answered. You can answer again.
15 A. I was never going to be the person who was going
16 to have that conversation with him. I was going to
17 facilitate that conversation between his leader and
18 himself.
19 Q. But you are not aware that that ever happened,
20 are you?
21 A. I'm aware that that did not occur.
22 Q. Did you ever ask Mr. McKnight about his
23 references and conversations with --
24 A. Can you repeat the question. I didn't hear.

Page 87

1  Q. Did you ever ask Mr. McKnight about him making
2  any reference in a conversation with Ms. Forsythe to
3  three colleagues at Walmart a former employer?
4  A. No, I'm not aware of that.
5  Q. What did talk to Mr. McKnight about after you got
6  the complaint of discrimination from Ms. Forsythe?
7  A. With Mr. McKnight?
8  Q. Yes.
9  A. I informed him upon receiving the complaint that
10 I would be conducting an investigation. And I informed
11 him when that investigation was concluded what my
12 findings were.
13 Q. You didn't communicate with him about it in any
14 other way?
15 A. I'm sorry?
16 Q. Did you not communicate with Mr. McKnight about
17 her complaint in any other way?
18 A. Not that I recall, no.
19 Q. What about Mr. Stark, did you communicate to
20 Mr. Stark in any way?
21 A. Chris Stark. Yes, I believe Mr. Stark was
22 present when I shared my findings with Mr. McKnight and
23 Mr. Witte and Ms. Smith.
24 Q. When you present were you in the same room as

Page 88

1  them?
2  A. No. None of us were in the same room. It was
3  all via a video call.
4  Q. You didn't talk to Mr. Stark about anything else,
5  either?
6  A. No.
7  Q. What did you talk to Mr. Witte about after you
8  got the complaint?
9  A. After I received the complaint?
10 Q. Yes.
11 A. I informed him that I would be conducting an
12 investigation and then I informed him of my findings
13 following that investigation?
14 Q. Did you talk about any other aspect of the
15 complaint other than those?
16 A. Not that I recall.
17 Q. So did you notify Mr. Witte on the same date that
18 you received that formal complaint from Ms. Forsythe?
19 A. Did I speak to Mr. Witte, the day that
20 he received the complaint?
21 Q. Right?
22 A. No, I did not.
23 Q. You spoke to him several days later and told him
24 you were going to be investigating it and then later

Page 89

1  told him that you had concluded it; correct?
2  A. Yes.
3  Q. You did not discuss the complaint with him?
4  A. No.
5  Q. Did anybody assist you in the investigation of
6  the August 14th complaint?
7  A. No.
8  Q. I take you communicated the fact that you were
9  going to investigate the complaint around the same time
10 to Candice Smith, Witte, McKnight and Axelrad?
11 A. So I did not make the decision to communicate to
12 Candice. Candice assigned the investigation to me.
13 Q. Yes told Mr. Witte and Mr. McKnight and Ms.
14 Axelrad that you were going to investigate the
15 complaint; correct?
16 A. I don't believe Ms. Axelrad was present when I
17 said I be conducting an investigation. But the other
18 names are correct.
19 Q. But you never talked to Witte and McKnight again
20 about the complaint until you concluded it?
21 A. I believe there were some emails following up
22 just letting them how the investigation was progressing.
23 I let them know the timeline. I did not share content
24 or context. I share with them, I have one witness to

1  speak to before I resolve it, that sort of them just to
2  keep them abreast of my progress.
3     Q.  Mr. Witte, were encounters between Ms. Forsythe
4  and Witte referred to in the August 14th complaint?
5        MS. KAPPELMAN:  Object to form.
6        What was that question.
7  BY MR. GOODMAN:
8     Q.  Were encounters between Ms. Forsythe and Mr.
9  Witte referred to in the August 14th complaint?
10    A.  Not that I recall.
11    Q.  Were encounters between Mr. McDole and Mr. Witte
12  referred to in the August 14th complaint?
13    A.  Not that I recall.
14    Q.  Did you ever talk to Mr. Lowe --
15       MS. KAPPELMAN:  Objection.  Asked and
16  answered.
17       MR. GOODMAN:  You don't even know what I'm
18  going to ask.
19       MS. KAPPELMAN:  I thought that was the
20  question.
21       MR. GOODMAN:  No, that was not the question.
22       MS. KAPPELMAN:  Okay.
23  BY MR. GOODMAN:
24    Q.  Did you ever talk to Mr. Lowe about his -- any

Page 90

1  statement he made to Emily Forsythe about Mr. McDole?
2        MS. KAPPELMAN:  Asked and answered.  You can
3  answer again, Trevor.
4     A.  Did I ask Mr. Lowe about statements that he made
5  about Mr. McDole?
6     Q.  Yes.
7     A.  No.
8     Q.  Did you talk with Mr. McDole about his going into
9  a meeting in August of 2019 without being invited?
10    A.  I asked him about going into a meeting on
11  August 14th, yes.
12    Q.  What did he say?
13    A.  That he was present during the meeting.
14    Q.  Did he say whether he left early in the meeting?
15    A.  I don't recall.
16    Q.  Did you ask him who the other participants of the
17  meeting were?
18    A.  I don't recall.
19    Q.  You knew that Ms. Forsythe was planning that he
20  has not invited to participate in it but sat down in the
21  meeting and then left while others waited for him to
22  leave, correct?
23    A.  Can you repeat the question.
24    Q.  You knew that she was complaining that he came

Page 91

1  into a meeting even though he wanted to participate;
2  correct?
3     A.  Yes.
4     Q.  Did you ask who the other participants were
5  besides him and Ms. Forsythe that were present at the
6  time?
7     A.  I don't recall asking him that question.
8     Q.  Well, if you had asked that question and gotten
9  an answer, you perhaps could have verified whether what
10  she was telling you was true; correct?
11       MS. KAPPELMAN:  Object to form.
12       You can answer, Trevor.
13    A.  I didn't say I didn't ask the question.  I said I
14  don't remember asking it.
15    Q.  Do you remember any talking to any of the other
16  participants in the meeting about that meeting?
17    A.  Jim Lowe.
18    Q.  Anybody else?
19    A.  No.
20    Q.  Did Mr. Lowe respond to your question whether --
21  did you ask Mr. McDole whether -- did you ask Mr. Lowe
22  whether Mr. McDole left the meeting early?
23    A.  I don't recall asking that question.
24    Q.  Did you ask Mr. Lowe any question about that

Page 92

1  meeting?
2     A.  Yes.
3     Q.  What was the question?
4     A.  I recall asking him to describe the meeting and
5  what happened during that meeting.
6     Q.  What did he tell you?
7     A.  That the two of them that -- Mr. McDole and.
8  Ms. Forsythe became argumentative with one another.
9     Q.  Did you ask him whether Mr. McDole left the
10  meeting early again?
11    A.  I don't recall him asking that question.
12    Q.  But he claimed that they were argumentative at
13  the meeting that Ms. Forsythe was complaining about?
14    A.  Yes.
15    Q.  Did you ask him whether Mr. McDole belonged in
16  the meeting?
17    A.  Did I ask Mr. Lowe if Mr McDole belonged in the
18  meeting?
19    Q.  Right.
20    A.  No, I did not.
21    Q.  You understood from Ms. Forsythe was that one of
22  her complaints was that Mr. McDole put himself in a
23  meeting without being invited to it; correct?
24    A.  Yes.

Page 93

24 (Pages 90 - 93)

1   Q.  You never asked Mr. Lowe the question whether to
2   verify that; correct?
3   A.  I didn't need to ask the question.
4   Q.  Why not?
5   A.  Because Mr. Lowe stated that Mr. McDole joined
6   the meeting.
7   Q.  But you didn't Mr. Lowe if Mr. McDole joined the
8   meeting because he was expected or invited to be there,
9   did you?
10  A.  No.  Again I didn't need to.
11  Q.  You knew one of the complaints of Ms. Forsythe is
12  that he was in the meeting without being invited;
13  correct?
14  A.  That is what Ms. Forsythe told me, yes.  That is
15  also what Mr. Lowe told me when I asked him to describe
16  the meeting?
17  Q.  He also told you that Mr. McDole was not invited
18  into the meeting?
19  A.  Yes.
20  Q.  But you didn't ask whether Mr. McDole left a
21  meeting he wasn't invited to?
22  A.  No.  Not that I recall.
23  Q.  Is there any reason that you told Ms. Forsythe
24  that her sexual harassment complaint against Mr. McDole
Page 94

1   her sexual harassment complaint was not going anywhere
2   that she can have a conversation with others to improve
3   the work relationship between her and Mr. McDole;
4   correct?
5       MS. KAPPELMAN:  Object to the form of the
6   question and the characterization of not going anywhere.
7       You can answer, Trevor.
8   A.  I informed her my recommendation was for she and
9   her respective leaders and Mr. McDole and his to get
10  together to discuss how they could communicate more
11  effectively moving forward?
12  Q.  Did she ask you whether there were any other
13  options available to address the issue?
14  A.  To address what.
15  Q.  To address the fact that she had made a sexual
16  harassment complaint against her employee who was not
17  willing -- who was not going to do anything?
18  A.  I don't recall her asking for other options, no.
19  Q.  Did Ms. Forsythe complain at any point about Mr.
20  McKnight excluding her from communication with others in
21  the group?
22  A.  I recall that complaint.  I don't recall the time
23  frame of it.  I believe it came after the initial
24  complaint was received.
Page 96

1   was unfounded except for his denial?
2       MS. KAPPELMAN:  Object to the form of the
3   question.
4       If you understand it, Trevor, go ahead and
5   answer it.
6   A.  I believe I do.
7       I never told Ms. Forsythe that her allegations
8   were unfounded.  I said I was unable to substantiate her
9   allegations.
10  Q.  Did you not use the word unfounded?
11  A.  I don't believe so.
12  Q.  You are not denying that, but you can't remember
13  using that word; is that what I understand?
14  A.  I don't recall telling her that her allegations
15  were unfounded.
16  Q.  You told her when you advised her of the
17  resolution of the complaint that you referred to a
18  conversation between and her and McDole and Mr. Witte
19  among others; correct?
20      MS. KAPPELMAN:  I didn't hear the question.
21  If somebody else got it you can read it back.
22      What is the question, Bob?
23  BY MR. GOODMAN:
24  Q.  You also told Ms. Forsythe when you told her that
Page 95

1   Q.  Did you ask Mr. McKnight to address it?
2   A.  When she made the retaliation claim I spoke to
3   Mr. McKnight about that allegation.
4   Q.  Did Mr. McKnight inform you prior to September
5   19th that Emily had complained to him about being
6   excluded from communications within his group?
7   A.  Did Mr. Mr. McKnight reveal that to me?
8   Q.  Yeah.
9   A.  It was discussed.  I don't know if it was me that
10  initiated that topic or it was him.
11  Q.  Isn't that something he himself disclosed that a
12  complaint was made that he was excluding her from
13  communications under the circumstances?
14      MS. KAPPELMAN:  Objection form of question.
15      You can answer, Trevor.
16  A.  Is that something that he should have brought up
17  to me?
18  Q.  Right.  That in the wake of a sexual harassment
19  investigation he was complaining that he was excluding
20  her from communications, you know, in going around her
21  in his communications, yes?
22      MS. KAPPELMAN:  Object to the form of the
23  question.
24      You can answer, Trevor.
Page 97

25 (Pages 94 - 97)

1   A.  As to whether the should or should not, I would
2   think it should, yes.  He did discuss it with me.  I
3   don't remember if I initiated it or if he did.
4   Q.  It is your testimony that discussed it with you
5   before the retaliation complaint or only after the
6   retaliation complaint was made?
7   A.  I believe it was during the conversation about
8   the retaliation complaint when I interviewed him.
9       THE VIDEOGRAPHER:  This is the videographer,
10  can we go off the record.
11      MR. GOODMAN:  Yes.
12      THE VIDEOGRAPHER:  The time is 1:20 p.m.       0
13  Eastern time.  We are going off the record.  This is
14  media two.
15      (Break in the proceedings.)
16      THE VIDEOGRAPHER:  Back on the record.  The
17  time is 1:44 p.m. Eastern time.  This is the beginning   0
18  of media file number three.
19  BY MR. GOODMAN:
20  Q.  What was the retaliation claim by Ms. Forsythe.
21  A.  I'm sorry?
22  Q.  What was the substance of the retaliation come by
23  Ms. Forsythe?
24  A.  Ms. Forsythe indicated that Mr. McKnight had

Page 98

1   Q.  What did you say and what did he say in response?
2   A.  I asked him to describe the conversation that she
3   had described to me.  He shared that he was voicing some
4   frustrations around the way that he communicated.
5       At one point he described her as becoming very
6   loud.  And he communicated to her that this quote,
7   unquote, this wasn't working and that he wanted to get
8   HR involved.
9   Q.  She told you that he said he was already working
10  with human resources to remove her from the position;
11  correct?
12      MS. KAPPELMAN:  Objection to form.
13      You can answer.
14  A.  That is what she alleged, yes.
15  Q.  Did you communicate that specific allegation to
16  Mr. McKnight when you spoke to him?
17  A.  Yes.
18  Q.  He acknowledged that he said I'm already started
19  working with HR representatives?
20  A.  No, he did not.
21  Q.  Did you make any effort to verify with any HR
22  representatives that he had started to work with others
23  to remove her from that position?
24  A.  I personally did not, no.

Page 100

1   informed her that he didn't want her on his team was the
2   allegation from Ms. Forsythe.
3   Q.  Did she call you directly you about it?
4   A.  No.
5   Q.  How did she make the complaint?
6   A.  Email.
7   Q.  To who?
8   A.  I'm sorry?
9   Q.  Email to who?
10  A.  I don't remember the entire distribution.  But I
11  believe it went to Mr. Witte myself and Ms. Smith.
12  There could have been others.
13  Q.  Okay.  We talked about the complaint of
14  retaliation, as I understood your testimony, the
15  complaint was September 17, 2019 -- September 19, 2019,
16  the Thursday before her separation?
17  A.  I believe the email that she sent may have been
18  sent on Tuesday or Wednesday.  But I don't recall the
19  exact time frame.
20  Q.  Did you talk to Mr. Witte about her complaint of
21  retaliation?
22  A.  I don't recall.  I don't recall.
23  Q.  Did you talk to Mr. McKnight about it?
24  A.  I did, yes.

Page 99

1   Q.  Did you ask anybody on your term to talk to other
2   HR representatives to verify whether Mr. McKnight
3   responded to them?
4   A.  I did not ask anyone to speak to other
5   professionals, no.
6   Q.  Nobody tried to verify the allegation of who told
7   who was already working with other HR representatives?
8       MS. KAPPELMAN:  Object to the form of the
9   question.
10      You can answer again, Trevor.
11  A.  That's not what I'm stating.
12  Q.  Who tried to verify the allegation by
13  Ms. Forsythe that Mr. McKnight had told her that he was
14  already working with other HR representatives to remove
15  her?
16  A.  I don't know who attempted to verify.  I do know
17  that I spoke to Candice Smith about the allegation
18  itself.
19  Q.  Did Mr. McKnight -- did Emily identify Candice
20  Smith as somebody who McKnight was working already
21  working with?
22  A.  Ms. Forsythe did not share who Mr. McKnight said
23  he talked to.
24  Q.  Do you know if Ms. Smith talked to anybody else

Page 101

26 (Pages 98 - 101)

Page 102

1  who might have verified her allegation?
2      A. I don't know that she spoke to anyone to verify
3  the allegation.
4      Q. As far as you know that was an allegation that
5  was made that was never followed up on to determined
6  whether it was true or false; right?
7          MS. KAPPELMAN: Objection to the form of the
8  question.
9      You can answer, Trevor?
10     A. No. I asked Ms. Smith if we were working to
11 remove or if anyone was working to remove Ms. Forsythe
12 and her answer was no.
13     Q. If it hadn't come up to her level she wouldn't
14 know, right?
15     A. I have no idea what she would know and what she
16 wouldn't know.
17     Q. If it hadn't come to her level, she wouldn't
18 know; right?
19         MS. KAPPELMAN: Asked and answered.
20     You answer again, Trevor.
21     A. Not necessary.
22     Q. You just asked her whether she knew that
23 happened, right?
24     A. I asked her if she was aware that we were

Page 103

1  performance out, so to speak, Ms. Forsythe and her
2  answer was no.
3      Q. That wasn't even the allegation that Ms. Forsythe
4  made, was it?
5          MS. KAPPELMAN: Object to the form of the
6  question.
7      Do you have a question?
8      Q. Her allegation was that was McKnight had already
9  told her he had spoken with HR representatives to remove
10 her.
11     He didn't say anything about performance her out,
12 did she?
13         MS. KAPPELMAN: Object to the form of the
14 question. It is synonymous.
15     You can answer, Trevor.
16     A. The terms are synonymous.
17     Q. Work to remove and perform somebody out are
18 synonymous?
19     A. In context, yes.
20     Q. In what context?
21     A. In the context of the conversation that Ms. Smith
22 and I were engaged in.
23     Q. There is no suggestion what Ms. Forsythe told you
24 that Mr. McKnight was going to make a performance issue

Page 104

1  in order to remove her from that position, was it?
2          MS. KAPPELMAN: Object to form.
3      You can answer again, Trevor.
4      A. Can you repeat the question?
5      Q. There is nothing in what Ms. Forsythe complained
6  about to suggest that Mr. McKnight had told her he was
7  going to quote performance her out?
8      A. Removing her from his team is synonymous.
9      Q. He could remove her from the team for some reason
10 other than performance, couldn't he?
11     A. If she performed some sort of gross misconduct,
12 certainly.
13     Q. Or if she was being harassed by a subordinate of
14 his and the company thought it was appropriate thing to
15 isolate her from that individual; correct?
16         MS. KAPPELMAN: Object to the form of the
17 question.
18     You can answer, Trevor.
19     A. Are you asking me if it is company policy or
20 standard procedure to engage in unethical behavior?
21     Q. Does Wayfair ever isolate individuals who are
22 alleged harassers to respond to any type of harassment
23 claim whether sexual or otherwise.
24         MS. KAPPELMAN: Objection to form.

Page 105

1      You can answer if you understand it, Trevor.
2      A. I don't.
3      Q. Have you -- the various employers that you've
4  worked with you've handled different types of harassment
5  claims; correct?
6      A. Yes.
7      Q. One of the approaches to that is to isolate the
8  alleged harassee from the alleged harasser, right.
9          MS. KAPPELMAN: Objection to form.
10     You can answer?
11     A. You mean to ensure that they don't interact with
12 one another for the protection of the alleged victim.
13     Q. Yes.
14     A. Yes. I have received requests from people in the
15 past with other organizations to not interact with their
16 alleged harasser.
17     Q. Have you ever granted that request?
18     A. Yes.
19     Q. So that segue that somebody could remove somebody
20 from their team that has nothing to do with the
21 employee's performance correct?
22     A. Mr. McKnight was not the alleged harasser.
23     Q. I'm not suggesting that he was.
24     Another any somebody be moved off the team is if

27 (Pages 102 - 105)

**Page 106**

1  there was a restructure, correct?

2  A. Sure.

3  Q. Okay. Another way if was a transfer from one

4  position to another of other people; correct?

5  A. Yes.

6  Q. Did you ask Mr. Witte whether he ever ceased

7  communication with Ms. Forsythe?

8  A. If he had ceased communicating with her?

9  Q. Yes.

10  A. No.

11  Q. Who made the decision to advise Ms. Forsythe not

12  to go on a business trip to Atlanta on Tuesday morning

13  September 23, 2019?

14  A. I don't know.

15  Q. Have you read that that communication was made to

16  her?

17      MS. KAPPELMAN: Bob, we have already heard

18  this testimony this morning, right. About this exact

19  issue.

20      MR. GOODMAN: You can answer.

21      MS. KAPPELMAN: You can testify about it

22  again.

23  A. I don't remember the nature of that communication

24  or if that communication occurred.

**Page 107**

1  Q. When was the last communication you had with

2  Ms. Forsythe before Tuesday, September 24, 2019 at noon?

3  A. Actual communication was when she reached out to

4  me on Thursday evening or Friday morning to indicate

5  that she was going to take the day off because she was

6  stressed.

7  Q. The last communication you actually had was in

8  writing on Monday that evening, correct?

9  A. Then I sent the email to her indicating that we

10  had accepted her resignation on Monday, yes.

11  Q. Who drafted the letter?

12      MS. KAPPELMAN: Again, to the extent it was

13  drafted by counsel, I'm going to direct you not to

14  answer.

15  Q. Was it drafted by you, sir?

16  A. If I can clarify which letter? The email itself

17  or the attachment?

18  Q. The email.

19  A. Parts of it were written by me.

20  Q. And the other part by counsel?

21  A. Correct.

22  Q. Did you write the part that claimed that --

23  claimed the statement made to you on Thursday she had

24  resigned?

**Page 108**

1      MS. KAPPELMAN: Listen, Bob, we are not

2  going to get into attorney-client privilege information.

3      MR. GOODMAN: I'm not. I'm asking him

4  whether he was responsible for that part of the letter.

5      MS. KAPPELMAN: By asking him which parts he

6  was responsible necessarily tries to get at which parts

7  counsel were responsible so I'm directing him not to

8  answer.

9      MR. GOODMAN: A letter to her was not

10  privilege. I'm not asking about privileged

11  communication. I'm asking about communications with

12  employees.

13      MS. KAPPELMAN: I'm directing him not to

14  answer with respect to who wrote any portion of that

15  communication because it will allow you to know

16  privileged communications and attorney work product.

17      If you really want to discuss with a judge

18  later, I'm happy to. But your efforts to ask which part

19  he wrote and which part the lawyer wrote are privilege.

20      MR. GOODMAN: It was a communication with a

21  nonclient.

22      MS. KAPPELMAN: You are right. The entire

23  communication itself is not privileged because it went

24  to her. Who wrote parts of it, is privileged

**Page 109**

1  information. That you are not entitled to.

2      MR. GOODMAN: I disagree with you. I

3  understand you are going to be a stonewall on that

4  point.

5      MS. KAPPELMAN: I'm going to maintain my

6  objection, if that's what you mean, yes.

7  BY MR. GOODMAN:

8  Q. There is a draft of a severance agreement,

9  correct?

10  A. That's correct.

11  Q. What was the name of the lawyer that you were

12  dealing with? How do you spell his last name?

13  A. I'm sorry?

14      MS. KAPPELMAN: How do you spell Berendt's

15  last name.

16  A. B-E-R-E-N-D-T.

17  Q. No "H"?

18  A. Is there an H in Berendt? No.

19      MS. KAPPELMAN: Do you need another break?

20  You have just five of us sitting here waiting.

21      MR. GOODMAN: Sometimes that is going to

22  happen.

23  BY MR. GOODMAN:

24  Q. Did Mr. Berendt -- did you ever review an email

28 (Pages 106 - 109)

1 from me to Mr. Berendt dated September 24, 2019 at
2 10:25 a.m.
3     A. I don't recall.
4     Q. What was the immediately preceding message from
5 you to the discussion between you and Ms. Forsythe in
6 terms of separation?
7         MS. KAPPELMAN:  Object to the form of the
8 question.
9         If you understand it, you can answer.
10    A. I don't understand the question.
11    Q. What did you say to Ms. Forsythe immediately
12 before she brought up the question of consideration of
13 separations as an alternative?
14    A. What I did say to her before she communicated
15 that she wanted to separate?  Or what did I communicate
16 to her before I sent the email?
17    Q. What did you communicate immediately before -- to
18 her immediately before the question of separation as one
19 alternative was brought up?
20    A. When?  I'm confused.
21        MS. KAPPELMAN:  I think he wants to know if
22 you remember what you said to her on the call where she
23 asked for severance before she asked for it.
24    A. Before she asked for the severance?

Page 110

1     Q. Before me discussed separation as one alternative
2 way of proceeding, yes.  Immediately before that, what
3 did you say to her?
4     A. I had communicated to her the results of the
5 investigation into her alleged retaliation claim.
6     Q. Say that again, please?
7     A. The intent of the call and the initial primary
8 topic was that I had concluded the investigation into
9 her allegation that she was being retaliated against so
10 I communicated that to her.
11    Q. Anything else that you recall saying immediately
12 before the subject of separation --
13        Anything else that you said to her immediately
14 before the issue of terms of separation one way to
15 address the stipulation or not?
16    A. Yes.  She asked if she was going to have to work
17 with him?  And I said that was not what I was sharing
18 with her.  That was not what I was saying.
19    Q. By rejecting -- by calling her retaliation claim
20 -- to use your continued -- not substantiated, you were
21 clarifying her continue to work with Mr. McKnight,
22 correct?
23    A. I may have conflated pronouns as well.  Forgive
24 me.

Page 111

1         When I said "him," I meant Mr. McDole.  She was
2 objecting to at that point, for the first time, having
3 to continue to have a working relationship with him
4 which was not what I was telling her she had to do.  So
5 I clarified that point.
6     Q. You are saying on Thursday, September 19th, she
7 see complained about Mr. McDole not the retaliation by
8 Mr. McKnight?
9     A. I believe she brought up that situation again.
10        To be quite frank there were a couple of
11 conversations back and forth.  If that specific
12 conversation you need very specific details on, I
13 believe she illegally recorded the conversation.  You
14 can certainly listen to the recording.
15 BY MR. GOODMAN:
16    Q. Do you recall the email that was sent to you by
17 me on the evening of September 23rd?
18    A. Not specifically, no.
19    Q. Did you follow up my communication with you to
20 anybody other than counsel specifically Ms. Gulliver or
21 any other representative of had HR.
22        MS. KAPPELMAN:  Without counsel present.
23    A. No.
24    Q. Not at all?  Not at all?

Page 112

1     A. I'm unaccustomed being communicated with by
2 opposing attorneys.  I forwarded any communication that
3 you've sent to in-house counsel.
4     Q. I'm not accustomed being contacted by
5 representatives of the company to whom I have indicated
6 in a letter that I --
7         MS. KAPPELMAN:  Bob, please don't testify on
8 the record.  If you have a question, let's hear it.
9 BY MR. GOODMAN:
10    Q. What was the substance of your declaration in the
11 Hamilton versus Wayfair case?
12        MS. KAPPELMAN:  Object to the form.  Unless
13 you've got an offer of proof as to why you need to bring
14 in a declaration from another case, I'm going to direct
15 him not to answer.  If you can tell me how it is
16 relevant to this case before I so direct.
17 BY MR. GOODMAN:
18    Q. Do you remember whether Hamilton versus Wayfair
19 dealt with any issue of discrimination?
20    A. I'm sorry can you repeat?
21    Q. Do you remember whether the Federal court case by
22 Liaesha Hamilton versus Wayfair whether it dealt with
23 any issue of discrimination?
24    A. I believe the substance of that case was related

Page 113

29 (Pages 110 - 113)

1 to meal violations and breaks.
2        MS. KAPPELMAN: Okay. We are going to
3 direct him not to answer about some other case that is
4 not this one. Let's maybe focus on this case, Bob.
5        I think you have a bunch of documents about
6 this case.
7        MR. GOODMAN: I don't appreciate your
8 sarcasm.
9        MS. KAPPELMAN: Not sarcastic. We are not
10 going to talk about another case.
11       MR. GOODMAN: Maybe if it an substantiated
12 question.
13       MS. KAPPELMAN: It doesn't matter.
14       MR. GOODMAN: It does matter.
15       MS. KAPPELMAN: Let's talk about this case,
16 Bob. We are hear for his personal knowledge about this
17 case.
18       MR. GOODMAN: As I said, I don't know if
19 you know a nonlecturing mode.
20       MS. KAPPELMAN: Bob, please ask your next
21 question. We are here for a deposition.
22       MR. GOODMAN: I'm ready to except you are
23 hogging the mic.
24       MS. KAPPELMAN: Please ask your next

1 for you to know that she had rejected him prior to the
2 allegations of nonconsenting behavior being made by
3 Ms. Forsythe?
4        MS. KAPPELMAN: You are stating facts not in
5 evidence. Assume, Trevor, that he is stating facts not
6 in evidence and you can go ahead and answer.
7    A. Ms. Forsythe never communicated to that he had
8 expressed an interest and had been rejected so it was
9 not a specific question that I asked Mr. McDole.
10   Q. And he did not disclose it?
11   A. No, he did not.
12   Q. Did Wayfair have I a rule against personal
13 relationships between peers and insubordinates at any
14 time in 2019?
15   A. I couldn't understand every word.
16   Q. Did Wayfair have a rule against personal
17 relationships superiors and subordinates at any time in
18 2019?
19       MS. KAPPELMAN: Do you mean romantic
20 relationships or friendships?
21       MR. GOODMAN: Romantic relationships.
22   A. I believe so.
23   Q. Two of the alleged incidents of physical sexual
24 harassment occurred before Mr. McDole was transferred

1 question. I'm going to ask you one more time.
2        MR. GOODMAN: Counsel, I'm preparing to. If
3 you will be quiet for a minute, I will.
4        MS. KAPPELMAN: We are looking forward to
5 it, thanks.
6 BY MR. GOODMAN:
7    Q. Have you ever have you read the deposition
8 transcript of Ms. Forsythe?
9    A. I'm sorry?
10   Q. Have you read the transcript of the deposition of
11 Ms. Forsythe?
12   A. No, I have not.
13   Q. Did you ask Mr. McDole or -- did Mr. McDole tell
14 you when you questioned him in the August investigation
15 about dealings that he had with Ms. Forsythe before he
16 was employed at Wayfair?
17   A. He shared with me that they new each other prior
18 to both of their employment with Wayfair. I'm not sure
19 what you mean by dealings.
20   Q. Did he share with you had that he sought -- he
21 had expressed a romantic in Ms. Forsythe before employed
22 by Wayfair and his interest was rejected?
23   A. No. That was not conveyed to me by Mr. McDole.
24   Q. The nature of allegations made was that important

1 away from the supervision of Ms. Forsythe, correct?
2    A. She allowed someone she allegedly believed to be
3 a harasser to transfer out of her line of authority
4 without sharing that information, yes.
5        MR. GOODMAN: Object to responsiveness.
6    Q. Who -- the first two alleged incidents of sexual
7 harassment by Mr. McDole occurred at a time prior to his
8 transfer away from the supervision of Ms. Forsythe,
9 correct?
10   A. I'm sorry, could you repeat the question.
11   Q. The two incidents of alleged physical sexual
12 harassment occurred prior to the time Mr. McDole
13 transferred away from Ms. Forsythe; correct?
14   A. Yes.
15   Q. Did you ask him whether he was aware of the
16 policy against fraternization between subordinates and
17 superiors at Wayfair?
18   A. No.
19   Q. Did you ask Mr. Witte why Mr. McDole left his
20 team and that of Ms. Forsythe on April 1, 2019?
21   A. Did I ask Mr. Witte that question?
22   Q. Right?
23   A. I don't recall.
24   Q. Did you Mr. McDole that question.

1    A. Yes.
2    Q. What did he tell you?
3    A. He did not enjoy working for Ms. Forsythe and had
4    an interest in exploring a career change into operations
5    and away from IE.
6    Q. Did you report that to Ms. Forsythe so she could
7    respond to that?
8    A. Did I report to her that one of her subordinates
9    communicated to me that he did not enjoy working for
10   her? Is that the question?
11   Q. Did you report to Ms. Forsythe that Mr. McDole
12   told you an explanation of his transfer?
13   A. No, I did not.
14   Q. That's an example, isn't it, of a failure to pass
15   the credibility of witness to an investigation by not
16   going back to the complainant and talking with them;
17   isn't it?
18        MS. KAPPELMAN:  Objection to the form of
19   question.
20        You can answer, Trevor.
21   A. No, it is not.
22   Q. You didn't attempt to verify that statement by
23   Mr. McDole with either Mr. Witte or Ms. Forsythe?
24   A. How would I verify with Mr. Witte or with

Page 118

1    Q. That didn't effect his credibility, did it?
2    A. I didn't find it to be impactful.
3    Q. It gives you two different reasons but tells his
4    bosses only one.  You don't think that's a problem, sir?
5    A. I don't know that I would communicate to my boss
6    that I didn't like her.  So it was not problematic.
7    Q. Not if you communicate to your boss that you
8    didn't like her?
9        MS. KAPPELMAN:  Really, Bob?  Is this really
10   your question.
11   BY MR. GOODMAN:
12   Q. Would you be afraid of retaliation, sir?
13   A. Would I be afraid of retaliation?  No.
14   Q. Would you be afraid of adverse consequences?
15   A. No.  Again, I would just find it rude.
16   Q. Yes know Mr. McDole told her that he didn't think
17   she was a good person?
18        MS. KAPPELMAN:  Is that a question, Bob?
19        MR. GOODMAN:  Yes.
20   BY MR. GOODMAN:
21   Q. You knew that, didn't you?
22   A. That was after the transfer.
23   Q. So it was okay to -- it was credible for him to
24   say something different to his bosses than he said to

Page 120

1    Ms. Forsythe that Mr. McDole was no longer happy
2    reporting to someone?
3    Q. Because they had to be the recipients of a
4    requested transfer in order for the transfer to occur.
5    You knew that at the time that he would have had to tell
6    either an immediate superior, Ms. Forsythe or superior
7    supervisor or Mr. Witte of his reason for requesting a
8    transfer, correct?
9    A. He would need to give them a reason to transfer,
10   yes.
11   Q. He didn't talk to either of them about what he
12   told you, did he?
13   A. I believe the second part is what he communicated
14   to them and both of them confirmed that.
15        The second part being that he wished to explore a
16   role in operations.
17   Q. So you are aware that he stated something
18   different to you about motivation than he stated to
19   Ms. Forsythe and Mr. Witte?
20        MS. KAPPELMAN:  Objection to form of the
21   question.
22        You can answer.
23   A. He gave two reasons and one of those reasons was
24   consistent with what he told them.

Page 119

1    you, but then speak the truth after he was transferred?
2        MS. KAPPELMAN:  Object to the form of the
3    question.
4    BY MR. GOODMAN:
5    Q. That is not what you are saying?
6    A. I did not find it problematic for him to not
7    share with her that he didn't like her or like reporting
8    to her at the time he requested a transfer.  I did not
9    think that was problematic and I still do not.
10   Q. Did you ever ask Mr. McDole about an HR meeting
11   that he had suggested to Ms. Forsythe that never ended
12   up happening in April of 2019?
13   A. I'm sorry, can you repeat the question?
14   Q. Do you recall asking Mr. McDole about a meeting
15   that he claims he suggested to Ms. Forsythe could occur
16   but did never set up?
17   A. No, I don't believe I was aware of that meeting
18   or alleged meeting.
19   Q. You know what I'm talking about as we speak?
20   A. I'm sorry?
21   Q. You know what I'm talking about when I ask the
22   question?
23   A. No, I don't.
24   Q. I asked you earlier about the reluctance on the

Page 121

31 (Pages 118 - 121)

1 resignation.
2         MR. GOODMAN:  Object to the responsiveness.
3    Q.  Who knew before you sent your email that you were
4 claiming that Ms. Forsythe was separated besides Mr.
5 Berendt?
6    A.  Mr. McKnight, Ms. Witte, Ms. Smith, Ms. Axelrad.
7    Q.  When did they know?
8    A.  There may be others.
9       Those are the only names I can think of.
10   Q.  What is the earliest they would have known?
11   A.  That we were communicating our intent to accept
12 her resignation?  I'm sorry?
13   Q.  When is your earliest they would have known that
14 that is when you intended to deliver to her?
15   A.  Thursday.
16   Q.  But none of them told her to take the business
17 trips off her calendar?
18         MS. KAPPELMAN:  Objection.  Asked and
19 answered six times.
20         Trevor, one more time and maybe we can move
21 on.
22 BY MR. GOODMAN:
23   Q.  None of the people who supposedly knew this and
24 what you were going to do told her not to go on a
                                            Page 130

1    A.  Yes.
2         (Document marked as Exhibit No. 1 for
3 identification.)
4    Q.  What is this email that is Shaffer 1, Bates No.
5 466.
6    A.  Those are emails that I sent to myself as I was
7 discussing -- as I was having a conversation with --
8 based on the time.
9    Q.  You acknowledge in the third paragraph that there
10 was there at least a second instance of Mr. McDole
11 asking for information in a harsh manner.  Do you see
12 that?
13   A.  Yes.
14   Q.  And that you recorded that that employee spoke to
15 McDole.  Do you see that?
16   A.  Yes.
17   Q.  How did you learn that?
18   A.  There would have be a conversation with Ms. Smith
19 and with Mr. McDole and Mr. McKnight.  So one of them
20 would have shared that with me.
21   Q.  Did you didn't that learn from Mr. Witte you
22 learned that from McKnight?
23   A.  I'm reading to make sure I'm giving you the right
24 who said what.
                                            Page 132

1 business trip the following week; correct?
2         MS. KAPPELMAN:  Asked and answered answer.
3 If you known, Trevor.  Six time.  This may be a charm.
4    A.  The attempt was to accept her resignation on
5 Friday.  She called out that day.  I don't know when it
6 was communicated to her that she shouldn't travel.
7    Q.  You don't know if it was ever communicated to
8 her, do you?
9         MS. KAPPELMAN:  Asked and answered, Bob.
10        Answer one more time, Trevor.  Maybe we can
11 move on.
12   A.  I don't know that.
13   Q.  For your information, Mr. Figueroa, I'm looking
14 at some documents, I may ask you several questions about
15 some of them to minimize the number of questions.
16        THE VIDEOGRAPHER:  I'm sorry, did you say
17 you wanted to go off the record.
18        MR. GOODMAN:  No, I did not.
19        THE VIDEOGRAPHER:  If you can get a little
20 closer to your mic.  There a number of documents that I
21 want to look at.
22 BY MR. GOODMAN:
23   Q.  I need to screen sharing to be enabled, please.
24        Can you see this?
                                            Page 131

1         This was a conversation with Ms. Smith, Mr. Witte
2 and Mr. McKnight.  I was just documenting what was said
3 during that conversation.
4    Q.  What did Matt and Lowe say to McDole about his
5 communications in a conversation that was posed to you?
6    A.  As I recall that they spoke to him about his
7 email communication and that he didn't feel -- that
8 Mr. McDole didn't feel that it was harsh.
9    Q.  So just another --
10   A.  Yes.
11   Q.  -- not withstanding in this case the actual email
12 as evidence in the contrary, right?
13        MS. KAPPELMAN:  Objection to the form of
14 question.
15        Listen to the question, Trevor.
16 BY MR. GOODMAN:
17   Q.  Did you read the emails themselves?
18   A.  I read the emails, yes.
19   Q.  Did you read the emails that were characterized
20 as aggressively asking for information that
21 Ms. Forsythe claimed Mr. McDole knew she did not have?
22   A.  Yes.
23   Q.  What was your conclusion about whether it was --
24 the email was appropriate?
                                            Page 133

1    A.  I agreed with Ms. Smith's statement there that
2  the email seemed to be appropriate and not hostile.
3    Q.  So when you made a note that Candice said email
4  seemed to be appropriate, do you see that?
5    A.  Um-hmm.
6    Q.  That was a single email, correct?
7    A.  No, I believe it was more than one.
8    Q.  What email was she referring to when she said
9  email seemed to be appropriate?
10    A.  Email as in email communication not a singular
11  email.  The ones that she and I reviewed.
12    Q.  Did you review all of the ones that Ms. Forsythe
13  was complaining about to Mr. McDole and Mr. McKnight
14  to Mr. Witte and Mr. McKnight?
15    A.  I reviewed a series of emails.  I can't say for
16  certain that Candice and I reviewed the identical
17  emails.
18    Q.  You didn't form any independent conclusion
19  yourself, you just followed what your boss's boss
20  concluded?
21    A.  No.  That's no what I said.
22    Q.  You said you agreed with her.  Did you form any
23  independent conclusion yourself about the
24  appropriateness of the emails?

Page 134

1    A.  Yes.  I reviewed emails that were provided to me
2  and found them not to be hostile as did Ms. Smith.  I
3  can't tell you if they were the exact same emails.
4    Q.  It's hostile by definition for an email to ask
5  somebody for information that the sender knows they
6  don't have; right?
7      MS. KAPPELMAN:  Object to the form of the
8  question.
9  BY MR. GOODMAN:
10    Q.  You can answer.
11    A.  No.
12    Q.  So if I ask you for information that I know you
13  don't have and keep asking you for information that I
14  know you don't have, that's not hostile communication?
15    A.  No.
16    Q.  Is it stupid communication?
17      MS. KAPPELMAN:  Object to form of the
18  question.
19      You can answer, Trevor.
20    Q.  It is not hostile, is what you are saying?
21    A.  I would woman describe it as unusual.
22    Q.  So McDole submitted a transfer request that were
23  approved for others?
24      What was the meaning that were approved for

Page 135

1  others?
2    A.  Some of his other transfer requests had been
3  approved so he was seeking other roles.  He had options.
4    Q.  Are you saying that "the others" does not refer
5  to other employees?
6    A.  Correct.
7    Q.  It refers to other transfer requests?
8    A.  Correct.
9      He was seeking other opportunities and had
10  options is what I was told in this conversation.
11    Q.  What did you mean when you said, Submitted a
12  series of transfer requests that we, apostrophe,
13  approved to others?
14    A.  The apostrophe is a typo.
15      MS. KAPPELMAN:  Asked and answered.
16      You can answer again.
17    Q.  It seems to suggest that he submitted transfer
18  requests of a type that were approved for others?
19      MS. KAPPELMAN:  Object to the form.
20  Mischaracterizes his testimony.  You can answer again,
21  Trevor.
22    A.  As I recall, the reason I wrote that sentence
23  down is that someone shared that McDole had submitted a
24  series of transfer requests and that he had options

Page 136

1  available to him.  Others had been approved as well as
2  the one that he ended up taking.
3  BY MR. GOODMAN:
4    Q.  You admit that is a strained interpretation of
5  that line, don't you?
6      MS. KAPPELMAN:  Object to the form of the
7  question.
8      You can answer, Trevor.
9    A.  If I were interpreting someone else's word,
10  perhaps.  But they are mine so it is not a strained.
11    Q.  Let me go back to that document for a minute.
12      Who is B-A-I-S-H-R-A --
13    A.  Baishra Andriati (ph)is the associate director
14  that I report to.
15    Q.  She is the person between you and Ms. Smith?
16    A.  She was at the time, yes.
17      She is now the person between myself and Ms.
18  Axelrad.  Ms. Smith no longer supports supply chain
19  operations.
20    Q.  What was the source of the statement that McDole
21  blew up in April?
22    A.  Where is that?
23    Q.  The past examples.  First paragraph from the
24  bottom.  Candice paragraph.

Page 137

35 (Pages 134 - 137)

1    A.  Candice asked if we had past examples of any
2  inappropriate conduct or inappropriate behavior.
3       Matt replied, yes, that there had been an
4  argument between he and Emily and that McDole had raised
5  his voice.
6    Q.  It is actually a unilateral description.  It says
7  McDole blew up at Emily.  It doesn't say the reverse,
8  does it?
9    A.  It does not.
10     (Document marked as Exhibit No. 2 for
11  identification.)
12  BY MR. GOODMAN:
13    Q.  Now what -- you see this next exhibit, Exhibit 2.
14  497, 498.
15     Do you see that?
16    A.  Yes.
17    Q.  That was notes of a conversation with
18  Ms. Forsythe on August 29th?
19    A.  Yes.
20    Q.  You didn't talk to her for more than a week after
21  the earlier email describing what the complaint was,
22  right?
23    A.  I reached out to her on the 21st.  Then I don't
24  remember the dates after.  She communicated to me via

Page 138

1  Slack that she would available on the 28th or the 29th.
2  That she had taken some time off.
3    Q.  In the paragraph beginning "In January --" the
4  person who is described as having meltdown moments was
5  Mr. McDole; correct?
6    A.  That's what she reported to me, yes.
7    Q.  And this is based on a conversation that -- who
8  was this email based on a conversation with?
9    A.  These are my notes on a conversation that I was
10  having with Ms. Forsythe.
11    Q.  It says in the middle paragraph, "Came to an
12  agreement that tone of email should change."
13     Do you see that?
14    A.  Yes.
15    Q.  So that was Mr. McDole promising that he would
16  change the tone of his emails.
17    A.  That's what she stated yes.
18    Q.  Did you ask Mr. McDole about the incident in
19  January of 2019, the touching incident, in the terms
20  that are described in the paragraph beginning "One
21  incident" in your notes?
22    A.  Yes.
23    Q.  You spoke with him.
24     Did you ask him what he did with his chair?

Page 139

1    A.  I described the incident as she described it.
2  And asked him if he recalled that occurring.  And he
3  denied that that occurred.
4    Q.  Did you not ask him more specific questions as
5  you did in another context like, "Did you put your hand
6  on her thigh"?
7    A.  I asked specifically with the words that she gave
8  and then I asked if he had any physical contact with her
9  and he denied both.
10    Q.  Did you ask him whether he put his hand on her
11  thigh?
12    A.  Yes.
13    Q.  Did you ask him whether she scooted back and he
14  did not move?
15    A.  I asked as she described it here so I believe so.
16    Q.  It says he was focused on task not assigned to
17  him.  This was when she was his boss, correct?
18    A.  I'm sorry where are you?
19    Q.  In March.
20    A.  I believe he still reported to her in March.
21    Q.  Would it be appropriate for him to be focusing on
22  tasks that were not assigned to him by a superior?
23    A.  Potentially.
24    Q.  Potentially be inappropriate or appropriate?

Page 140

1    A.  It could potentially be inappropriate.  Every
2  associate at Wayfair is tasked with being innovative and
3  solving problems that sometimes exceed the scope of
4  roles.
5    Q.  Is that an explanation he ever gave you for
6  focusing on a tasks not assigned to him before
7  April 1, 2018?
8    A.  No, that is my explanation for expectations at
9  Wayfair.
10    Q.  Of expectation what?
11    A.  At Wayfair.
12     Yes.  Why it may not be appropriate to focus on
13  tasks not immediately assigned to you.
14    Q.  He didn't use that rationale, did he?
15    A.  No.
16    Q.  Did you ask him about this second incident
17  involving him sitting next to -- sitting close to
18  Ms. Forsythe and moving closer to her even though she
19  was uncomfortable?
20    A.  Yes.
21    Q.  Did you ask him about asking if they could spend
22  time together after work?
23    A.  Yes.
24    Q.  This was the same month that he says he was

Page 141

36 (Pages 138 - 141)

1  requesting to be transferred away from her, right?
2   A.  Yes.
3   Q.  Did he acknowledge that he sought to spend time
4  after work with somebody who was trying to get away from
5  as a supervisor?
6   A.  No.  He denied those allegations and stated that
7  she was actually seeking his attention.
8   Q.  Did he ever complain that she had touched him
9  lack of consent?
10   A.  I'm sorry, can you repeat the question?
11   Q.  Did he ever complain that she had touched him
12  without his consent?
13   A.  That she had touched him?  No, he didn't complain
14  about that.
15   Q.  There is a reference in the working in Paris
16  paragraph to, My complaint of Emily would be get out of
17  the building.
18    Do you see that?
19   A.  Yes.
20   Q.  Was that -- that's what Mr. McDole said?
21   A.  That's what she alleged he said.
22   Q.  If that's what he said would that have been
23  appropriate?
24   A.  Would it be appropriate for him to tell her to

Page 142

1  get out of the building?
2   Q.  McDole to tell her or to tell others that she
3  needed to get out of building.
4   A.  It would not be appropriate to say that to her
5  using those words.
6   Q.  Did you ask Mr. McDole whether he reached out and
7  touched the buttons on her pokkadot shirt?
8   A.  Yes, I did.
9   Q.  Did he tell you that he wasn't in the same room
10  any day that she was wearing the pokkadot shirt?
11   A.  No.
12   Q.  So he admitted that he was with her when she was
13  wearing a pokkadot shirt?
14   A.  This didn't occur in a room.  It allegedly
15  occurred in an open office environment.
16   Q.  Whatever it occurred in.  What is the answer to
17  my question?
18   A.  Could you repeat it?
19   Q.  Did he tell you that he was never with her when
20  she was wearing a pokkadot shirt?
21   A.  No.
22   Q.  Did you ask him whether he inquired of Emily
23  whether she still had a boyfriend?
24   A.  I did ask him, yes.

Page 143

1   Q.  What did he say?
2   A.  That he didn't ask her that question.
3   Q.  What about asking Emily whether she was on dating
4  apps.  Did you ask him that question?
5   A.  Yes.
6   Q.  What did he say?
7   A.  I don't recall exactly.  I believe he said he
8  made a joke about it.
9   Q.  Then when you saw this, did -- and asked him
10  about if he and Ms. Forsythe should get together again,
11  what did he say in response to that?
12   A.  I asked and he denied that.
13   Q.  Okay.  Next to last paragraph.  Mr. Lowe
14  apparently told you or -- Mr. Lowe apparently told
15  Ms. Forsythe and she complained about it to you that
16  Mike is trying sabotage her.
17    Did you ask Mr. Lowe about that report by
18  Ms. Forsythe?
19   A.  I believe so but I don't recall exactly.
20   Q.  You don't recall what he said?
21   A.  Correct.
22   Q.  Bates No. 526, the email that you refer to in
23  which Ms. Forsythe clarified that she was touched
24  between her breasts?

Page 144

1   A.  Yes.
2   Q.  You got a clarification, did you ask Mr. McDole
3  about that?
4   A.  Yes.
5   Q.  What did he say?
6   A.  No.  He denied it.
7   Q.  Did you find, as a man, that his denials of
8  physical sexual harassment allegations by
9  Ms. Forsythe was credible?
10    MS. KAPPELMAN:  Object to the form of the
11  question.
12    You can answer, Trevor, as person, as an
13  investigator, as an HR professional.
14  BY MR. GOODMAN:
15   Q.  And as a man?
16   A.  I don't understand the question.
17   Q.  Did you find his flat denial of very detailed
18  physical sexual harassment allegations credible, sir?
19   A.  Yes.
20   Q.  Is that based on personal experience?  Or work
21  experience?  Or neither?
22   A.  I had no reason to doubt his credibility during
23  the course of this investigation.
24   Q.  You had no reason to doubt the credibility of

Page 145

37 (Pages 142 - 145)

1 week that I was at a summit conference and there were
2 multiple attempts. I would reach out asking if she had
3 time or availability on her calendar and then a couple
4 of hours later I would get a response either by email or
5 by Slack, Can you talk right now? Or did you have time
6 to set something up?
7     We missed each other a couple of times because I
8 was at a conference. And she wasn't giving me specific
9 times that she was available. She would just say, "How
10 about right now?" And I would be in the middle of a
11 meeting or something.
12    (Document marked as Exhibit No. 3 for
13 identification.)
14 BY MR. GOODMAN:
15    Q. Is this the formal complaint of retaliation that
16 you investigated or is this a conclusion of that which
17 581 Bates No. 581. I will call it Exhibit 3.
18    A. This is -- my understanding is that this is her
19 initial complaint of retaliation.
20    Q. Is it true that she had been on Mr. McKnight's
21 team less than three weeks?
22    A. I believe so.
23    Q. Is it true that she with him only one time in
24 person?

Page 150

1    A. I don't recall.
2    Q. Is it true that he was made aware by Mr. Berendt
3 of her complaint to HR in mid August?
4    A. I believe so.
5    Q. He was saying -- getting me off -- Mr. McKnight
6 talking about getting her off his team, are you telling
7 the jury you did not believe her?
8    A. I'm not sure I understand the question.
9    Q. You asked Mr. McKnight about that; right?
10   A. Yes.
11   Q. You accepted his denial, right?
12   A. He denied having said that to her.
13   Q. Right. And you accepted that as the end of the
14 matter; right?
15   A. I don't know that I would categorize it as the
16 end of the matter.
17   Q. Well, you told her that you concluded --
18   A. Based on that statement.
19   Q. You told her that you concluded her complaint of
20 retaliation in general had not been substantiated,
21 right?
22   A. Yes.
23   Q. Even though everything she said in that email was
24 true except that you believed him concerning the

Page 151

1 statement that he made to her?
2    A. My belief of his position was not based solely on
3 his denial of having said what she said that he said.
4    Q. What else was it based on?
5    A. He described that he was a having a conversation
6 with her where she became upset. That he had shared
7 with her that things were working. And he had used that
8 phrase with me previously that he was afraid things
9 weren't going to work with her.
10   Q. That to you justified his telling her that he was
11 -- already talked to Matt in HR about getting her off
12 the team?
13   A. I would conclude that it would be difficult to
14 quote, unquote get her off his team if he was denying to
15 HR that he wanted her off of his team.
16   Q. Are you saying that he said he was frustrated
17 with her and that's why he said something to her that
18 she may have understood as threatening?
19   A. He was having conversations with her based on, as
20 previously mentioned in the other emails, that their
21 communication needed work.
22   Q. But he denied telling her that he was going to
23 get her off the team or that he had talked to HR;
24 correct?

Page 152

1    A. He denied saying that they needed to go to HR to
2 get her off the team and he denied saying that he wanted
3 her off of his team.
4     (Document marked as Exhibit No. 4 for
5 identification.)
6 BY MR. GOODMAN:
7    Q. What is exhibit -- Bates No. 591 Exhibit 4?
8    A. This was an appointment request that I believe is
9 surrounding her allegation -- Ms. Forsythe's allegation
10 of retaliation.
11   Q. That you sent to her?
12   A. No.
13   Q. She sent it to you?
14   A. Yes.
15   Q. And 1269 is your notes with Mr. McKnight,
16 correct?
17   A. I believe so. If I can have one second to read
18 it fast. Okay.
19   Q. That is a conversation with Mr. McKnight,
20 correct?
21   A. That's correct.
22   Q. What is the exhibit -- what is Bates No. 1271.
23   A. Conversation with Ms. Forsythe.
24   Q. Did you go through that with Mr. --- that was on

Page 153

39 (Pages 150 - 153)

1 Thursday, did you go through that with Mr. McKnight?
2  A. May I have a moment to read it?
3  Q. Yes.
4  A. Yes. These are some of the conversation with
5  Ms. Forsythe.
6  Q. That Mr. McKnight had said?
7  A. I believe this is prior to based on the time
8  stamp. I could be wrong.
9  Q. 6:15. 11:13 p.m. and 11:13 p.m.?
10  A. I pushed send at the same time. The second
11 conversation I have notes there showing the time I was
12 taking the notes, so it is 5:45 a.m. my time.
13  Q. The information that she provided you effectively
14 responded to everything Mr. McKnight told you and gave
15 you in more detail about their conversation?
16  A. The details were fairly consistent. She sort of
17 downplayed her own volume and he indicated that she was
18 louder and more upset than she had indicated.
19  Q. You do always give the benefit of the doubt to
20 management when you have an employee-management dispute?
21  A. No. And I don't know that I'm doing that here.
22  Q. So did you go back to Mr. McKnight and address
23 the issues raised by Ms. Forsythe's email to you which
24 you said was after you talked with him?

Page 154

1  A. I didn't follow that.
2  Q. Did you go back to Mr. McKnight -- did you
3 address with Mr. McKnight the issues raised by
4 Ms. Forsythe in this email?
5  A. I asked him to describe the conversation to me.
6  Q. So you did not specifically ask him to address
7 each of the aspects of this email; correct?
8  A. I asked him -- I would have to look at my
9 investigation workbook. But I addressed this call with
10 him and he provided a very different recap of that call.
11  Q. By the investigation workbook, are you referring
12 to the Excel spreadsheet you created?
13  A. The Excel document, yes.
14  Q. So the investigation workbook, so to speak, would
15 reflect what you did with all the specific information
16 about a conversation; correct?
17  A. Yes.
18    I typically prepare questions in advance on the
19 workbook. But then take notes as people sort of
20 describe things, freehand. And then move things over or
21 capture them in the Excel document depending on the
22 nature of the conversation and how quickly people talk.
23  Q. Okay.
24    Looking at 1306 is the PTO email from Friday,

Page 155

1 September 21, the September 20, 2019; correct?
2  A. Yes.
3  Q. According to your testimony, you had already
4 decided that Ms. Forsythe was no longer employed by
5 Wayfair; correct?
6    MS. KAPPELMAN: Objection to the form of the
7 question.
8  A. I did not make that decision.
9  Q. You said you reached the conclusion that she had
10 resigned on Thursday. This is Friday morning, correct,
11 at 1:25:27 a.m. your time?
12    MS. KAPPELMAN: Mischaracterizes the
13 testimony. You can answer, Trevor.
14  A. The decision had been made to accept her
15 resignation on Thursday.
16  Q. Say that again?
17  A. The decision had been made to accept her
18 resignation on Thursday.
19  Q. You didn't respond by saying "This a moot point;"
20 did you?
21  A. That was not my response to this, no.
22  Q. Neither did Mr. Witte or Mr. McKnight, the other
23 addressees, they didn't respond that way either, did
24 they?

Page 156

1  A. I don't know how they would have responded. I
2 don't have access to their email.
3  Q. You are not aware of him responding that she was
4 pissing in the wind, are you?
5    MS. KAPPELMAN: Object to the form of the
6 question. I'm sure you didn't mean to say it that way.
7    You can answer, Trevor.
8  A. I apologize but I'm not familiar with the phrase.
9  Q. You never heard the phrase "pissing in the wind"?
10  A. No.
11  Q. You are not aware of anybody saying to her,
12 "Don't worry about taking PPO, you are already out of
13 our organization"?
14  A. I'm not aware that anyone said that to her, no.
15  Q. Her insight and would you consider --
16    There is a gap between the first and second
17 paragraph; do you see that?
18  A. Yes.
19  Q. Is that a result of cutting and pasting into this
20 email from another email?
21  A. I don't know.
22  Q. Would that be an explanation for the gap?
23  A. Potentially.
24  Q. According to this other one --

Page 157

40 (Pages 154 - 157)

1    (Break in the proceedings.)
2    THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 3:43 p.m. Eastern time.  This is      0
4  beginning of media file five.
5  By MR. GOODMAN:
6    Q.  Mr. Shaffer, can you see the document on the
7  screen dated 9-19-2019, Emily notes?
8    A.  Yes.
9    Q.  What I guess -- those were reflecting -- that is
10  another -- I don't know why he made the reference to
11  5-25.  But that is a different conversation than the one
12  that we went over before, correct?
13    A.  I believe this was her sharing with me how the
14  conversation proceeded with Mr. McKnight that led her to
15  conclude that she was being retaliated against.
16    Q.  This is different than the one that was sent on
17  the 17th that you said was a precursor to that email;
18  correct, to this email?
19    MS. KAPPELMAN:  These are notes.
20    A.  These are my notes.  This is an email to myself.
21    Q.  This is your follow-up to that email?
22    A.  She sent that email.  I reached out and spoke to
23  her and these are notes that I transcribed to myself.
24    Q.  I stand corrected.

Page 162

1    She was giving you more detail?
2    A.  Yes.
3    Q.  And what was the meaning of the reference,
4  absolutely that makes sense, in quotes, in the second?
5    A.  That was me responding to what she was
6  describing.
7    I put it in parenthesis because it is me speaking
8  during the course of --
9    Q.  You think it made sense that she should at least
10  be cc'd under those circumstances?
11    A.  I agree when she made the statement, "I need to
12  be aware of stuff."  I said that made sense.
13    It's a simple aside.  I wasn't characterizing her
14  entire complaint.
15    Q.  She let you know that other members of her team
16  told her that she was being excluded from communications
17  with them, correct?
18    A.  Can you repeat the question?
19    Q.  She told you in the second paragraph under the
20  5:45 a.m. reference that other members of his team told
21  her that she has being cut out of communications;
22  correct?
23    A.  Yes.
24    Q.  And she expressed that was related to her

Page 163

1  complaint about Mr. McDole; correct?
2    A.  That was her interpretation of why she was not
3  copied on certain emails.
4    Q.  And it says, "Does he know Mike?  I'm not sure."
5  Correct?
6    A.  Correct.  I asked her if he even knew who
7  Mike McDole was outside of the context of knowing that
8  he was a former associate of hers who had been involved
9  in the investigation and she said "I'm not sure."
10    Q.  You now know that he was aware that Mr. McDole --
11  he was aware of her complaint against Mr. McDole that
12  was formalized in mid August; correct?
13    A.  Yes, I was aware that he knew about that
14  complaint, absolutely.
15    Q.  Did you ask Mr. McKnight about the comment that
16  was attributed to him during his first meeting with
17  Ms. Forsythe about the stock price?
18    A.  Yes.
19    Q.  Did he confirm that?
20    A.  No.
21    Q.  So you have a female employee making a number of
22  complaints, in particular, about two male employees and
23  in both cases you gave them credit for their denial even
24  though her allegations were much more specific in each

Page 164

1  case; correct?
2    MS. KAPPELMAN:  Object to the form of the
3  question.
4    You can answer, Trevor.
5    A.  That's not how I would have described it.
6    Q.  How would you describe it?  How would you
7  describe your claiming that detail allegations by
8  Ms. Forsythe were unsubstantiated when the reason seems
9  to be in most cases, mainly or only, that the
10  individuals denied those allegations?
11    MS. KAPPELMAN:  Object to the form of the
12  question.
13    You can answer it, if you understand.
14    THE WITNESS:  I believe I do.
15    A.  And the allegations lacks evidence or witnesses
16  to substantiate or support them.
17    Q.  Well, Ms. Forsythe never said that physical
18  sexual harassment was witnessed, did she?
19    A.  I specifically asked if it was and she said that
20  it was not.
21    Q.  So is that to say right there so long as
22  something is not witnessed you always believe the
23  denier.  That's what you seem to be saying, sir?
24    A.  No, that's not what I'm saying.

Page 165

1    Q. What are you saying if the fact that she was --
2    the fact that -- just for the record the prior email was
3    1271 and 1272.
4       What do you mean other than that you give credit
5    to the deniers to two serious allegations against
6    Mr. McKnight and Mr. McDole were deemed unsubstantiated
7    based, again, largely or if not exclusively on the fact
8    that they denied them?
9       MS. KAPPELMAN: I totally don't understand
10   that question, Trevor. But if you do, go for it.
11      THE WITNESS: I don't.
12   Q. Are there any other instances at Wayfair where
13   you have determined allegations to be unsubstantiated
14   solely because the allegations were denied?
15   A. Me personally or at the organization as a whole?
16   Q. You as an HR representative?
17   A. No.
18   Q. What about the organization as a whole?
19   A. I have no idea.
20   Q. And you are aware of any other instance in which
21   detailed allegations were denied and the denial was --
22   any reason that the allegations were being
23   unsubstantiated at Wayfair?
24   A. I apologize I don't understand what you are

Page 166

1    claiming was in retaliation, did it?
2    A. It went to substantiating his version of the
3    story for which there were no witnesses.
4    Q. She was not a witness to her own conversation
5    with Mr. McKnight, sir?
6    A. She was a participant not a witness.
7    Q. Have you ever been a courthouse on a trial in an
8    employment case?
9    A. No.
10   Q. You know, don't you, that employees can testify
11   as to conversations that they've had with members of
12   management in a lawsuit; correct?
13      MS. KAPPELMAN: I object. Where is this
14   going, Bob? Anywhere? Is it going anywhere relevant?
15   After five hours of deposition. I hope.
16   Q. Do you know?
17      MS. KAPPELMAN: Does he know what? What
18   is the question, Bob?
19   BY MR. GOODMAN:
20   Q. An employee can testify to their own
21   participation in a conversation, correct? They are not
22   required to have a corroborating witness in order to
23   testify themselves as to the nature of the conversation,
24   are they?

Page 168

1    asking me.
2    Q. Is there any other instance at Wayfair of which
3    you are familiar in which detailed allegations were made
4    against individuals and their denial was a major reason
5    that they were being unsubstantiated?
6    A. That I'm aware of, no.
7    Q. The denials of Mr. McDole and Mr. McKnight were
8    major reasons that you didn't deem substantiated the
9    allegations of Ms. Forsythe; correct?
10      MS. KAPPELMAN: Mischaracterizes his
11   testimony. You can answer again, Trevor.
12   A. They were contributing factors to the
13   determination.
14   Q. What other contributing factors were there in the
15   complaint against Mr. McKnight besides his denial?
16   A. I'm sorry?
17   Q. Besides his denial, what other contributing
18   factors were there in the case of the allegations
19   against Mr. McKnight?
20   A. His description of the conversation seemed
21   consistent with the report from others that she would
22   occasionally become loud and difficult to deal with in
23   those types of situations.
24   Q. That didn't have anything to do with what she was

Page 167

1    A. That is correct.
2    Q. Wayfair 79 is the -- is Wayfair 79 what you were
3    calling your investigation checklist or something a few
4    minutes ago?
5    A. Notebook, yes.
6    Q. What did you call it?
7    A. Notebook.
8    Q. Investigation notebook, okay.
9       And you deemed partially substantiated the claim
10   of unprofessional emails and unprofessional
11   conversation, correct?
12   A. Those were both partially substantiated, yes.
13   Q. And the recommendation was that there be a
14   conversation with all concerned, correct?
15   A. Correct.
16   Q. PFS. Question. Statement? What is that? Your
17   own private notes to yourself?
18   A. Or a follow-up question.
19   Q. Is this a complete record of all of the
20   conversations that you had with any persons about the
21   August 14th formal complaint of Emily Forsythe?
22   A. Yes.
23   Q. Who discussed -- when did you first discuss the
24   prospect of a severance to Ms. Forsythe other than this

Page 169

43 (Pages 166 - 169)

1 conversation you had on Thursday, September 19th?
2        MS. KAPPELMAN: We are now getting into
3 attorney-client privilege, again. I think we've talked
4 about this a number of times. I don't think I have to
5 make the objection clear, again.
6        MR. GOODMAN: I'm not asking about attorney-
7 client communications.
8 BY MR. GOODMAN:
9    Q. When did the idea of a severance first come up
10 after the conversation on Thursday?
11        MS. KAPPELMAN: Again, he testified -- I'm
12 going to make my objection as clear as I possibly can on
13 the record. He has testified many, many times that
14 after he spoke to Emily, he spoke with counsel. I
15 really -- I'm going to make this as clear as I can. I
16 don't want you asking about substantive conversations
17 that he had with in-house counsel about the subject.
18 BY MR. GOODMAN:
19    Q. When did the -- when did the amount of any
20 severance to be offered Emily Forsythe first get decided
21 on?
22        MS. KAPPELMAN: Was it with counsel, Trevor?
23 Or not with counsel?
24    A. I'm not privy to that. There may have been other

Page 170

1 conversations. I was simply instructed on how much to
2 put in the document.
3        MS. KAPPELMAN: By who? Who instructed you?
4        THE WITNESS: Counsel.
5        MS. KAPPELMAN: Thank you.
6 BY MR. GOODMAN:
7    Q. Was there a severance agreement in existence of
8 the kind that you ultimately sent on Monday at any time
9 before Monday?
10    A. Yes.
11    Q. When did it first come into existence?
12    A. It was either Thursday evening or Friday, I'm not
13 sure which.
14    Q. It was a written version of it on which day?
15 First written version of it?
16    A. I don't know that there were multiple versions.
17 The dates were simply changed on the version that she
18 presented based on the fact that she was not at work on
19 Friday.
20        MR. GOODMAN: Pass the witness.
21        MS. KAPPELMAN: I only have a few questions,
22 Mr. Shaffer. Do you need a break before we start or are
23 you okay?
24        THE WITNESS: I'm fine.

Page 171

1 BY MS. KAPPELMAN:
2    Q. You testified earlier today that you were asked
3 to conduct an investigation into Ms. Forsythe's
4 August 14, 2019, complaints including sexual harassment;
5 am I right?
6    A. Yes.
7    Q. There were three incidents that she reported of
8 sexual harassment in that complaint; is that correct?
9    A. It is.
10    Q. With respect to the first incident with
11 Mr. McDole in January of 2019, did you ask Ms. Forsythe
12 if she had complained to anyone after that incident in
13 January of 2019?
14        MR. GOODMAN: Objection.
15        Asked and answered.
16 BY MS. KAPPELMAN:
17    Q. Can you answer.
18    A. I asked if she had reported her concerns?
19    Q. And what did she say?
20    A. She said that she did not.
21    Q. Am I correct that during the of January 2019,
22 Mr. McDole actually reported to Ms. Forsythe?
23    A. You are correct.
24    Q. He was not in position of power over her at work;

Page 172

1 is that correct?
2    A. That's correct.
3    Q. She was in a position to actually evaluate his
4 performance; correct?
5    A. She was in a position to and had a managerial
6 obligation to report any inappropriate conduct.
7    Q. And I believe you also looked into a concern that
8 she had about an interaction she had with Mr. McDole in
9 March of 2019; is that correct?
10    A. That's correct.
11    Q. Did you ask Ms. Forsythe if she had complained to
12 anyone at Wayfair after that March interaction?
13    A. I asked if she had reported her concerns, yes.
14    Q. What did she say?
15    A. She said that she had not.
16    Q. Did you ask Ms. Forsythe if she had indicated to
17 Mr. McDole in January or March that she believed that
18 the interactions were unwelcome?
19    A. I asked her that question, yes.
20    Q. And what was her response about January?
21    A. That she did not mention it to him in either
22 instance.
23    Q. So the fact that Ms. Forsythe was Mr. McDole's
24 manager, and the fact that she didn't report these

Page 173

1  incidents to anyone in January or March, and the fact
2  that she never indicated to Mr. McDole that his
3  advances, if there were advances, were unwelcome, did
4  that play any port in your decision that her complaints
5  were unsubstantiated in January and March?
6  A.  Yes.
7       MR. GOODMAN:  Objection.
8  BY MS. KAPPELMAN:
9  Q.  During the course your investigation of her
10  concerns about Mr. McDole, did you ask her if she knew
11  Mr. McDole before they both came to Wayfair?
12  A.  Yes.
13  Q.  And did you ask her if she knew him
14  professionally?
15  A.  She had replied that they had worked together
16  previously.
17  Q.  Did you ask her specifically whether she knew
18  Mr. McDole personally before she hired him to come to
19  Wayfair?
20       MR. GOODMAN:  Objection.  Asked and
21  answered.
22  A.  Yes.
23  Q.  What did she tell you about whether she knew him
24  personally versus professionally before they came to

*Page 174*

1  Wayfair?
2  A.  She indicated they did not have a personal
3  relationship prior to Wayfair.
4  Q.  Did she tell you that he had come to visit her at
5  her parents' house in Cohasset before she reached out to
6  hire him for Wayfair?
7  A.  No, she did.
8  Q.  Would that have been responsive to any of your
9  questions that you asked her?
10  A.  Yes.
11  Q.  Specifically what question did you ask her that
12  would have been responsive to?
13  A.  If she had a relationship with him prior to
14  joining Wayfair.  And if she had any reason to believe
15  that he had a romantic interest in her.
16  Q.  Okay.  And she kept that information from you?
17  A.  She did.
18       MR. GOODMAN:  Objection.
19  BY MS. KAPPELMAN:
20  Q.  And when you learned, after the fact, that they
21  had had a romantic interlude at her parents' house in
22  Cohasset before she hired him, did that surprise you?
23  A.  Yes.
24       MR. GOODMAN:  Objection; leading.

*Page 175*

1  BY MS. KAPPELMAN:
2  Q.  Would that have been something that would have
3  been important for you to know in weighing credibility
4  of her sexual harassment complaint against him in 2019?
5       MR. GOODMAN:  Same objection.
6  Q.  You can answer.
7  A.  Yes.
8  Q.  I believe in testimony today you talked about the
9  fact that Emily mentioned severance in that phone call
10  with you that Thursday, September 19th; is that correct?
11  A.  That's correct.
12  Q.  Who was the first person to use the word
13  "severance" during that phone call?
14  A.  Ms. Forsythe.
15  Q.  Did you say anything to suggest that you were
16  considering terminating her employment in that phone
17  call on September 19th?
18       MR. GOODMAN:  Objection.  Asked and
19  answered.
20  A.  Absolutely not.
21  Q.  Did you say anything to indicate that you would
22  be willing to give her severance in that phone call on
23  September 19th, before she brought it up?
24  A.  No.

*Page 176*

1  Q.  I think she used another qualifier before she
2  said severance -- that she wanted severance.  Do you
3  happen to know what that word was?
4  A.  I do.
5  Q.  What was it?
6  A.  Compelling.
7  Q.  Have you ever heard the word compelling used with
8  severance before that phone call with Emily on
9  September 19th?
10  A.  No, I have not.
11  Q.  So when she said that she wanted a compelling
12  severance to you on September 19th, what did you
13  understand that to mean?  What did you believe it to
14  mean?
15  A.  That she was asking Wayfair to pay her to go
16  away.
17  Q.  When you were asked earlier today about whether
18  you had ever been involved with any employee who had
19  forwarded confidential information -- strike that.
20       When you were asked earlier today if you had ever
21  been involved with an employee sending information from
22  their Wayfair account to their personal email account
23  you said, no.  Correct?
24  A.  That's correct.

*Page 177*

1    Q. Are you aware of whether Wayfair has any policies
2 about employees sending confidential proprietary
3 information from their work email to their personal
4 email?
5       MR. GOODMAN: Objection. Asked and
6 answered.
7    A. I don't know the specific policy but transmitting
8 proprietary information would seem to be a clear
9 violation of company policy and just basic common sense.
10    Q. With respect to individuals taking confidential
11 proprietary information with them after they leave the
12 company, have you ever been involved in a situation
13 where the company has gone after an individual, an
14 employee, who has taken confidential proprietary
15 information with them after they have left the company?
16       MR. GOODMAN: Objection, leading.
17    A. Yes.
18    Q. So as you sit here today, do you understand that
19 is something prohibited by Wayfair; that is, an employee
20 taking confidential proprietary information with them
21 after they leave employment?
22    A. Yes.
23       MR. GOODMAN: Objection. Calls for a legal
24 conclusion.

Page 178

---

1 BY MS. KAPPELMAN:
2    Q. So as you sit here today, have you ever been
3 involved in a situation where an employee, who is on
4 their way out of the company, sends themselves, to their
5 home address, confidential proprietary information so
6 that they can secrete it out of the company?
7       MR. GOODMAN: Objection. Asked and
8 answered. Assume facts not in evidence.
9    A. Yes.
10      MS. KAPPELMAN: That's all I have. Thank
11 you.
12      MR. GOODMAN: Nothing here.
13      MS. KAPPELMAN: Thank you, Trevor.
14      THE VIDEOGRAPHER: The time is 4:08 p.m.
15 Eastern time. We are going off the record. This is the
16 end of media file number five. That concludes this
17 deposition.
18
19
20
21
22
23
24

Page 179

---

1
2
3
4       COMMONWEALTH OF MASSACHUSETTS.
5
 COUNTY OF SUFFOLK, SS.
6
7    I, Lori J. Atkinson, Professional Court Reporter
 and Notary Public duly and qualified in and for the
8 State of Massachusetts do hereby certify that the
 foregoing transcript is a true and correct transcript of
9 my original stenographic notes.
 I further certify that I am neither an attorney or
10 counsel for, nor related to or employed by any of the
 parties to the action in which this deposition is taken;
11 and furthermore, that I am not a relative or employee of
 any attorney or counsel employed by the parties hereto
12 or financially interested in the action.
13
14 IN WITNESS THEREOF, I have hereunto
 Set my hand and affixed my Notarial Seal this 1st day
15 of September, 2020.
16
17
18
   LORI J. ATKINSON
19    NOTARY PUBLIC
20    ***PLEASE NOTE***
21
22
23
24

Page 180

---

1
 THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
2 APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE
 SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
3 SUPERVISION OF THE CERTIFYING COURT REPORTER.
4 DEPOSITION ERRATA SHEET
5 Case Caption: FORSYTHE vs. WAYFAIR
6 Deponent: TREVOR SHAFFER-FIGUEROA
7 Deposition Date July 27, 2020
8   To the Reporter:
9 I have read the entire transcript of my Deposition taken
10 in the captioned matter or the same has been read to me.
11 I request that the following changes be entered upon the
12 record for the reasons indicated. I have signed my name
13 to the Errata Sheet and the appropriate Certificate and
14 authorize you to attach both to the original transcript.
15 Page No.    Line No.    Change to
16
17 Reason for change:
18 Page No.    Line No.    Change to
19
20 Reason for change:
21 Page No.    Line No.    Change to
22
23 Reason for change:
24 Page No.    Line No.    Change to

Page 181

46 (Pages 178 - 181)