# Exhibit 6

**In the Matter Of:**

*EMILY FORSYTHE vs*

*WAYFAIR, LLC*

*CANDICE SMITH*

*September 02, 2020*



Page 5

```
 1              E X H I B I T   I N D E X
 2
 3   No.        Description        Page
 4
 5   Exhibit 1              Emily Forsythe -- ......84
                Written Complaint
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1           P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  We are on
 3   the record at approximately 9:34 a.m., on
 4   September 2nd 2020.  My name is
 5   Icelsa Garcia.  I will be the
 6   videographer for today's deposition.
 7      Will the court reporter please swear
 8   in the witness.
 9           MR. GOODMAN:  Robert Goodman,
10   for plaintiff, Emily Forsythe.
11           MS. MILLER:  Emily Miller,
12   for defendant, Wayfair.
13             CANDICE SMITH
14   Having been duly sworn testified as follows:
15   EXAMINATION BY MR. GOODMAN:
16     Q.  Ms. Smith, are you using the
17   headphones as your microphone?
18     A.  I am.  Yes.
19     Q.  I may ask you to make an adjustment,
20   if we discover there are problems.  But that
21   does not say -- not to do something different,
22   which you may not have; but sometimes, even a
23   little shift can help improve the audio
24   quality.
25           Are you currently employed by
```

Page 7

```
 1   Wayfair?
 2     A.  Yes.
 3     Q.  All right.  How long have you been
 4   employed by Wayfair?
 5     A.  Six Years.
 6     Q.  What is your title?
 7     A.  Director of Talent Management for
 8   field locations.
 9     Q.  Nationwide?
10     A.  Globally.
11     Q.  How many -- how many facilities
12   outside of the United States does Wayfair
13   have, approximately?
14     A.  Six, I think.
15     Q.  Have you held that position for the
16   entire last six years?
17     A.  No.
18     Q.  And have you been located in
19   Washington State for the entire last six
20   years?
21     A.  No.
22     Q.  Okay.  Where were you before you
23   moved to Washington State?
24     A.  Salt Lake City, Utah.
25     Q.  All right.  And is that where you
```

Page 8

```
 1   started with Wayfair?
 2     A.  Yes.
 3     Q.  Okay.  And how long have you been in
 4   Washington State?
 5     A.  Two and a half years.
 6     Q.  You're in Spokane?  Seattle?  Where
 7   are you?
 8     A.  Technically, Pasco, Washington;
 9   which is the tri-cities area.
10     Q.  And the tri-cities are?
11     A.  Pasco; Kennewick; Richland.
12     Q.  Okay.  How old are you?
13     A.  Forty-three.  Have to do the math.
14     Q.  All right.  Did you graduate from
15   college?
16     A.  No.
17     Q.  And where'd you go to high school?
18     A.  New Mexico.  Albuquerque, New
19   Mexico.
20     Q.  I am from El Paso.  So we have that
21   in common.
22     A.  Oh, yeah.
23     Q.  And between high school and your job
24   with Wayfair, where did you work?
25     A.  You want to know all of them?
```

**Page 33**

1    But you can answer.
2    A. No.
3    Q. Ms. Forsythe asked for a personal
4 day off, on the Friday before the Tuesday,
5 where she was planning to go to Atlanta on the
6 business trip. Correct?
7    A. I don't know.
8    Q. Nobody told you that?
9    A. Not that I recall.
10   Q. Do people who are no longer employed
11 by Wayfair need to ask permission for a PTO,
12 the day after they cease their employment?
13   A. No.
14   Q. That doesn't make any sense at all,
15 does it?
16   A. Well, in this circumstance, if
17 you -- like, if you resign, typically, you
18 give notice. So, there would be a situation
19 where you would resign and still be working
20 for the company.
21   Q. Okay. But that's not what's
22 being -- even being claimed here, is it?
23       MS. MILLER: I'm going to
24   object to the form.
25   A. I believe that it is being claimed

**Page 34**

1 that she was resigning.
2    Q. Ma'am, the example you just gave
3 said resigning -- the hook you gave was
4 "notice." You have never heard from anybody
5 that Ms. Forsythe used the word,
6 "resignation." Right?
7    A. Used that word; no.
8    Q. Or that she gave any specific number
9 of days, or weeks, of notice. Right?
10   A. Specific days, no.
11   Q. Specific hours. She didn't give
12 specific hours; or weeks; or months; or years.
13 Did she?
14   A. Well, I think we were working
15 through her resignation, which was
16 undetermined, as far as the timeline.
17   Q. She didn't give notice of a specific
18 number of minutes; hours; days; weeks; or
19 months, did she?
20       MS. MILLER: Bob, asked and
21   answered. Object -- objection. Asked
22   and answered.
23   Q. Okay. You can answer.
24   A. We were working through her notice
25 period, as she was resigning.

**Page 35**

1    Q. Ma'am, she didn't give a notice
2 period, did she?
3    A. She asked for severance, which, in
4 our world is resigning. And working through
5 that process takes time.
6    Q. Objection. Responsiveness. She did
7 not specify any notice period of minutes;
8 hours; days; weeks; or months, using those --
9       MS. MILLER: Objection. Asked
10   and answered.
11   Q. Using those words, did she?
12   A. I wasn't there. So I don't know the
13 exact conversation.
14   Q. And you haven't been told that she
15 gave any notice of specific number of minutes;
16 hours; days; weeks; or months, either, have
17 you?
18   A. I don't think that she would have
19 had to give specifics, because we were working
20 through her resignation period.
21   Q. Okay. You're saying she wouldn't
22 have had to do it, but she, in fact -- nobody
23 has told you that she did do it. Correct?
24   A. Not a specific amount of time, as we
25 worked through her resignation.

**Page 36**

1    Q. All right. Did you -- did you talk
2 to anybody about her Thursday conversation
3 with Mr. Shaffer-Figueroa, but
4 Mr. Shaffer-Figueroa?
5    A. Can you clarify what her Thursday
6 conversation was?
7    Q. A conversation where you claim -- or
8 Wayfair claims -- that somehow, she resigned
9 without giving a notice period; without using
10 the word "resign." That conversation.
11       MS. MILLER: I'm going to
12   object.
13       And to the extent that you're
14   talking about conversations that you had
15   with counsel, Candice, I'm going to
16   direct you not to answer, as
17   attorney/client privileged conversations.
18   A. I did talk with Marcie Axelrad and
19 Mike Barent, related to this situation.
20   Q. Okay. I know Mr. Barent is an
21 attorney. Is Ms. Axelrad an attorney?
22   A. Yes.
23   Q. Did you talk to them --
24   A. I don't know what her clarification
25 is. I know she has practiced in the past.

**Page 37**

1  Q. Excuse me?
2  A. I don't know if she's -- like, has
3  an active license to practice. I know she has
4  practiced as an attorney in the past.
5  Q. Okay. Where is she located?
6  A. Boston.
7  Q. And she told you that she had a
8  license in the past?
9  A. She told me that she's practiced in
10 the past.
11 Q. Okay. When did you first talk to
12 Mr. Shaffer-Figueroa about this -- what we've
13 identified as the "Thursday conversation?"
14 Did you talk to him on that Thursday; or the
15 next day; or the Saturday; or Sunday; or
16 Monday; or Tuesday?
17 A. I'm pretty sure it was that Thursday
18 afternoon.
19 Q. Did you talk to anybody else about
20 Mr. Shaffer-Figueroa's Thursday conversation,
21 with Ms. Forsythe, on Thursday, before
22 midnight, beside Mr. Shaffer-Figueroa?
23 A. I don't remember when I had the
24 conversation with Mike and Marcie. If it was
25 Thursday or Friday.

**Page 38**

1  Q. Okay. Who initiated that
2  conversation?
3  A. Which one?
4  Q. Any conversation you had with
5  Axelrad or Barent?
6  A. I initiated the conversation.
7  Q. Do you know why Ms. Forsythe was
8  told, on Tuesday morning, not to go on the
9  business trip to Atlanta?
10 A. I don't.
11 Q. Do you know of any communications
12 between Thursday, when you spoke to
13 Mr. Shaffer-Figueroa, and Tuesday morning,
14 when she was told not to go to Atlanta, with
15 Cory McKnight, or Matt Woody?
16 A. I had a conversation with Mike and
17 Marcie related to the situation.
18 Q. I don't think you understood my
19 question. Between Thursday, when you spoke to
20 Mr. Shaffer-Figueroa, and Tuesday morning,
21 when Ms. Forsythe was told not to go to
22 Atlanta, are you aware of any conversation
23 about Ms. Forsythe, between you and
24 Mr. McKnight, and Ms. -- or Mr. Woody; or
25 between Shaffer-Figueroa, and McKnight, and

**Page 39**

1  Woody?
2  MS. MILLER: Object to the
3  form.
4  But you can answer.
5  A. I don't specifically remember.
6  Q. Okay. And Mr. McKnight and
7  Mr. Woody were the chain of command for
8  Ms. Forsythe at the time. Correct?
9  A. Yes.
10 Q. Is it customary, in Wayfair, for --
11 have you ever heard of individuals at Wayfair
12 being terminated without the knowledge of
13 their immediate supervisor, or the immediate
14 supervisor's superior?
15 A. Yes.
16 Q. Okay. What were the circumstances?
17 A. I know that we've done
18 investigations -- I think I've specifically
19 done investigations where I've talked to
20 somebody at a very senior level -- a director
21 or above -- to inform them of the expectation
22 that we were going to separate employment,
23 without informing their direct manager, or
24 their manager's manager.
25 It would be several levels above

**Page 40**

1  them.
2  Q. Do you -- did you inform Mr. Woody's
3  superior, at any time, between Thursday, when
4  you spoke to Mr. Shaffer-Figueroa, or Tuesday,
5  when Ms. Forsythe was told not to go to
6  Atlanta?
7  MS. MILLER: Object to the
8  form.
9  A. I don't -- I don't believe I had a
10 conversation with his manager between that
11 time.
12 Q. And who was it?
13 A. Chris Stark.
14 Q. Did you ever discuss Emily Forsythe
15 with Mr. Stark?
16 A. Yes.
17 Q. But that was after the following
18 Tuesday, when she was told not to go to
19 Atlanta?
20 A. No. Before then.
21 Q. Okay. But it was before Thursday,
22 when you talked to Mr. Shaffer-Figueroa?
23 A. Yes.
24 Q. How many times did you talk with
25 Mr. Stark?

53
1  seriously, or more seriously than a complaint
2  of unlawful discrimination?
3        MS. MILLER: I'm going to,
4     again, object that she is not a 30(b)(6)
5     witness, speaking on behalf of the
6     company. And so, to base that on her
7     experience --
8     Q. You can base it on your experience,
9  only.
10    A. I take all complaints equally
11 serious.
12    Q. All complaints of alleged unlawful
13 conduct, equally seriously?
14    A. I take all complaints equally
15 seriously?
16        MS. MILLER: Yeah. To the
17    extent that we're creating this
18    distinction between "lawful" and
19    "unlawful," and you're asking the
20    witness to draw legal conclusions about
21    which complaints were of unlawful
22    conduct, versus lawful, I object to that.
23        MR. GOODMAN: No. I'm not.
24 BY MR. GOODMAN:
25    Q. You've been in -- you've been in HR

54
1  for 10 or 15 years. Correct?
2     A. Yes.
3     Q. You know when something is alleging
4  a violation of one of the discrimination laws,
5  and when it's just alleging unfairness.
6  Correct?
7     A. Typically, I need all of the
8  information to make a determination on whether
9  or not something is unlawful or lawful -- or
10 unlawful, or not related to a law.
11    Q. But, ultimately, you can make the
12 distinction -- you could make the distinction,
13 as a human resources professional; can't you?
14    A. I make the distinction after I have
15 the information. I don't make a distinction
16 based on an initial complaint.
17    Q. Right. But there is a distinction
18 to be made, once you have necessary facts.
19 Correct?
20    A. Yes.
21    Q. Are you aware of the allegation that
22 Mr. Woody told Ms. Forsythe that he wanted to
23 hire three -- three male colleagues -- former
24 colleagues of his, at Wal-Mart, and to remove
25 Ms. Forsythe from her supervision?

55
1     A. No.
2     Q. You never heard of that?
3     A. I believe it was mentioned in my
4  conversation with Emily and Lynn yesterday.
5        MS. MILLER: And I'm going to
6     object to any conversation that you had
7     with me and Lynn, as -- you don't need to
8     speak to the contents of those
9     conversations. They are privileged.
10    Q. Do you know if anybody spoke before
11 the Tuesday Ms. Forsythe was told not to go to
12 Atlanta, about -- to Mr. McKnight, about his
13 saying any of that to Ms. Forsythe?
14    A. No.
15    Q. Did Mr. Shaffer-Figueroa tell you,
16 or disclose to you that he had -- he actually
17 had a conversation after the complaint of
18 sexual harassment of Ms. Forsythe was
19 received, about that sexual harassment?
20        MS. MILLER: Object to the
21    form.
22    A. Yeah. Can you clarify?
23    Q. Yeah. Mr. Shaffer-Figueroa
24 disclosed to you that he had actually talked
25 to Emily Forsythe about her complaint of

56
1  sexual harassment. Not only seen her written
2  complaint?
3     A. Correct.
4     Q. And did he share any of the details
5  of his conversation with Ms. Forsythe, about
6  that sexual harassment with you?
7     A. I'm sure he did. But I don't
8  remember the specifics of that conversation.
9     Q. All right. As a woman, how did that
10 make you feel?
11    A. My gender doesn't drive any
12 reasoning behind, you know -- I don't think I
13 took into consideration -- I know I didn't
14 take into consideration, my gender, in my
15 conversation with Trevor.
16    Q. Well, a woman would be particularly
17 sensitive to having a man, without her
18 consent, rubbing -- coursing his hand down her
19 chest. Correct?
20        MS. MILLER: I'm going to
21    object to your calling for speculation,
22    about how women globally would feel about
23    something.
24    Q. Okay. Well then, you, as a woman.
25 That's something that you can relate to, the

Page 69

```
 1  is merit or not; or if there is partial merit,
 2  or complete merit.  Correct?
 3      A.  It's a very broad statement.
 4  Whether or not you talk to the complainant
 5  really depends on the investigation.  And if
 6  you have a written complaint, you may not
 7  necessarily need to have a conversation with
 8  the person, until after you've done additional
 9  due diligence.
10      Q.  Okay.  Can you -- yeah.  Can you
11  complete an investigation of discrimination,
12  or retaliation of any kind, without actually
13  ever talking to the complainant?
14      A.  I'm sure there is a circumstance
15  where that could happen.
16      Q.  But, in practice, you always talk to
17  the complainant.  Correct?
18      A.  Again, "always" is a very definitive
19  word.  But, in most cases, yes.
20      Q.  And you can't readily think of a
21  circumstance in which you would not talk to
22  the complainant, at some point in an
23  investigation, of unlawful discrimination, or
24  unlawful retaliation.  Correct?
25              MS. MILLER:  Objection.  Asked
```

Page 70

```
 1      and answered.  She's responded to this
 2      question in several different ways.
 3      A.  No.  I think there is a situation
 4  where you may not need to talk to the
 5  complainant.
 6      Q.  And is that when -- would that be
 7  when a supervisor, or other employee, admitted
 8  unlawful discrimination or retaliation?
 9      A.  I think it depends on the additional
10  circumstances of the investigation.  That one
11  piece would not drive whether or not I would
12  talk to a complainant.
13      Q.  All right.  And what -- in what
14  circumstance would a professional human
15  resource representative not talk to a
16  complainant about the complainant -- the
17  complainant's claim of an unlawful
18  discrimination or retaliation?  If you can
19  think of any.
20      A.  Yeah.  I think if you have all of
21  the details in writing, you likely do not need
22  to reach out to the complainant to get
23  additional information, if you feel like you
24  have enough information to start your
25  investigation.
```

Page 71

```
 1      Q.  Right.  But once you hear from, say,
 2  the target of the complaint, that often
 3  generates more questions for the complainant;
 4  doesn't it?
 5      A.  Most of the time.
 6      Q.  Yes.  Because it's -- you know,
 7  basically, them replying to the response to
 8  their complaint.
 9      A.  In most circumstances, yes.
10      Q.  Okay.  Did Mr. McKnight contact you,
11  at any time in August or September 2019, about
12  getting -- getting Ms. Forsythe removed from
13  his supervision?
14      A.  I know he and I had a conversation,
15  but I don't remember who initiated the
16  conversation.  But, related to her
17  performance.  Not necessarily, removal of her
18  from her position.
19      Q.  Okay.  Because -- and I say that
20  because, she alleges that he told her that he
21  was -- that he had already started working
22  with HR representatives to remove plaintiff
23  from his supervision.
24              So you are saying that you did
25  not, in fact, have a conversation with him
```

Page 72

```
 1  about removing her from his supervision.
 2  Correct?
 3      A.  I don't, specifically, remember the
 4  details of the conversation, and whether or
 5  not that topic was brought up.
 6      Q.  Okay.  Are you changing your
 7  testimony?  Now you're saying it may have been
 8  brought up?  Before you said, it wasn't
 9  brought up?  Which is it?
10      A.  The conversation that he and I had
11  was related to her performance.  Whether or
12  not it was brought up that he would like her
13  removed from his supervision, I don't
14  specifically remember.
15      Q.  Okay.  What did he say about her
16  performance to you, in that conversation?
17      A.  It was around her communication
18  style.  And that there was some complaints
19  from others that her communication was not
20  good.
21      Q.  Okay.  What does the word "around"
22  mean?  You said "it was around her
23  communication style."  What does that mean?
24      A.  Related to her communication style.
25  I mean, nothing specific.
```

**Page 105**

1 Wayfair had determined that it was going to
2 say, "Well, she actually resigned the prior
3 Thursday?"
4      MS. MILLER:  She's not
5 refusing.  I'm directing her not to
6 answer as to the contents of the
7 conversation with counsel present.
8      And we can take it to a judge.
9 BY MR. GOODMAN:
10    Q.  And this -- was this -- have you
11 ever, in your time at Wayfair, as an HR
12 professional, thought that a position that
13 Wayfair was taking was inappropriate?
14    A.  So, "inappropriate," I struggle with
15 that word.  I think there are situations that
16 Wayfair --
17    Q.  [Inaudible]
18    A.  I think Wayfair has made decisions
19 that I don't necessarily agree with.  I have a
20 comfortable relationship with my supervisor
21 and manager that I can have those
22 conversations if I don't agree with an
23 approach.
24    Q.  Okay.  And was the disposition of
25 the employment of Ms. Forsythe one of those

**Page 106**

1 instances, during your employment, prior to
2 your going to the bank?
3    A.  That conversation was with Mike and
4 Marcie.
5    Q.  Okay.  Because Marcie, in addition
6 to being on the conversation, was your boss.
7 Correct?
8    A.  Yes.  Marcie is my manager.
9      MR. GOODMAN:  I'm going to take
10 a couple minutes break.  See if I have
11 any more questions.
12      THE VIDEOGRAPHER:  The time is
13 11:47 a.m..  We're going off the record.
14    (Short break.)
15      THE VIDEOGRAPHER:  The time is
16 11:49 a.m..  We are going back on the
17 record.
18      MR. GOODMAN:  Ms. Mitchell,
19 Ms. Miller, Ms. Smith; I'm passing the
20 witness.
21      MS. MILLER:  Thank you.  So, I
22 have a couple of questions for you,
23 Ms. Smith.  Just to clarify a few things
24 on the record.
25

**Page 107**

1 EXAMINATION BY MS. MILLER:
2    Q.  Did you conduct the investigation
3 into Ms. Forsythe's complaint of harassment by
4 Mr. McDole?
5    A.  No.
6    Q.  Did you conduct the investigation
7 into Ms. Forsythe's complaint of retaliation
8 by Mr. McKnight?
9    A.  No.
10    Q.  When someone under you is conducting
11 an investigation, do you expect them to
12 discuss every detail of the investigation with
13 you?
14    A.  No.
15    Q.  And were you the decision-maker when
16 it came to accepting Ms. Forsythe's
17 resignation?
18    A.  No.
19      MS. MILLER:  Okay.
20      MR. GOODMAN:  I can't hear you
21 Emily.  Please repeat the question.
22      MS. MILLER:  All of them?  Or
23 the final one?
24      MR. GOODMAN:  The final one,
25 sorry.

**Page 108**

1      MS. MILLER:  I asked if she was
2 the decision-maker when it came to
3 accepting Ms. Forsythe's resignation.
4      THE WITNESS:  And I said no.
5      MS. MILLER:  Those are all the
6 questions I have.
7 FURTHER EXAMINATION BY MR. GOODMAN:
8    Q.  All right, Ms. Smith.  So you expect
9 your subordinates to give you less than
10 complete explanations of their investigation?
11    A.  No.  But I did not expect them to
12 provide every single detail, based on the
13 investigation.  We typically talk about a
14 general overview.
15    Q.  Right.  And you ask them questions
16 to make sure that they have hit all the spots
17 with regard to professional conduct of
18 investigations.  Correct?
19    A.  I asked them questions to ensure I
20 understand the situation, and if they are
21 unable to answer, will ask -- direct them to
22 go back and get additional information.
23    Q.  All right.  And, also, so assure
24 quality control.  Correct?
25    A.  I don't know that I would