# Exhibit 7

# In the Matter Of:

*EMILY FORSYTHE vs*

*WAYFAIR, LLC*

*BRITTANEY SKAGGS*

*August 31, 2020*



17
1  Q   And who did Shannon work for directly?
2  A   Brandon Mowrey.
3  Q   Was Brandon Mowrey a peer of Emily?
4  A   Yes.
5  Q   Okay.  Anybody else that you can remember?
6  A   I cannot off the top of my head.  I'm not sure
7  if there were additional women, females or not.
8  Q   And then how many males -- how many males were
9  on Witte's team other than Mr. Lowe, Mr. Martin, and
10 Mr. Chin?
11     A   That was the entire team for -- those were
12 answering to Keith Wertman, not to Witte.
13 Q   Okay.  When we talked about the broader
14 Witte/Wertman team -- you've identified the females.
15 Were there any -- can you identify the males, please?
16     A   Yes.  Brandon Mowrey, Robert Holtz, Sean Lane,
17 Jeff Neuharth, Michael McDole, Eric Worley, William
18 Ensuncho.  Sorry.  It's been a very long time since I've
19 seen any of these people in person so, it's hard to
20 remember at the time.
21 Q   I understand.
22 A   Alec Foos, F-o-o-s, and that's all I can
23 recall, currently.
24 Q   All right.  Is Kelly Brieg still with Wayfair?
25 A   Yes.

18
1  Q   And Shannon Johnson?
2  A   Yes.
3  Q   Are there -- are any of the -- is Mr. Mowrey
4  still with Wayfair?
5  A   Yes.
6  Q   Any of the other males that you named, are
7  they gone from Wayfair?  Or are they all still with
8  Wayfair?
9  A   They're all still with Wayfair, with the
10 exception of obviously Keith Wertman, who has left, my
11 boss.
12 Q   And why did he leave?
13 A   I have no knowledge as to why he left.
14 Q   Do you know when he -- when he left?
15 A   About approximately two months ago, so
16 July-ish.
17 Q   Who is Trevor Figueroa?
18 A   He works in human resources in Perris,
19 California.
20 Q   Did you ever talk to him about Ms. Forsythe?
21 A   Yes.
22 Q   Do you remember what -- was that at his
23 initiation?
24 A   Yes.
25 Q   Did you talk to him more than once about

19
1  Ms. Forsythe, or just once?
2  A   Just once, to my recollection.
3  Q   Do you remember what he asked you about?
4  A   He asked me in reference to a sexual
5  harassment lawsuit -- or I'm sorry, sexual harassment
6  investigation that he was conducting on behalf of
7  Ms. Forsythe.
8  Q   And what was the sexual harassment
9  investigation about other than, as you say, the subject
10 of sexual harassment?  What specific facts was it
11 about, if you know?
12     MS. KAPPELMAN:  Object to the form of the
13 question.
14     You can answer, if you know.
15     THE WITNESS:  He asked me about interactions
16 that I had witnessed or heard of between
17 Ms. Forsythe and Mr. McDole.
18 BY MR. GOODMAN:
19 Q   Did you -- do you remember how you
20 characterized -- you had seen them interact; correct?
21 A   I'm sorry, I didn't hear you.
22 Q   You had seen the two of them interact,
23 Mr. McDole, and Ms. Forsythe; correct?
24 A   Yes.
25 Q   Did you ever -- did you ever -- how did you

20
1  characterize their interactions to Mr. Shaffer?
2  A   Hostile, on occasion.
3  Q   Did you ever address whether there may have
4  been a personal interest by Mr. McDole in Ms. Forsythe
5  with him?
6  A   Did I address it with who?
7  Q   Whether he seemed to have an interest in a
8  relationship beyond work with her.
9  A   Not exactly.
10 Q   I'm going to show you a document.  Hopefully
11 you can see it on your desktop.  Can you see this
12 document, Ms. Skaggs?
13 A   Yeah.  Yes.
14 Q   Does this appear to be -- if you can -- you
15 can browse at it.  Does it appear to be a summary of
16 Mr. Shaffer's conversation with you?
17     MS. KAPPELMAN:  Object to the form of the
18 question.
19     If you know what it is.
20     THE WITNESS:  I did not hear the question.
21 I'm sorry.
22 BY MR. GOODMAN:
23 Q   Yes.  Please read it and then I'll ask you a
24 question.
25     (The Court Reporter is directed to read back

25
1  **If you think it was inadequate in that regard, what did**
2  **it leave out?**
3       MS. KAPPELMAN: Object to the form of the
4    question. It mischaracterizes her testimony.
5       You can answer, Brittaney.
6       THE WITNESS: The comment that was asked to me
7    was whether or not I said specifically, I think he
8    has a crush on you, when referring to Mr. McDole.
9  BY MR. GOODMAN:
10     **Q   And you're saying it doesn't record the entire**
11  **context. What aspect of your conversation with**
12  **Mr. Figueroa was not contained in his memo?**
13      MS. KAPPELMAN: Object to the form of the
14   question.
15      You can answer, Brittaney.
16      THE WITNESS: The comment that this is
17   referring to is part of a broader conversation.
18   And it is not characterized because the
19   conversation did not -- I don't recall specifically
20   saying, I think he has a crush on you. I don't
21   think I did. But the conversation came back as me
22   asking Ms. Forsythe if there was a background or
23   reason to the back and forth that I had seen and
24   others had seen between her and Mr. McDole. And
25   below that, it also states that I knew some

26
1   background as that they had grown up in the same
2   town, they grew up together, and had asked if there
3   was a previous relationship that would cause so
4   much tension and dislike between the two parties.
5  BY MR. GOODMAN:
6     **Q   So that's a record of questions you asked**
7  **Emily?**
8       MS. KAPPELMAN: Object to the form of the
9    question.
10      I don't understand it, but if you do,
11   Brittaney, feel free to answer.
12      THE WITNESS: It is part of a conversation
13   that Ms. Forsythe and I had in a car in Savannah,
14   Georgia.
15  BY MR. GOODMAN:
16    **Q   Okay.**
17    A   So it's not something that you can write three
18   lines of and then characterize it as the whole
19   conversation because this is -- there's not enough
20   context here for me to corroborate or disclaim on.
21    **Q   Is there -- are there -- are there aspects of**
22  **the conversation you had with Mr. Figueroa concerning**
23  **Emily Forsythe that are not accurately reflected in this**
24  **memo?**
25      MS. KAPPELMAN: Asked and answered.

27
1       You can answer again.
2       THE WITNESS: Yes. There is a context that is
3    not included in this memo.
4  BY MR. GOODMAN:
5     **Q   Okay. And if it had been included, what would**
6  **it have properly said?**
7       MS. KAPPELMAN: You can answer again.
8       THE WITNESS: It would have said, based on my
9    knowledge of your background, is there a previous
10   relationship or some other instance that has caused
11   you two to have such dislike for each other.
12  BY MR. GOODMAN:
13    **Q   And what -- okay. And what -- and you're**
14  **saying you asked that question of Emily; correct?**
15    A   Correct.
16    **Q   And what was her response?**
17    A   To my knowledge, paraphrasing is that she said
18   that they had never had any sort of romantic
19   relationship before, and that she wasn't entirely
20   certain as to why they did not get along.
21    **Q   Okay. And that's not -- neither of those**
22  **statements are in the memo or anything like them;**
23  **correct?**
24    A   I do not see them in there, no.
25    **Q   Okay. And did you -- did you say anything**

28
1  **about either of those two comments to Mr. Figueroa?**
2    A   Yes. We talked about the entire conversation
3   that Ms. Forsythe and I had had.
4     **Q   And why do you think Mr. Figueroa didn't**
5  **include those two statements?**
6       MS. KAPPELMAN: Object to the form of the
7    question. She has no way of knowing what
8    Mr. Figueroa's thinking or why he wrote certain
9    notes and didn't write others.
10  BY MR. GOODMAN:
11    **Q   You can answer.**
12      MS. KAPPELMAN: You can, but I don't know what
13   you're going to say since you're not in
14   Mr. Figueroa's head.
15      MR. GOODMAN: Please don't coach the witness,
16   honestly.
17      MS. KAPPELMAN: It's an inane question, Bob.
18   She can't answer why he wrote --
19      MR. GOODMAN: That's not a proper objection.
20      MS. KAPPELMAN: It is. She's here with her
21   personal knowledge. That's what this deposition's
22   about.
23      MR. GOODMAN: Ms. Skaggs -- Ms. Skaggs --
24      MS. KAPPELMAN: You had a chance to enter
25   in -- to ask questions of Mr. Figueroa. That would

**Page 33**

1  A  I'm sorry. You cut out. I only heard part of
2  it.
3  Q  Yeah. Do you have occasion to observe whether
4  people are being verbally aggressive in written or
5  non-written communications with you as fellow employees
6  of Wayfair?
7  A  I interact with a large group of people, so I
8  see a lot of interactions, whether they be positive or
9  not, from a lot of different people throughout the
10 company.
11 Q  Have you ever observed Mr. McDole being
12 verbally aggressive, either in person or in writing, or
13 on a phone call?
14 A  Yes.
15 Q  When was the first time?
16 A  Sorry. I'm calculating timelines.
17 Q  Approximately.
18 A  Approximately April of 2019, there was a nasty
19 exchange between Ms. Forsythe and Mr. McDole over the
20 launch of our Lathrop, California building.
21 Q  What was the location?
22 A  Lathrop, L-a-t-h-r-o-p.
23 Q  Okay. I got it.
24    Any other occasions?
25 A  I witnessed a lot of interactions between the

**Page 34**

1  two. They weren't always hostile. There was a lot of
2  work interactions.
3  Q  Any -- and have you seen him being verbally
4  aggressive with anybody besides Ms. Forsythe?
5  A  I've seen him be very passionate towards other
6  people about work things. I don't know that I would
7  categorize his reactions as always aggressive.
8  Q  Excuse me?
9  A  I don't know that I would categorize all of
10 the interactions as aggressive. I have seen him -- he
11 gets very passionate about things.
12 Q  All right. So in the conversations with
13 Ms. Forsythe, he was being verbally aggressive, but in
14 other instances, with other people, he's been
15 passionate, was the word you used?
16 A  I think I would say he gets passionate about
17 things. I don't know that I would necessarily call him
18 verbally aggressive.
19 Q  Okay. Have you ever seen him be verbally
20 aggressive with anybody other than Emily?
21 A  No.
22 Q  Did you ever suspect romantic feelings for
23 Ms. Forsythe coming from Mr. McDole?
24 A  I often wondered if the two of them had
25 feelings for each other based on the way they

**Page 35**

1  communicated and interacted with each other.
2  Q  What was the -- what kind of words or tone of
3  voice was Mr. McDole using on those occasions when he
4  was verbally aggressive with Ms. Forsythe?
5  A  They both were -- had raised their voices on
6  the video call.
7  Q  Did he -- did he use cuss words, for example?
8  A  Not that I recall, no.
9  Q  So it was just -- so none of it was in person.
10 It was on video calls, but he was loud. Is that what
11 you're saying?
12     MS. KAPPELMAN: Objection, mischaracterizing
13   her testimony. He said they were both raised --
14   they were both raised voices at each other.
15 BY MR. GOODMAN:
16 Q  Right. I'm asking about him. Are you saying
17 he was loud on video calls?
18 A  Yes. They were both loud.
19 Q  Both what?
20 A  They were both loud.
21 Q  Okay. Any other characteristic that has led
22 you to say that he was verbally aggressive in his
23 communications with her that you observed?
24 A  I'm sorry, I don't understand the question.
25 Q  Any other thing than -- than decibel level

**Page 36**

1  that leads you to say that he was verbally aggressive in
2  communications with her?
3  A  They would both regularly cut each other off
4  mid-sentence.
5     MR. GOODMAN: Object to responsiveness.
6  BY MR. GOODMAN:
7  Q  Anything else?
8     MS. KAPPELMAN: I think it was perfectly
9   responsive. What wasn't responsive about her
10  answer, other than you didn't like it, Bob?
11    MR. GOODMAN: Please stay within the rules.
12    MS. KAPPELMAN: It is in the rules. What
13  wasn't responsive? I'm asking about your
14  objection. What wasn't responsive to her answer
15  other than that you didn't like it?
16 BY MR. GOODMAN:
17 Q  Ms. Skaggs, you can answer.
18    Anything else besides decibel level that
19 you're referring to when you speak about Mr. McDole's
20 verbal aggressiveness?
21    MS. KAPPELMAN: Asked and answered.
22    You can answer again, Brittaney.
23    THE WITNESS: They would both cut each other
24  off mid-sentence. And that was it.
25 BY MR. GOODMAN:

**49**
1   A   More than once.
2   Q   What were the occasions?
3   A   We -- he was going to be the regional manager
4   for automation and infrastructure -- or I'm sorry,
5   automation and maintenance for the Lathrop, California
6   location. So during the launch of that building, there
7   was a lot of interaction between Ms. Forsythe and
8   Mr. McDole.
9   Q   Okay. And you talked with Mr. Lowe about
10  that?
11  A   Yes.
12  Q   Who initiated the conversation?
13  A   I don't recall.
14  Q   Did he -- did he tell you what he thought
15  about Mr. McDole?
16  A   Not to my -- not that I recall, no.
17  Q   Did he tell you what he thought Mr. McDole's
18  intentions or desires were with respect to
19  Ms. Forsythe's career at Wayfair?
20  A   Not that I recall.
21  Q   Well, then, what did you talk to him about --
22  Ms. Forsythe -- about at any point, then?
23  A   We spoke about the calls in which occasionally
24  got heated between Ms. Forsythe pushing Mr. McDole's
25  buttons or leaving him out of the loop of communication

**50**
1   on certain things which would cause issues with the
2   launch of the building and spoke about just, in general,
3   the back-and-forth nature of their relationship and how
4   it occasionally affected productivity when Emily would
5   cut Mike out of the loop.
6   Q   Were there occasions -- or did you ever talk
7   with Emily about Mr. McDole not communicating with her
8   about certain issues?
9   A   Yes.
10  Q   What did you -- what was the substance of
11  that?
12  A   Ms. Forsythe had approached me about meetings
13  that we were holding about the launch of the building
14  and the parties that were involved. Mr. McDole was in
15  charge of project managing the entire launch. At that
16  point in time, he had left Ms. Forsythe's team and was
17  operating under a different manager. And with that
18  being said, he was focused on launching the building.
19  And there were meetings that Ms. Forsythe was not
20  invited to.
21      She asked me some specific questions about the
22  status of things, to which I replied, Yes, we had a
23  meeting about that, here's the rundown. And she became
24  very agitated that she was not invited to the meetings.
25  Q   Okay. You were on her team at that point.

**51**
1   You were on the Witte --
2   A   Industrial engineering team, yes.
3   Q   The Witte/Wertman team at that point, but he
4   was on another team; correct?
5   A   Yes. He was part of operations group at that
6   point.
7   Q   So operations -- okay. So he, as part of
8   operations, was addressing issues with certain
9   industrial engineering personnel; correct?
10  A   Yes. He -- the building was under
11  construction so he was working with me regularly on an
12  active basis as well as transportation logistics. So it
13  wasn't just the industrial engineering team, but it was
14  every -- every team you have to coordinate with in order
15  to launch the building.
16  Q   Who else on the industrial engineering team
17  was he communicating with about this?
18  A   Kyle Page, who is an industrial engineer that
19  was responsible for the building at that time; Jim Lowe,
20  obviously, is the maintenance counterpart; myself;
21  Brandon Mowrey, who runs capacity; and then Rob Holtz
22  and his team who run automation and racking, so design
23  for our sorter and the racking throughout the building.
24  Q   Okay. And Mr. Mowrey was at -- at Emily's
25  level; correct?

**52**
1   A   Correct.
2   Q   Did Mr. McDole explain to you why he was not
3   including Emily in communications or meeting
4   invitations? Did he ever disclose that to you?
5   A   He just said that he was part of -- he was
6   handling the launch of the team -- or I'm sorry, the
7   launch of the site and it didn't need to include her
8   because he had added the stakeholders from both her team
9   and the other teams to the meetings, so it wasn't
10  necessary for her to also be there.
11  Q   How did the discussion of that even come up
12  between you and him?
13  A   After Emily had expressed her agitation of not
14  being invited to a meeting, on the next call with him, I
15  said, Hey, just FYI, Emily and I had a conversation and
16  she's not happy that she wasn't invited to the meetings.
17  And I think by then, she had probably already reached
18  out to him and asked to be included. And I just said
19  that she was -- she was agitated. And he said, I have
20  all the stakeholders on here, I don't understand why she
21  also needs to be involved.
22  Q   Okay. And by stakeholders, did he mean L3s?
23  A   A stakeholder by definition for this purpose
24  is anyone that actively holds a piece of the puzzle in
25  order to get the site up and launched. So it's both

### Page 61

1  Q   Do you remember when that was?
2  A   I don't. I know that both parties later told
3  me that they did not end up meeting after work. But
4  other than that, I don't recall a timeline. Somewhere
5  in the neighborhood of that February to August of 2019
6  time.
7  Q   When you say trying to make work -- work
8  better, what do you mean by that?
9  A   They were trying to make -- their
10 communication back and forth on calls occasionally made
11 others -- made me uncomfortable occasionally because
12 Ms. Forsythe would bait Mr. McDole and find ways to get
13 him upset, in which case then it would be -- they would
14 both raise their voices at each other and it would make
15 others uncomfortable. So I think the -- the goal of
16 them going to grab dinner was that they could work on
17 their communication issues and therefore stop making
18 other employees and counterparts and stakeholders
19 uncomfortable when they communicated on occasion.
20 Q   Okay. So you heard from Mr. McDole that
21 Ms. Forsythe initiated an effort to do that. Is that
22 what I understand?
23 A   Yes.
24 Q   And what did you -- did you hear from
25 Ms. Forsythe about an attempt by her to -- to improve

### Page 62

1  communications by doing that?
2  A   I did.
3  Q   And do you know why it did not occur?
4  A   I do not recall why they didn't end up going
5  to meet each other for dinner. I just know that both
6  had told me that they didn't go.
7  Q   Are you aware of any conversations with --
8  Mr. McDole had with Ms. [sic] Witte about Emily?
9      MS. KAPPELMAN: Object to the form of the
10     question.
11     You can answer, if you understand it.
12     THE WITNESS: Yeah. Can you -- can you tell
13     me again, like...
14 BY MR. GOODMAN:
15 Q   Are you aware of any communications by
16 Mr. McDole to Mr. Witte about Emily Forsythe?
17     MS. KAPPELMAN: Same objection. Are you aware
18     of conversations between Witte and McDole about
19     Forsythe?
20     THE WITNESS: Yes.
21 BY MR. GOODMAN:
22 Q   Okay. From who?
23 A   I was present for -- when they were speaking,
24 and just overheard bits and pieces. And then I know
25 that previously they -- Mike, Mr. -- sorry, Mr. McDole

### Page 63

1  had informed me that he had spoken to Mr. Witte about he
2  wishes Ms. Forsythe would not come to the location that
3  he's at unless she absolutely needed to, to avoid any
4  conflict and stop the back and forth.
5  Q   Okay. The thing you heard bits and pieces of
6  was a conversation between Mr. McDole and Mr. Witte?
7  A   Correct.
8  Q   Were they on the phone or were they in the
9  same room or where?
10 A   They were -- we were on a construction site in
11 Lathrop, California, I believe.
12 Q   Okay.
13 A   It was part of that week. We all traveled as
14 a group to do multiple projects. So it took place that
15 week. I don't exactly remember where we were standing
16 when they were having the conversation.
17 Q   And what did you hear?
18 A   Just that I had heard Emily's name come up,
19 and that, you know, just back and forth in general.
20 They were just having a conversation about Emily. And I
21 don't know specifics because, like I said, I had just
22 heard her name and saw the back and forth conversation.
23 I don't want to testify to something that I don't know
24 the whole conversation of.
25 Q   Since you've been at Wayfair, have you ever

### Page 64

1  heard about anybody besides Mr. McDole asking a boss
2  that somebody else with Wayfair not come to a location
3  to do their work?
4  A   Yes.
5  Q   Okay. Who?
6      MS. KAPPELMAN: Object to the form of the
7      question.
8      You can answer, Brittaney.
9      THE WITNESS: Just people that had
10     interpersonal conflicts and didn't want them
11     working on their project. I've had site directors,
12     et cetera, ask to have people removed from -- from
13     projects because they didn't feel like they were
14     doing a good job before. But nothing serious.
15 BY MR. GOODMAN:
16 Q   Nothing serious, you said?
17 A   It was -- yeah. It was just they didn't get
18 along with the project manager or they didn't get along
19 with specific, you know, vendors or something like that.
20 They just asked them not to be -- not to return to their
21 building.
22 Q   Okay. So that's -- those are requests to
23 remove people from teams?
24 A   Sorry. I thought Lynn was talking.
25     MS. KAPPELMAN: No.

**Page 69**

1  Q  Okay. When you talked to Mr. McDole about
2  Ms. Forsythe, what was the subject matter?
3  A  Team work. For example, like our teams
4  interlacing, that kind of stuff, having to do the
5  Lathrop launch, Emily's role in whether or not she was
6  involved with specifics within the launch, Emily's
7  team's involvement when they tried to replace Mr. McDole
8  as the project manager on the project when he moved to
9  operations, and then in general, the back and forth
10 nastiness between the two. Mr. McDole and I had a
11 conversation about that a few times.
12 Q  Did he say -- so did he -- what did he say
13 that was critical of Ms. Forsythe, that is Mr. McDole?
14 A  I'm sorry. You cut out.
15 Q  What did Mr. McDole say that was critical of
16 Ms. Forsythe?
17 A  That she was a micromanager and that she
18 didn't trust him to execute on the projects that he had
19 done so successfully in the past.
20 Q  Did he -- and he had done it successfully in
21 the past because he had opened another building?
22 A  Just project managing other racking installs
23 and that kind of stuff. Just different things that he
24 had been doing for the company and learning.
25 Q  Did he criticize her other than as a

**Page 70**

1  micromanager?
2  A  Micromanager and being hard to work with are
3  the only things that he really said negatively. And I
4  don't even know that that's negative. It's just a
5  comment on the personality and working style --
6  Q  I'm sorry I can't hear you. Do you mind
7  repeating everything after micromanaging? I couldn't
8  hear you.
9  A  The only comments that he made were more along
10 her work style and her behavior was micromanaging and --
11 sorry -- micromanaging and then getting involved and
12 that kind of thing. So it wasn't really critical of her
13 personally, just more of her work style.
14 Q  Did you and Emily discuss a complaint she made
15 in August 2019 about Mr. McDole, a written complaint?
16 A  Yes.
17 Q  What did -- what did she tell you?
18 A  This was after I had already spoken to
19 Mr. Figueroa. And Emily and I went to lunch. She was
20 having a rough day. So we had -- I'd asked her if she'd
21 like to go to lunch to get out of the building because
22 she seemed visibly just annoyed and unhappy. And we
23 went to lunch. And she had told me that she had made
24 the claim against Mr. McDole, which of course, I had
25 already spoken to HR at the time, so I was aware of the

**Page 71**

1  situation. She would not give me any specifics or tell
2  me anything outside of, you know, that she was dealing
3  with that.
4  Q  How did you find out about -- how did you find
5  out about Emily being terminated?
6      MS. KAPPELMAN: Object to the form of the
7    question. Emily resigned.
8      MR. GOODMAN: Object to this improper --
9      MS. KAPPELMAN: Object to the form of the
10   question. It mischaracterizes the evidence.
11     MR. GOODMAN: Please don't coach your witness.
12 BY MR. GOODMAN:
13 Q  Ms. Skaggs --
14     MS. KAPPELMAN: Object to the form of the
15   question. You've mischaracterized the evidence.
16     MR. GOODMAN: Stop testifying.
17 BY MR. GOODMAN:
18 Q  Ms. Skaggs, how did you --
19     MS. KAPPELMAN: Object to the form of the
20   question. You've mischaracterized the evidence.
21 BY MR. GOODMAN:
22 Q  How did you -- how did you find out about the
23 termination of her employment?
24     MS. KAPPELMAN: Same objection.
25     You can answer, Brittaney, how you found out

**Page 72**

1  she left.
2      THE WITNESS: We were distributed -- or I'm
3    sorry. The sites put up a piece of paper at the
4    security desk for the security guard that she was
5    not able to get -- she was not allowed access to
6    the buildings.
7  BY MR. GOODMAN:
8  Q  And how did you see this piece of paper?
9  A  It was distributed in a text message, a photo
10 of it.
11 Q  By who?
12 A  It was a group of people. I don't recall
13 who -- who sent the original message.
14 Q  Who was on the text chain?
15 A  Maybe eight people. But I'll be honest with
16 you, I deleted the text message a long time ago and I
17 don't really recall who all was on there.
18 Q  It was not an official text; right?
19 A  No. No. No. No. It was just a group of
20 people that I worked with.
21 Q  Who else was on the text chain?
22 A  I'll be honest with you. Off the top of my
23 head, I don't really recall who all was on there. And I
24 don't want to name someone and they turned out not to be
25 involved. So I really don't. It's been a year.

## Page 77

    MS. KAPPELMAN: Bob, you want to go on the
record and pass?
    MR. GOODMAN: I'll pass the witness.
         CROSS EXAMINATION
BY MS. KAPPELMAN:
  Q   Okay. Ms. Skaggs, I just really truly have a
few questions. And I am going to focus on
Ms. Forsythe's complaint in this case; okay?
      Earlier today during your deposition, you were
describing a conversation you had with Ms. Forsythe in
which you inquired about whether she and Mr. McDole had
a prior romantic relationship. Do you remember talking
about that conversation earlier today?
  A   I do.
  Q   Where did that conversation occur?
  A   In a airport parking lot while waiting to pick
up a co-worker in Savannah, Georgia.
  Q   Were you in a car?
  A   Yes, we were.
  Q   Was anyone else in the car with you and
Ms. Forsythe when that conversation occurred?
  A   No.
  Q   Okay. Do you have any sense of the month and
date of that conversation?
  A   The building was open, so that means it's

## Page 78

after May.
  Q   So it was after May 2019?
  A   Approximately, yes.
  Q   Was it before you learned -- before you met
with Mr. Shaffer-Figueroa about Ms. Forsythe's
complaints?
  A   Yes.
  Q   So it was sometime between May 2019 and
August 2019?
  A   Correct.
  Q   Okay. And as you sit here today, what did you
say to Ms. Forsythe about whether or not they had had a
prior romantic relationship in that airport parking lot
in Savannah?
     MR. GOODMAN: Objection, form.
     You can answer.
     THE WITNESS: I had brought up the contentious
  nature of the conversations that were going back
  and forth on our team meetings about the new build
  in California. And I had asked Ms. Forsythe if
  there was any particular reason as to why her and
  Mr. McDole did not seem to like each other. And I
  knew the background that they had grown up in the
  same area, grown up proximately close and may know
  each other, and that she had recruited Mr. McDole

## Page 79

for the position at Wayfair. So the nature of
the -- the conversation was me asking Emily if
there had been a previous romantic relationship, if
there was unrequited feelings from her or
Mr. McDole as far as that's why they were
contentious and why they -- basically why they
couldn't get along and why they were dragging
everyone in the entire team into their drama.
BY MS. KAPPELMAN:
  Q   And did she respond about whether there was
ever a prior romantic relationship with Mr. McDole?
  A   She told me there had never been a romantic
relationship between the two, ever.
  Q   Okay. And did anything else occur during that
conversation with her about Mr. McDole?
  A   Just back and forth about the project
management and how it wasn't falling on -- she wanted to
be in control of it, but he had already -- he was moving
on to a new team in operations, and how she was going to
add another project manager in there to -- to basically
control Mr. McDole so that she would have oversight into
the project.
  Q   Did you ever say, during that conversation, to
Ms. Forsythe that you thought that Mr. McDole had a
crush on her?

## Page 80

  A   I do not recall ever saying those exact words,
no.
  Q   Okay. I'm going to switch topics for a
moment. Was there ever a point where Ms. Forsythe asked
you to help her surveil or watch Mr. McDole through
cameras?
  A   Yes. There was an incident which I had
reported to my direct manager, Keith Wertman at the
time, where Ms. Forsythe had sent me a message on our
intercompany chat and asked about the views of the
cameras at CA3, which is the Perris two location that
Mr. McDole was in charge of, and also where Mr. Figueroa
sits. There are two cameras in the offices. Both of
them have a similar viewpoint of what you can see. She
had asked me if the cameras were down, because she was
unable to see something. I verified the cameras were
not down, and she then asked me if there was any way to
move the camera because some of our cameras are
pan-tilt-zoom, which means that you can turn them with
the controls. And I asked her specifically what she was
trying to see. And she said, Is there any views in
which I can see into the HR office, which is where
Mr. Figueroa sat.
  Q   Okay. I appreciate that. And I just would
like to understand the timing of this request by