# Exhibit 8

# In the Matter Of:

*EMILY FORSYTHE vs*

*WAYFAIR, LLC*

*JIM LOWE*

*August 31, 2020*



13

1  Q   Right. Why don't you -- it may be easier
2  for -- to just go sentence by sentence. Do you mind,
3  please? And then I think that's going to be a better
4  record. So do you mind? The first sentence, I'll just
5  ask it. Did you approach her and ask her if the two of
6  you could talk?
7  A   Yes.
8  Q   Did you go into a room with her after you said
9  that to her?
10  A   Yes.
11  Q   Did you ask her if she was aware of what was
12  going on with Mr. McDole?
13  A   I asked her if she was aware that Mike did not
14  want her on site.
15  Q   Okay. And then it says [as read]: Jim said
16  he thought I should know Mike is trying to torpedo my
17  projects and career.
18      Do I understand you to say that you told her
19  that you didn't want somebody's career disrupted?
20      MS. KAPPELMAN: Object to the form of the
21  question. That's not what he said. Why don't you
22  just ask him what he said?
23  BY MR. GOODMAN:
24  Q   You can answer.
25  A   I said I didn't want to see anybody's career

14

1  destroyed.
2  Q   Okay. And then it says [as read]: Jim said
3  he didn't think it was right for him to stand by and
4  watch this happen without saying something.
5      Did you say that?
6  A   I said I did not want to be caught in the
7  middle of any conflicts within the workplace.
8  Q   Okay. Did you -- so are you denying saying I
9  didn't -- you didn't think it was right for him to stand
10  by and watch this happen without saying something?
11  A   I didn't think it was right for me to be
12  caught in the middle.
13  Q   Okay.
14  A   And -- and, yeah. Specifically, I don't
15  recall 100 percent of what I said, word for word. I
16  really don't.
17  Q   Well, you would agree with me, wouldn't you,
18  that the thrust of the statement "Jim said he didn't
19  think it was right" was that -- that something needed to
20  be said for her to be aware of what was going on that
21  she may not have been aware of --
22      MS. KAPPELMAN: Bob, are you testifying? I'm
23  not really sure what you're doing.
24      MR. GOODMAN: I get to ask -- I get to ask
25  leading questions on cross examination.

15

1  BY MR. GOODMAN:
2  Q   The thrust of --
3      MS. KAPPELMAN: But you're putting words in
4  his mouth. He's already testified. Stop
5  mischaracterizing his testimony. Ask him what he
6  said.
7      MR. GOODMAN: I'm not mischaracterizing his
8  testimony at all.
9  BY MR. GOODMAN:
10  Q   [As read]: Jim said he didn't think it was
11  right for him to stand by and watch this happen without
12  saying something.
13      That reflects that a statement was made that
14  you didn't want her to know something -- you didn't want
15  her to be blind to something that may have been going
16  on; correct?
17      MS. KAPPELMAN: Are you asking him if he said
18  that or what she means by that?
19      MR. GOODMAN: That's what that --
20      MS. KAPPELMAN: Your question makes zero
21  sense.
22  BY MR. GOODMAN:
23  Q   Mr. Lowe, Ms. Kappelman is, from my
24  standpoint, interfering in this deposition in an
25  improper way. But I'm asking you, the sentence that

16

1  said "Jim didn't think it was right for him to stand by
2  and watch this happen without saying something" refers
3  to you not wanting to have something happen without
4  Emily knowing about it; correct?
5      MS. KAPPELMAN: Bob, objection. That makes no
6  sense.
7      You can answer if you understand the question,
8  Jim.
9  BY MR. GOODMAN:
10  Q   You can answer.
11  A   I can't speak to what Emily interpreted or
12  what her thoughts are in the sentence.
13  Q   Okay. But you --
14  A   I can -- I can testify as to, you know, what
15  my intent was with anything that I said. And that was
16  to eliminate any conflict in the workplace.
17  Q   Right.
18  A   I don't know what conflict was. I don't know
19  what the context of any disagreements were. I was aware
20  that Michael did not want her on site. And that's about
21  all I was aware of.
22  Q   Are you -- the sentence that says "Jim said he
23  didn't think it was right," are you denying that you
24  said that to Emily?
25  A   Correct.

Page 33

1  Q  Did you ever talk with Trevor Shaffer-Figueroa
2  about Mr. -- about Ms. Forsythe?
3  A  No, I did not.
4  Q  You know who I'm referring to; right?
5  A  Yes.
6  Q  Okay.  He never -- he never attempted to reach
7  you to talk to you about Ms. Forsythe?
8  A  He did ask me if I observed any interactions
9  between the two of them.
10  Q  Then I don't understand your answer a minute
11  ago.  Did you talk to him about Emily Forsythe?
12  A  Well, sorry.  I took it as you asking me if I
13  approached him or had any specific conversation in
14  detail about Emily in particular.  I'm aware that he was
15  doing an investigation of a report and a lot of details
16  were not shared with me because that's just privacy
17  information.
18     He asked me if I observed any interactions
19  whatsoever between Mr. McDole and Ms. Forsythe.
20  Q  And what did you tell him?
21  A  No, I had not because I had not observed any
22  interactions between the two of them.
23  Q  Was there any question and answer between you
24  and Mr. Figueroa besides that one question and one
25  answer?

Page 34

1  A  That's what I recall.
2  Q  Did he tell you what he was investigating?
3  A  A complaint was all he elaborated.
4  Q  Did you ever discuss Ms. Forsythe with
5  Mr. McDole?
6  A  No, other than the occasion of the question
7  about asking her emails, or the question -- the project
8  questions that he emailed to her and she emailed -- she
9  asked me.
10  Q  Before --
11  A  Other than that, no.
12  Q  Before Ms. Forsythe told you her employment
13  had terminated, did you speak with anybody about
14  Ms. Forsythe that we haven't discussed today?
15  A  No.
16  Q  Have you talked with Emily since her
17  employment ended?
18  A  No.
19  Q  Do you -- do you think she would be
20  disappointed to hear the extent of which you deny what
21  she put in her memo about your conversation with her on
22  August 21, 2019?
23     MS. KAPPELMAN:  Object to the form of the
24  question.  Do you really think that's an
25  appropriate question?

Page 35

1     MR. GOODMAN:  I do.
2     MS. KAPPELMAN:  For a deposition?
3     MR. GOODMAN:  I do.
4     MS. KAPPELMAN:  Do you think she would be
5  disappointed to hear your testimony?  Do you think
6  that's an appropriate question for a deposition?
7     MR. GOODMAN:  I certainly do.  I think it's an
8  appropriate question in trial and an appropriate
9  question --
10     (Overspeaking.)
11     MS. KAPPELMAN:  You can answer, Mr. Lowe.
12  It's the most outlandish question I've heard at a
13  deposition, but you can answer.
14     THE WITNESS:  I can't speak to somebody else's
15  feelings.
16  BY MR. GOODMAN:
17  Q  Okay.  Well, if -- if somebody with whom you
18  worked claimed that you had said things or not said
19  things contrary to the actual conversation, would you be
20  disappointed in them?
21     MS. KAPPELMAN:  Object to the form of the
22  question, Bob.  It makes no sense.
23     Go ahead, Jim.  You can answer if you think
24  you know what he's saying.
25  BY MR. GOODMAN:

Page 36

1  Q  When people don't tell the truth, are you
2  disappointed in them?
3     MS. KAPPELMAN:  Object to the form of the
4  question.  That's the third question that is
5  unrelated to the first two.
6  BY MR. GOODMAN:
7  Q  Mr. Lowe --
8     MS. KAPPELMAN:  Is that the question -- is
9  that the question you want him to answer or do you
10  want him to answer the other two questions?
11  BY MR. GOODMAN:
12  Q  I replaced the question.
13     Mr. Lowe, when somebody you work with and
14  somebody you know doesn't tell the truth about a
15  conversation they had with you, does that disappoint
16  you?
17     MS. KAPPELMAN:  Are you suggesting that
18  Mr. Lowe is not telling the truth, Bob?  Is that
19  what that -- is that what that question is
20  suggesting?
21  BY MR. GOODMAN:
22  Q  You can answer, Mr. Lowe.
23     MS. KAPPELMAN:  Are you suggesting that
24  Mr. Lowe did not tell the truth here under oath in
25  this deposition?  That's my question.

**Page 37**

MR. GOODMAN: I'm not -- I'm not the deponent here.

BY MR. GOODMAN:

Q  Mr. Lowe, can you answer the question?

MS. KAPPELMAN: I'm just asking you, is that the question? Are you suggesting --

(Overspeaking.)

MR. GOODMAN: You can ask me all day. But I'm not here to answer questions. I'm here to ask questions.

MS. KAPPELMAN: But if you are saying that my witness lied under oath, I'm going to direct him not to answer under the Fifth. You're suggesting that Mr. Lowe perjured himself today and I'm not going to let him answer that question because that's what it implies.

BY MR. GOODMAN:

Q  Mr. Lowe, I'll restate -- I'll restate the question.

When somebody you know describes a conversation you had with them in a completely different way than it actually happened, are you disappointed in them?

A  How it actually happened versus somebody's interpretation of a conversation?

**Page 38**

Q  Yes.

A  I don't really put much into it. Everybody has a different interpretation of how a conversation went.

Q  I'm not asking about interpretation because you excluded that as a possibility. When somebody says that you said something to them which you didn't say, does that disappoint you?

A  It does not disappoint me, no.

Q  Because you have no trust in people you work with?

MS. KAPPELMAN: Really? Do you have a real question, Bob? I think you could probably come up with a real question that has something to do with this case.

BY MR. GOODMAN:

Q  You can answer, sir.

A  I've had plenty of conversations where the opposite party had a different memory of the conversation than I did.

Q  You prefer working with people who have the same memory of conversations you have with them, don't you?

MS. KAPPELMAN: Object to the form of the question.

**Page 39**

If you understand that at all, Jim, go ahead and answer.

THE WITNESS: I would say I suppose.

MR. GOODMAN: Okay. Pass the witness.

CROSS EXAMINATION

BY MS. KAPPELMAN:

Q  I'm going to ask you a couple questions actually about Ms. Forsythe, if you don't mind, Jim.

A  Okay.

Q  And it's just a couple.

And the questions are this: Do you recall the conversation that you had with Ms. Forsythe about the conflicts she was having in the workplace with Mr. McDole; correct?

A  Yes.

Q  And that's the conversation that we were talking about earlier today in your deposition?

A  Yes.

Q  During that conversation, did you ever tell Ms. Forsythe that Mr. McDole was sabotaging her career?

A  No. I said I --

Q  Go ahead. Sorry to interrupt you. Please, please.

A  I did not want to see anybody's career sabotaged.

**Page 40**

Q  Okay. And at any point other than that conversation, did you tell Ms. Forsythe that you thought Mr. McDole was trying to ruin her career?

A  No, I never said that.

Q  Okay. Did you tell her -- did you say to her that you thought she was trying to ruin Mr. McDole's career?

A  No, I did not say that.

Q  Okay.

A  Or anything similar to that.

Q  For the record -- for the record, what did you say to Ms. Forsythe during the conversation that we were discussing earlier today with Mr. Goodman, in your words?

MR. GOODMAN: Objection, asked and answered. You can answer.

THE WITNESS: I asked her if she was aware that Michael had requested that she not be allowed to come to this site. She said, "No, I was not aware of that." I said, "I don't know what the issue is between the two of you, but I do not want to see anybody's career sabotaged. It looks bad for everybody. And I definitely do not want to be caught in the middle of it."

BY MS. KAPPELMAN: